1  JOHN-PATRICK M. FRITZ (State Bar No. 245240)
   LEVENE, NEALE, BENDER,
2  YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email: JPF@LNBYG.COM

6
   Attorneys for Chapter 11
7  Debtor and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT
9              CENTRAL DISTRICT OF CALIFORNIA
                 LOS ANGELES DIVISION
10
   In re:                          ) Case No.: 2:22-bk-10266-BB
11                                  )
   ESCADA AMERICA LLC,              ) Chapter 11 Case
12                                  ) Subchapter V
                                    )
           Debtor and Debtor in Possession.  )
13                                  ) **MOTION FOR ORDER:    (I)**
                                    ) **AUTHORIZING    USE    OF    CASH**
14                                  ) **COLLATERAL    PURSUANT    TO**
                                    ) **SECTION 363 OF THE BANKRUPTCY**
15                                  ) **CODE;    AND    (II)    APPROVING**
                                    ) **ADEQUATE    PROTECTION;**
16                                  ) **MEMORANDUM   OF   POINTS   AND**
                                    ) **AUTHORITIES;   DECLARATION   OF**
17                                  ) **KEVIN WALSH IN SUPPORT**
                                    )
18                                  )
                                    ) Hearing:
19                                  ) Date:   April 6, 2022
                                    ) Time:   10:00 a.m.
20                                  ) Place:  Courtroom 1539
                                    )         255 East Temple Street
21                                  )         Los Angeles, CA 90012
                                    )
22                                  )
                                    ) Hearing to be held in-person and by video-
23                                  ) conference Government Zoom, see Court's
                                    ) website under "Telephonic Instructions" for
24                                  ) more details:
                                    ) https://www.cacb.uscourts.gov/judges/honor
25                                  ) able-sheri-bluebond
                                    )
26                                  )
                                    )
27  _____)

28

1

# TABLE OF CONTENTS

SUMMARY ...............................................................................................................2

ADDITIONAL INFORMATION............................................................................7

MEMORANDUM OF POINTS AND AUTHORITIES........................................9

    I.  STATEMENT OF FACTS ..........................................................................9

        A. General Background........................................................................9

        B. The Budget, Cash Collateral, Secured Creditors, and
           Adequate Protection ........................................................................9

    II.      COMPLIANCE WITH FRBP 4001(c) & LBR 4001-2..................14

    III. DISCUSSION ............................................................................................15

        A. The Debtor Must Be Authorized to Use Cash Collateral to
           Operate, Maintain and Preserve the Property and Estate in
           Accordance with the Budget .........................................................15

        B.  Secured Creditors Consent and Adequate Protection ..........................17

        C.  Compliance with Rule 4001 of the Federal Rules of Bankruptcy
           Procedure and  Local Bankruptcy Rule 4001-2.......................... 19

        D. Waiver of Any Applicable Stay is Appropriate ........................................ 19

    IV. CONCLUSION ........................................................................................20

DECLARATION OF KEVIN WALSH ................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

In re Dynaco Corporation,
 162 B.R. 389 (Bankr.D.N.H.1993) ...................................................................................16, 18

In re Immenhausen Corp.,
 <u>164 B.R.</u> 347 (Bankr.M.D.Fla.1994) ......................................................................................18

In re McCombs Properties VI, Ltd.,
 88 B.R. 261 ......................................................................................................................17, 18

In re Mellor,
 734 F.2d 1396 (9th Cir.1984) ................................................................................................17

In re Newark Airport/Hotel Ltd. Partnership,
 156 B.R. 444 (Bankr.D.N.J.1993) .........................................................................................18

In re O'Connor,
 808 F.2d 1393 (10th Cir.1987) .........................................................................................17, 18

In re Oak Glen R-Vee,
 8 B.R. 213 (Bankr.C.D.Cal.1981)..........................................................................................16

Matter of Pursuit Athletic Footwear, Inc.,
 193 B.R. 713 (Bankr.D.Del.1996) .........................................................................................18

In re Stein,
 19 B.R. 458. (Bankr.E.D.Pa.1982) ........................................................................................17

In re Triplett,
 87 B.R. 25 (Bankr.W.D.Tex.1988)........................................................................................17

In re Tucson Industrial Partners,
 129 B.R. 614 (9th Cir.B.A.P.1991).........................................................................................16

United Savings Association v. Timbers of Inwood Forest Associates,
 108 S.Ct. 626 (1988).............................................................................................................17

**Federal Statutes**

11 U.S.C.
  § 361,...................................................................................................................2, 7
  § 363...........................................................................................................2, 7, 16, 17
  § 506....................................................................................................................15, 28
  § 544....................................................................................................................15, 28
  § 545,...................................................................................................................15, 28
  § 547....................................................................................................................15, 28
  § 548....................................................................................................................15, 28
  § 549....................................................................................................................15, 28
  § 1107(a)..................................................................................................................16

28 U.S.C.
  § 157..........................................................................................................................15
  § 1334........................................................................................................................15
  § 1408........................................................................................................................15
  § 1409........................................................................................................................15

CARES Act.............................................................................................................4, 11, 24

**Other State Statutes**

UCC 9-204(a) and 9-315(a)..........................................................................................19

## SUMMARY

Pursuant to Rules 4001-2 and 9013-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California* (the "Local Rules"), 11 U.S.C. §§ 361, and 363(c), and Rules 4001 and 9014 of the *Federal Rules of Bankruptcy Procedure* (the "Bankruptcy Rules"), Escada America LLC, a Delaware limited liability company (the "Debtor"), the debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case, respectfully submits its "Motion for Order: (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and (II) Approving Adequate Protection" (the "Motion"), to be heard on regular notice, and respectfully requesting entry of an order (i) authorizing the Debtor to use cash collateral on a final basis through July 15, 2022, in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as **Exhibit "1"** to the annexed declaration of Kevin Walsh ("Declaration") submitted concurrently herewith;  and (ii) approving adequate protection to secured creditors.  The relief requested in this Motion is based on this Motion, the memorandum of points and authorities and Declaration of Kevin Walsh annexed to the Motion, and previously filed declaration of John-Patrick M. Fritz, Esq. (the "Fritz Declaration") [ECF 15].

The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on January 18, 2022, (the "Petition Date").  The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession.

The Debtor was formed as a Delaware limited liability company in 2009.  The Debtor is a national specialty retailer selling high-end, ready-to-wear women's apparel with its main office in Beverly Hills, California, an office New York City, New York, and, as of the Petition Date, ten (10) retail stores across seven (7) states in the United States, and over 50 fulltime employees. As part of its first-day motions, the Debtor rejected five (5) leases, and is now operating at five leased locations with approximately 4 employees in its corporate office and 29 employees in stores.

The Debtor's retail business is generally known to the public and branded as "Escada." The Debtor uses the "Escada" brand via a license agreement and does not own any intellectual property rights in connection with the "Escada" brand.   For several decades, Escada had been a global retail brand for high-fashion, high-end, ready-to-wear apparel for women, with an emphasis on high-fashion evening wear. On a global scale, Escada has various retail stores and subsidiaries in several countries in Europe, including but not limited to Spain, England and Germany.  Escada also has retail stores in North America, including the Debtor, which operates Escada's brick-and-mortar retail business only in the United States.

