WILLIAM W. HUCKINS (BAR NO. 201098)
IVAN M. GOLD (BAR NO. 121486)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, California  94111-4074
Phone:  (415) 837-1515
Fax:  (415) 837-1516
E-Mail:  igold@allenmatkins.com
        whuckins@allenmatkins.com

Attorneys for Brookfield Properties Retail, Inc., Simon
Property Group, Inc., and certain of their respective affiliates

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. Case No.: 2:22-bk-10266-BB |
| ESCADA AMERICA LLC, | Chapter 11, Subchapter V |
| Debtor and Debtor in Possession. | **OBJECTION OF SIMON PROPERTY GROUP AND BROOKFIELD PROPERTIES RETAIL TO DEBTOR'S SUBCHAPTER V ELECTION OR, ALTERNATIVELY, MOTION FOR APPOINTMENT OF AN OFFICIAL COMMITTEE OF UNSECURED CREDITORS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Declaration of Ivan M. Gold Filed Concurrently Herewith |
| | Date:    April 6, 2022<br>Time:   10:00  a.m.<br>Place:  Edward R. Roybal Federal Building and<br>          Courthouse<br>          Courtroom 1539<br>          255 East Temple Street<br>          Los Angeles, CA 90012 |
| | Hearing to be held in-person and by videoconference Government Zoom, see Court's website under "Telephonic Instructions" for more details:<br>https://www.cacb.uscourts.gov/judges/honorable-sheri-bluebond |

**TO THE HONORABLE SHERI BLUEBOND, THE OFFICE OF THE UNITED STATES TRUSTEE, AND TO ALL PARTIES IN INTEREST AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on <u>April 6, 2022, at 10:00 a.m</u>. in Courtroom 1539 of the above-entitled Court, located at 255 East Temple Street, Los Angeles, California 90012, Brookfield Properties Retail, Inc., Simon Property Group, Inc., and certain of their respective affiliates (collectively, "<u>Objecting Landlords</u>") will and hereby does (1) assert their objection, pursuant to Interim Rule 1020(b) of the Federal Rules of Bankruptcy Procedure, to the statement of debtor Escada America LLC ("<u>Debtor</u>") that it is a small business debtor eligible for relief under subchapter V of chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 1182 *et. seq*.) or, alternatively, (2) move for an order directing the appointment of an official committee of unsecured creditors pursuant to 11 U.S.C. §§ 1102(a)(3) and 1181(b) (the "<u>Objection</u>").

The Objection is made and based upon this Notice of Objection, the Objection, the Memorandum of Points and Authorities and Declaration of Ivan M. Gold in support of the Objection, filed concurrently herewith, and upon any additional evidence, both oral and documentary, that may be presented to the Court at or before the time of the hearing on this Objection.

**IF YOU DO NOT OPPOSE THE OBJECTION DESCRIBED ABOVE, YOU NEED NOT TAKE FURTHER ACTION. HOWEVER, IF YOU DO OPPOSE THE OBJECTION, PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1, ANY OPPOSITION TO THE OBJECTION MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE OBJECTION. YOU MUST FILE ANY SUCH OPPOSITION WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT LOCATED AT 255 EAST TEMPLE STREET, LOS ANGELES, CA 90012. YOU MUST ALSO SERVE A COPY OF YOUR OPPOSITION UPON OBJECTING LANDLORDS' COUNSEL AT THE MAILING ADDRESS INDICATED IN THE UPPER LEFT CORNER OF THIS OBJECTION AND ON THE OFFICE OF THE UNITED STATES TRUSTEE LOCATED AT 915 WILSHIRE BLVD., SUITE 1850, LOS ANGELES,**

1  **CA 90017. FAILURE TO TIMELY FILE AND SERVE AN OPPOSITION TO THE**

2  **OBJECTION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE**

3  **COURT MAY ENTER AN ORDER SUSTAINING THE OBJECTION WITHOUT**

4  **FURTHER NOTICE.  MOREOVER, SHOULD YOU FAIL TO ATTEND THE HEARING**

5  **ON THE OBJECTION, THE COURT IS AUTHORIZED TO ENTER YOUR DEFAULT**

6  **AND TO GRANT THE RELIEF REQUESTED BY 5900 WILSHIRE IN THE**

7  **OBJECTION.**

8     **WHEREFORE,** Objecting Landlords pray that the Court enter an order:

9     1.     Finding that the Debtor's statement that it is a small business debtor eligible for

10  relief under subchapter V of chapter 11 the Bankruptcy Code was incorrect and revoking such

11  statement;

12    2.     Finding that the Debtor i not eligible for relief under subchapter V of chapter 11 of

13  the Bankruptcy Code pursuant to section 1182(1)(A) of the Bankruptcy Code;

14    3.     Alternatively, directing the appointment of an official committee of unsecured

15  creditors pursuant to 11 U.S.C. §§ 1102(a)(3) and 1181(b); and

16    4.     Granting such other and further relief as the Court deems just and appropriate under

17  the circumstances.

18  Dated:  March 16, 2022                    Respectfully submitted,

19                                             ALLEN MATKINS LECK GAMBLE
20                                              MALLORY & NATSIS LLP

21

22                                             By:  */s/ WILLIAM W. HUCKINS*
23                                             WILLIAM W. HUCKINS
                                               Attorneys for Brookfield Properties Retail,
24                                             Inc., Simon Property Group, Inc., and certain
                                               of their respective affiliates

25

26

27

28

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4860-6246-3252.2                            -2-

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................................... 1

II.    BACKGROUND ................................................................................................................. 3

     A.    Procedural Background ............................................................................... 3

     B.    The Debtor's Business ................................................................................ 4

     C.    The Leases .................................................................................................. 5

     D.    The Debtor's Aggregate Debt .................................................................... 6

         1.    Insider Secured Debt .................................................................... 7

             a.    Eden Roc International, LLC ("Eden Roc") ..................... 7

             b.    Mega International, LLC ("Mega") ................................. 7

             c.    Escada Sourcing and Production LLC ("ESP") ............... 8

         2.    Landlord Debt ............................................................................... 9

             a.    Scheduled Landlord Debt ................................................ 9

             b.    Landlord Proofs of Claim .............................................. 10

         3.    Non-Landlord Unsecured Debt .................................................. 11

     E.    Additional Insider Transactions ............................................................... 11

     F.    The Debtor's Subchapter V Strategy ....................................................... 12

III.    JURISDICTION AND VENUE ......................................................................................... 12

IV.    ARGUMENT .................................................................................................................. 13

     A.    The Debtor is Ineligible for Relief Under Subchapter V Because it
has Over $7.5 Million in Liquidated, Non-Contingent, Non-Insider
Debt ........................................................................................................ 13

         1.    Subchapter V is Not Intended to Protect Private Equity
Sponsors ..................................................................................... 13

         2.    Upon a Timely Objection, the Debtor Must Prove its
Eligibility for Subchapter V ....................................................... 14

         3.    Rent Claims are Neither Contingent Nor Unliquidated ............ 16

         4.    The Debtor Has More than $7.5 Million in Qualifying Debt .... 18

             a.    Scheduled Debt Exceeds the Subchapter V Limit ......... 18

**Page**

b.    Proofs of Claim Exceed the Debt Limit ........................................20

B.    An Official Committee of Unsecured Creditors Should Be
Appointed ........................................................................................................21

1.    A Committee Will Improve Recoveries to Unsecured
Creditors ...............................................................................................21

2.    A Committee Will Assist in the Prompt Resolution of This
Case .......................................................................................................23

3.    A Committee is Necessary to Provide Effective Oversight of
the Debtor .............................................................................................24

V.    CONCLUSION ...............................................................................................................25

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Fountain v. Deutsche Bank Nat'l Trust Co. (In re Fountain),*
    612 B.R. 743 (9th Cir. BAP 2020) ................................................................................. 16

*Guastella v. Hampton (In re Guastella),*
    341 B.R. 908 (9th Cir. BAP 2006) ................................................................................. 16

*In re Aparicio,*
    589 B.R. 667 (Bankr. E.D. Cal. 2018) ........................................................................... 17

*In re Blue,*
    630 B.R. 179 (Bankr. M.D.N.C. 2021) .......................................................................... 15

*In re Bonert,*
    619 B.R. 248 (Bankr. C.D. Cal. 2020) ........................................................................... 21

*In re Coleman Enterprises, Inc.,*
    266 B.R. 423 (Bankr. D. Minn. 2001) ............................................................................ 15

*In re De La Hoz,*
    451 B.R. 192 (Bankr. M.D. Fla. 2011) .......................................................................... 16

*In re Dille Family Trust,*
    598 B.R. 179 (Bankr. W.D. Pa. 2019) ........................................................................... 15

*In re Fostevedt,*
    823 F.2d 305 (9th Cir. 1987) .......................................................................................... 17

*In re Gamble,*
    570 B.R. 272 (Bankr. S.D. Tex. 2017) ........................................................................... 18

*In re Haskell-Dawes, Inc.,*
    188 B.R. 515 (Bankr. E.D. Pa. 1995) ............................................................................ 23

*In re Iron Oak Supply Corp.,*
    169 B.R. 414 (Bankr. E.D. Cal. 1994) ........................................................................... 17

*In re Kelly,*
    Case No. 18-13244, 2018 Bankr. LEXIS 2755, 2018 WL 4354653 (Bankr.
    D. Md. 2018) ................................................................................................................... 15

*In re Mazzeo,*
    131 F.3d 295 (2d Cir. 1997) ........................................................................................... 17