By 2019, the Escada business on a global scale was in deep distress and could not continue.  At that time, the Debtor, together with other subsidiaries of Escada's then-parent company, was acquired by new ownership (which is now the current ownership and management).  At the time of the acquisition of Debtor in 2019, Escada had 29 subsidiaries in 22 countries, all of which were financially distressed.   In December 2019, the Debtor devised and began implementation of a plan to turn around the United States Escada retail business. Debtor believed that the business could be operated at a profit if fundamental business-model changes were implemented, such as overhauling the Debtor's technological suite and reducing speed to market by shifting supply chains from Asia to Europe.  Debtor's turnaround plan was also contingent upon Debtor's ability to sell product at Debtor's physical locations because ecommerce sales were minimal.  However, what was not – and could not be – known at the time of the acquisition in November 2019, was that an unprecedented, global, catastrophic, and life-changing event with severe economic consequences was on the immediate horizon – the Covid-19 pandemic.

In December 2019, just one month after the acquisition and just as the Debtor's transformation plan was being put into effect, the novel corona virus, known to us now as Covid-19, was quietly spreading in certain regions of Asia, unbeknownst to the rest of the world.  From December 2019 through February 2020, the Debtor prepared to implement a number of business-model and operational changes with the goal of making the United States Escada retail business

profitable and correct the mistakes of its prior management and prior owners.  However, in March 2020, the world drastically changed, and set the Debtor on course for this current bankruptcy filing.  On or about March 15, 2020, the City of Los Angeles declared a state of emergency with shelter in place orders. In the following days, many business and financial centers across the United States came to a near total standstill as the nation was gripped by the Covid-19 crisis.  In the span of just 12 days, all fifteen (15) of the Debtor's then-active stores in eight (8) States were shuttered due to lockdown restrictions.

In late March 2020, the United States federal government responded with historic economic aid, passing the CARES Act and providing approximately $3 trillion of stimulus to the economy, which may have bolstered the stock market's recovery, but such economic stimulus did nothing to help retail businesses such as the Debtor, which rely on foot traffic from customer shopping in stores to generate sales.  Unfortunately, the Debtor was not eligible for any of these stimulus payments and was left with no support during these unprecedented times.  In addition, as long as the pandemic lockdowns continued and stores remained closed, or shoppers refrained from shopping due to deep concerns about their health and safety, the Covid-19 recession for retail businesses would continue.

From March 2020 to December 2021, the Debtor reduced its overhead expenses by an estimated $13,383,037.40 and entered into negotiations with its commercial landlords for rent relief at all store locations.  Nonetheless, the 21 months leading up to the Debtor's petition date were a marked state of tremendous uncertainty for the world's health and economic affairs brought on by an unprecedented pandemic, followed by an unprecedented recession, then unprecedented trillions of dollars of government aid, none of which has prevented the ongoing uncertainty posed by Covid-19 variants and the attendant on-again-off-again lockdowns across the nation and around the world, all of which made business in the current economic environment very difficult.

The Debtor negotiated workouts with some, but not all, of its various landlords during 2020 and 2021, but with the consequences of the Covid-19 pandemic that Debtor was forced to

1    file bankruptcy to restructure its business affairs.  The Debtor cannot survive ongoing litigation

2    with these landlords and the attendant litigation costs and potential liability for breach of those

3    leases.  Accordingly, the Debtor determined in its reasonable business judgment that it was in the

4    best interest of its estate to file this current bankruptcy case to preserve the going-concern value

5    of its business and save the jobs of its employees.  The Debtor intends to propose a subchapter V

6    plan in good faith to reorganize its financial affairs and avoid a senseless and unnecessary

7    liquidation

8         To keep the Debtor operating through its reorganization, the Debtor requires the use of

9    cash collateral.  Pursuant to the Motion, the Debtor seeks Court approval authorizing use of cash

10   collateral in order to pay the expenses of maintaining and operating its business as a going

11   concern, as set forth in the Budget.  The Budget reflects the Debtor's ordinary and necessary

12   operating expenses that must be paid post-petition to preserve the Debtor's business.  While the

13   Budget represents the Debtor's best estimates of such expenses, the needs of the business may

14   fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses contained in the

15   Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the

16   Debtor does not pay expenses outside any of the categories) without the need for further Court

17   order.

18        The Debtor has three secured creditors (each a "Secured Creditor" and collectively, the

19   "Secured Creditors").  Eden Roc International, LLC ("Eden Roc") has a first-position security

20   interest perfected by the filing of a UCC-1 on substantially all the Debtor's assets and a secured

21   debt of approximately $579,025.32.  Mega International, LLC ("Mega") has a second-position

22   security interest perfected by the filing of a UCC-1 on substantially all the Debtor's assets and a

23   secured debt of approximately $1,506,953.  Escada Sourcing and Production, LLC ("ESP") is a

24   true consignor, and substantially all of the Debtor's inventory is owned by ESP via a

25   consignment agreement between the parties.  ESP recorded a UCC-1 to give the world notice of

26   its consignment; additionally, ESP has a security interest on the proceeds and products of ESP's

27   inventory.  The Secured Creditors consent to the use of cash collateral set forth in the Budget.

28

1      In order to provide the Secured Creditors with adequate protection against any potential

2  post-petition decline in the value of the Secured Creditors' collateral, the Debtor proposes that

3  the Secured Creditors receive: (i) replacement liens against the Debtor's post-petition assets,

4  with such replacement liens to have the same validity, priority, and extent as the prepetition liens

5  held by the Secured Creditors; and (ii) a super-priority administrative claim pursuant to section

6  507(b) of the Bankruptcy Code.

7      The Budget includes payments to ESP for sales of merchandise based on the consignment

8  agreement with 15% of weekly sales revenue remitted to ESP on a weekly basis, as shown by

9  comparing the "Total Receipts" line and "Consignment Fee" line in the Budget. These payments

10  are not on account of prepetition debt. As reflected in the initial budget filed with the Court

11  [ECF 8 at 22], the Debtor did not make any payments to ESP for consignment fees. ESP has not

12  waived its administrative claim for these fees in the first 13 weeks of the case, but the Debtor

13  wishes to make clear that consignment fee payments in the Budget attached hereto are go-

14  forward current weekly sales, not sales for the first 13 weeks of the case.

15      The Budget also includes payment of $55,000 approximately every four weeks for

16  "Benefits," which are for the Debtor's employees benefits. These payments are made to the

17  Debtor's affiliate, Mega Corporate Offices as part of a larger benefits plan. The Debtor's

18  affiliate had voluntarily paid these "Benefits" expense without any contribution from the Debtor

19  for the first 13 weeks of the case. The Debtor's affiliate has not waived its administrative claim

20  for these fees in the first 13 weeks of the case, but the Debtor wishes to make clear that

21  "Benefits" payment in the Budget attached hereto are go-forward benefit expenses, not benefit

22  expenses going back for the first 13 weeks of the case.