*In re Nicholes,*
    184 B.R. 82 (9th Cir. BAP 1995) ................................................................................... 17

*In re Offer Space, LLC,*
    629 B.R. 299 (Bankr. D. Utah 2021) .............................................................................. 15

*In re Ollis,*
    609 B.R. 459 (Bankr. D.S.C. 2019) ............................................................................... 15

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

**Page(s)**

*In re Port Arthur Steam Energy, L.P.,*
    629 B.R. 233 (Bankr. S.D. Tex. 2021) ........................................................................ 15

*In re Progressive Solutions, Inc.,*
    615 B.R. 894 (Bankr. C.D. Cal 2020) ......................................................................... 13

*In re Scovis,*
    249 F.3d 973 (9th Cir. 2001) ................................................................................. 16, 17

*In re Slack,*
    187 F.3d 1070 (9th Cir. 1999) .................................................................................... 17

*In re Smith,*
    325 B.R. 498 (Bankr. D.N.H. 2005) ........................................................................... 18

*In re Steffens,*
    342 B.R. 851 (Bankr. M.D. Fla. 2005) ....................................................................... 15

*In re Sullivan,*
    626 B.R. 326 (Bankr. D. Colo. 2021) ......................................................................... 15

*In re Sylvester,*
    19 B.R. 671 (9th Cir. BAP 1982) ................................................................................ 17

*In re Texaco Capital, Inc.,*
    79 B.R. 560  (Bankr. S.D.N.Y. 1987) ......................................................................... 21

*In re Travel 2000, Inc.,*
    264 B.R. 444 (Bankr. W.D. Mich. 2001) .................................................................... 23

*In re Ventura,*
    615 B.R. 1 (Bankr. E.D.N.Y. 2020) ............................................................................ 13

*In re Wildwood Villages, LLC,*
    2021 Bankr. LEXIS 1188 (Bankr. M.D. Fla. 2021) ................................................... 24

*Stern v. Marshall,*
    564 U.S. 462, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011) ........................................... 13

*Subway Equip. Leasing Corp. v. Sims (In re Sims),*
    994 F.2d 210 (5th Cir. 1987)....................................................................................... 17

**Statutes**

11 U.S.C. § 1102(a)(1) ........................................................................................................ 21

11 U.S.C. § 1102(a)(3) ................................................................................................... 13, 21

11 U.S.C. § 1106(a) ............................................................................................................ 24

11 U.S.C. § 1181(a) ............................................................................................................ 13

11 U.S.C. § 1181(b) ....................................................................................................... 13, 21

**Page(s)**

11 U.S.C. § 1182(1)(A) ........................................................................................... 14

11 U.S.C. § 1183(b) ................................................................................................. 24

11 U.S.C. § 1191(b) ................................................................................................. 13

11 U.S.C. § 303(b)(1) .............................................................................................. 17

11 U.S.C. § 704(a) ................................................................................................... 24

28 U.S.C. § 1334 ..................................................................................................... 12

28 U.S.C. § 157 ....................................................................................................... 12

**Rules**

Interim Rule 1020(a), Federal Rules of Bankruptcy Procedure ................................... 14

Interim Rule 1020(b), Federal Rules of Bankruptcy Procedure ........................... 1, 13, 14

Interim Rule 1020(c), Federal Rules of Bankruptcy Procedure ................................... 13

Rule 9014, Federal Rules of Bankruptcy Procedure ................................................... 14

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Brookfield Properties Retail, Inc. and its affiliate, Ala Moana Anchor Acquisition, LLC (collectively, "Brookfield"), and Simon Property Group, Inc. and its affiliates, Premium Outlet Partners, LP, SPG Houston Holdings, L.P., Las Vegas North Outlets, LLC, The Retail Property Trust, and Sawgrass Mills Phase IV, LLC (collectively, "Simon," and together with Brookfield, the "Objecting Landlords"), landlords and/or managing agents for the landlords of several of the Debtor's former retail locations, respectfully submit this memorandum of points and authorities in support of their  objection, pursuant to Interim Rule 1020(b) of the Federal Rules of Bankruptcy Procedure, to the statement of debtor Escada America LLC ("Debtor") that it is a small business debtor eligible for relief under subchapter V of chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 1182 *et. seq*.) ("Subchapter V") or, alternatively, motion for an order directing the appointment of an official committee of unsecured creditors ("Committee") pursuant to 11 U.S.C. §§ 1102(a)(3) and 1181(b) (the "Objection").

## I.    **PRELIMINARY STATEMENT**

Simply put, Debtor is ineligible for relief under Subchapter V because its non-insider debt exceeds Subchapter V's $7.5 million debt ceiling.  The Debtor's schedules of assets and liabilities disclose over $12 Million in non-insider debt, of which over $11 Million is prepetition accrued liabilities under the Debtor's current and former commercial real property leases.  Knowing the magnitude of this debt would disqualify it from Subchapter V, Debtor has asserted that every one of its landlord's claims is contingent, unliquidated and disputed.

The law, however, is clear.  Claims for prepetition lease arrears are non-contingent, liquidated claims that count when assessing a debtor's eligibility under Subchapter V.  Any disputes or offsets associated with those claims simply do not matter as to whether such claims are "contingent" or "unliquidated." Debtor's own schedules, clarified by testimony at the Section 341(a) Meeting of Creditors, establishes that the Debtor is not eligible to proceed under Subchapter V.

Filed proofs of claim further evidence the Debtor's ineligibility.  To date, non-insider creditors have proofs of claim for liquidated, non-contingent debts totaling $8,051,804.41, well in

1  excess of the $7.5 Million statutory limit.  The bar date has not passed, and the total amount of

2  filed claims will grow.

3    There is little doubt the Debtor filed for bankruptcy to discharge the substantial debts it

4  owes to landlords.  The Debtor's desire to proceed under Subchapter V is also clear:  the Debtor

5  wants to discharge its debts pursuant to a Subchapter V plan unfettered by the absolute priority

6  rule, which will allow the Debtor's private equity owner to retain its investment in Debtor and

7  protect a history of insider transactions, without the oversight of an official Committee and other

8  standard chapter 11 creditor protections.

9    The Court should not allow this to happen.  The Debtor has engaged, and continues to

10  engage, in numerous suspect insider and affiliate transactions, including (1) operating and paying

11  rent for three store locations leased by a non-debtor affiliate, (2) funding over $400,000 in security

12  deposits for such non-debtor leases, (3) funding surety deposits to support customs import bonds

13  for the benefit of another non-debtor affiliate, (4) paying significant sums to non-debtor affiliates

14  under undisclosed "shared services" arrangements, and (5) engaging in preferential transfers with

15  insiders.  These are all classic insider transactions that should be subject to the heightened scrutiny

16  a Committee in an ordinary Chapter 11 case can provide.

17    The Debtor is ineligible for Subchapter V and its election should be revoked.  Upon

18  redesignation, Bankruptcy Code section 1102(a)(1) mandates the appointment of a Committee to

19  safeguard the interests of unsecured creditors.  However, even if the Debtor were to remain in

20  Subchapter V, given this Debtor's complexity and relationships, and the resulting need for

21  investigation and oversight, a Committee should be appointed for cause.

22    The Debtor is not the small, uncomplicated "mom-and-pop" business that Congress

23  intended to help when it enacted Subchapter V.  The Debtor is part of a global private equity

24  enterprise that is using Subchapter V to avoid the standard protections that non-insider creditors

25  enjoy in a traditional chapter 11 proceeding.  Subchapter V does not exist to shield private equity

26  insiders from scrutiny.  As discussed below, the Court should revoke the Debtor's Subchapter V

27  election.

28

1  ## II.    **BACKGROUND**

2      A.      **Procedural Background**

3          On January 18, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief

4  under chapter 11 of the Bankruptcy Code [Docket No. 1] and elected to pursue its bankruptcy case

5  as a small business debtor under Subchapter V, despite having over $12 million in non-insider

6  unsecured debt. *See Schedule E/F:Creditors Who Have Unsecured Claims* [Docket No. 75]. In

7  making its Subchapter V election, the Debtor characterized of all of its landlords' claims as

8  contingent, unliquidated and/or disputed.

9          Since the Petition Date, the Debtor has remained in possession of its assets and managed

10  its business as a debtor-in-possession pursuant to sections 1182(2) and 1184 of the Bankruptcy

11  Code.

12          On January 19, 2022, the Office of the United States Trustee (the "UST") appointed

13  Gregory K. Jones, Esq. as the Debtor's Subchapter V trustee. [Docket No. 28].

14          On February 1, 2022, the Debtor filed its *Schedules of Assets and Liabilities* ("Initial

15  Schedules") and *Statement of Financial Affairs* [Docket No. 75] (the "SOFA").  On February 7,

16  2022, the Debtor amended its Initial Schedules [Docket No. 79] ("Amended Schedules") to,

17  among other things, identify the Rejected Leases (defined below) in Schedule G. The Initial

18  Schedules listed eighteen (18) landlord claims totaling $11,069,061.33.[1]  The Initial Schedules and

19  Amended Schedules, like Debtor's *List of Creditors Who Have 20 Largest Unsecured Claims and*

20  *Are Not Insiders* [Official Form 204], asserts that every single landlord claim is disputed and

21  either contingent, unliquidated, or both. Debtor further amended its Initial and Amended

22  Schedules [Docket No. 92] ("Second Amended Schedules") on March 8, 2022.[2]

23          On February 8, 2022, the Office of the United States Trustee (the "UST") commenced, but

24  did not conclude, a Section 341 Meeting of Creditors (the "341 Meeting") [Docket No. 31].[3]  The

---

26  [1]  Initial Schedules at Schedule E/F at 3.1, 3.2, 3.4, 3.5, 3.10, 3.18, 3.19, 3.26, 3.27, 3.51, 3.89, 3.125, 3.138, 3.144, 3.148, 3.150, 3.173, 3.174.