23      If the Debtor is not permitted to use its cash collateral to maintain and operate its

24  business, the Debtor will be unable to operate, pay its rent, pay for insurance, or pay its

25  employees, and the enterprise value of the business will be lost along with any meaningful

26  chance of recovery by creditors.

27  / / /

28

## ADDITIONAL INFORMATION

This Motion is based upon Local Rule 4001-2 and 9013-1, 11 U.S.C. §§ 361 and 363(c), and Bankruptcy Rules 4001 and 9014, the supporting Memorandum of Points and Authorities and declaration of Kevin Walsh Declaration annexed hereto, the previously filed declaration of John-Patrick M. Fritz, Esq. [ECF 15], the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

As set forth in detail in the accompanying Memorandum of Points and Authorities, the proposed use of cash collateral does not include any of the provisions set forth in Bankruptcy Rule 4001(c)(1)(B)(i) – (xi) or Local Bankruptcy Rule 4001-2(b).

In order to provide maximum notice of this Motion, and in conformity with the Court's order limiting notice [ECF 55], concurrently with the filing of this Motion with the Court, the Debtor served a copy of this Motion and all supportive papers upon the Office of the United States Trustee, the subchapter V trustee, the secured creditors or their counsel, the 20 largest unsecured creditors in the Debtor's case, and parties requesting special notice.

A copy of the proposed order granting the Motion is attached as **Exhibit 2** hereto.

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion on a final basis;

(3)    entering an order substantially in the form of the proposed order attached as **Exhibit 2** hereto;

(4)    authorizing the Debtor to use cash collateral through July 15, 2022, to pay all of the expenses set forth in the Budget attached as **Exhibit 1** hereto, with authority to deviate from the line items contained in the Budget by not more than 15%, on a cumulative and line-item basis;

(5)    approving adequate protection for the use of cash collateral to Eden Roc International, LLC, Mega International, LLC, and Escada Sourcing and Production, LLC with: (i)  replacement liens to the same validity, priority, and extent as their respective liens existed as

of the Petition Date and (ii) ) a super-priority administrative claim pursuant to section 507(b) of

the Bankruptcy Code;

      (6)    waiving the stay of FRBP 6004; and

      (7)    granting such other and further relief as the Court deems just and proper under the

circumstances.

Dated: March 16, 2022               ESCADA AMERICA LLC

                        By:   */s/ John-Patrick M. Fritz*
                              JOHN-PATRICK M. FRITZ
                              LEVENE, NEALE, BENDER,
                              YOO & GOLUBCHIK L.L.P.
                              Attorneys for Chapter 11
                              Debtor and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    General Background**

1.      The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on January 18, 2022, (the "Petition Date").  The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession.

2.      The Debtor was formed as a Delaware limited liability company in 2009.  The Debtor is a national specialty retailer selling high-end, ready-to-wear women's apparel with its main office in Beverly Hills, California, an office New York City, New York, and, as of the Petition Date, ten (10) retail stores across seven (7) states in the United States, and over 50 fulltime employees.  As part of its first-day motions, the Debtor rejected five (5) leases, and is now operating at five leased locations with approximately 4 employees in its corporate office and 29 employees in stores.

3.      The Debtor's retail business is generally known to the public and branded as "Escada."  The Debtor uses the "Escada" brand via a license agreement and does not own any intellectual property rights in connection with the "Escada" brand.

4.      For several decades, Escada had been a global retail brand for high-fashion, high-end, ready-to-wear apparel for women, with an emphasis on high-fashion evening wear.

5.      On a global scale, Escada has various retail stores and subsidiaries in several countries in Europe, including but not limited to Spain, England and Germany.

6.      Escada also has retail stores in North America, including the Debtor, which operates Escada's brick-and-mortar retail business only in the United States.

7.      By 2019, the Escada business on a global scale was in deep distress and could not continue.  At that time, the Debtor, together with other subsidiaries of Escada's then-parent company, was acquired by new ownership (which is now the current ownership and management).

8.    At the time of the acquisition of Debtor in 2019, Escada had 29 subsidiaries in 22 countries, all of which were financially distressed.

9.    In December 2019, the Debtor devised and began implementation of a plan to turn around the United States Escada retail business. Debtor believed that the business could be operated at a profit if fundamental business-model changes were implemented, such as overhauling the Debtor's technological suite and reducing speed to market by shifting supply chains from Asia to Europe.

10.    Debtor's turnaround plan was also contingent upon Debtor's ability to sell product at Debtor's physical locations because ecommerce sales were minimal.

11.    However, what was not – and could not be – known at the time of the acquisition in November 2019, was that an unprecedented, global, catastrophic, and life-changing event with severe economic consequences was on the immediate horizon – the Covid-19 pandemic.

12.    In December 2019, just one month after the acquisition and just as the Debtor's transformation plan was being put into effect, the novel corona virus, known to us now as Covid-19, was quietly spreading in certain regions of Asia, unbeknownst to the rest of the world.

13.    From December 2019 through February 2020, the Debtor prepared to implement a number of business-model and operational changes with the goal of making the United States Escada retail business profitable and correct the mistakes of its prior management and prior owners.

14.    However, in March 2020, the world drastically changed, and set the Debtor on course for this current bankruptcy filing.

15.    On or about March 15, 2020, the City of Los Angeles declared a state of emergency with shelter in place orders. In the following days, many business and financial centers across the United States came to a near total standstill as the nation was gripped by the Covid-19 crisis.  In the span of just 12 days, all fifteen (15) of the Debtor's then-active stores in eight (8) States were shuttered due to lockdown restrictions.

16.     In late March 2020, the United States federal government responded with historic economic aid, passing the CARES Act and providing approximately $3 trillion of stimulus to the economy, which may have bolstered the stock market's recovery, but such economic stimulus did nothing to help retail businesses such as the Debtor, which rely on foot traffic from customer shopping in stores to generate sales.

17.     Unfortunately, the Debtor was not eligible for any of these stimulus payments and was left with no support during these unprecedented times.

18.     In addition, as long as the pandemic lockdowns continued and stores remained closed, or shoppers refrained from shopping due to deep concerns about their health and safety, the Covid-19 recession for retail businesses would continue.

19.     From March 2020 to December 2021, the Debtor reduced its overhead expenses by an estimated $13,383,037.40 and entered into negotiations with its commercial landlords for rent relief at all store locations.

20.     Nonetheless, the 21 months leading up to the Debtor's petition date were a marked state of tremendous uncertainty for the world's health and economic affairs brought on by an unprecedented pandemic, followed by an unprecedented recession, then unprecedented trillions of dollars of government aid, none of which has prevented the ongoing uncertainty posed by Covid-19 variants and the attendant on-again-off-again lockdowns across the nation and around the world, all of which made business in the current economic environment very difficult.

21.     The Debtor negotiated workouts with some, but not all, of its various landlords during 2020 and 2021, but with the consequences of the Covid-19 pandemic that Debtor was forced to file bankruptcy to restructure its business affairs.