27  [2]  Debtor's Initial Schedules, Amended Schedules and Second Amended Schedules are collectively referred to as the "Schedules."

28  [3]  A copy of the transcript of the 341 Meeting (the "341 Transcript"), is attached as Exhibit B to the accompanying *Declaration of Ivan M. Gold Supporting Objection of Simon Property Group and Brookfield Properties Retail To*

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

1  UST continued the 341 Meeting to March 10, 2022 [Docket No. 82] in light of numerous open

2  questions regarding the Debtor's insider transactions and relationships. *See* 341 Transcript at 64:3-

3  65:14. The 341 Meeting has been further continued to March 22, 2022 [Docket No. 99].

4         B.    **The Debtor's Business**

5         The Debtor is one part of Escada, a global retail brand selling high-end women's apparel.[4]

6  Escada is art of a portfolio of companies owned by Regent L.P. ("Regent"), a Los Angeles-based

7  private equity firm.[5]  Michael Reinstein ("Reinstein") is Regent's founder and Chief executive

8  Officer.[6]  The Debtor operates Escada's "brick and mortar" retail stores in the United States.[7]

9  Escada's "back office" accounting and technology functions and wholesale, online and foreign

10 sales are conducted by various foreign and domestic non-debtor affiliates.[8]

11        It is unclear who manages the Debtor's business.  Kevin Walsh is the Debtor's Director of

12 Finance and the person who executed the Petition, SOFA and Schedules for the Debtor.[9]  When

13 asked for details about the Debtor's management at the 341 Meeting, Mr. Walsh was unable to

14 provide a clear answer:

15             Q:  Who are the current officers and directors of Escada America
               LLC?

16
               A:  I know Mr. Reinstein is a principal of the debtor.

17
               Q:  Well, who do you report to?

18
               A:  I don't have an official direct reporting relationship in terms of a

19             day-to-day manager.  We don't' really have a—

20             Q:  Do you have a president or CEO?  You have had one.  So who's
               your president or CEO?

21
               A:  Escada Store Services oversees Escada America LLC, but on—

22             on the payroll of Escada LLC, there isn't a specific president.

23

24
   _____

25   *Debtor's Subchapter V Election or, Alternatively, Motion For Appointment of an Official Committee of Unsecured*
     *Creditors* (the "Gold Decl."), filed contemporaneously herewith.

26   [4]  *Master Statement of Facts and Declaration of Kevin Walsh in Support of Emergency First Day Motions,* Docket
     No. 16 (the "First Day Decl.") at 21-22: ¶¶ 11-12.

27   [5]  REGENT LP, https://www.regentlp.com/portfolio  (last visited March 15, 2022).
     [6]  REGENT LP, https://www.regentlp.com/team  (last visited March 15, 2022).

     [7]  First Day Decl. at 22: ¶ 13.
28   [8]  341 Transcript at 12:17-13:21; 16:22–24:13; 33:1–40:14; 44:19–62:10.
     [9]  Petition at 5; First Day Decl. at ¶ 2; Schedules at 1; SOFA at 9; 341 Transcript at 6:21–7:7.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

1    Q:  Okay.

2    A:  If I'm understanding our question correctly.

3    Q:  Well, who do you—you say that Escada Stores oversees, that
was your word, Escada Store Services LLC oversees the operations
of Escada America.  So who is the president or CEO of Escada Store
4    Services LLC?

5    A:  I guess as we talked about earlier.  I can confirm that Escada
6    Stores LLC is the 100 percent owner of Escada  America LLC and
Michael Reinstein, you know, I think the—the president.  To be
7    honest with you, I just don't use that title president, but he's—he's
the—I'd use the word "principal," but I think it would be fair to call
8    him the president of both entities."[10]

9    C.    **The Leases**

10    Before the Petition Date, the Debtor leased as many as fifteen (15) stores from various

11    landlords pursuant to nonresidential lease agreements (collectively, the "Store Leases").[11]

12    Although headquartered in Beverly Hills, California,[12] the Debtor also leases approximately 5,000

13    square feet[13] of office space in midtown Manhattan (the "NY Office") at a monthly rental of

14    approximately $40,000.[14]  It is unclear whether any non-debtor affiliates or other Regent portfolio

15    companies use Debtor's NY Office.  If they do, the terms on which they compensate the Debtor

16    for doing so have not been disclosed.[15]

17    Eight (8) of Debtor's Store Leases were either terminated prepetition or the premises

18    abandoned.[16]  On the Petition Date, the Debtor filed a motion to reject five (5) other Store Leases

19    (the "Rejected Leases").[17]  The Court entered an Order granting the Rejection Motion on

20

21    [10]  341 Transcript at 44:3–45:4.
[11]  First Day Decl. at 24-25: ¶¶ 24, 30.
22    [12]  Petition at 1; 341 Transcript at 7:11-17.
[13]  Lois Weiss, *Designers Relocating to Very Fashionable Fifth Avenue Tower*, N.Y. Post (August 21, 2018),
23    https://nypost.com/2018/08/21/designers-relocating-to-very-fashionable-fifth-avenue-tower/.
[14]  SOFA,  Ex. 3 (reflecting payments totaling $120,675.86 to 693 Fifth Owner LLC, the NY Office landlord, during
24    the three (3) months preceding the Petition Date).
[15]  Amended Schedules at Schedule G (failing to disclose any written intercompany agreements other than the ESP
25    consignment agreement).
[16]  *Transcript Regarding Hearing Held 01/20/22 RE: In Re: Escada America, LLC*, Docket No. 74 (the "First Day
26    Transcript") at 10: 13-19 (describing how the Debtor had approximately seven (7) to eight (8) stores on the Petition
Date and would be left with two (2) to three (3) stores after five (5) leases were rejected pursuant to the Rejection
27    Motion (defined below)); Amended Schedule G (listing eight (8) leases in total as of the Petition Date, including
the five (5) leases rejected pursuant to the Rejection Motion).  A copy of the First Day Transcript is attached to the
28    Gold Decl. as Ex. A.
[17]  *Debtor's First Omnibus Emergency Motion for Order Authorizing Debtor to (i) Reject Certain Unexpired Non-*

January 20, 2022.[18]  As a result, the Debtor currently has only two (2) go-forward Store Leases (Scottsdale, AZ and Palm Beach, FL), as well as the lease of its NY Office (collectively, the "Go-Forward Leases").[19]

In addition to the Go-Forward Leases, the Debtor apparently operates and manages three (3) additional Escada-branded  stores located in Beverly Hills, and Costa Mesa, California and Chicago, Illinois (collectively, the "Affiliate Stores")[20] that are leased from  unrelated third parties by Escada America Management LLC ("EAM"), one of the Debtor's many non-debtor affiliates, (collectively, the "Affiliate Leases").[21]

The Debtor is apparently the former tenant of each Affiliate Store.[22]  Even though the Debtor is no longer the tenant at the Affiliated Stores, as of the Petition Date, $435,000.00 of the Debtor's cash was held by the landlords of the Affiliate Stores as security deposits for EAM's benefit.[23]  The Debtor also pays at least some of the operating expenses at these Affiliate Stores, including rent.[24]  The terms by which the Debtor manages the Affiliate Stores for EAM have not been disclosed and Schedule H does not identify any codebtor liability for these locations.[25]

D.    **The Debtor's Aggregate Debt**

The Schedules list over $34 million in secured and unsecured debt that falls into three categories:

1.    Insider secured debt totaling $21,805,695.78;

---

*Residential Real Property Leases Pursuant to 11 U.S.C. § 365, and (ii) Abandon any Remaining Personal Property Located at the Leased Premises; Memorandum of Points and Authorities* [Docket No. 14] (the "Rejection Motion").
[18]    Docket No. 48.
[19]    Amended Schedules at Schedule G.
[20]    341 Transcript at 57:11-58:6.
[21]    First Day Decl. at 36-37: ¶ 77.
[22]    341 Transcript at 58:7-13.
[23]    Schedule A/B at 7.1, 7.2, Ex. 7.
[24]    *See Emergency Motion For Order: (I) Authorizing Debtor to Provide Adequate Assurance of Future Payment to Utility Companies Pursuant to Section 366(c) of the Bankruptcy Code and (II) Setting A Final Hearing; Memorandum of Points and Authorities*, Docket No. 10 at Ex. 3 (requesting authority to provide adequate assurance to utility providers in Costa Mesa, Beverly Hills and Chicago (*i.e.* where the Affiliate Stores are located)).  The Debtor also requested authority to provide adequate assurance to a telephone provider to a New Jersey warehouse. *Id.*  It is unclear which Escada entity leases that location or conducts operations there.  *See* Amended Schedules at Schedule G (failing to list a lease for a warehouse in New Jersey).
[25]    Amended Schedules at Schedule G (failing to disclose any written agreement by which the Debtor manages the Affiliate Stores for EAM); 341 Transcript at 57:23–58:2.