22.     The Debtor cannot survive ongoing litigation with these landlords and the attendant litigation costs and potential liability for breach of those leases.

23.     Accordingly, the Debtor determined in its reasonable business judgment that it was in the best interest of its estate to file this current bankruptcy case to preserve the going-concern value of its business and save the jobs of its employees.

24.     The Debtor intends to propose a subchapter V plan in good faith to reorganize its financial affairs and avoid a senseless and unnecessary liquidation

**B.     The Budget, Cash Collateral, Secured Creditors, and Adequate Protection**

25.     To keep the Debtor operating through its reorganization, the Debtor requires the use of cash collateral.

26.     The Debtor requires the use of cash collateral to maintain and operate its business and preserve its going concern value by paying ordinary and necessary expenses, as set forth in the Budget through July 15, 2022.  The payment of the expenses reflected in the Budget are in the best interest of the estate.  A true and correct copy of the Budget is attached as **Exhibit 1** hereto.

27.     The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid post-petition to preserve the Debtor's business.

28.     While the Budget represents the Debtor's best estimates of such expenses, the needs of the business may fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the Debtor does not pay expenses outside any of the categories) without the need for further Court order.

29.     The Debtor has three secured creditors (each a "Secured Creditor" and collectively, the "Secured Creditors").

30.     Eden Roc International, LLC ("Eden Roc") has a first-position security interest perfected by the filing of a UCC-1 on substantially all the Debtor's assets and a secured debt of approximately $579,025.32.

31.    Mega International, LLC ("Mega") has a second-position security interest perfected by the filing of a UCC-1 on substantially all the Debtor's assets and a secured debt of approximately $1,506,953.

32.    Escada Sourcing and Production, LLC ("ESP") is a true consignor, and substantially all of the Debtor's inventory is owned by ESP via a consignment agreement between the parties.  ESP recorded a UCC-1 to give the world notice of its consignment; additionally, ESP has a security interest on the proceeds and products of ESP's inventory.

33.    The Secured Creditors consent to the use of cash collateral set forth in the Budget.

34.    In order to provide the Secured Creditors with adequate protection against any potential post-petition decline in the value of the Secured Creditors' collateral, the Debtor proposes that the Secured Creditors receive: (i) replacement liens against the Debtor's post-petition assets, with such replacement liens to have the same validity, priority, and extent as the prepetition liens held by the Secured Creditors; and (ii) a super-priority administrative claim pursuant to section 507(b) of the Bankruptcy Code.

35.    The Budget includes payments to ESP for sales of merchandise based on the consignment agreement with 15% of weekly sales revenue remitted to ESP on a weekly basis, as shown by comparing the "Total Receipts" line and "Consignment Fee" line in the Budget.  These payments are not on account of prepetition debt.  As reflected in the initial budget filed with the Court [ECF 8 at 22], the Debtor did not make any payments to ESP for consignment fees.  ESP has not waived its administrative claim for these fees in the first 13 weeks of the case, but the Debtor wishes to make clear that consignment fee payments in the Budget attached hereto are go-forward current weekly sales, not sales for the first 13 weeks of the case.

36.    The Budget also includes payment of $55,000 approximately every four weeks for "Benefits," which are for the Debtor's employees benefits.  These payments are made to the Debtor's affiliate, Mega Corporate Offices as part of a larger benefits plan.  The Debtor's affiliate had voluntarily paid these "Benefits" expense without any contribution from the Debtor for the first 13 weeks of the case.  The Debtor's affiliate has not waived its administrative claim

for these fees in the first 13 weeks of the case, but the Debtor wishes to make clear that "Benefits" payment in the Budget attached hereto are go-forward benefit expenses, not benefit expenses going back for the first 13 weeks of the case.

37.    If the Debtor is not permitted to use its cash collateral to maintain and operate its business, the Debtor will be unable to operate, pay its rent, pay for insurance, or pay its employees, and the enterprise value of the business will be lost along with any meaningful chance of recovery by creditors.

## II.    COMPLIANCE WITH FRBP 4001(c) & LBR 4001-2

Pursuant to Rules 4001(b) and 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtor submits that the relief requested by the Debtor pertaining to the use of cash collateral does not contain any of the following provisions, except as otherwise indicated below:

| Provision | Cash Coll. |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |

| **Provision** | **Cash Coll.** |
| --- | --- |
| | |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

## III.    DISCUSSION

**A.    The Debtor Must Be Authorized to Use Cash Collateral to Operate, Maintain and Preserve the Property and Estate in Accordance with the Budget**

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

A debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l). A debtor in possession has all of the rights and powers of a trustee with

respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  <u>See</u> 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

<u>See</u> 11 U. S. C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); <u>In re Oak Glen R-Vee</u>, 8 B.R. 213, 216 (Bankr.C.D.Cal.1981); <u>In re Tucson Industrial Partners</u>, 129 B.R. 614 (9th Cir.B.A.P.1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  <u>In re Dynaco Corporation</u>, 162 B.R. 389 (Bankr.D.N.H.1993), <u>quoting</u> <u>In re Stein</u>, 19 B.R. 458, 459. (Bankr.E.D.Pa.1982).

The only current source of revenue available to the Debtor to use to maintain and operate its business is its cash on hand and cash collateral.  If the Debtor is not permitted to use cash collateral to maintain and operate the business, it is a virtual certainty that the going-concern value of the business will be eviscerated to the detriment of the estate and the secured creditors.

The operating expenses that the Debtor must be able to pay during the pendency of this case are set forth in the Budget through July 15, 2022.  The Budget reflect the Debtor's ordinary and necessary operating expenses that must be paid postpetition to preserve the Debtor's business as a going concern.  While the Budget represents the Debtor's best estimates of such expenses, the

needs of the businesses may fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15% on a line-item and cumulative basis without the need for further Court order.

**B.     Secured Creditors Consent and Adequate Protection**

Pursuant to 11 U.S.C. § 363(c)(2)(A), the Secured Creditors consent to the use of cash collateral as set forth in the Budget.  Pursuant to FRBP 4001(d)(1)(B), and as demonstrated in the table, *supra*, the use of cash collateral and the Secured Creditors' consent is not subject to or conditioned on any of the offending provisions found in FRBP 4001(c)(1)(B) or Local Bankruptcy Rule 4001-2(b) and (d).

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734 F.2d 1396, 1400 (9th Cir.1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir.1987); In re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr.C.D.Cal.l988) ("McCombs").

Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.  See also McCombs, Id., at 266.  Section 506(a) "limit[s] the secured status of a creditor (*i.e.*, the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." McCombs, Id., at 266.

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.  In re Triplett, 87 B.R. 25 (Bankr.W.D.Tex.1988).  See also In re Stein, 19 B.R. 458 (Bankr.E.D.Pa.1982).  The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued

1    operation of the debtor's business.  See also, In re McCombs, supra, where the court determined

2    that the debtor's use of cash collateral for needed repairs, renovations and operating expenses

3    eliminated the risk of diminution in the creditor's interest in the cash collateral and such use

4    would more likely increase cash collateral.