2.      Landlord debt totaling $11,069,061.33; and

3.      Non-insider, non-landlord debt totaling $1,205,189.00.

### 1.      **Insider Secured Debt**

The Debtor has three (3) secured creditors.[26]  Each is an insider.[27]

### a.      **Eden Roc International, LLC ("Eden Roc")**

Eden Roc is an insider of the Debtor because Eden Roc and the Debtor are under Reinstein's common control.[28]  Eden Roc was formed in May 2019,[29] and it provides financing to a "portfolio of companies," including the Debtor.[30]

Eden Roc extended a loan to the Debtor on June 26, 2020.[31]  The original principal amount of the loan is unknown, but the Schedules reflect that $579,025.32 was outstanding on the Petition Date.[32]  Eden Roc Filed a UCC-1 financing statement against the Debtor on July 2, 2020.[33]

### b.      **Mega International, LLC ("Mega")**

Mega is an insider of the Debtor because it is also controlled by Reinstein.[34]  Mega is a shared services provider to the Debtor and other Reinstein affiliates.[35]  Mega has provided shared services to the Debtor since Reinstein acquired Escada in 2019.[36]

According to the Debtor, as of the Petition Date, the Debtor owed Mega $1,506,953.00 on account of a "combination" of unpaid shared services and a loan to the Debtor (the "Mega Debt").[37]  Mega filed a UCC-1 financing statement against the Debtor on July 2, 2020.[38]

---

[26]  First Day Decl. at 25-26: ¶¶ 36-38 (disclosing the names of the Debtor's secured creditors).
[27]  Schedule D (identifying the secured creditors as insiders); 341 Transcript at 16:22–20:16 (confirming that all scheduled secured creditors are insiders).
[28]  341 Transcript at 17:2-20, 19:5-17.
[29]  Gold Decl., Ex. C. [Lexis report reflecting Eden Roc date of formation]
[30]  341 Transcript at 17:10.
[31]  Initial Schedules at Schedule D at 2.1; 341 Transcript at 49:16-50:4.
[32]  Initial Schedules at Schedule D at 2.1.
[33]  *Declaration of John-Patrick M. Fritz, Esq. in Support of Emergency First Day Motions*, Docket No. 15 (the "Fritz Decl.") at ¶ 5, Ex. 7.
[34]  Gold Decl., Ex. D. [Corporate report establishing Mega as a Regent company]; 341 Transcript at 45:24–46:11 (Mega's in-house counsel appeared on behalf of the Debtor at the 341 Meeting, underscoring insider relationship).
[35]  341 Transcript at 46:22-49:10; 50:16-23.
[36]  341 Transcript at 49:11-15.
[37]  341 Transcript at 49:1-10.
[38]  Fritz Decl. at ¶ 6, Ex. 7.

1    At the 341 Meeting, Debtor's representative was unable to confirm whether the Mega Debt

2  is subject to a written agreement between Mega and the Debtor.[39]  Although the SOFA does not

3  initially disclose any payments to Mega during the year before the Petition Date, the Debtor

4  testified that may have been an error, and the Debtor may have made payments to Mega during

5  that timeframe.[40] Since the Petition Date, Debtor has amended its schedules and statement of

6  financial affairs twice [Docket Nos. 79 and 92] and any potential payments to Mega remain

7  unidentified.

8    c.    **Escada Sourcing and Production LLC ("ESP")**

9    ESP is an insider affiliate formed in June 2020[41] that provides the Debtor with inventory,

10 on a consignment basis, for sale in its retail stores.[42]  Debtor contends it does not own any retail

11 inventory in its stores, because its arrangement with ESP is a "true consignment."[43]  Despite not

12 owning any interest in inventory, the Debtor has posted $1.75 million in customs bonds for ESP's

13 benefit.[44]

14    Debtor scheduled two secured claims that ESP purportedly holds against the Debtor:

15 (i) $675,361.39 on account of proceeds from the sale of consigned goods, and (ii) $19,044,356.07

16 in "legacy debt" that ESP acquired from certain European affiliates of the Debtor.[45]  ESP filed a

17 UCC-1 financing statement against the Debtor on February 11, 2021 – less than one year prior to

18 the Petition Date.[46]  Within one year of the Petition Date, the Debtor paid ESP $2,067,636.00 on

19 account of inventory, although Debtor has recently re-characterized a portion of those payments as

20 being on account of the "legacy debt."[47]

21

22

23

24  [39]   341 Transcript at 50:5-25.
[40]   341 Transcript at 39:24-40:14.
25  [41]   Initial Schedules at Schedule D, 2.2 (identifying Escada Sourcing as an insider); 341 Transcript at 23:13-16
       (confirming ESP is an insider); Gold Decl., Ex. E. (Lexis report reflecting ESP's formation date in 2020.)
26  [42]   First Day Decl. at 26: ¶ 38.
[43]   *Id.*
27  [44]   Initial Schedules at Schedule A/B, Ex. 7; 341 Transcript at 56:16–57:10.
[45]   Initial Schedules at Schedule D at 2.2, 2.3; 341 Transcript at 60:24–62:5.
28  [46]   Fritz Decl. at ¶ 7, Ex. 7.
[47]   Second Amended Schedules, Ex. 4 to SOFA; 341 Transcript at 37:11–39:23.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

2.    **Landlord Debt**

a.    **Scheduled Landlord Debt**

The Initial Schedules listed seventeen (17) claims for "rent" owed to various landlords:

| Line No. | Landlord | Amended Schedule G[48] | Amount |
|---|---|---|---|
| 3.1 | 693 Fifth Owner LLC (NY Office) | Yes | $1,641.00 |
| 3.2 | 717 GFC LLC | No | $5,055,143.00 |
| 3.4 | Ala Moana Anchor Acquisition LLC* | Yes | $264,681.00 |
| 3.10 | American Commercial Equities Three | No | $29,341.00 |
| 3.18 | Bal Harbor Shops LLLP | No | $81,623.00 |
| 3.19 | Beverly Hills Wilshire Hotel | No | $2,546,815.33 |
| 3.26 | CHETRIT 1412 LLC | No | $250,000.00 |
| 3.27 | Chicago Oak Street Partners, LLC | No | $554,764.00 |
| 3.51 | El Paseo Collection North | No | $6,554.00 |
| 3.89 | Las Vegas North Outlets LLC* | Yes | $266,918.00 |
| 3.125 | Premium Outlet Partners LP* | Yes | $102,433.00 |
| 3.138 | Scottsdale Fashion Square | Yes | $116,909.00 |
| 3.144 | Simon Property Group* | Yes | $55,572.00 |
| 3.147 | South Coast Plaza | No | $10,064.00 |
| 3.150 | SPG Houston Holdings, LP* | No | $274,232.00 |
| 3.173 | Woodbury Common Premium Outlets* | Yes | $108,024.00 |
| 3.174 | Worth-Pondfield LLC | Yes | $1,343,149.00 |
| **Total All Locations:** | | | **$11,067,863.33** |
| **Total All Locations Not Listed on Amended Schedule G:** | | | **$8,808,536.33[49]** |

* Objecting Landlords

At the 341 Meeting, the Debtor testified that each of the foregoing amounts is the prepetition arrears due under the corresponding lease.[50]  In response to questioning by the UST's attorney, Debtor's counsel asserted that the Debtor designated each landlord claim as contingent because the associated lease is subject to assumption or rejection under section 365 of the Bankruptcy Code, even though such assertion is not factually correct:

> Q: Okay.  Yeah, that's fine.  All righty.  Okay.  I'm jumping now to Schedule EF and I'm going to page 17.  For Claim 3.1, it's 6935th [sic] Owner, LLC.  The basis for the claim is rent.  The debt [sic]

---

48    Schedule G to Debtor's Amended Schedules lists the Debtor's unexpired real property leases as of the Petition Date, including the five leases that were the subject of the Rejection Motion. By extension, landlords of leases on Schedule G of the Amended Schedules hold claims under leases that were terminated or breached before the Petition Date.

49    This total reflects scheduled claims under leases that were breached and/or terminated pre-petition.

50    341 Transcript at 25:22–26:7; 30:14–31:12.

marked that this claim is contingent and unliquidated.  So starting with contingent, why is this claim contingent?

Mr. Fritz:  This is J.P. Fritz.  Eryk, could you please let me know which number you're looking at again?

Mr. Escobar:    Yes.  I'm starting with Claim 3.1.  That's on page 17 of the .pdf of Schedule EF, 6—

Mr. Fritz:  Okay.  I think that might be more of a legal question.  In looking at how to calculate claims related to commercial leases there are a number of variables based on Bankruptcy Code Sections 502(b)(1), 502(b)(6), 365 and whether the lease is going to be assumed or rejected and what sort of date might be used under 502(g) in calculating the resulting claims and then what also might be available in terms of state law and offset and cover damages and trying to figure out what the claim would be, if any, and how it was – resulted in so many different permutations that it could be that the claim might not be fully appreciable and, therefore, contingent.

Mr. Escobar:  Okay.  So what I heard in all that was the contingency, right, the thing that might happen or not happen is a lease being assumed or rejected.  Was there anything else in there that I missed, some other contingency, some other event that could or could not happen?