5        Other courts have determined that a debtor's continued business operations can constitute

6    the adequate protection of a secured creditor.  See Matter of Pursuit Athletic Footwear, Inc., 193

7    B.R. 713 (Bankr.D.Del.1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450

8    (Bankr.D.N.J.1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr.D.N.H.1993); In re

9    Immenhausen Corp., 164 B.R. 347, 352 (Bankr.M.D.Fla.1994).

10        Additionally, in determining adequate protection, Courts have stressed the importance of

11    promoting a debtor's reorganization.

12        In In re O'Connor, supra, the Tenth Circuit stated:

13        "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed
          to deal with cash collateral for the purpose of enhancing the prospects of
14        reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the
          Debtor's efforts are not only to be encouraged, but also their efforts during the
15        administration of the proceeding are to be measured in light of that quest.
          Because the ultimate benefit to be achieved by a successful reorganization
16        inures to all the creditors of the estate, a fair opportunity must be given to the
          Debtors to achieve that end.  Thus, while interests of the secured creditor whose
17        property rights are of concern to the court, the interests of all other creditors
          also have bearing upon the question of whether use of cash collateral shall be
18        permitted during the early stages of administration."
19

20    808 F.2d at 1937.

21        The use of cash collateral is critical to the Debtor's ability to implement an effective

22    reorganization strategy for the benefit of all creditors.  As demonstrated herein, the use of the

23    Debtor's cash collateral, in accordance with the Budget, will preserve and maximize the Debtor's

24    assets for the benefit of the estate and all creditors.  If the Debtor is not permitted to use cash

25    collateral to operate and maintain its business as a going concern, then the going concern value

26    will be eviscerated to the severe prejudice of all the creditors of the estate.

27

28

The Debtor proposes that the Secured Creditors receive replacement liens against the Debtor's post-petition assets, with such replacement liens to have the same validity, priority, and extent as the prepetition liens held by the Secured Creditors. Bankruptcy Code Section 552(b) suggests that such replacement liens for post-petition collateral and proceeds are the norm unless the Court finds otherwise based on the "equities of the case." 11 U.S.C. § 552(b). Moreover, this is consistent with non-bankruptcy commercial law, as the Uniform Commercial Code provides for continuing liens on after-acquired property and the automatic perfection of a lien in the proceeds and products of collateral. *See*, UCC 9-204(a) and 9-315(a).

To the extent the foregoing does not protect the Secured Creditors against any post-petition diminution in the value of their collateral, the Secured Creditors will receive a super-priority administrative claim pursuant to section 507(b) of the Bankruptcy Code, as a matter of law. *See*, 11 U.S.C. § 507(b).

**C.    Compliance with Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 4001-2.**

Pursuant to Bankruptcy Rules 4001(b)(1)(C), the Debtor is required to serve a copy of the Motion on any entity with an interest in the Debtor's cash collateral, the 20 largest unsecured creditors, and any other entity that the Court directs. The Debtor has complied with the foregoing by serving a copy of the Motion, the proposed order, the supporting declarations and other pleadings on the secured creditors, the 20 largest unsecured creditors, the United States Trustee, the subchapter V trustee, and parties requesting special notice.

In addition, in compliance with Local Bankruptcy Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which discloses whether the proposed Order contains certain provisions of findings of fact. Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

**D.    Waiver of Any Applicable Stay is Appropriate**

The Debtor requires a waiver of the 14-day stay provided for under Bankruptcy Rule 6004 because the Debtor needs to use cash collateral as soon as possible to maintain the Debtor's

1    business as a going concern for the benefit of the Debtor's estate.  Notably, Rule 6004(h) is not

2    meant to apply to the use of cash collateral.  *See*, FED.R.BANKR.P. 6004(h) ("… other than cash

3    collateral"). In an abundance of caution, the Debtor requests that any applicable stay, including the

4    stay provided under Bankruptcy Rule 6004, be waived to allow Order on this Motion to become

5    immediately effective.

6                                   **IV.    <u>CONCLUSION</u>**

7    **WHEREFORE**, the Debtor respectfully requests that this Court enter an order:

8         (1)    affirming the adequacy of the Notice given herein;

9         (2)    granting the Motion on a final basis;

10        (3)    entering an order substantially in the form of the proposed order attached as

11               **Exhibit 2** hereto;

12        (4)    authorizing the Debtor to use cash collateral through July 15, 2022, to pay all of

13               the expenses set forth in the Budget attached as **Exhibit 1** hereto, with authority

14               to deviate from the line items contained in the Budget by not more than 15%, on a

15               cumulative and line-item basis;

16        (5)    approving adequate protection for the use of cash collateral to Eden Roc

17               International, LLC, Mega International, LLC, and Escada Sourcing and

18               Production, LLC with: (i)  replacement liens to the same validity, priority, and

19               extent as their respective liens existed as of the Petition Date and (ii) ) a super-

20               priority administrative claim pursuant to section 507(b) of the Bankruptcy Code;

21        (6)    waiving the stay of FRBP 6004; and

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

(7)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: March 16, 2022                    ESCADA AMERICA LLC

                                    By: ___*/s/ John-Patrick M. Fritz*_____
                                        JOHN-PATRICK M. FRITZ
                                        LEVENE, NEALE, BENDER,
                                        YOO & GOLUBCHIK L.L.P.
                                        Attorneys for Chapter 11
                                        Debtor and Debtor in Possession

### DECLARATION OF KEVIN WALSH

I, Kevin Walsh, hereby declare as follows:

1.     I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.     I am the Director of Finance for Escada America LLC, a Delaware limited liability company. (the "Debtor"), the debtor and debtor in possession in this chapter 11 bankruptcy case.

3.     I am an experienced finance professional, having worked for the Debtor since 2016 and with prior work experience at Fortune 500 companies including Johnson & Johnson (Controller/Director) and Pfizer (Finance Director).

4.     I have reviewed and am familiar with and am knowledgeable about the books and records of the Debtor, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

5.     I make this declaration in support of the Debtor's "Motion for Order: (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and (II) Approving Adequate Protection" (the "Motion").

6.     The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on January 18, 2022, (the "Petition Date").  The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession.

7.     The Debtor was formed as a Delaware limited liability company in 2009.  The Debtor is a national specialty retailer selling high-end, ready-to-wear women's apparel with its main office in Beverly Hills, California, an office New York City, New York, and, as of the Petition Date, ten (10) retail stores across seven (7) states in the United States, and over 50 fulltime employees.  As part of its first-day motions, the Debtor rejected five (5) leases, and is

now operating at five leased locations with approximately 4 employees in its corporate office and 29 employees in stores.

8.      The Debtor's retail business is generally known to the public and branded as "Escada."  The Debtor uses the "Escada" brand via a license agreement and does not own any intellectual property rights in connection with the "Escada" brand.

9.      For several decades, Escada had been a global retail brand for high-fashion, high-end, ready-to-wear apparel for women, with an emphasis on high-fashion evening wear.