Mr. Fritz:  I think your summary is accurate.[51]

b.    **Landlord Proofs of Claim**

To date, as set forth in the Court's claims docket, a number of landlords have filed proofs of claim against the Debtor totaling over $5 Million as of the Petition Date:

| Claim | Landlord | Prepetition Arrears | Administrative Claim | 502(b)(6) Claim | Total Claim |
|---|---|---|---|---|---|
| 3-1 | Premium Outlet Partners LP (Desert Hills)* | $148,576.84 | $5,328.85 | $687,843.32 | $841,749.01 |
| 4-1 | SPG Holdings, L.P. | $13,226.39 | $100.00 | $0.00 | $13,326.39 |
| 5-2 | Las Vegas North Outlets, LLC* | $293,053.61 | $3,387.18 | $454,329.08 | $750,769.87 |
| 10-2 | The Retail Property Trust | $440,000.00 | $0.00 | $0.00 | $440,000.00 |
| 11-1 | Sawgrass Mills Phase IV, LLC* | $29,455.32 | $4,205.33 | $510,277.32 | $543,937.97 |
| 12-1 | Premium Outlet Partners LP (Woodbury Commons)* | $139,452.38 | $5,326.37 | $272,660.70 | $417,439.45 |

---

[51]    *Id*. at 24:14–25:19

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

| 14-1 | Ala Moana Anchor Acquisition LLC* | $801,400.22 | $7,220.63 | $581,222.04 | $1,382,622.26 |
|------|-----------------------------------|-------------|-----------|--------------|----------------|
| 15-1 | B.W. Hotel, L.L.C. | $2,065,272.61 | $0.00 | $286,101.29 | $2,441,373.90 |
| 16-1 | CHETRIT 1412 LLC | $250,000.00 | $0.00 | $0.00 | $250,000.00 |
| 20-1 | Chicago Oaks Street Partners, LLC | $837,026.18 | $0.00 | $0.00 | $837,026.18 |
| **Total:** | | **$5,017,463.55** | **$25,568.36** | **$2,792,433.75** | **$7,918,245.03** |

*Rejected Lease Location

### 3. **Non-Landlord Unsecured Debt**

In addition to the landlord claims described above, the Initial Schedules listed $1,205,189.00 in non-landlord unsecured claims, primarily debt to utilities and service providers.[52] Of this amount, $1,123,473.00 was scheduled as non-contingent, liquidated debt.[53] To date, eleven (11) non-landlord creditors have filed proofs of claim.[54]

### E. **Additional Insider Transactions**

The Debtor's insider transactions are not limited to the Eden Roc, Mega, ESP and EAM transactions described above. The Debtor apparently licenses the Escada brand from Margaretha International GmbH ("MIG"), a Reinstein entity to which Escada's intellectual property was transferred in August 2020[55] or indirectly through other Escada entities. Debtor did not disclose a licensing agreement with MIG or any other party in its Schedules.[56]

The Debtor also made sizeable payments to other insiders during the year before the Petition Date.[57] Besides the $2,067,636.00 it paid to ESP and undisclosed amounts it may have paid to Mega, the Debtor paid $742,967.33 to four other Escada affiliates:

---

[52]    Schedule E/F at 3.3, 3.6-3.9, 3.11-3.17, 3.20-3.25, 3.28-3.50, 3.52-3.88, 3.90-3.124, 3.126-3.137, 3.139-3.143, 3.145-3.147, 3.149, 3.151-3.172, 3.175.

[53]    Schedule E/F at 3.47, 3.62.

[54]    Gold Decl. at Ex. E.  [Attaching copy of claims summary report.]

[55]    First Day Decl. at 21-22: ¶ 11;  ESCADA, Registration No. 2,639,433 (registered October 22, 2002, assigned to Margaretha International GmbH by Escada Luxembourg S.À.R.L. on August 5, 2020, https://assignments.uspto.gov/assignments/q?db=tm&qt=sno&reel=&frame=&sno=76362037).;    Martin Mehringer, *Escada Files for Bankruptcy, Regent Loots Fashion Group,* Manager Magazine (September 1, 2020), https://newsrnd.com/news/2020-09-01-escada-files-for-bankruptcy--regent-loots-fashion-group-.Sy0kXJn7v.html.

[56]    Amended Schedules at Schedule G (failing to list any licensing agreement).

[57]    Schedule A/B, Ex. 7.

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

| Insider Payee | Amount | Description |
|---|---|---|
| Escada (UK) Ltd. | $77,000 | Shared accounting services[58] |
| Escada Shared Services Ltd. | $610,967.33 | Shared services[59] |
| Escada Online US LLC | $30,000 | Possible royalty payments for inventory[60] |
| Escada Store Services LLC | $25,000 | Unknown[61] |
| **Total:** | **$742,967.33** | |

Together with the security deposits and customs bonds the Debtor posted for the benefit of EAM and ESP Sourcing, respectively, the Debtor has transferred over $4.6 million to, or for the benefit of, insiders.[62]

F.    **The Debtor's Subchapter V Strategy**

The Debtor intends to reorganize under Subchapter V.[63]  The Debtor does not intend to conduct a sale process,[64] which would confirm whether (i) a third party transaction could provide a greater return to creditors, or (ii) the value the Debtor proposes to deliver to unsecured creditors reasonably compensates them for their claims.  The Debtor also did not budget any amounts for professional fees in its cash collateral budget,[65] indicating it does not intend for an estate fiduciary to investigate the numerous insider transactions discussed above before a Subchapter V plan (likely to include insider releases) is proposed or confirmed.

III.    **JURISDICTION AND VENUE**

The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and General Order 13-05 of the U.S. District Court for the Central District of California.  The resolution of the Debtor's eligibility to qualify for a particular type of relief under the Bankruptcy

---

[58]   341 Transcript at 33:23–34:18.

[59]   341 Transcript at 34:19–35:12.

[60]   341 Transcript at 36:3-24.

[61]   341 Transcript at 36:25–37:10 (admitting a lack of knowledge about the purpose of such payment, but dismissing the payment as "fairly minor in nature").

[62]   The actual amount of insider transfers may be higher.  The Debtor also posted $550,000.00 with credit card processors, but the Debtor does not appear to be a party to any credit card processing agreements.  Schedule A/B at 7.3, 7.4 (disclosing transfers); Schedule G (failing to list any credit card processing agreements).  If another Escada entity is the counterparty, the Debtor's cash should not have been used to secure that party's performance.

[63]   *Id.* at 25: ¶ 34; First Day Transcript at 12: 18-19; 341 Transcript at 8:13-19.

[64]   First Day Transcript at 12: 20-21; 341 Transcript at 62:24–63:2.

[65]   *Emergency Motion For Order: (I) Authorizing Interim Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and (II) Setting a Final Hearing; Memorandum of Points and Authorities,* Docket No. 8, Ex. 1.

1  Code and whether this Court may appoint a committee of unsecured creditors for "cause" are

2  statutory core proceedings under 28 U.S.C. § 157(b)(2)(A) and constitutionally core proceedings

3  under the standards of *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011).

4  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory

5  predicates for the relief requested are sections 1102, 1181 and 1182 of the Bankruptcy Code and

6  Interim Bankruptcy Rule 1020(b)-(c).

7  **IV.**     **ARGUMENT**

8      A.     **The Debtor is Ineligible for Relief Under Subchapter V Because it has Over**

9          **$7.5 Million in Liquidated, Non-Contingent, Non-Insider Debt**

10          1.     **Subchapter V is Not Intended to Protect Private Equity Sponsors**

11      The Small Business Reorganization Act of 2019 (the "SBRA"), providing a new

12  subchapter V of Chapter 11 of the Bankruptcy Code, became effective on February 19, 2020.  The

13  purpose of SBRA is to "streamline[s] the existing bankruptcy processes" by which **small business**

14  **debtors** reorganize and rehabilitate their financial affairs.  *In re Progressive Solutions, Inc*.,

15  615 B.R. 894, 896-898 (Bankr. C.D. Cal 2020) (reviewing legislative history referring to intent to

16  benefit "mom-and-pop" and "Main Street" small businesses); *In re Ventura*, 615 B.R. 1, 12

17  (Bankr. E.D.N.Y. 2020) ("By enacting this law, Congress intended to streamline the

18  reorganization for small business debtors because small businesses have often struggled to

19  reorganize under chapter 11 process for small business debtors because small businesses have

20  often struggled to reorganize under chapter 11.")

21      To achieve its goals, Subchapter V offers powerful incentives to qualifying debtors,

22  including:  (i) the ability to confirm a plan without an impaired consenting class of creditors

23  (11 U.S.C. § 1191(b)), (ii) relief from the absolute priority rule, thereby allowing small business

24  owners to retain their ownership interests even if general unsecured creditors are not paid in full

25  (or at all) (11 U.S.C. §§ 1181(a), 1191(b)), (iii) limited disclosure obligations (11 U.S.C.

26  § 1181(b)) (providing that a Subchapter V plan does not require a disclosure statement), and

27  (iv) potentially reduced scrutiny (11 U.S.C. § 1102(a)(3) (providing that a Committee will only be

28  appointed in a Subchapter V case for "cause").  While these incentives may be necessary for small

1    businesses to reorganize effectively, consistent with the objectives of subchapter V, they are

2    potentially subject to manipulation and abuse by certain parties.

3           2.    **Upon a Timely Objection, the Debtor Must Prove its Eligibility for**

4              **Subchapter V**

5         To be eligible for Subchapter V relief, the debtor's "aggregate noncontingent liquidated

6    secured and unsecured debts as of the date of the filing of the petition" can be "in an amount not

7    more than $7,500,000." (11 U.S.C. § 1182(1)(A).)[66]

8         Under Interim Rule 1020(a) of the Federal Rules of Bankruptcy Procedure, a debtor

9    proceeds as a subchapter V or a small business debtor if so indicated by the debtor's statement on

10    the petition unless and until the court enters an order finding that the debtor's statement is

11    incorrect.