10.     On a global scale, Escada has various retail stores and subsidiaries in several countries in Europe, including but not limited to Spain, England and Germany.

11.     Escada also has retail stores in North America, including the Debtor, which operates Escada's brick-and-mortar retail business only in the United States.

12.     By 2019, the Escada business on a global scale was in deep distress and could not continue.  At that time, the Debtor, together with other subsidiaries of Escada's then-parent company, was acquired by new ownership (which is now the current ownership and management).

13.     At the time of the acquisition of Debtor in 2019, Escada had 29 subsidiaries in 22 countries, all of which were financially distressed.

14.     In December 2019, the Debtor devised and began implementation of a plan to turn around the United States Escada retail business. Debtor believed that the business could be operated at a profit if fundamental business-model changes were implemented, such as overhauling the Debtor's technological suite and reducing speed to market by shifting supply chains from Asia to Europe.

15.     Debtor's turnaround plan was also contingent upon Debtor's ability to sell product at Debtor's physical locations because ecommerce sales were minimal.

16.     However, what was not – and could not be – known at the time of the acquisition in November 2019, was that an unprecedented, global, catastrophic, and life-changing event with severe economic consequences was on the immediate horizon – the Covid-19 pandemic.

17. In December 2019, just one month after the acquisition and just as the Debtor's transformation plan was being put into effect, the novel corona virus, known to us now as Covid-19, was quietly spreading in certain regions of Asia, unbeknownst to the rest of the world.

18. From December 2019 through February 2020, the Debtor prepared to implement a number of business-model and operational changes with the goal of making the United States Escada retail business profitable and correct the mistakes of its prior management and prior owners.

19. However, in March 2020, the world drastically changed, and set the Debtor on course for this current bankruptcy filing.

20. On or about March 15, 2020, the City of Los Angeles declared a state of emergency with shelter in place orders. In the following days, many business and financial centers across the United States came to a near total standstill as the nation was gripped by the Covid-19 crisis. In the span of just 12 days, all fifteen (15) of the Debtor's then-active stores in eight (8) States were shuttered due to lockdown restrictions.

21. In late March 2020, the United States federal government responded with historic economic aid, passing the CARES Act and providing approximately $3 trillion of stimulus to the economy, which may have bolstered the stock market's recovery, but such economic stimulus did nothing to help retail businesses such as the Debtor, which rely on foot traffic from customer shopping in stores to generate sales.

22. Unfortunately, the Debtor was not eligible for any of these stimulus payments and was left with no support during these unprecedented times.

23. In addition, as long as the pandemic lockdowns continued and stores remained closed, or shoppers refrained from shopping due to deep concerns about their health and safety, the Covid-19 recession for retail businesses would continue.

24. From March 2020 to December 2021, the Debtor reduced its overhead expenses by an estimated $13,383,037.40 and entered into negotiations with its commercial landlords for rent relief at all store locations.

25.     Nonetheless, the 21 months leading up to the Debtor's petition date were a marked state of tremendous uncertainty for the world's health and economic affairs brought on by an unprecedented pandemic, followed by an unprecedented recession, then unprecedented trillions of dollars of government aid, none of which has prevented the ongoing uncertainty posed by Covid-19 variants and the attendant on-again-off-again lockdowns across the nation and around the world, all of which made business in the current economic environment very difficult.

26.     The Debtor negotiated workouts with some, but not all, of its various landlords during 2020 and 2021, but with the consequences of the Covid-19 pandemic that Debtor was forced to file bankruptcy to restructure its business affairs.

27.     The Debtor cannot survive ongoing litigation with these landlords and the attendant litigation costs and potential liability for breach of those leases.

28.     Accordingly, the Debtor determined in its reasonable business judgment that it was in the best interest of its estate to file this current bankruptcy case to preserve the going-concern value of its business and save the jobs of its employees.

29.     The Debtor intends to propose a subchapter V plan in good faith to reorganize its financial affairs and avoid a senseless and unnecessary liquidation

30.     To keep the Debtor operating through its reorganization, the Debtor requires the use of cash collateral.

31.     The Debtor requires the use of cash collateral to maintain and operate its business and preserve its going concern value by paying ordinary and necessary expenses, as set forth in the Budget through July 15, 2022.  The payment of the expenses reflected in the Budget are in in the best interest of the estate.  A true and correct copy of the Budget is attached as **Exhibit 1** hereto.

32.     The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid post-petition to preserve the Debtor's business.

33.     While the Budget represents the Debtor's best estimates of such expenses, the needs of the business may fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the Debtor does not pay expenses outside any of the categories) without the need for further Court order.

34.     The Debtor has three secured creditors (each a "<u>Secured Creditor</u>" and collectively, the "<u>Secured Creditors</u>").

35.     Eden Roc International, LLC ("<u>Eden Roc</u>") has a first-position security interest perfected by the filing of a UCC-1 on substantially all the Debtor's assets and a secured debt of approximately $579,025.32.

36.     Mega International, LLC ("<u>Mega</u>") has a second-position security interest perfected by the filing of a UCC-1 on substantially all the Debtor's assets and a secured debt of approximately $1,506,953.

37.     Escada Sourcing and Production, LLC ("<u>ESP</u>") is a true consignor, and substantially all of the Debtor's inventory is owned by ESP via a consignment agreement between the parties.  ESP recorded a UCC-1 to give the world notice of its consignment; additionally, ESP has a security interest on the proceeds and products of ESP's inventory.

38.     The Secured Creditors consent to the use of cash collateral set forth in the Budget.

39.     In order to provide the Secured Creditors with adequate protection against any potential post-petition decline in the value of the Secured Creditors' collateral, the Debtor proposes that the Secured Creditors receive: (i) replacement liens against the Debtor's post-petition assets, with such replacement liens to have the same validity, priority, and extent as the prepetition liens held by the Secured Creditors; and (ii) a super-priority administrative claim pursuant to section 507(b) of the Bankruptcy Code.

40.     The Budget includes payments to ESP for sales of merchandise based on the consignment agreement with 15% of weekly sales revenue remitted to ESP on a weekly basis, as shown by comparing the "Total Receipts" line and "Consignment Fee" line in the Budget.  These

payments are not on account of prepetition debt.  As reflected in the initial budget filed with the Court [ECF 8 at 22], the Debtor did not make any payments to ESP for consignment fees.  ESP has not waived its administrative claim for these fees in the first 13 weeks of the case, but the Debtor wishes to make clear that consignment fee payments in the Budget attached hereto are go-forward current weekly sales, not sales for the first 13 weeks of the case.

41.    The Budget also includes payment of $55,000 approximately every four weeks for "Benefits," which are for the Debtor's employees benefits.  These payments are made to the Debtor's affiliate, Mega Corporate Offices as part of a larger benefits plan.  The Debtor's affiliate had voluntarily paid these "Benefits" expense without any contribution from the Debtor for the first 13 weeks of the case.  The Debtor's affiliate has not waived its administrative claim for these fees in the first 13 weeks of the case, but the Debtor wishes to make clear that "Benefits" payment in the Budget attached hereto are go-forward benefit expenses, not benefit expenses going back for the first 13 weeks of the case.