12         Interim Rule 1020(b) provides that "the United States trustee or a party in interest may file

13    an objection to the debtor's statement under subdivision (a) no later than 30 days after the

14    conclusion of the meeting of creditors held under § 341(a) of the Code, or within 30 days after any

15    amendment to the statement, <u>whichever is later</u>." (Emphasis added.) Here, Debtor's

16    Section 341(a) Meeting of Creditors was commenced on February 8, 2022 but was not concluded.

17    While initially rescheduled for March 10, 2022 [Docket No. 82], the Meeting of Creditors has

18    been further continued, at the request of Debtor's counsel, to March 22, 2022 [Docket No. 99].

19    Since the Meeting of Creditors has not concluded, this Objection is timely.

20         While an objection to a debtor's Subchapter V designation commences a contested matter

21    under Rule 9014 of the Federal Rules of Bankruptcy Procedure (Interim Rule 1020(c)), the Debtor

22    bears the burden of establishing its eligibility for the application of subchapter V. It has been

23    generally held that the burden of proof in establishing eligibility for bankruptcy relief lies with the

24

---

25    [66]    Under the Coronavirus Aid, Relief, and Economic Security Act Pub. L. No.116-136, § 1113, 134 Stat 281 (2020),
(the "CARES Act") Congress moved the definition of a "debtor" for purposes of eligibility to elect to proceed

26    under Subchapter V to § 1182(1), and raised the debt limit of debtors that are eligible to elect subchapter V from
$2.765 million to $7.5 million. Congress did not, however, raise the debt limit for purposes of defining those

27    debtors who constitute small business debtors under § 101[51D]. The CARES Act became effective March 27,
2020 and was set to sunset one year after its enactment. On March 27, 2021, President Biden signed the Covid-19

28    Bankruptcy Relief Extension Act, Pub. L. No. 117-5, § 2, 135 Stat. 249 (2021), extending the $7,500,000
eligibility threshold through March 27, 2022.

1  party filing the bankruptcy petition. *See, e.g., In re Blue*, 630 B.R. 179, 187 (Bankr. M.D.N.C.

2  2021) ("When a party challenges debtor's eligibility to file under a particular chapter of the United

3  States Bankruptcy Code, the debtor carries the burden of establishing such eligibility."); *In re*

4  *Dille Family Trust*, 598 B.R. 179, 189 (Bankr. W.D. Pa. 2019).[67] More specifically, numerous

5  cases have held that "the Debtor bears the burden to demonstrate satisfaction of the eligibility

6  requirements for subchapter V." *In re Sullivan*, 626 B.R. 326, 330 (Bankr. D. Colo. 2021) (noting

7  "that the Debtor bears the burden to demonstrate satisfaction of the eligibility requirements for

8  subchapter V"); *accord*, *In re Blue*, *supra*, 630 B.R. at 187; *In re Offer Space, LLC*, 629 B.R. 299,

9  304 (Bankr. D. Utah 2021); *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 235 (Bankr. S.D.

10  Tex. 2021) ("If a party-in-interest objects, the debtor bears the burden of proving eligibility under

11  Subchapter V.").

12          In making the eligibility determination, the Court may rely on Debtor's schedules and filed

13  proofs of claim. *In re Blue*, 630 B.R. 179, 187 (Bankr. M.D.N.C. 2021).  The Court ordinarily

14  considers the scheduled amount of claims unless a creditor has filed a proof of claim.  If a claim

15  has been filed, the Court should use the amounts asserted in the claim.  *In re Steffens*, 342 B.R.

16  851 (Bankr. M.D. Fla. 2005) (finding the court could look beyond debtors' schedules at the filed

17  proofs of claim to determine whether debtors' debt exceeded the chapter 13 statutory limit); *see*

18  *also In re Ollis*, 609 B.R. 459, 465 (Bankr. D.S.C. 2019) (looking beyond the schedules to

19  determine a chapter 13 debtor's aggregate debt "because the evidence demonstrates that certain

20  amounts on [debtor's] Schedules were grossly inaccurate and numerous debts were omitted"); *In*

21  *re Kelly*, Case No. 18-13244, 2018 Bankr. LEXIS 2755, 2018 WL 4354653, at *5 (Bankr. D. Md.

22  2018) ("[I]t would eviscerate the Chapter 13 eligibility requirements if a court could only consider

23  a debtor's schedules regardless of their completion and apparent inaccuracies."); *In re Coleman*

24  *Enterprises, Inc.*, 266 B.R. 423, 437 (Bankr. D. Minn. 2001) (relying, in part, on the *prima facie*

25  validity and amount of filed proofs of claim to abrogate election as a pre-Subchapter V small

26

27  [67] Since Subchapter V's debt limitation is similar to the aggregate debt ceiling that governs an individual debtor's
right to chapter 13 relief, caselaw interpreting a debtor's eligibility under chapter 13 should apply with equal
28  force in Subchapter V.  *See, e.g., In re Blue*, supra, 630 B.R. at 192 n.12 (applying chapter 13 authority to
determine eligibility under Subchapter V).

business "fast track" case, by finding that "[t]his group of noncontingent claims alone, then,

liquidates at an aggregate that is greater than the statutory maximum under § 101(51C).  The

Debtors had the underlying debts, with all of their characteristics, when they filed for Chapter 11.

The conclusion is inescapable: the Debtors were not eligible…").

For purposes of determining debtor eligibility under Chapter 13, the Ninth Circuit has held

that eligibility under § 109(e) "should normally be determined by the debtor's originally filed

schedules, checking only to see if the schedules were made in good faith."  *In re Scovis,* 249 F.3d

973, 982 (9th Cir. 2001).  But, where a good faith objection to eligibility has been filed by a party

in interest, the bankruptcy court can make a limited inquiry outside of the schedules to determine

if a debtor estimated his or her debts in good faith, and if not, whether he or she was eligible for

chapter 13 relief.  *Fountain v. Deutsche Bank Nat'l Trust Co.* (*In re Fountain)*, 612 B.R. 743, 748-

749 (9th Cir. BAP 2020); *Guastella v. Hampton (In re Guastella),* 341 B.R. 908, 918 (9th Cir.

BAP 2006). These principles apply here.

Debtor here cannot meet its burden of proof here by mischaracterizing debts on its

Schedules, such as by selectively designating large fixed, non-insider debts as contingent and

unliquidated when, as a matter of fact and law, they are not.  The true nature of the vast majority

of Debtor's unsecured debts can be readily ascertained.

### 3.    <u>Rent Claims are Neither Contingent Nor Unliquidated</u>

As described above, Subchapter V eligibility is determined by reference to a debtor's non-

contingent, unliquidated debts as of the petition date.  Here, Debtor has scheduled each and every

unsecured claim of its landlords and former landlords as contingent, unliquidated and disputed.  In

assessing Chapter 13 eligibility where the debtor had designated virtually all of its scheduled and

unsecured claims as contingent or unliquidated, where the debtor would otherwise far exceed the

§ 109(e) debt limits, the bankruptcy court in *In re De La Hoz*, 451 B.R. 192, 202 (Bankr. M.D.

Fla. 2011) observed that such conduct "certainly raises, at a minimum, an inference that the debtor

is abusing the judicial process."  Such an inference is equally present in this case.

As a threshold matter, the characterization of all landlord claims as "disputed" is not

relevant to the eligibility analysis under § 1182(1)(A).  The term "disputed" does not appear in the

governing statute, as it does elsewhere in the Bankruptcy Code.[68] Numerous cases have held that a debtor's assertion of a "dispute" does not automatically render a claim to be "contingent" or "unliquidated," the relevant terms in the Subchapter V eligibility statute. *See In re S*ylvester, 19 B.R. 671, 673 (9th Cir. BAP 1982) (contract claim is non-contingent and liquidated, even if debtor has counterclaims or otherwise disputes it); *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997) (debt is not contingent simply because the debtor disputes it).

"[A] debt is noncontingent if all events giving rise to liability occurred prior to the filing of the bankruptcy petition." *In re Nicholes*, 184 B.R. 82, 88 (9th Cir. BAP 1995); *see also In re Fostevedt*, 823 F.2d 305, 306 (9th Cir. 1987) (holding debt was non-contingent when "no further act or extrinsic event was needed to trigger [the debtor's] liability"); *In re Aparicio*, 589 B.R. 667, 674-75 (Bankr. E.D. Cal. 2018) (holding debt not contingent when all events that triggered liability occurred prepetition). A debt is liquidated if the amount can be calculated easily, including by reference to a contract or statute. *See, e.g., In re Scovis*, 249 F.3d 975, 983 (9th Cir. 2001); *In re Slack*, 187 F.3d 1070, 1074 (9th Cir. 1999); *In re Nicholes*, *supra*, 184 B.R. at 89 (stating a debt is liquidated, if "the amount due is fixed or certain or otherwise ascertainable by reference to an agreement or by a simple computation"). Claims for prepetition arrears under a real property lease are non-contingent, because the debtor occupied the premises and did not pay, and such liability does rest upon the occurrence of a future event.  Indeed, it is well-established that "[u]npaid rent is not contingent as to liability.  *See*, *e.g.*, *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 220 (5th Cir. 1987).