42.    If the Debtor is not permitted to use its cash collateral to maintain and operate its business, the Debtor will be unable to operate, pay its rent, pay for insurance, or pay its employees, and the enterprise value of the business will be lost along with any meaningful chance of recovery by creditors.

43.    The Debtor submits that the relief requested by the Debtor pertaining to the use of cash collateral does not contain any of the following provisions, except as otherwise indicated below:

[remainder of page intentionally left blank]

| Provision | Cash Coll. |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

44.     The Debtor requires a waiver of the 14-day stay provided for under Bankruptcy Rule 6004 because the Debtor needs to use cash collateral as soon as possible to maintain the Debtor's business as a going concern for the benefit of the Debtor's estate.

45.     The Debtor requests that any applicable stay, including the stay provided under Bankruptcy Rule 6004, be waived to allow Order on this Motion to become immediately effective.

46.     Immediate use of cash collateral is necessary to avoid immediate and irreparable harm, as the Budget's expenses are for immediate necessary expenses, such as payroll, insurance, rent, and utilities, all of which are needed to preserve the value of ongoing operations.

47.     A true and correct copy of the proposed order is attached as **Exhibit 2** hereto.


I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 16th day of March 2022, at  Playa Flamingo, Gunacaste, Costa Rica


_Kevin G Walsh_
Kevin Walsh, Declarant

**Exhibit 1**

**Escada America LLC**
**Cash flow Projections**
$ in Thousands, Except per Unit Data

| | WE | WE | WE | WE | WE | WE | WE | WE | WE | WE | WE | WE | WE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fcst / Act | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
| Projection Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 |
| Week Ending | 04/22/22 | 04/29/22 | 05/06/22 | 05/13/22 | 05/20/22 | 05/27/22 | 06/03/22 | 06/10/22 | 06/17/22 | 06/24/22 | 07/01/22 | 07/08/22 | 07/15/22 | 07/15/22 |
| **Beginning Cash** | $1,600 | $1,655 | $1,603 | $1,562 | $1,539 | $1,561 | $1,500 | $1,453 | $1,455 | $1,478 | $1,424 | $1,394 | $1,396 | $1,600 |
| (+) FP Receipts | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $72 | $930 |
| (+) OU Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (+) WHS Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (+) Other Receipts | - | 20 | - | - | - | 20 | - | - | - | - | 20 | - | - | 60 |
| **Total Receipts** | $72 | $92 | $72 | $72 | $72 | $92 | $72 | $72 | $72 | $72 | $92 | $72 | $72 | $990 |
| (-) Consignment Fee | ($11) | ($14) | ($11) | ($11) | ($11) | ($14) | ($11) | ($11) | ($11) | ($11) | ($14) | ($11) | ($11) | ($148) |
| (-) HQ Personnel | - | (20) | - | (20) | - | (20) | - | (20) | - | (20) | - | (20) | - | (120) |
| (-) Store Personnel | (33) | - | (33) | - | (33) | - | (33) | - | (33) | - | (33) | - | - | (198) |
| (-) Store Retention Bonus 2 | - | (11) | - | (25) | - | (25) | - | (1) | - | (1) | - | (1) | - | (64) |
| (-) Store Retention Bonus 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (-) Selling and Shipping | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | - | (3) | (33) |
| (-) Store Rent | - | (97) | - | - | - | - | (97) | - | - | - | (97) | - | - | (291) |
| (-) Warehouse Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| (-) Financial Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (14) |
| (-) Benefits | - | (55) | - | - | - | (55) | - | - | - | (55) | - | - | - | (165) |
| (-) Misc. (Facilities & Other) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (26) |
| (-) Utilities, Telephones, Networks | - | (5) | - | - | - | (5) | - | - | - | (5) | - | - | - | (15) |
| (-) Taxes | - | - | - | - | - | - | - | - | (32) | - | - | - | (26) | (91) |
| (-) Shared Services Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | ($16) | ($143) | ($113) | ($94) | ($49) | ($152) | ($118) | ($70) | ($48) | ($125) | ($121) | ($70) | ($42) | ($1,165) |
| **Weekly Net Operating Cash** | $55 | ($52) | ($42) | ($23) | $22 | ($61) | ($47) | $1 | $23 | ($54) | ($30) | $1 | $29 | ($175) |
| **Ending Cash** | $1,655 | $1,603 | $1,562 | $1,539 | $1,561 | $1,500 | $1,453 | $1,455 | $1,478 | $1,424 | $1,394 | $1,396 | $1,425 | $1,425 |

# Exhibit 2

1   JOHN-PATRICK M. FRITZ (State Bar No. 245240)
    LEVENE, NEALE, BENDER,
2   YOO & GOLUBCHIK L.L.P.
3   2818 La Cienega Avenue
    Los Angeles, California 90034
4   Telephone:  (310) 229-1234
    Facsimile:   (310) 229-1244
5   Email: JPF@LNBYG.COM

6   Attorneys for Chapter 11
7   Debtor and Debtor in Possession

8                    UNITED STATES BANKRUPTCY COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
                          LOS ANGELES DIVISION
10
    In re:                              ) Case No.: 2:22-bk-10266-BB
11                                      )
    ESCADA AMERICA LLC,                 ) Chapter 11 Case
12                                      ) Subchapter V
                                        )
            Debtor and Debtor in Possession.  )
13                                      ) **ORDER AUTHORIZING USE OF CASH
                                        ) COLLATERAL    AND    PROVIDING
14                                      ) ADEQUATE          PROTECTION
                                        ) PURSUANT TO SECTIONS 361 AND
15                                      ) 363 OF THE BANKRUPTCY CODE ON
                                        ) A FINAL BASIS THROUGH JULY 15,
16                                      ) 2022**
                                        )
17                                      ) Hearing:
                                        ) Date:    April 6, 2022
18                                      ) Time:  10:00 a.m.
                                        ) Place:  Courtroom 1539
19                                      )            255 East Temple Street
                                        )            Los Angeles, CA 90012
20                                      )
                                        )
21                                      )
                                        )
22                                      )
                                        )
23                                      )
                                        )
24                                      )
                                        )
25                                      )
                                        )
26  _____   )

27

28

                                        1

On April 6, 2022, at 10:00 a.m., the Honorable Sheri Bluebond, United States Bankruptcy Judge for the Central District of California (the "Court"), held a final hearing (the "Hearing") in Courtroom 1539 of the United States Bankruptcy Courthouse located at 255 East Temple Street, Los Angeles, California, to consider the Motion for Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and (II) Providing Adequate Protection (the "Motion") [ECF __], filed by Escada America LLC, a Delaware limited liability company (the "Debtor"), the debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case.  Appearances were made as set forth on the Court's record of the hearing.