Similarly, claim for unpaid pre-petition rent are liquidated, because rent and other monthly charges have already accrued and can be readily calculated by reference to the underlying lease. *In re Sylvester*, *supra*, 19 B.R. at 673 (allegedly disputed claim was liquidated because the claim was "based on a contract and the amount of the claim was readily ascertainable"); *In re Iron Oak Supply Corp.*, 169 B.R. 414, 418 (Bankr. E.D. Cal. 1994) (stating, "[a]s of the filing of a bankruptcy petition, [] unpaid rent is a prepetition claim of the same dignity as any other

---

[68]    *See, e.g.,* 11 U.S.C. § 303(b)(1).

prepetition claim"); *In re Smith*, 325 B.R. 498, 503 (Bankr. D.N.H. 2005) (holding prepetition

arrears under an executory automobile lease counted towards chapter 13's aggregate debt

eligibility limit). Indeed, Debtor has done so here, asserting pre-petition arrearages under its

leases, i.e., "the situation as of the petition date," in its filed schedules. 341 Transcript at 30:14–

31:12.

Debtor has attempted to camouflage its pre-petition lease liabilities by characterizing all of

its lease liabilities as contingent because of "a number of variables based on Bankruptcy Code

Sections 502(b)(1), 502(b)(6), 365 and whether the lease is going to be assumed or rejected and

what sort of date might be used in calculating the resulting claims …" 341 Transcript at 24:14-

25:12.  While there is certainly an argument that lease rejection damages can be contingent until

the bankruptcy court approves the rejection of a lease, there is a countervailing argument that

Section 502(g) provides that rejection damages claims are deemed to have arisen before the date

of the filing of the petition."  Lease rejection damages are readily calculable, and thus liquidated,

by reference to the underlying leases and the formula provided by Section 502(b)(6).  Debtor's

arguments simply obfuscate the inescapable facts that (1) many of Debtor's leases were terminated

before the Petition Date and thus not subject to rejection (*see* Schedule G of Amended Schedules),

and (2) based on pre-petition arrearages <u>alone</u>, Debtor is ineligible for relief under Subchapter V.

With respect to landlord claims based on pre-petition lease terminations, there is even authority

that a debtor's eligibility for bankruptcy is determined based on the <u>full amount</u> of the landlord's

damages under applicable state law, without regard to the prospective application of the

Section 502(b)(6) "cap."  *In re Gamble*, 570 B.R. 272, 276 (Bankr. S.D. Tex. 2017) (in assessing

Chapter 13 eligibility under § 109(e), bankruptcy court concluded that "Section 502(b)(6) may not

be invoked until an eligible debtor files a bankruptcy petition).

### 4.    <u>The Debtor Has More than $7.5 Million in Qualifying Debt</u>

#### a.    <u>Scheduled Debt Exceeds the Subchapter V Limit</u>

According to Debtor's Initial Schedules [Schedule E/F of Docket No. 75], it owed non-

insider creditors $12,274,250.33 as of the Petition Date -- $4,774,250.33 <u>more</u> than

Subchapter V's $7.5 million limit.  Through subsequent amendments, the aggregate amount of

1    scheduled non-insider claims has increased to $12,824,194.18.  As of the Petition Date, Debtor

2    identified $11,069,611.33 owed to landlords, and $1,205,189.00 to other non-insider creditors.  To

3    avoid *prima facie* ineligibility, as discussed above, Debtor designated each and every landlord

4    claim (and several non-landlord claims)[69] as contingent and unliquidated.[70]  The total amount of

5    the Debtor's scheduled debt identified as contingent and unliquidated is $11,150,777.33.[71]

6        Despite scheduling over ninety percent (90%) of its non-insider debt as contingent and

7    unliquidated in an improper attempt to manufacture eligibility under Subchapter V, the Debtor

8    testified at the 341 Meeting that its scheduled landlord claims are the prepetition arrears due under

9    the Debtor's current and former leases.[72]  As discussed above, contrary to Debtor's contention,

10   prepetition lease arrears are liquidated, non-contingent claims. Coupled with the $1,205,189.00 in

11   scheduled non-landlord debt the Debtor agrees is non-contingent and liquidated, the Schedules and

12   the Debtor's own testimony prove that the Debtor has over $12 million in qualifying debt and is

13   ineligible for relief under Subchapter V.

14       At the 341 Meeting, the Debtor also claimed that it scheduled all of its landlords' claims as

15   contingent because the leases were subject to assumption or rejection on the Petition Date.[73]  The

16   Debtor applied this theory only its landlords, knowing their claims would otherwise disqualify the

17   Debtor from Subchapter V, and a few litigation claims.  Tellingly, the Debtor did not apply its

18   asserted contingency to claims under other types of executory contracts, which are scheduled as

19   liquidated and non-contingent.[74]

20       But this asserted contingency is not entirely factually correct.  As of the Petition Date,

21   Debtor had only eight (8) real property leases that were subject to potential assumption or

22   rejection.  *See* Schedule G of Amended Schedules; First Day Transcript at 9:24-12:10.  Debtor

23

24   [69]  *See* Schedule E/F at 3.1, 3.2, 3.4, 3.5, 3.10, 3.18, 3.19, 3.26, 3.27, 3.47, 3.51, 3.62, 3.89, 3.125, 3.138, 3.144, 3.148, 3.150, 3.173, 3.174.

25   [70]  The Debtor also marked *every* landlord claim as disputed.  As discussed above, however, the existence of a dispute is irrelevant to whether a debt counts towards Subchapter V's eligibility limit.

26   [71]  *See id.*

     [72]  *See* 341 Transcript at 25:22–26:7; 30:14–31:12.

27   [73]  *See* fn. 61, *supra.*

     [74]  *See, e.g.,* Schedule D at 2.2 (not listing Escada Sourcing's claim under its consignment agreement as either

28   contingent or unliquidated); Schedule E/F at 3.30 (not listing a claim under an equipment lease as either contingent or unliquidated).

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

1   thus had nine (9) additional nonresidential real property leases that had been either terminated or

2   abandoned prior to the Petition Date (identified in the Schedules as holding claims for "rent"),

3   with underscored pre-petition claims in excess of $8.8 Million.  There is nothing contingent, as

4   defined by the case law, about these accrued rent liabilities. Accordingly, Debtor has liquidated

5   non-contingent claims in excess of the $7.5 non-insider debt limitation provided by

6   Section 1182(1)(A) and is thus ineligible for Subchapter V treatment.

7        Indeed, Debtor is ineligible for Subchapter V treatment simply based on the claims of (1)

8   717 GFC LLC, the former lessor of Debtor's former store in New York City, scheduled at

9   $5,055,143, and (3) B.W. Hotel, LLC, the former lessor of Debtor's former Beverly Hills store,

10  which Debtor has scheduled at $2,546,815.33.  There is no extrinsic event that must occur to

11  trigger these liabilities.  These two leases are among Debtor's nine (9) leases that were not subject

12  to assumption, eliminating Debtor's purported contingency.

13                    b.    **Proofs of Claim Exceed the Debt Limit**

14       Filed proofs of claim further confirm that the Debtor is not eligible for Subchapter V

15  treatment. Ten (10) landlords and twelve (12) other non-insider creditors have filed proofs of

16  claim against the Debtor.  Each of these claims is *prima facie* valid.[75]  Landlords' filed proofs of

17  claim alone are in excess of $7.9 Million.  The overall number of filed claims will only increase as

18  additional creditors file proofs of claim against the Debtor in advance of the March 29, 2022

19  claims bar date.

20       The attempt by Debtor to justify the blanket assertion that landlord claims are all

21  contingent and unliquidated is unavailing and contrary to both fact and applicable case law.

22  Whether assessed by reference to the Schedules, filed proofs of claims, or both, there should be no

23  doubt this Debtor is ineligible for, and does not belong, in a Subchapter V case.  The Court should

24  find that Debtor ineligible to elect application of Subchapter V and revoke its Subchapter V

25  election.

26

27

---

28  [75]  *See* Fed. R. Bankr. P. 3001(f) (stating, "[a] proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim").

### B.    An Official Committee of Unsecured Creditors Should Be Appointed

If the Court for some reason determines that this case has been properly designated as a Subchapter V case, which it should not, there nevertheless is ample "cause" to order the UST to appoint a committee of unsecured creditors in this case.  In an ordinary Chapter 11 case, Bankruptcy Code section 1102(a)(1) requires the appointment of a committee of unsecured creditors so long as there are creditors willing to serve on such committee.  11 U.S.C. § 1102(a)(1); *see*, *e.g.*, *In re Texaco Capital, Inc.*, 79 B.R. 560, 566  (Bankr. S.D.N.Y. 1987) (appointment of committee of unsecured creditors is "mandated "under § 1102(a)(1) if there are creditors willing to serve").  In a Chapter 11 case proceeding under Subchapter V, however, a creditors' committee is not appointed "[u]nless the court for cause orders otherwise."  11 U.S.C. §§ 1102(a)(3); 1181(b).

While the Bankruptcy Code does not define what constitutes "cause" to appoint a committee of unsecured creditors in a Subchapter V case, a creditors' committee is warranted in a subchapter V case if a committee "will improve recoveries to creditors, will assist in the prompt resolution of this case, and is necessary to provide effective oversight of the Debtors." *In re Bonert*, 619 B.R. 248, 253-254 (Bankr. C.D. Cal. 2020).  As demonstrated below, each of these factors warrants the appointment of a creditors' committee in this case.

### 1.    A Committee Will Improve Recoveries to Unsecured Creditors

The Debtor disingenuously portrays itself as a struggling small business forced into bankruptcy by COVID-19 and the refusal of its 'obstinate' landlords to grant sufficient concessions on account of their substantial claims against the Debtor.[76]  Reality paints a different picture.