The Court, having read and considered the Motion and all papers in support of the Motion, including the declaration of Kevin Walsh (the "Declaration") annexed to the Motion, and the previously filed declaration of John-Patrick M. Fritz [ECF 15], the statements of counsel made orally at the hearing, the record in the case, the docket in the case, no opposition having been filed or received, and for good cause appearing, therefor,

**HEREBY FINDS** that notice of the Motion and Hearing were good and proper under the circumstances and pursuant to the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, and

**HEREBY ORDERS AS FOLLOWS:**

(1)    The Motion is granted on a final basis as set forth in this Order;

(2)    Through July 15, 2022, the Debtor is authorized to use cash collateral to pay all of the expenses set forth in the Budget attached as **Exhibit 1** to the Motion and Declaration, with authority to deviate from the line items contained in the Budget by not more than 15%, on a cumulative and line-item basis;

(3)    As adequate protection for the use of cash collateral, Eden Roc International, LLC, Mega International, LLC, and Escada Sourcing and Production, LLC shall have: (i) replacement liens to the same validity, priority, and extent as their respective liens existed as of the Petition Date and (ii) ) super-priority administrative claims pursuant to section 507(b) of the Bankruptcy Code; and

1    (4)    The stay of FRBP 6004 is waived.

2    **SO ORDERED.**

3                                                    ###

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 2818 La Cienega Avenue, Las Vegas, CA 90034

A true and correct copy of the foregoing document entitled **MOTION FOR ORDER: (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; AND (II) APPROVING ADEQUATE PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KEVIN WALSH IN SUPPORT** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 16, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **March 16, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 16, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Sheri Bluebond
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| **March 16, 2022** | Jason Klassi | */s/ Jason Klassi* |
| Date | Type Name | Signature |

Escada 9277
20 Largest, Secured and RSN

| | | |
|---|---|---|
| 717 GFC LLC | Beverly Hills Wilshire Hotel | Worth-Pondfield LLC |
| Attn: Mrs.Tsui Yeung | 9500 WILSHIRE BLVD | c/o SAMSON MANAGEMENT CORP. |
| 500 5th Avenue 54th Floor | BEVERLY HILLS, CA 90212 | Attn.: Kathy Panaro |
| New York City, NY 10110 | | 97-77 QUEENS BLVD, SUITE 710 |
| | | REGO PARK, NY 11374 |
| | | |
| Chicago Oak Street Partners, LLC | Alliant Insurance Services, Inc. | SPG HOUSTON HOLDINGS,LP |
| Attn: Lesley Pembroke | 701 B St 6th Floor | PO Box 822693 |
| 1343 N. Wells Street, Rear Bldg. | San Diego, CA 92101 | PHILADELPHIA, PA 19182-2693 |
| Chicago, IL 60610 | | |
| | | |
| Las Vegas North Outlets, LLC | Ala Moana Anchor Acquisition, LLC | CHETRIT 1412 LLC |
| Attn: Marie Wood | Attn: Lisa Gordon | Attn: Nativ Winiarsky |
| 875 South Grand Central Parkway, #1 | PO Box 860375 | PO Box 785000 |
| Las Vegas, NV 89106 | Minneapolis, MN 55486-0074 | PHILADELPHIA, PA 10018 |
| | | |
| Syzygy Performance GmbH | Scottsdale Fashion Square LLC | Woodbury Common Premium Outlets |
| Osterwaldstra e 10 | Attn: Tamara Ortega | Attn: Marie Wood |
| Munchen, Germany 80805-0000 | PO Box 31001-2156 | PO Box 822884 |
| | Pasadena, CA 91110-2156 | Philadelphia, PA 19182-2884 |
| | | |
| Premium Outlet Partners LP | Bal Harbour Shops LLLP | METROPOLITAN TELECOMM. |
| Attn: Leslie C. Traylor | Attn: Lorena Dehogues | PO Box 9660 |
| PO Box 822873 | 9700 Collins Avenue | MANCHESTER, NH 03108-9660 |
| Philadelphia, PA 19182-2873 | Bal Harbour, FL 33154 | |
| | | |
| AMERICAN EXPRESS | Johnson Controls Security Solutions | Simon Property Group LP |
| PO Box 1270 | Attn: Virgil Guerra | 2696 Solution Center |
| NEWARK, NJ 07101-1270 | PO Box 371994 | Chicago, IL 60677-2006 |
| | Pittsburgh, PA 15250-7994 | |
| | | |
| Cushman and Wakefield | Funaro & co., P.C. | Sawgrass Mills Phase IV, L.L.C. |
| Attn: Kaleb McCullough | Attn: Joseph M. Catalano | c/o M.S. Management Associates Inc., |
| 1290 Avenue of the Americas | 350 Fifth Avenue, 41st Fl | 225 W Washington St, |
| New York, NY 10104 | New York, NY 10118 | Indianapolis, IN 46204 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RSN

Dustin P. Branch, Esq.
Jessica M. Simon, Esq.
Nahal Zarnighian, Esq.
BALLARD SPAHR LLP
2029 Century Park East, Suite 1400

Secured

Eden Roc International, LLC
9720 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212

RSN

Simon Property Group, Inc.
Attn:  Ronald M. Tucker, Esq.
225 West Washington Street
Indianapolis, Indiana 46204

Secured

Escada Sourcing and Production LLC
9720 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212

Secured

Mega International, LLC
9720 Wilshire Blvd. 6th Floor
Beverly Hills, CA 90212

1    **2:22-bk-10266-BB Notice will be electronically mailed to:**

2    Dustin P Branch on behalf of Creditor The Macerich Company
     branchd@ballardspahr.com, carolod@ballardspahr.com;hubenb@ballardspahr.com

3
     John C Cannizzaro on behalf of Creditor 717 GFC LLC
4    john.cannizzaro@icemiller.com, julia.yankula@icemiller.com

5    Michael J Darlow on behalf of Creditor Harris County Municipal Utility District #358
     mdarlow@pbfcm.com, tpope@pbfcm.com

6
     Caroline Djang on behalf of Interested Party Caroline R. Djang
7    caroline.djang@bbklaw.com, laurie.verstegen@bbklaw.com;wilma.escalante@bbklaw.com

8    Eryk R Escobar on behalf of U.S. Trustee United States Trustee (LA)
     eryk.r.escobar@usdoj.gov

9
     John-Patrick M Fritz on behalf of Debtor Escada America, LLC
10   jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com

11   William W Huckins on behalf of Creditor Brookfield Properties Retail, Inc.
     whuckins@allenmatkins.com, clynch@allenmatkins.com;igold@allenmatkins.com

12
     Gregory Kent Jones (TR)
13   gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com

14   Michael S Kogan on behalf of Creditor Michael Kogan Law Firm, APC
     mkogan@koganlawfirm.com

15
     Kristen N Pate on behalf of Creditor Brookfield Properties Retail, Inc.
16   ggpbk@ggp.com

17   Lindsey L Smith on behalf of Debtor Escada America, LLC
     lls@lnbyg.com, lls@ecf.inforuptcy.com

18
     Ronald M Tucker, Esq on behalf of Creditor SIMON PROPERTY GROUP INC
19   rtucker@simon.com, cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com

20   United States Trustee (LA)
     ustpregion16.la.ecf@usdoj.gov

21

22

23

24

25

26

27

28