As described above, Debtor is only one component of Escada, a global brand that is one of the portfolio of companies owned by Regent, a global private equity firm.  While COVID-19 unquestionably impacted Debtor's retail business, the number of Debtor's relationships and transactions with insiders and affiliates (discussed in detail, above) go far beyond what would

---

[76]    *See* First Day Decl. at 23-25; ¶¶ 19-33.

ordinarily be expected in Subchapter V reorganization of a "mom-and-pop" or "Main Street"

business and explain Debtor's illiquidity and under-capitalization following Regent LP's 2019

acquisition far better than Debtor's First Day Declaration:

- Debtor's retail inventory is not owned by Debtor but is instead owned by ESP through what Debtor asserts is a "true consignment" with perfection of ESP's security interest occurring less than a year prior to the Petition Date.  Debtor acknowledges that "the recording of ESP's UCC-1 in the one-year period prior to the Petition Date may create a preferential lien issue …" *Chapter 11 Status Report; Declaration of Kevin Walsh in Support* [Docket No. 84] at ¶ 36.
- Debtor funded the security deposits of three retail store leases (leased by non-debtor affiliate AEM, in the aggregate sum of $435,000.
- Debtor pays the rent and expenses under the three EAM leases. Whatever the contractual relationship between Debtor and EAM may be, it is not disclosed in Debtor's Schedule G nor is EAM identified as a codebtor on any of these leases in Schedule H.
- Debtor's funds have been deposited or pledged to support $1.75 Million in customs bonds issued by Western Surety Company and Lexon Insurance Company, even though the customs bonds supports the importation of goods owned by ESP. Similarly, Debtor apparently pays freight forwarder fees for ESP.  *See* Exhibit 3 to SOFA accompanying Second Amended Schedules [Docket No. 92].
- In addition to their consignment arrangement, ESP is asserted to be a secured creditor of Debtor in the principal sum of $19.044 Million based on "legacy debt related to other entities."  This debt was apparently acquired by ESP (presumably at a discount) from the bankruptcy administrators of insolvent European affiliates of Escada (341 Transcript at 60: 24-61:19) apparently to protect Debtor from collection lawsuits.
- Debtor disclosed over $2.8 Million in payments to insiders made within the year before the Petition Date, with approximately $2.067 Million paid to ESP.  While Debtor initially asserted such payments to ESP were made on account of consignment inventory payments, Debtor's most recent Second Amended Schedules [Docket No. 92] re-characterized these payments as now including the "Partial Repayment of Intercompany Debt," raising additional questions regarding further potential insider preferences.
- In the year prior to the Petition Date, with Debtor operating only five (5) retail stores, Debtor paid over $700,000 to various affiliated entities, in irregular amounts "based on affordability," on account of "shared services," including "Financial, "IT" and legal services.  *See* Exhibit 4 to SOFA accompanying Second Amended Schedules; 341 Transcript at 33:23–37:10; 47:13–48:3; 50:5–55:22 (describing multiple shared services arrangements); 34:24-35:5 and 47:13-10 (describing accounting shared services provided by both Escada (UK) Ltd. and Escada Shared Services Ltd.).  Schedule G to Debtor's schedules does not identify any formal shared services agreements.  Only Escada Shared Services Ltd. is identified as an unsecured creditor of Debtor.  See Second Amended Schedules, Schedule E/F at ¶ 3.55.
- Anthony DePatie, identified as Debtor's in-house counsel, is in fact employed by Mega, one of the Regent affiliates and a secured creditor of Debtor, under another

"shared services" arrangement that is not identified in Schedule G.  *See* 341 Transcript at 45:24-49:15.

In fact, the Debtor's primary unencumbered assets appear to be potential causes of action against the very insiders that starved the Debtor of cash before the Petition Date.  *See Chapter 11 Status Report; Declaration of Kevin Walsh in Support* [Docket No. 84] at 6-7 (acknowledging the Debtor has limited assets).  Without a Committee to investigate and pursue such causes of action, Debtor will undoubtedly propose a plan that provides little to no recovery for any non-Escada creditor and potentially releases Reinstein and his Escada and non-Escada affiliates from liability. Directing the appointment of a Committee will ensure that the Debtor's insider transactions are fully and properly investigated, thereby maximizing the value of the Debtor's estate for non-insider general unsecured creditors, whether through litigation or pursuant to a Committee-negotiated plan.

Debtor will likely argue that the appointment of a creditors' committee may result in additional costs to the bankruptcy estate.  Indeed, the "the truism that the appointment of a creditors' committee may result in additional costs to the debtor could be advanced by every small business seeking relief …" *In re Haskell-Dawes, Inc*., 188 B.R. 515, 520 (Bankr. E.D. Pa. 1995).  "The overall purpose and function of the Bankruptcy Code is to strike a balance between creditor protection and debtor relief." *In re Travel 2000, Inc*., 264 B.R. 444, 448 (Bankr. W.D. Mich. 2001).  Here, the benefits that could be achieved through the efforts of a committee outweigh any generalized assertions regarding potential costs.

2.     **A Committee Will Assist in the Prompt Resolution of This Case**

A Committee will also help to resolve this case promptly.  A Committee can engage experienced professionals that can quickly investigate the Debtor and its transactions with affiliates and assess the Debtor's financial affairs.  A Committee will use the results of its investigation to negotiate with the Debtor on behalf of all unsecured creditors and determine the Debtor's prospects to confirm a plan.  Debtor has already acknowledged that individual creditors will likely dispute key components of Debtor's anticipated plan, including "the appropriateness of addressing insider claims, liens, and possible avoidance actions in the § 1129(a)(7) [hypothetical

1  liquidation] analysis." *Chapter 11 Status Report; Declaration of Kevin Walsh in Support* [Docket

2  No. 84] at ¶ 37.

3      If the Debtor is unable to propose a confirmable plan, a Committee can prosecute causes of

4  action on behalf of all creditors, thereby avoiding potentially duplicative litigation efforts

5  individual creditors would have to pursue if a Committee is not appointed.

6              3.   **A Committee is Necessary to Provide Effective Oversight of the Debtor**

7      Given the number of incomplete disclosures and numerous insider transactions and

8  relationships disclosed to date, this Debtor unquestionably requires independent oversight.  The

9  Debtor's prepetition conduct and transactions require investigation to maximize creditor

10  recoveries, and the Debtor's postpetition conduct requires oversight to ensure, among other things,

11  the Debtor's prepetition practice of paying non-Debtor debts does not continue.

12      These are oversight functions the Subchapter V trustee is not generally authorized to

13  provide.  While the Subchapter V trustee serves an important function in Subchapter V cases, their

14  role is limited.  Critically, a Subchapter V trustee is not authorized to investigate or litigate against

15  a debtor.  *See* 11 U.S.C. §§ 1183(b), 704(a), 1106(a) (collectively providing that a Subchapter V

16  trustee cannot investigate a debtor absent further court order and providing no authority for a

17  Subchapter V to engage in litigation with a debtor at all).  As a result, unless a Committee is

18  appointed, the Debtor will not be fully investigated and creditor recoveries will not be maximized,

19  unless individual creditors incur the time and expense to police the Debtor on their own.

20  Unsecured creditors are entitled to adequate representation in complex reorganizations.

21  Subchapter V was intended to make chapter 11 more effective for small businesses, not to allow a

22  private equity-sponsored debtor to evade scrutiny of insider transactions and relationships at the

23  expense of general unsecured creditors. *See In re Wildwood Villages, LLC,* 2021 Bankr. LEXIS

24  1188 at *8 (Bankr. M.D. Fla. 2021) ("envision[ing] possible scenarios where a creditors'

25  committee . . . may be an efficient and appropriate vehicle in a Subchapter V case, particularly

26  while the debt limits are set at a higher level"). The Debtor is hardly the "mom-and-pop" small

27  business envisioned by Chapter V.  Under these extraordinary circumstances, if the Court does not

28

1  redesignate this case as an ordinary Chapter 11 case, as it should, a Committee should be

2  appointed for cause pursuant to Bankruptcy Code sections 1102(a)(3) and 1881(b).

3  **V.    <u>CONCLUSION</u>**

4       For the reasons set forth above, the Objecting Landlords respectfully request that the Court

5  enter an order:

6       1.      Finding that the Debtor's statement that it is a small business debtor eligible for

7  relief under subchapter V of chapter 11 the Bankruptcy Code was incorrect and revoking such

8  statement;

9       2.      Finding that the Debtor i not eligible for relief under subchapter V of chapter 11 of

10  the Bankruptcy Code pursuant to section 1182(1)(A) of the Bankruptcy Code;

11      3.      Alternatively, directing the appointment of an official committee of unsecured

12  creditors pursuant to 11 U.S.C. §§ 1102(a)(3) and 1181(b); and

13      4.      Granting such other and further relief as the Court deems just and appropriate under

14  the circumstances.

15  Dated:  March 16, 2022                    Respectfully submitted,

16                                            ALLEN MATKINS LECK GAMBLE
17                                              MALLORY & NATSIS LLP

18

19                                            By:  */s/ WILLIAM W. HUCKINS*
                                              _____
20                                            WILLIAM W. HUCKINS
                                              Attorneys for Brookfield Properties Retail,
21                                            Inc., Simon Property Group, Inc., and certain
                                              of their respective affiliates

22

23

24

25

26

27

28