WILLIAM W. HUCKINS (BAR NO. 201098)
IVAN M. GOLD (BAR NO. 121486)
ALLEN MATKINS LECK GAMBLE
    MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, California  94111-4074
Phone:  (415) 837-1515
Fax:  (415) 837-1516
E-Mail: igold@allenmatkins.com
        whuckins@allenmatkins.com

Attorneys for Brookfield Properties Retail, Inc.,
Simon Property Group, Inc., and certain of their
respective affiliates

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.  Case No.: 2:22-bk-10266-BB |
| ESCADA AMERICA LLC, | Chapter 11, Subchapter V |
| Debtor and Debtor in Possession. | **DECLARATION OF IVAN M. GOLD SUPPORTING OBJECTION OF SIMON PROPERTY GROUP AND BROOKFIELD PROPERTIES RETAIL TO DEBTOR'S SUBCHAPTER V ELECTION OR, ALTERNATIVELY, MOTION FOR APPOINTMENT OF AN OFFICIAL COMMITTEE OF UNSECURED CREDITORS** |
| | Date:   April 6, 2022<br>Time:   10:00 a.m.<br>Place:  Edward R. Roybal Federal Building and Courthouse<br>    Courtroom 1539<br>    255 East Temple Street<br>    Los Angeles, CA 90012 |
| | Hearing to be held in-person and by videoconference Government Zoom, see Court's website under "Telephonic Instructions" for more details:<br>https://www.cacb.uscourts.gov/judges/honorable-sheri-bluebond |

I, Ivan M. Gold, pursuant to 28 U.S.C. §1746, hereby declares as follows:

1.    I am an attorney at law, duly admitted to practice before all of the courts of the State of California and a member of the bar of this Court.  I am Of Counsel with the law firm Allen Matkins Leck Gamble Mallory & Natsis, LLP, counsel herein for Brookfield Properties Retail, Inc. and its affiliate, Ala Moana Anchor Acquisition, LLC (collectively, "Brookfield"), and Simon Property Group, Inc., and its affiliates, Premium Outlet Partners, LP, SPG Houston Holdings, L.P., Las Vegas North Outlets, LLC, The Retail Property Trust, and Sawgrass Mills Phase IV, LLC (collectively, "Simon," and together with Brookfield, the "Objecting Landlords").

2.    The Objecting Landlords are the landlords or managing agents for several of the above-captioned Debtor's former retail locations.

3.    This Declaration is submitted in support of the *Objection of Simon Property Group and Brookfield Properties Retail To Debtor's Subchapter V Election or, Alternatively, Motion For Appointment of an Official Committee Of Unsecured Creditors* (the "Objection").  This Declaration is based on my personal knowledge, unless noted otherwise, and I could competently testify to its contents if called to do so.

4.    On January 20, 2022, I personally attended, via Zoom videoconference, the hearing on the "first day" motions in this case filed by debtor Escada America, LLC ("Debtor").hearing. Following the hearing, I requested that Ben Hyatt Deposition Reporters, one of this Court's approved transcription service providers, to prepare a transcript of the electronic audio recording of such proceedings. Attached hereto as Exhibit A, and incorporated herein by this reference, is a true and correct copy of the transcript of the January 20, 2022 hearing in this case.

5.    On February 8, 2022, I personally participated, via telephone, in the Section 341(a) First Meeting of Creditors. A true and correct copy of the transcript of the Section 341(a) Meeting of Creditors, prepared by Ben Hyatt Deposition Reporters from the electronic sound recording provided by the Office of the U.S. Trustee, is attached hereto as Exhibit B and incorporated herein by this reference.

6.    Attached hereto as Exhibit C is a true and correct copy of Business Registration Records Report, generated February 15, 2022, from the LexisNexis database, reflecting that Eden Roc was registered as a Delaware limited liability company on May 31, 2019.

7. Attached hereto as Exhibit D is a true and correct copy of the Application of Mega International, LLC Register as a Foreign Limited Liability Company in the State of California, dated August 15, 2016, executed by Michael Reinstein. This document is available from the public database of the California Secretary of State at: https://businesssearch.sos.ca.gov.

8. Attached hereto as Exhibit E is a true and correct copy of Business Registration Records Report, generated February 15, 2022, from the LexisNexis database, reflecting that Escada Sourcing and Production LLC was registered as a Delaware limited liability company on June 17, 2020.

9. Attached hereto as Exhibit F is a true and correct copy of the Claims Summary Report in the above-captioned Chapter 11 case, generated from this Court's CM/ECF system on March 16, 2022. Judicial notice may be taken of this Court's own records pursuant to Rule 201 of the Federal Rules of Evidence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on March 16, 2022 at the City and County of San Francisco, California.

_____
Ivan M. Gold

# EXHIBIT A

ORIGINAL

1                UNITED STATES BANKRUPTCY COURT

2           CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES

3                           --oOo--

4   In Re:                      )   Case No. 2:22-bk-10266-BB
                                )
5   ESCADA AMERICA, LLC,        )   Chapter 11
                                )
6   Debtors,                    )   Los Angeles, California
                                )   January 20, 2022
7   ----------------------------)   Thursday, 10:00 A.M.

8                                   DEBTOR'S EMERGENCY MOTION
                                    FOR ORDER AUTHORIZING
9                                   DEBTOR TO: (I) PAY
                                    PREPETITION PRIORITY
10                                  WAGES, COMMISSIONS, AND
                                    BONUSES (II) HONOR ACCURED
11                                  VACATION AND LEAVE BENEFIT
                                    IN THE ORDINARY COURSE OF
12                                  BUSINESS

13                                  DEBTOR'S EMERGENCY MOTION
                                    FOR ORDER LIMITING NOTICE
14                                  AND RELEATED RELIEF

15                                  DEBTOR'S EMERGENCY MOTION
                                    FOR ORDER AUTHORIZING
16                                  DEBTOR TO HONOR ERTAIN
                                    PREPETITION OBLIGATIONS TO
17                                  CUSTOMERS

18                                  DEBTOR'S EMERGENCY MOTION
                                    FOR ORDER AUTHORIZING
19                                  DEBTOR TO PAY CERTAIN
                                    PREPETITION TAXES AND
20                                  CUSTOMS DUTIES

21                                  DEBTOR'S FIRST OMNIBUS
                                    EMERGENCY MOTION FOR ORDER
22                                  AUTHORIZING DEBTOR TO: (I)
                                    REJECT CERTAIN UNEXPIRED
23                                  NON-RESIDENTIAL REAL
                                    PROPERTY LEASES PURSUANT
24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.

```
 1                          TO 11 U.S.C. §365 (II)
                            ABANDON ANY REMAINING
 2                          PERSONAL PROPERTY LOCATED
                            AT THE LEASED PREMISES
 3
                            DEBTOR'S EMERGENCY MOTION
 4                          ORDER: (I) AUTHORIZING
                            DEBTOR TO PROVIDE ADEQUATE
 5                          ASURANCE OF FUTURE PAYMENT
                            TO UTILITY COMPANIES
 6                          PURSUANT TO SECTION 355(C)
                            OF THE BANKRUPTCY CODE
 7                          (II) SETTING A FINAL
                            HEARING
 8
                            DEBTOR'S EMERGENCY MOTION
 9                          ORDER: (I) AUTHORIZING
                            INTERIM USE OF CASH
10                          COLLATERAL PURSUANT TO
                            SECTION 363 OF THE
11                          BANKRUPTCY CODE (II)
                            SETTING A FINAL HEARING
12
                    TRANSCRIPT OF PROCEEDINGS
13            BEFORE THE HONORABLE SHERI BLUEBOND
                 UNITED STATES BANKRUPTCY JUDGE
14

15   APPEARANCES:

16   For the Debtor:        JOHN-PATRICK M. FRITZ, ESQ.
                            Levene, Neale, Bender, Yoo &
17                          Golubchik, LLP
                            2818 La Cienega Avenue
18                          Los Angeles, California 90034

19                          KEVIN WALSH, ESQ.
                            462 Chatham Road
20                          Burlingame, California  94010

21   For Scottsdale Fashion  NAHAL ZARNIGHIAN, ESQ.
     Square:                 Ballard Spahr, LLP
22                          2029 Century Park East
                            Suite #1400
23                          Los Angeles, California  90067

24

25
```

```
 1   For the Sub-Chapter 5    GREG JONES, ESQ.
     Trustee:
 2
     For Potential           KRISTIN ELLIOTT, ESQ.
 3   Interested Parties:     Kelley Drye & Warren
                             3 World Trade Center
 4                           175 Greenwich Street
                             New York, New York 10007
 5
     For Simon Properties    IVAN GOLD, ESQ.
 6   Group; Brookfield       Allen Matkins Leck Gamble
     Properties:               Mallory & Natsis, LLP
 7                           3 Embarcadero Center
                             12th Floor
 8                           San Francisco, California 94111

 9   For the U.S. Trustee:   ERYK R. ESCOBAR, ESQ.
                             Office of the U.S. Trustee
10                           915 Wilshire Boulevard
                             Suite #1850
11                           Los Angeles, California 90017

12   Court Recorder:         William Kaaumoana
                             U.S. Bankruptcy Court
13                           Central District of California
                             Edward R. Roybal Federal Building
14                             and Courthouse
                             255 East Temple Street, Room #940
15                           Los Angeles, California  90012
                             (855) 460-9641
16
     Court Transcriptionist: Ruth Ann Hager, C.E.T.**D-641
17                           Ben Hyatt Certified Deposition
                               Reporters
18                           17835 Ventura Boulevard
                             Suite #310
19                           Encino, California  91316

20

21

22

23

24

25
```

Page                                                                        4

1      LOS ANGELES, CALIFORNIA, THURSDAY, JANUARY 20, 2022,

2                          10:09 A.M.

3                          --oOo--

4          THE COURT:  Good morning.  Got a number of

5   matters on calendar today in the -- now, let's see.  What

6   is the name of this case?  It is the Escada America, LLC

7   case.  I have -- let's see.  I've got to call them all at

8   once and I'll call the names that I have on the calendar,

9   and once we're done with those names, if there's more

10  people who want to appear, that's fine.

11         Okay.  So #1.00 is the debtor's emergency motion

12  for an order authorizing the payment of prepetition wages,

13  et cetera; #2.00 is the debtor's emergency motion for an

14  order limiting notice and related relief; #3.00 is the

15  emergency motion to honor certain prepetition obligations

16  to customers; and #4.00 is a motion of authorizing the

17  debtor to pay certain prepetition taxes and custom duties;

18  #5.00 is the emergency motion for an order authorizing the

19  debtor to reject certain leases and abandon personal

20  property remaining on the premises; #6.00 is the emergency

21  motion authorizing the debtor to provide adequate assurance

22  to utilities; and #7.00 is an emergency motion authorizing

23  the use of cash collateral.

24         All right.  So do I have a Nathan [*sic*]

25  Zarnighian appearing?

Page                                                              5

1            (No audible response.)

2            I see your box.  You're on mute -- or Nahal

3  (phonetic).  I'm sorry.  Not Nathan, Nahal.  Is  there --

4            MS. ZARNIGHIAN:  Good morning, Your Honor.  Nahal

5  Zarnighian on behalf of the Masridge Company (phonetic).

6            THE COURT:  I'm sorry.  Behalf -- on behalf of

7  whom?

8            MS. ZARNIGHIAN:  Oh, it's Scottsdale Fashion

9  Square for the Masridge Company.

10           THE COURT:  All right.  Thank you.  Thank you,

11  and, Mr. Fritz, would you make your appearance, please?

12           MR. FRITZ:  Yes.  Good morning, Your Honor.  J.P.

13  Fritz of Levene, Neale, Bender, Yoo & Golubchik, for the

14  debtor and debtor in possession, Escada America, LLC.

15           THE COURT:  All right.  Thank you.

16           And Kevin Walsh, would you make an appearance,

17  please?

18           MR. WALSH:  Good morning, Your Honor.  Kevin

19  Walsh.  I work for Escada America, LLC.

20           THE COURT:  All right.  Thank you.

21           And, Mr. Jones, would you make your appearance?

22           MR. JONES:  Good morning, Your Honor.  Greg

23  Jones, sub-Chapter 5 trustee.

24           THE COURT:  Thank you.

25           And, Mr. Gold, would you make your appearance?

Page                                                                6

1           MR. GOLD:  Good morning, Your Honor.  Ivan Gold

2    of Allen Matkins for five landlords affiliated with Simon

3    Property Group and Brookfield Properties Retail.  They're

4    identified by entity name in the debtor's motion that is

5    calendar #5.00.

6           THE COURT:  Okay.  Got it.  Thank you.

7           And, Kristin Elliott, would you make an

8    appearance, please?

9           MS. ELLIOTT:  Yes.  Good morning, Your Honor.

10   Kristin Elliott of Kelley, Drye & Warren on behalf of

11   certain potentially interested parties.

12          THE COURT:  Okay.  What kind of potentially

13   interested parties, creditor types?

14          MS. ELLIOTT:  Yes, Your Honor.

15          THE COURT:  Okay.  Okay.  All right.  Ms.

16   Elliott.  Okay.  All right.

17          And then I see Mr. Escobar there.  Did you want

18   to make an appearance?

19          MR. ESCOBAR:  Good morning.  Eryk Escobar for the

20   U.S. Trustee.

21          THE COURT:  Okay.  Thank you.

22          And I see somebody labeled spectator.  Okay.

23   Let's see.  Is there anyone else -- two people named

24   spectator.  Okay.  Anyone else want to make an appearance?

25          (No audible response.)

Page                                                                        7

1            THE COURT:  All right.  Hearing no one, okay.

2            So, Mr. Jones -- oh, not Mr. Jones.  Mr. Fritz,

3    first time hearing this case.  Tell me about the case.

4    Tell me how you served today's motions.  Yeah.  And

5    anything else you want to tell me before we launch into the

6    specific matters on calendar.

7            MR. FRITZ:  Thank you, Your Honor.  For the

8    record, J.P. Fritz, and I'd like to begin by thanking Your

9    Honor, the Court and the court staff setting this on an

10   emergency basis and preparing for the hearing on the

11   emergency basis as well.  It's very --

12           THE COURT:  You're welcome.

13           MR. FRITZ:  -- important to the company,

14   especially the payroll issue, and I just wanted to extend

15   on that appreciation on behalf of the company.

16           THE COURT:  Okay.

17           MR. FRITZ:  The pleadings were served on -- by

18   way of overnight mail and email as set forth in the service

19   declaration that we filed yesterday.  That is -- if Your

20   Honor will give me a moment.

21           THE COURT:  Sure.

22           MR. FRITZ:  That is docket entry number 30, the

23   declaration of service.

24           THE COURT:  All right.  Let me have a look at

25   that.  Let's see.  30, declaration of service.  Excellent.

Page                                                          8

1   Okay.  Lord, that's large.  Okay, declaration of service.

2   Okay.  Overnight mail on Exhibit 1, overnight mail,

3   utilities, email, Exhibit 3.

4           I'm not sure how to formulate this question.

5   Looking at the proof of service, there's Exhibit 1 and

6   Exhibit 2, both of which were served by overnight mail on

7   January 18.  One is the utilities and the other is just

8   other people.

9           So is it just that we've separated out the

10  utilities from the other people you were serving or is

11  there something -- and same thing with #3.00 and #4.00.

12  They seem to be the same.  You know, they're both email

13  served on January 18, but we've separated #4.00 is the

14  utilities and #3.00 is not.  Is that -- is there something

15  else going on that I'm missing or is it just that you show

16  them separately, here's the utilities that we served?

17          MR. FRITZ:  It's -- Your Honor, the difference

18  is, is that there's no need to serve the utilities with all

19  the other motions besides the utility motion and the

20  supporting declaration and exhibits on that.  There's no

21  point in serving the utilities with things like the tax

22  motion and the customer loyalty motion.  That's the reason

23  for the difference.

24          THE COURT:  Oh, I see.  The utilities motion and

25  Walsh declaration.  Okay.  Utilities motion and Walsh

Page                                                                    9

1  declaration and notice.  Okay.  I got it.  Okay.  D-2 is

2  our list of utilities.  All right.  Okay.  All right.  I

3  see that.  Okay.  That looks fine.

4        Okay.  Anything -- any hiccups in the service

5  process that you wanted to bring to my attention or as far

6  as you can tell, you've complied with our instructions

7  about service?

8        MR. FRITZ:  Yes, Your Honor.  As far as I can

9  tell, we've complied.  No hiccups that I'm aware of.  I

10 also had various email exchanges and telephone

11 conversations with the United States Trustee's Office and

12 Mr. Jones, and then on the landlord-related issues with

13 Mr. Ivan Gold to try to work out as many of these issues.

14 So I do believe that service was effective and we're

15 prepared to move forward today.

16       THE COURT:  Great.  All right.

17       MR. FRITZ:  Thank you, Your Honor.  The first

18 matter on calendar is the prepetition payroll and wages

19 motion, and I have had discussions about this with

20 Mr. Escobar from the United States Trustee's Office and

21 also exchanged emails with Mr. Jones about this.

22       THE COURT:  Actually, let's go back a second.

23       MR. FRITZ:  This is a critical --

24       THE COURT:  Let's go back a step.  Before we

25 actually launch into the specific motions, let's talk about

Page                                                                    10

1    the business in general.  I just want to make sure I

2    understood.  It's at one point you had 15 stores.  Now --

3    and you're trying to reject day five leases, so that's

4    going to leave you with 10 stores.  But do you have a

5    separate office location or is there offices in one of the

6    stores or how -- I was a little confused about how many

7    locations we have.

8             MR. FRITZ:  Yes, Your Honor.  There were 15

9    stores.  Over the past couple of years during the pandemic,

10   the store count has been reduced as an effort to cut back

11   on overhead and expenses and right-size the business to the

12   profitable stores.

13            I believe as of the filing, we're down to

14   approximately seven, maybe eight, stores.  Five are being

15   rejected today and then that should leave two, and at most

16   maybe three stores left for ongoing operations.  But this

17   has been a process of shrinking the footprint during the

18   pandemic and now further shrinking it through today's

19   rejection motion.

20            THE COURT:  All right.

21            MR. FRITZ:  There is --

22            THE COURT:  As we sit here today, in terms of --

23   I asked about stores.  Now let's talk about leases.  In

24   terms of the number of leases that are in effect, you've

25   got five that you want reject today.  That will leave you

Page                                                                      11

1   with how many leases that have not been terminated as of

2   the petition date, if we grant that?

3          MR. FRITZ:  I believe -- well, Your Honor, I --

4   just because Your Honor mentioned the petition date, we're

5   withdrawing our request for retroactive relief of the

6   rejection date.  Despite best efforts, we weren't able to

7   vacate and turn over possession.  So we've addressed that

8   in the revised order with --

9          THE COURT:  Okay.

10         MR. FRITZ:  -- proposed language.  I just wanted

11  to make that clear.

12         THE COURT:  Okay.

13         MR. FRITZ:  Our -- apologies.  We -- I'm told

14  that we have six -- that we have four stores remaining plus

15  one in the New York office.  So, let's say, five -- closed

16  like five stores.

17         THE COURT:  Okay, and how many leases?  Was each

18  one a separate lease?

19         MR. FRITZ:  Each one is a separate lease and I'm

20  aware that there are Escada operations going on at a couple

21  of locations that are leases that are not signed under the

22  debtor's name, but the economic benefits of the operations

23  there will be part of the estate and the estate's cash

24  flow.

25         THE COURT:  Okay.

Page                                                              12

1          MR. FRITZ:  So there will be some certain

2    situations where there will be a business going on

3    someplace and expenses are being paid and money is coming

4    in, which will be part of the cash flow to pay creditors.

5    It's just that the lease is not in the name of Escada

6    America, LLC.

7          THE COURT:  Okay.  And what about the New York

8    office?  Does that have its own lease?

9          MR. FRITZ:  Yes, Your Honor, that has its own

10   lease.

11         THE COURT:  Okay.  All right.  And you -- is it

12   your vision -- and I know obviously this can change, but is

13   it your vision that you're going to emerge with two or

14   three stores continuing operations or you're trying to wind

15   it down entirely?  You're trying to do a sale?  I mean

16   what's our big picture?  What's our exit strategy, if you

17   have one, at this point?

18         MR. FRITZ:  This is going to be a Chapter 11 plan

19   exit strategy.  The business will continue to go on.

20   There's no intention at this time to do a 363 sale or

21   liquidate.

22         THE COURT:  Okay.  All right.  Okay.  And I know

23   it's not a case status conference, but -- well, at some

24   point I want to hear if Mr. Escobar's got any issues yet or

25   Mr. Jones has got any issues yet, and I guess this is as

Page                                                                    13

1  good a time as any before locking it.

2          Let me ask at in this point.  I mean I want to --

3  I am going to talk about each of the motions independently.

4  So I guess what I want to know is whether there's anything

5  that Mr. Escobar wants to say at this point that is sort of

6  at -- on a general level across the board as distinguished

7  from input on any of the particular individual motions.

8          MR. ESCOBAR:  Eryk Escobar for the U.S. Trustee.

9          THE COURT:  Um-hum.

10          MR. ESCOBAR:  On a general level, no.

11          THE COURT:  Okay.

12          MR. ESCOBAR:  Thank you.

13          THE COURT:  All right.  What about you, Mr.

14  Jones?

15          MR. JONES:  Your Honor, same with me.  I have

16  nothing to say at a general level.  I've spoken with

17  Mr. Fritz yesterday extensively and I have an idea what's

18  going to -- what the exit strategy is going to be.

19          THE COURT:  Okay.  Terrific.  All right.  Then,

20  Mr. Fritz, let's get to -- go back to where I interrupted

21  and diverted you.  You were talk -- starting to talk about

22  the wage motion.

23          MR. FRITZ:  Yes, Your Honor.  Thank you.  Payroll

24  is to be funded this morning through ADP --

25          THE COURT:  Um-hum.

Page                                                              14

1        MR. FRITZ:  -- and I've had an opportunity to

2   review the Court's tentative ruling and discuss this issue

3   by email with Mr. Escobar and Mr. Jones.  All of the

4   employees to be paid are non-insiders.  This is all within

5   the limits set forth under the Code for priority.

6        In discussions yesterday with the general in-

7   house counsel for JPMorgan Chase, where the debtor's

8   prepetition bank account is held, I was informed that Chase

9   is going to need specific language in order to make the

10  transfer of -- or allow the wire to ADP to fund the

11  payroll.

12       So we have revised that proposed order, uploaded

13  it this morning, and done a notice of lodgment.  I've also

14  shared it with Mr. Escobar and Mr. Jones.  I know

15  Mr. Escobar had some questions about it and I just have

16  checked with the client and wanted to assure the Court and

17  Mr. Escobar that no prepetition checks are going to be out

18  there.  The checks come from ADP and this is only a matter

19  of wiring the funds from this account to ADP this morning

20  and it's supposed to be very circumscribed relief.  And

21  after we accomplish that, we're going to get back to

22  closing the prepetition accounts and opening up post-

23  petition DIP accounts.

24       We did not seek a cash management motion or

25  order.  We're going to do our best to comply with the U.S.

Page                                                                              15

1   Trustee's requirements on opening DIP accounts.  This is

2   only to make sure that the prepetition payroll gets funded

3   by way of wire and then ADP is cutting the checks separate.

4            THE COURT:  Okay.  So --

5            MR. FRITZ:  And I've done my best to reflect that

6   in the new proposed order.

7            THE COURT:  Okay.  All right.  So just -- so you

8   made a reference to my tentative ruling, which isn't in the

9   record, so let me go ahead and put it in.

10           The tentative ruling says:

11           "Authorized debtor to pay prepetition wages and

12       honor prepetition benefits up to aggregate of priority

13       amounts per employee excluding insiders.  With regard

14       to insiders, orders can provide that if and when and

15       to the extent that insider compensation has been

16       approved, the debtor is authorized to pay prepetition

17       wages to insiders in accordance with any formula

18       adopted through approved the insider compensation

19       process.  The Court does not see in the motion a

20       request honor outstanding checks for prepetition

21       payroll amounts as bank accounts must be closed.  Any

22       outstanding pre-petition checks should be replaced

23       with new checks.  This may be inapplicable as the

24       debtor uses ADP to pay its employees."

25           So if there are outstanding checks out there,

Page                                                                16

1   they're ADP's checks, not the debtor's checks.  So closing

2   your bank accounts isn't going to make those checks bounce,

3   so that seems like that's irrelevant.

4          And the note, this isn't -- by granting this

5   motion I'm not authorizing use of cash collateral, but

6   we've got the cash collateral hearing on motion -- on

7   calendar as well.  So if I do that, then you'll have the

8   authority -- this is the prepetition part.  So when I grant

9   this motion, that's giving you permission to do something

10  you otherwise wouldn't be able to do, namely pay a pre-

11  petition obligation, but then you still have to come up

12  with the money to do it, which you do through the cash

13  collateral motion.

14         Okay.  So you've uploaded a new order and I have

15  that.  Let me have a look at it and then if there's -- you

16  said -- I think you said the parties had some issues about

17  it.  So let's see.  Okay.  I think that the first paragraph

18  we need to say, you know, up to the statutory maximum to

19  the statutory for priority claims.  We can figure out how

20  to say that in a minute.

21         (Pause)

22         Okay.  Other than that, one little caveat, which

23  is not quite in there by virtue of the language of

24  paragraph 3, but sort of, I'm fine with the language of the

25  order.

Page                                                        17

1          So you said other people had issues with the form

2    of the order?

3          MR. FRITZ:  Your Honor, I believe Mr. Escobar had

4    some concerns about it.  I think that I have addressed

5    those with him prior to the hearing in our email exchange,

6    but I would invite him to make any comments on the record

7    if he still has concerns.

8          THE COURT:  Okay.  Mr. Escobar?

9          MR. ESCOBAR:  Thank you.  Eryk Escobar for the

10   U.S. Trustee.  Your Honor, my concern was as to paragraph 6

11   where I understand that language has been added a request

12   to JPMorgan Chase and I understand at a practical level why

13   it's there.

14         My concern was simply that when I first read it,

15   it seemed to almost allow the debtor to honor prepetition

16   checks and I understand that the only request at the moment

17   is that the wires to fund the current payroll be honored

18   from the non-DIP account that is being closed otherwise.

19         And so with that in mind, we're comfortable with

20   the order.  Counsel did provide the additional information,

21   and so we appreciate that.

22         THE COURT:  Okay.  Plus, don't forget that all

23   paragraph 6 does is protect Chase; it doesn't protect the

24   debtor.  So to the extent the debtor authorized Chase or

25   instructed Chase to do something it really ought not to

Page                                                                    18

1   have done, I'm not even happy about that and there may be

2   negative implications afloat.  Just we're not going to

3   punish Chase for it if they had --

4          MR. FRITZ:  Right.

5          THE COURT:  -- a good faith belief, et cetera.

6   Okay.  All right.  Any other comments other than my

7   comment, which I think I can readily make in lieu here.  I

8   can add something about "provided that no employer shall

9   receive in value over" -- you know, the same kind of

10  language that you've got in 3, except I've got to clarify

11  that the amounts that get paid in 2 when combined with 3

12  can't exceed that cap, but I think I can do that.

13         Any other comments or concerns about the form of

14  this order?  No?

15         MR. JONES:  No.

16         THE COURT:  Okay.  All right.  Well, let's look

17  at that order then.  Let's see.  And I'll see if I can fix

18  that.  Lodged -- Escada America, I want to -- right here.

19  Okay.  Okay.  Let's fix that.  Okay.  This is to pay.

20  Okay.  Let's do this.  I hope this won't do violence to

21  anything here.

22         I'm going to add at the beginning of paragraph 4,

23  "Provided that the aggregate of such payments and benefits

24  does not exceed in value the sum of $13,650 per employee,

25  the debtor is authorized to: pay and/or honor all

Page                                                          19

1   prepetition wages, salaries, and bonuses, including the

2   matching contributions all applicable," yada yada yada,

3   and -- oh no, that's wrong.  (B) -- oops, why is it doing

4   that?  There we go.  Okay.

5          All right.  So I've got the caveat of the

6   beginning.  So paragraph 2 now reads, "Provided that the

7   aggregate of such payments and benefits does not exceed in

8   value the sum of $13,650 per employee, the debtor is

9   authorized to: (a) pay and/or honor all pre-petition wages,

10  et cetera," all the way up through the end of that

11  paragraph, and, "on or but not pay at this time accrued

12  vacation and leave benefits by allowing employees to take

13  their approved vacation as the ordinary course of

14  business."

15         Okay.  And I'm going to delete that "provided no

16  employees shall receive," et cetera.  Now, does that phrase

17  "on account of" still work?  Yeah, I think so.  Oh, maybe

18  not.  Maybe I just need -- delete the "on account of."

19         "Honor but not pay at this time accrued vacation

20  and leave benefits by allowing employees to take their

21  accrued vacation or leave time in the ordinary course of

22  business."  All right.  I don't think I need the "on

23  account of prepetition claims for," or do I?  And I -- you

24  know what?  I don't say is anything about the 180 days

25  prior to the bankruptcy in here.  Maybe I need to add that

Page                                                                        20

1   in the proviso.

2          Provided that the aggregate of such payments

3   is -- and that such wages and benefits -- well, it may not

4   be true for the vacation policies.  Yeah.  "Provided that

5   the aggregate of such payments and benefits does not exceed

6   in value the sum of $13,650 per employee and that such

7   wages and benefits relate to the 180-day period prior to

8   the bankruptcy, the debtor is authorized to such honor but

9   not pay in the ordinary course of business" and then I'll

10  delete the "on account of prepetition claims for wages,

11  salaries, commissions, bonuses, and vacation leave

12  benefits."  I think that works.  Of course, you don't have

13  the benefit of seeing it, but -- and you've got this

14  footnote, which I have left in, about that this payment

15  includes all salaries and taxes, et cetera.

16         All right.  Should I read that all again or did

17  that make some sense, Mr. Fritz?  Do you understand what

18  I'm saying?

19         MR. FRITZ:  It made sense to me, Your Honor.

20         THE COURT:  Okay.  All right. Then I think the

21  rest of it's fine the way it is.  I think we end up a

22  little bit lower on the page then I'm supposed to end, so

23  I'm going to put this onto the next page.  And then -- all

24  right, and if you -- when you look at it, you find that

25  I've messed it up royally, you can always lodge something

Page                                                                    21

1  asking me to amend it to fix it.  I hope it's right.  Okay.

2  So all right.  And we'll approve that for entry, so that'll

3  get done today.

4          Okay.  So that one is granted.  The ruling for it

5  approved.  Today is the 20th.  Okay -- oh, no, the 20th --

6  2022.  All right.

7          So then the next motion is the limiting notice

8  and, in general, I thought the motion was fine.  The only

9  thing that I -- I had an issue with, in part D on page 8,

10  you talk about what you want to do when you have to send

11  out notices, that you want to be able to send just the

12  notice of the motion that tells parties and interests how

13  to get the full thing and not necessarily provide the

14  moving papers.

15          And I'm concerned about that because of, you

16  know, frankly our timing with our self-calendaring and

17  throwing things in the mail and 21-day hearing process, it

18  leaves very little time if somebody gets the notice.  Then

19  they've got to get a copy of the motion and then they've

20  got to do an opposition if they wanted to oppose.

21          Now, maybe this would be prohibitive, maybe

22  you've got a huge universe of people.  I don't know.  It

23  didn't look like your mailing lists were that -- were that

24  long.  Of course, that was only the 20 largest, but still.

25  If that is going to be problematic and cost you a fortune,

Page                                                                  22

1  you know, we can continue the hearing.  You can give me,

2  you know, more evidence on it.

3          But absent of showing that we really are talking

4  about a large universe here, I -- and, plus, you're going

5  to have many parties are going to be -- appear and you'll

6  be able to serve them by NEF.  I'm assuming you're not

7  going to have many people that you're going to actually be

8  mailing hard copies to.

9          But to the extent that it's somebody that's

10 directly effected by the motion and they're not on your 20

11 largest -- excuse me -- they're not on your NEF list, let's

12 go ahead and actually mail them the motion.  Yeah.  So that

13 was my point in the tentatives.  So I don't know if you

14 have a problem with that or not.

15         MR. FRITZ:  No problem with that, Your Honor.

16 The debtor submits on the tentative and will strike that

17 request for relief.

18         THE COURT:  Okay.  All right.  And you haven't

19 uploaded an order on that yet or have you?

20         MR. FRITZ:  I have not, Your Honor.  We --

21         THE COURT:  Okay.  Okay.

22         MR. FRITZ:  -- only uploaded the payroll motion,

23 not -- or nothing else.

24         THE COURT:  Okay.  All right.  Did anyone else

25 have comments on number #2.00?

Page                                                                23

1          MR. JONES:  Your Honor, with the Court's

2     tentative, I was concerned that the notice that was going

3     to be sent out to everybody didn't have a date for

4     oppositions for the -- just a notice saying you can get it.

5     But I think based on what the Court has done here, what I

6     have say is, you know, not relevant anymore.

7          THE COURT:  Got it.  Okay.  All right.  Okay.  So

8     then the motion will be granted on the terms set forth on

9     the tentative and we'll watch for an order.

10         Okay.  So then we go to #3.00.  That is honoring

11    customer obligations.  And I think the only thing I said

12    was:

13         "Fine with that provided that none of the

14            benefits or programs you're honoring are going to

15            result in distributions of more than the statutory

16            priority, not to any one recipient."

17         I think you said you didn't think it would, but

18    that's the theory under which I'm authorizing this.  So I

19    think we need to build that into the order.  Do we think

20    that's going to present a problem?

21         MR. FRITZ:  No, Your Honor.  I do not expect that

22    will be a problem.  The debtor submits on the tentative and

23    I will add that concept to the proposed order before

24    lodging.

25         THE COURT:  All right.  Great.  Okay.  So the

Page                                                                24

1  tentative will be the ruling.  Order to follow.  All right.
2  From the debtor.
3          All right.  And then the post-petition taxes and
4  custom duties.  I think there was language in there where
5  you said most but not all of these tax -- or made most, if
6  not all, yeah, of these taxes would qualify for priority
7  status," but I don't think you took the time to go through
8  it.  There may well be a basis to approve the ones that
9  aren't priority claims, but I think we need to go and
10 actually look at it and come up with a basis for it.  So my
11 tentative on this one also says, "Granted to the extent
12 that the taxes in question would, if unpaid, qualify for
13 priority status.  If there are additional taxes that the
14 debtor would like to pay that are not priority claims, the
15 Court will need to evaluate those more closely in a case-
16 by-case or state-by-state basis to ascertain whether
17 relevant standard has been met" or any -- not, yeah,
18 whatever the standard is depending on what the
19 circumstances are.
20         Can the debtor live with that?
21         MR. FRITZ:  Yes, Your Honor.  The debtor submits
22 on the tentative ruling and I will build that concept into
23 the proposed order before lodging.
24         THE COURT:  All right.  And, again, I understand
25 that there certainly could be consequences from not paying

Page                                                                    25

1  taxes and there -- that you might well be able to make some

2  case as to why under 363 you should be allowed to use, you

3  know, assets of the estate in order to make those payments

4  even if they are priority, but we'd have to look at it, so

5  all right.

6          Okay.  And then we've got the lease rejection.

7  So my comment on that one was, it seems to me that it's

8  unfair to have a rejection be effective as of any date

9  earlier than the date at which you actually gave back the

10 premises, gave the keys, and said please go try to find

11 yourself a new tenant.  And I don't -- didn't know when

12 that actually occurred.  It sounded like you have modified

13 the relief that you're requesting.  So I want to hear about

14 that and I -- I don't know if Mr. Gold has other issues he

15 wants to raise.  But, Mr. Fritz, why don't you tell me what

16 exactly you're now proposing on #5.00.

17         MR. FRITZ:  Thank you, Your Honor.  Yes, we agree

18 with Your Honor's comment and we are retracting our request

19 for rejection effective as of the petition date.  I've had

20 exchanges with Mr. Gold regarding certain language about

21 the rejection effective date, protection for the landlord

22 when it comes to disposing of any personal property that

23 may be left behind.  And we have agreed on language in a

24 proposed form of order that would address both of those

25 concerns and that's language that's been used in other

Page                                                                 26

1   Central District of California cases with lease rejection.

2              In concept, the lease rejection will be effective

3   when the debtor provides notice to the landlord in writing,

4   which could be by email, that -- that possession has been

5   turned over and surrendered and also that the landlord will

6   not have any liability for whatever stuff the debtor leaves

7   behind at the premises.  Mr. Gold may want to add to that

8   in a more eloquent fashion, but I do believe we have

9   resolved those issues.

10             THE COURT:  Okay.  Mr. Gold?

11             MR. GOLD:  Thank you, Your Honor.  Ivan Gold of

12  Allen Matkins for the five landlords that are in this

13  motion.  Mr. Fritz and I have had very constructive and

14  productive conversations and emails on this issue.  I

15  referred him to a number of Central District cases, most

16  notably and recently Judge Brand's order in G-Star, which

17  is a multi-location retail case, also a sub-Chapter 5 case

18  from 2020.

19             So there are two pods here.  The first is, return

20  of possession can be accomplished two ways:  one is through

21  conventional return of keys or access codes.  The other, if

22  I may borrow the phrase that originated in the *Pier One*

23  bankruptcy back in Virginia in 2020, we also provide for

24  contactless return of possession, which is an email or

25  other writing from the debtor to the landlord confirming

Page                                                                    27

1    possession of the premises is being returned and

2    relinquished and authorizing the landlord to change the

3    locks.  That email or other writing provides us with an

4    objective marker for liability, claims, et cetera, purposes

5    and it's been successfully used other cases.

6             Mr. Fritz has represented that some of the key

7    return is in motion.  Some things may be delivered today.

8    But the email alternative gives the debtor, upon entry of

9    your order, an alternative to dispense with that expense

10   and provide a quick and what has proven to be in other

11   cases a reliable mechanism to confirm the return of

12   possession.  So that's step one.

13            Step two is just to tweak the abandonment

14   language since the debtor's secured debt is from affiliated

15   insiders.  We've adopted language, again, from other cases,

16   not just *G-Star* but *Styles For Less* and *Anna's Linens*,

17   which was also a Levene, Neale case, an Orange County case

18   a few years ago, that the landlord is free to dispose of

19   anything that is left behind in terms of abandonment.  That

20   way we are not dealing with the debtor's affiliates with

21   state law procedures.

22            Mr. Fritz has been agreeable to this, and it

23   does, in terms of Your Honor's tentative, which we thank

24   you for, it speaks to your tentative in terms of getting us

25   to position to -- to market quicker.  We won't be tied up

Page                                                        28

1  with, you know, dealing with notices regarding what, at

2  this point, is not inventory but like just miscellaneous

3  shelving and racking that is typical when a --

4          THE COURT:  That was --

5          MR. GOLD:  -- debtor leaves a store.

6          THE COURT:  -- going to be my question.  There

7  isn't inventory?  There's just shelving and that's --

8          MR. GOLD:  All of my clients have reported to me,

9  Your Honor, for all -- all five of these locations, they

10 are not observing inventory in the store.  What they're

11 seeing is racking and shelving.

12         THE COURT:  Okay.

13         MR. GOLD:  I mean, obviously if we -- if we are

14 surprised by anything, you know, there -- we're in

15 communication.  I'm not concerned about that, but the

16 visual -- the visual thus far doesn't seem to indicate

17 there are any material issues there and we're not talking

18 about large quantities of inventory or equipment.

19         We're talking about, you know, the -- the end-of-

20 the-line racking and shelving in these stores.  They've

21 mostly been cleaned out.

22         THE COURT:  Okay.  And obviously it's not

23 something I can take judicial notice of, but I can assume

24 that this racking and shelving isn't something that's of

25 any significant value if you tried to rip it out and resell

Page                                                                        29

1   it.  Is that a fair assumption?

2           MR. GOLD:  As not only for assumption, I would

3   add to that, Your Honor, the net cost, because we, of

4   course, have the cost of removal --

5           THE COURT:  Right.

6           MR. GOLD:  -- and that makes a small number even

7   smaller and perhaps in many cases a negative number.

8           THE COURT:  Right.

9           MR. GOLD:  So our experience --

10          THE COURT:  Okay.

11          MR. GOLD:  -- is there's -- there is not, at this

12  point in the cycle, a robust market for miscellaneous,

13  mismatched, partial racking and shelving that's slightly

14  worn.

15          THE COURT:  Got it.  Okay.  All right.  So I'll

16  get a proposed form of order that's been signed off on by

17  Mr. Gold, correct?

18          MR. GOLD:  We've agreed upon a form.  Mr. Fritz

19  was kind enough to send it last evening.  I've reviewed it

20  with both my clients this morning and we've communicated

21  our acceptance.  So what you'll see from Mr. Fritz is

22  something that all five parties affected by this motion

23  have given the thumbs up to, Your Honor.

24          THE COURT:  Beautiful.  All right.  Great.  Okay.

25  So that one'll be granted on those terms that we've been

Page                                                                    30

1  discussing and I'll watch for the order -- approved form of

2  order.

3          All right.  So #6.00, which is the utility

4  motion, and basically I -- the tentative is to grant, but I

5  -- I'm not sure that you described the procedure exactly

6  the same way I described the procedure.  So I gave you my

7  description but I don't think substantively it's materially

8  different from what you're looking for.

9          The only difference was, you've got this

10 provision in here.  You've requested that the utility be

11 ordered to return the deposit within ten days after service

12 is terminated.  Well, maybe not.  What if the debtor didn't

13 pay for all the service?  What if they are post-petition

14 defaults?  So it may well -- and you may well not want to

15 have them return.  You may want to just have them apply it.

16         So I don't know if I can say anything about

17 whether they should return it or when they should return it

18 or maybe they -- maybe within ten days, they've got to give

19 you an accounting of whether or not there's a credit?  I

20 mean, I don't know.  But I can't just say that they need to

21 return it, because maybe they don't.

22         So other than that, I was walking through how I

23 generally do this, which is I set the continued date now,

24 we give -- set of deadline for you to serve notice of the

25 final hearing and for you to actually send out the notice

Page                                                                            31

1   of what you're doing and to send out the deposits you're

2   going to make.  And then we tell them what the deadline is

3   for them to complain if they don't think what you're paying

4   is adequate assurance and that they have to do that in

5   writing, and then I gave you a period of time to try to

6   work it out.

7          If you can't work it out -- if you can work it

8   out, great.  You go away and you let me know you've worked

9   everything out and I can just take the final hearing off

10  and make the interim order a final order, if we even need

11  another order at that point.

12         If you can't work it out, then the debtor files

13  the papers that you got from the utility, along with the

14  debtor's response.  The utility has an opportunity for

15  further response and then we have a final hearing.  I've

16  been on the bench more than 20 years.  I can't remember

17  ever once having a final hearing on this because either --

18  either the utilities don't mind or you all work it out, but

19  -- which is good because I'm not exactly sure how that Code

20  section is supposed to work.  But I take -- it's got to be

21  the case that if there's a dispute about whether there's

22  adequate assurance or not that I should be able to figure

23  that out.

24         In any event, and then the order can also provide

25  that in the interim, you know, while pending the conclusion

Page                                                                    32

1  of this final hearing figuring out about whether or not

2  there's adequate assurance, that they can't terminate your

3  service based on, you know, the prepetition defaults or the

4  lack of adequate assurance.

5          So are you okay with that approach?

6          MR. FRITZ:  Yes, Your Honor.  The debtor submits

7  on the tentative ruling.  And just as a matter of

8  clarification, did Your Honor want to put that, all of

9  that, into the order or have a separate notice, just so I

10 know how to -- how to set this up?

11         THE COURT:  Yeah.  I think we put it all in the

12 order and we'll walk through some dates.  I'll -- we'll

13 figure out some dates now, and if you draft your order

14 appropriately, I suppose you can use the order as the

15 notice or you could just do a separate notice that goes

16 with the -- with the deposits explaining the deadlines.

17         I don't really care, as long as somebody who

18 receives whatever -- your package, you know, the utility

19 receiving it will be able to figure out what they're

20 supposed to do.

21         Okay.  So the tentative is going to be the

22 ruling, order to follow, and let's walk through the dates.

23 Okay.  So when do you want to actually mail a notice to the

24 utilities and send the deposits?

25         MR. FRITZ:  Next week, Your Honor, by Tuesday.

Page                                                                    33

1          THE COURT:  Okay.  Send deposits by -- Tuesday is

2    the 25th.  All right, by 1/25.  All right.  So then let's

3    tell the utilities if they object as to -- or disagree that

4    that's adequate assurance, to adequate assurance, that

5    utilities need to notify debtor in writing in such a way as

6    to be received by -- they don't have to file anything with

7    me.  They just have to get it to you.  Received by -- let's

8    say -- let's give them.  It may take them a while to even

9    get it to the right person to respond.  So why don't we say

10   February 8.  And then why don't we say if not resolved

11   consensually, debtor shall file and serve the objection,

12   plus debtor's response by -- doesn't give you much time,

13   but I doubt you'll have to do any of this -- by February

14   23rd.  And then any further papers from the utility by Feb

15   -- March 2nd.  And then why don't we have -- at that point,

16   they would have to file it -- they'd have to file and serve

17   it -- serve it.  And then why don't we have a hearing

18   March 9.  So final hearing 3/9 at 11:00 a.m., and so I've

19   put all of that in the order.

20          And then, yeah, if you don't have any unresolved

21   objections, you don't, you know, file those papers by the

22   23rd, but you could file something saying, you know, there

23   aren't any, please take the hearing off calendar.  And you

24   want to say that any utilities enjoined from terminating

25   service based on prepetition defaults or lack of adequate

Page                                                                    34

1   assurance pending outcome of final hearing -- something

2   like that.  I mean because at some point, if -- if I did

3   order the debtor to do something additional as adequate

4   assurance and the debtor didn't do it, then they would be

5   able to terminate service based on the prepetition

6   defaults, but we're never going to get to that.  And in the

7   meantime, while we're figuring it out, they're enjoined

8   from terminating service.  All right.  So I'm --

9           MR. FRITZ:  Understood, Your Honor, and I will

10  prepare the order.

11          THE COURT:  And I'm sure somebody at your firm's

12  got one of these floating around that they've done for me

13  before.  I really ought to have a form since I -- anyway.

14  Okay.  So order to follow from the debtor with language

15  like that.  Okay.

16          And then that brings us to the cash collateral

17  hearing.  And I didn't see -- and, you know, forgive me if

18  I'm, you know, raising something that you really, you know,

19  going to get away with if I hadn't mentioned anything about

20  it, but I didn't see anything about replacement liens

21  because I always want to make sure that we aren't granting

22  replacement liens and avoiding power claims.  So I didn't

23  see any language at all.  So are you granting replacement

24  liens and, if so, what are you granting it on.  And then

25  I'm find with authorizing you to use, on an interim basis

Page                                                                        35

1  between now and the final hearing, in accordance with the

2  budget to the extent that you need to, plus a 15 percent

3  variance.  So what's with the replacement liens?

4       MR. FRITZ:  Yes, Your Honor.  The concept was to

5  provide replace liens but not on any avoidance actions and

6  only to the same priority extent and validity as they

7  existed pre-petition.  And I will revise the order to

8  include one small paragraph related to that.

9       THE COURT:  Okay.

10      MR. FRITZ:  I had also contemplated adding in

11  language that JPMorgan Chase had requested just as safety

12  language to go with the payroll motion.  I understand the

13  U.S. Trustee has had concerns that we already addressed in

14  terms of the payroll motion.  And because of the payroll

15  motion seems to be adequate, I think that we could get rid

16  of any additional JPMorgan Chase language from the cash

17  collateral order and we could be safe to rely on the

18  payroll order alone.  I just wanted to put that out there

19  to give Mr. Escobar some comfort that we're not going to

20  try to do anything untoward with the pre-petition accounts.

21      THE COURT:  Okay.  All right.  Did anybody else

22  have concerns?  I mean, I know I need to sit -- set dates,

23  but were there any other concerns about the request for use

24  of cash collateral?

25      MR. ESCOBAR:  Eryk Escobar for the U.S. Trustee.

Page                                                                        36

1              THE COURT:  Um-hum.

2              MR. ESCOBAR:  Your Honor, I understand we have

3    the final hearing and I'll -- the U.S. Trustee will bring

4    any objections they might have at that point as it further

5    digests the motions and the request.

6              But one thing I did want to point out at this

7    point, however, just expressly on the record was that the

8    U.S. Trustee is exploring with debtor's counsel kind of the

9    details surrounding the store retention bonuses for "key

10   talent."  There are two line items in the projections.

11   There is no mention of them really in the motion itself, so

12   it's really devoid of a lot of detail.  It doesn't seem to

13   be a lot, but it does seem to be every two weeks a line

14   item that's there, and so we will be exploring that and I

15   just did want to put that on the record.

16             THE COURT:  Okay.  All right.  Yeah.  I mean if

17   there is anything in the budget that needs its own approval

18   because it's some -- triggering some other section of the

19   Code, I don't mean to be impliably approving that by virtue

20   of approving the budget.

21             So if there's some kind of, you know, key

22   employee retention bonuses or something where we've got to

23   have, you know, separate approval, you'll cross that

24   bridge.  It is -- do -- I don't know if we want to address

25   this issue now or not.

Page                                                                        37

1          I mean, Mr. Fritz, is there something -- or are

2    you just saying that people right now are getting combat

3    pay or are you -- is -- I mean is it -- or is it some kind

4    of bonus triggered by something else or -- I don't -- I'm

5    not sure which line item Mr. Escobar is talking about.

6          MR. FRITZ:  Yes, Your Honor.  These are not --

7    this is not what I would consider a key employee retention

8    program money.  This is not for insiders or officers.

9    These -- this is for rank-and-file store employees and this

10   is reflective of a very competitive market for labor right

11   now, particularly in retail where it's very difficult to

12   retain people, even when companies are not in bankruptcy.

13         THE COURT:  So --

14         MR. FRITZ:  Your Honor may have seen --

15         THE COURT:  -- what's the policy --

16         MR. FRITZ:  -- as I've seen --

17         THE COURT:  I mean what -- how does this work?

18   What exactly is it that you're doing?

19         MR. FRITZ:  It's a bonus pay -- it was my

20   understanding that it's a bonus payment to the rank-and-

21   file sales associates and the store managers for -- to stay

22   on, because otherwise in a competitive market we wouldn't

23   be able to retain them.

24         THE COURT:  No.  But I mean are they getting X

25   dollars more every week or in every paycheck they're just

Page                                                                    38

1  being paid a little bit more than they -- like, basically,

2  like, being given a raise or -- I mean what exactly is

3  happening?

4          MR. FRITZ:  Your Honor, I don't have the exact

5  details on that.  I've -- I'm providing the Court with the

6  most information I have at this time.  I would suggest that

7  I can come up with more details at the final hearing and

8  also continue to discuss this with Mr. Escobar between now

9  and the final hearing.  But I did want to give the Court

10 some kind of comfort this is not some sort of officer and

11 director current situation.

12         THE COURT:  Right.  Okay.  Yeah.  And it looks

13 like -- I mean, it's a recurring amount and obviously you

14 don't continue to pay people that are not working for you

15 anymore.  But, yeah, if it's simply that now we know it's a

16 more competitive market and, therefore, we're giving you

17 this raise, which, you know, we're not promising to do this

18 forever, but at least for now, we're paying you X dollars

19 more in every paycheck, that doesn't sound like a bonus

20 program *per se*.  I mean that's just a raise of some kind.

21         But anyway, look at it further and, yes, give us

22 more detail at the final hearing and if you conclude that

23 this is something for which you need a separate approval or

24 maybe it's out of the ordinary course for this debtor and,

25 therefore, you need to at least send out a notice that

Page                                                                    39

1   you're doing this and see if there's -- I don't know.  But

2   think it through and I don't -- I'm not going to worry

3   about it today.  It doesn't seem like it's a big number.

4   It seems more like you're just paying your employees more.

5           Okay.  All right.  When do you want to send out

6   notice of the final hearing on this one?  How quickly do

7   you want to do that?

8           MR. FRITZ:  Your Honor, may I suggest that we use

9   next week, Tuesday's date, since that's what we're using

10  for the utilities?

11          THE COURT:  Okay.  To send out final -- notice of

12  the final hearing on 1/25.  Let's set the final hearing --

13  I don't think we want to wait all the way until March 9.

14  1/25.  Supposed to do it on a fully-noticed basis, so let's

15  see.  One, two, three -- okay.  Why don't we do February 16

16  at 11:00 for the final hearing and then let's have -- that

17  would mean any oppositions -- that's kind of tight, but,

18  yeah, we'll give a little extra time.  All right.  Why

19  don't we say any oppositions by February 4, replies by

20  February 10.  And if you want to do any supplemental papers

21  from the debtor/updates to the budget, let's get those

22  filed by February 1, if you can.  Doesn't give everybody

23  else much time to respond to that, but we'll, you know --

24  if they complain they need more time, we'll continue the

25  hearing if we have to, but -- have another interim hearing

Page                                                                    40

1  if we need to.

2         But, all right.  So you're going to mail the

3  papers with the notice -- oh, and in the meantime, I'm

4  going to authorize tentative -- authorize the debtor to use

5  as little cash as it needs to.  So don't go -- don't prepay

6  anything, pay as little as you need to but in accordance

7  with the budget with the 15 percent variance between the

8  petition date and the date of the final hearing, which

9  we're setting for -- the conclusion of the final hearing,

10 which we're setting for February 16 at 11:00.  And you're

11 going to mail the moving papers by January 25th and

12 oppositions are going to be due February 4th, replies by

13 February 10.

14        If the debtor wants to give us a -- change the

15 budget or supplemental updates or anything else new you

16 want to tell us about, try to do that by February 1, and I

17 think that's it.  Order to -- from debtor.

18        All right.  Questions?  No?

19        MR. FRITZ:  Not about the cash collateral, Your

20 Honor.

21        THE COURT:  All right.  Other questions?

22 Anything else we should do today?

23        MR. FRITZ:  Your Honor, if I may impose on the

24 Court?  I was just -- I just wanted to know if it's

25 possible to have that payroll motions signed and entered so

Page                                                                41

1  that we can show that to Chase this morning so that they're

2  comfortable in allowing that wire to go out --

3         THE COURT:  I --

4         MR. FRITZ:  -- to ADP?

5         THE COURT:  I did it already.  I approved it for

6  entry.  It'll magically happen now that I did my part.  So,

7  yeah, I went through that and I made those changes -- or

8  you're talking about cash collateral?  You said payroll.

9  Do you mean cash collateral?

10        MR. FRITZ:  No, payroll, Your Honor.

11        THE COURT:  Yeah.  Yeah.

12        MR. FRITZ:  Yes, that's --

13        THE COURT:  I already approved that, so that's --

14        MR. FRITZ:  Okay.

15        THE COURT:  -- that's -- yeah, that -- who knows?

16 That might be approved even as we speak.  But it'll happen

17 shortly and then you can check, you know -- check the

18 docket and it should show up and you should get that.  I

19 don't know how you get your notices of entry of things.

20 You know, sometimes you get the digest version, it may not

21 come through.  But you should be able to see on the docket

22 as soon as they enter it, and they will enter it right away

23 I think.  I'll ask.

24        MR. FRITZ:  Thank you, Your Honor.  Thank you for

25 setting this on an emergency basis and for preparing for

Page                                                                    42

1    the hearing with your staff, and thank you to all the

2    counsel that participated for all their cooperation making

3    this a very smooth process.  I know the company appreciates

4    it very, very much.

5            THE COURT:  All right.  And I appreciate you all

6    talking to one another and working things out.  So -- oh, I

7    just got a little note the order has been entered.  So if

8    you go online, you'll be able to print yourself an inter

9    version.  So all right --

10           MR. FRITZ:  Thank you, Your Honor.

11           THE COURT:  -- look at that.  Aren't we

12   efficient?  Yah.  All right.  Okay.  Thank you very much.

13   That concludes the matters on calendar for Thursday,

14   January 20th.  We are off the record.  Thank you.

15           MR. FRITZ:  Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. ESCOBAR:  Thank you.

18           MR. GOLD:  Thank you.

19           THE COURT:  Okay.

20   (End at 11:02 a.m.)

21                    * * * * * * * *

22

23

24

25

Page                                                                    43

1        I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   *Ruth Ann Hager*

6   _____        Date:   2/01/2022

7   RUTH ANN HAGER, C.E.T.**D-641

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 888.272.0022  F 818.343.7119        BENHYATT
                                      Certified Deposition Reporters        www.benhyatt.com

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

--oOo--

| | | |
|---|---|---|
| In Re: | ) | Case No. 2:22-bk-10266-BB |
| | ) | |
| ESCADA AMERICA, LLC, | ) | Chapter 11 |
| | ) | |
| Debtors, | ) | Los Angeles, California |
| | ) | February 8 2022 |
| -----------------------------) | | Tuesday, 9:15 A.M. |

TRANSCRIPT OF 341(a) PROCEEDINGS

APPEARANCES:

For the U.S. Trustee:        ERYK R. ESCOBAR, ESQ.
                            Office of the U.S. Trustee
                            915 Wilshire Boulevard
                            Suite #1850
                            Los Angeles, California 90017

For the Debtor and          JOHN-PATRICK M. FRITZ, ESQ.
Debtor in possession:       Levene, Neale, Bender, Yoo &
                               Golubchik, LLP
                            2818 La Cienega Avenue
                            Los Angeles, California 90034

                            KEVIN WALSH, ESQ.
                            462 Chatham Road
                            Burlingame, California 94010

                            ANTHONY DePATIE, ESQ.
                            Regent, LP
                            9720 Wilshire Boulevard
                            Floor 6
                            Beverly Hills, California 90212

For the Sub-Chapter 5       GREG JONES, ESQ.
Trustee:

Proceedings produced by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (Continued):

```
For Simon Properties;        IVAN GOLD, ESQ.
Allen Moana Center;          Allen Matkins Leck Gamble Mallory
Beverly Wilshire:               & Natsis, LLP
                             3 Embarcadero Center
                             12th Floor
                             San Francisco, California 94111


For 717 GFC, LLC:            JOHN C. CANNIZZARO, ESQ.
                             Ice Miller, LLC
                             Arena District
                             250 West Street
                             Suite #700
                             Columbus, Ohio 43215


Court Transcriptionist:      Ruth Ann Hager, C.E.T.**D-641
                             Ben Hyatt Certified Deposition
                                Reporters
                             17835 Ventura Boulevard
                             Suite #310
                             Encino, California  91316
```

LOS ANGELES, CALIFORNIA, TUESDAY, FEBRUARY 8, 2022,

9:18 A.M.

--oOo--

MR. ESCOBAR:  Good morning.  This is an initial
341(a) meeting of creditors for Escada America, LLC, case
number 2:22-bk-10266-BB.  Today is February 8, 2022.  It is
now 9:18 a.m.  This is Eryk R. Escobar, trial attorney on
behalf of the U.S. Trustee.

These proceedings are being recorded.  Because
these proceedings are being recorded, I ask that we all
speak slowly and try not to speak over one another.  Before
speaking, if you could state your name so we all know who
is speaking that would be appreciated.

May I have appearances from debtor's counsel,
please?

MR. FRITZ:  J. P. Fritz for Levene, Neale,
Bender, Yoo & Golubchik for the debtor and debtor in
possession.

MR. ESCOBAR:  Thank you, and, Mr. Walsh, may I
have you state your name and relationship to the debtor for
the record, please?

MR. WALSH:  Certainly.  My name is Kevin Walsh.
I'm a finance director for Escada America, LLC, the debtor.

MR. ESCOBAR:  Thank you, and do we have an
appearance by in-house counsel for the debtor?

MR. DePATIE:  Yes.  This is Anthony DePatie, D-E-P-A-T-I-E, on behalf of the debtor.

MR. ESCOBAR:  Thank you.  And may I have an appearance by the Sub-Chapter 5 Trustee for the record, please?

MR. JONES:  Good morning, Your -- good morning, Eryk.  Greg Jones, Sub-Chapter 5 Trustee.

MR. ESCOBAR:  Thank you.  Okay.  May I have appearances from Mr. Gold, please?

MR. GOLD:  Good morning.  Ivan Gold of Allen Matkins for eight of the debtor's former landlords affiliated with Simon Property Group, Allen Moana Center (phonetic) and the Beverly Wilshire.

MR. ESCOBAR:  Thank you.  May I have appearances by Mr. Cannizzaro, please?

MR. CANNIZZARO:  Good morning.  John Cannizzaro of Ice Miller, LLC for landlord 717 GFC, LLC.

MR. ESCOBAR:  Thank you.  Okay.  Appearances from anyone else who has joined us on the call who has not had the opportunity to make their appearance for the record?

(No response.)

MR. ESCOBAR:  Hearing none, I will proceed. Mr. Fritz, will it be Mr. Walsh testifying on behalf of the debtor or Mr. DePatie, as well?

MR. FRITZ:  Mr. Walsh.



MR. ESCOBAR:  Okay.  All right.  Mr. Walsh, would you please raise your right hand so I might swear you in? Do you --

MR. WALSH:  Yes.

MR. ESCOBAR:  Thank you.

KEVIN WALSH, SWORN

MR. ESCOBAR:  Thank you.

EXAMINATION BY MR. ESCOBAR:

Q.    Do you understand that this is the same oath that you would take in a court of law and subject to the penalty of perjury?

A.    I do.

Q.    Please note that if there are any objections, they are for the record only.  If you can respond, please do so unless Mr. Fritz or Mr. DePatie instructs you not to answer.  Do you understand?

A.    Yes, I do.

Q.    Thank you.  Is there any reason, medical or otherwise, why you would not be able to testify truthfully today?

A.    No, there's not.

Q.    Okay.  And just so that you know kind of what's happening, I have my phone on speaker and then I have that next to the recorder.  So if you could just speak up a little bit more, that way I make sure that this is being

recorded properly, that would be appreciated.

        Okay.  As we go through the proceedings, if at any time you do not understand my question, please let me know and I will try to rephrase my question.  Do you understand?

A.   Yes, I do.

Q.   Thank you.  If you are guessing or estimating, please tell me that it is a guess or estimate.  It's okay to say you do not know if you truly do not know.  Do you understand?

A.   Yes, I do.

Q.   Thank you.  Okay.  Did you read and review the bankruptcy schedules and statements before you signed them?

A.   Yes, I did.

Q.   Okay.  And are they true and correct to the best of your knowledge?

A.   Yes, to the best of my knowledge.

MR. ESCOBAR:  Thank you.  And for the record, I did receive word of amendments filed last night.

BY MR. ESCOBAR:

Q.   Okay.  And, Mr. Walsh, returning to you, I do want to note that the signatures on these schedules and statements appears to be an electronic signature, as opposed to, say, a holographic signature.  Is that correct?

A.   That's correct.  They're electronic signatures.

P 888.272.0022  F 818.343.7119    BENHYATT
Certified Deposition Reporters    www.benhyatt.com
Page 54

Q.    Okay.  Did you authorize the use of this electronic signature on your behalf?

A.    Yes, I actually executed them myself.

Q.    Okay.  And that was my next question.  So you caused these electronic signatures to be placed on these schedules and statements, correct?

A.    Correct.

Q.    Okay.  Perfect.  Thank you so much for that.

MR. ESCOBAR:  Mr. Fritz, would you tell us a bit about this case and the reasons for filing bankruptcy?

MR. FRITZ:  Yes.  The debtor was formed as a Delaware limited liability company in 2009.  It's a national specialty retailer selling high-end ready to wear women's apparel with its main office is Beverly Hills, and as of the petition date, it had ten retail stores across seven states in the United States and an office in New York City with over 50 full-time employees.

The debtor's real estate business is generally known to the public and branded as Escada.  The debtor uses the Escada brand via a licensing agreement and for several decades, Escada has been a global retail brand, high fashion, high-end rated ready to wear apparel for with an emphasis on high fashion evening wear.

On a global scale, Escada has various retail stores and subsidiaries in several countries in Europe,

including, but not limited to Spain, England and Germany.
Escada also has retail stores in North America, including
the debtor, which operates Escada's brick-and-mortar retail
business only in the United States.  All right.

        MR. ESCOBAR:  Okay.

        MR. FRITZ:  During -- the current management took
ownership of Escada in 2019 and had a plan to turn around a
distressed Escada business and at the outset of
implementing that plan, COVID-19 happened in early 2020 and
then the whole plan was disrupted by that and the debtor
has been attempting to recover and reorganize the
distressed business since that time.

        Over that period, negotiations with landlords
have taken place, some with success, some without success,
and so ultimately the debtor decided in its reasonable
business judgment to file for bankruptcy to address the
leases and right size its business and continue operating
using the benefits of the Bankruptcy Code for -- at the
landlord plans and proposing a plan.

        MR. ESCOBAR:  Okay.  I'd like to go back to the
statement you said about current management.  I understand
from the petition that the own -- sole owner, right, of the
debtor is Escada Store Services, LLC.  Is that what you
mean when you say current management or did you mean
something else, other people or other entities?

            MR. FRITZ:  It's my understanding that a

complete, separate, third party owned Escada --

            MR. ESCOBAR:  Uh-huh.

            MR. FRITZ:  -- up until 2019 --

            MR. ESCOBAR:  Okay.

            MR. FRITZ:  -- and that the current ownership

came in and -- and bought that at in arms-length, third

party transaction.

BY MR. ESCOBAR:

     Q.   Okay.  And do -- Mr. Walsh, if you know, do you

know who the people or entities are who own Escada Store

Services, LLC?

     A.   Well, I can confirm that we're owned by Escada

Store Services, LLC.  I -- I'm not exactly sure of the full

ownership of Escada Store --

     Q.   Okay.

     A.   -- Services, LLC.  I think, and I'm just calling

out, it's my understanding that that is most likely Michael

Reinstein.

            MR. ESCOBAR:  Mr. Fritz, do you know the answer

to that to -- same question?

            MR. FRITZ:  Yeah.  Mr. Walsh's answer is

consistent with the information that I've seen that it's

Michael Reinstein who owns Escada's Store Services, LLC.

            MR. ESCOBAR:  Okay.  And can you spell his last



\--

          MR. FRITZ:  I believe --

          MR. ESCOBAR:  -- name for --

          MR. FRITZ:  I believe that that's listed on the
equity security holders.  It's spelled R-E-I-N-S-T-I-E-N
[*sic*].

          MR. ESCOBAR:  Okay.  And, I'm sorry.  You said
you believe that's listed where?

          MR. FRITZ:  I believe it's listed in the petition
package.

          MR. ESCOBAR:  I mean, I do see in the
declaration --

          MR. FRITZ:  You --

          MR. ESCOBAR:  -- of -- sorry -- in the list of
equity security holders Escada Store Services, LLC is
listed as 100 percent owner of the debtor and so I didn't
see Mr. Reinstein's name.  Maybe I missed it, but I don't
think -- I wouldn't think it --

          MR. FRITZ:  Yeah.  I think --

          MR. ESCOBAR:  -- would be in the petition.

          MR. FRITZ:  -- I think he's --

          MR. ESCOBAR:  So --

          MR. FRITZ:  I believe he's in a section where the
insiders are called out and listed.

          MR. ESCOBAR:  Okay.  I'll look out for that.  All



right.  So it's our understanding, as we sit here today,

that Mr. Reinstein is owner of Escada Stores Services, LLC,

who, in turn, owns the debtor 100 percent.  Okay.

      MR. FRITZ:  Correct.

BY MR. ESCOBAR:

    Q.    Okay.  Mr. Walsh, returning to you, has the

debtor paid any pre-petition obligations since the filing

of the bankruptcy case?  So that is to say, obligations

that it had pre-petition before the filing of the

bankruptcy.  Have those been paid after the filing of the

bankruptcy?

    A.    I can confirm that the debtor has not paid any

pre-petition claims --

    Q.    Okay.

    A.    -- after the filing.

    Q.    Okay.  Thank you.  And has --

    A.    With the exception of a payroll pursuant to the

court order.

    Q.    Of course.

    A.    That's a good clarification to the extent that,

yeah, there was some portion of that.  Yes.

    Q.    Okay.  Has the debtor paid any professionals?  So

by that, I mean professionals of the debtor such as

attorneys, accountants, CPAs?  Has the debtor paid any

professionals since the filing of the bankruptcy case?

A.    We have not.

Q.    Okay.  Are you aware of the obligation that the debtor has to file monthly operating reports?

A.    I am.

Q.    Is the debtor current on post-petition expenses and tax obligations, if any?

A.    Yes, we are.

MR. ESCOBAR:  Okay.  And so for everyone on the call, in case anyone wants to follow along, I am starting with the -- I'm just going to go through my questions on the schedules.  That's Docket #75.  Again, Docket Entry #75.

I'm just going to work my way through that if folks what to have that in front of them, you're more than welcome to do that.

Same for you, Mr. Walsh.  Okay.

BY MR. ESCOBAR:

Q.    So I see that the debtor owns 100 percent interest in Escada Online U.S. LLC, correct?

A.    Correct.

Q.    Okay.  What is the nature of the business for Escada Online?

A.    Escada Online handles the online transactions or sales for Escada on behalf of Sourcing and Production.

Q.    Okay.  So Escada Online handles the online



transactions and sales for the debtor?

    A.   (No response.)

    Q.   Is that correct?

    A.   No.  The inventory, Escada inventory in the U.S., is owned by Escada Source and Production.  It's one of the secured creditors.

    Q.   Okay.

    A.   So it markets that product just in the online channel as a separate entity as opposed to the debtor, Escada America LLC, and which markets that product on behalf of Sourcing and Production via stores, brick-and-mortar stores.

    Q.   Okay.  All right.  So we have basically three different entities here we were just talking about.  So we have Escada Online, Escada Sourcing and Production, and I do see them as a secured creditor, and then the debtor.  Okay.  Just trying to keep it all in order because they all use Escada.  So okay.

    So they -- does the debtor have any online transactions or sales of its own?

    A.   It does not.

    Q.   Okay.  Has Escada -- well, does Escada Online have its own bank accounts?

    A.   It does.

    Q.   Okay.  And has it always had separate bank



accounts from the debtor?

A.    It has.

Q.    Okay.  And is Escada Online currently operating?

A.    It is.  Yes.

Q.    Is Escada Online currently operating with positive net profits or is it losing money?

A.    It is probably losing money depending on the time period we -- we look at, but it's break -- break even in some periods to loss given and most recently losing.

Q.    Okay.  And just once again, I'm sorry, I'm going to have to ask you to speak up just a little bit more.  Do you handle the finances --

A.    Sorry.

Q.    That's okay.  Do you also handle the finances for Escada Online or is that someone else?

A.    Yes.  The finances and accounting themselves are handled out of a shared service environment, but I certainly have knowledge of them, yes.

Q.    Okay.  Okay.  I am now looking still at Schedule AB, Item Number 72.  So that would be page 9 of the .pdf itself or page 7 of Schedule AB.  The debtor listed unused NOLs, however a substantial portion of the unused NOLs is subject to an IRC 382 disallowance related to a pre-petition acquisition.

Mr. Walsh, can you explain this a little bit



more?  Flush it out for me?

    A.   Well, I'll take a stab at it.  I'm -- I'll just say for the record that I'm not a tax expert and I rely on our tax advisors, as well as some internal tax responsible folks.  So I'll only try to address this at a high level in the --

    Q.   Sure.

    A.   -- understanding that was conveyed to me.  The list that we gave on the NOLs that's part of the filing represents the operating losses from the companies over the period of time called out here --

    Q.   Uh-huh.

    A.   -- and also would be consistent with tax returns filed for the years in question.  In terms -- so in full transparency, all of those have been included in this filing.

        However, when you get to the disallowance, my understanding from the experts is that because Escada was acquired in late 2019 and had a change in ownership, the entity, the debtor, does not get full use going backwards of those NOLs.  There's a disallowance that happens due to the change of control, again, that happened in 2019.  So that's about the level that I'm comfortable discussing and understanding.

        I also was told that it's a fairly complex

calculation and project, you know, to confirm those and
calculate the exact amount has not been done to date only
because of the losses that the company's been incurring.

So I hope that that helps sets -- shed some light
on that comment.

Q.    It certainly does for me, and so just to clarify
then, when this description here on Schedule AB where it
says, "Disallowance related to a pre-petition acquisition,"
the pre-petition acquisition in question there is the
pre-petition acquisition of the debtor itself by new
management, correct?  That's what we're talking about
there?

A.    Correct.

Q.    Okay.  Okay.  So it's not some acquisition of
something -- some other --

A.    In the --

Q.    -- property or company or anything like that.
Okay.

A.    No.  No.  It -- the change in ownership and
management of Escada America, the debtor, back in 2019 that
Mr. Fritz highlighted earlier.

MR. ESCOBAR:  Okay.  Okay.  I am now turning to
Schedule D for -- so for anyone following, that's page 13
of the PDF.  Again, that's Docket Entry Number 75.  All
right.  Okay.

BY MR. ESCOBAR:

    Q.    Eden Rock International, LLC, who owns Eden Rock,
if you know, Mr. Walsh?

    A.    I don't know the ownership of that.  My
assumption is that Michael Reinstein owns that, as well,
and it's -- it's a related company of the group and I'm
almost 100 percent sure he's the -- he's the full owner.

    Q.    Okay.  And what is the relationship between Eden
Rock and the debtor?

    A.    There's not a day-to-day relationship.  It did
provide some financing during the strain of COVID in order
to allow Escada to make some payments to landlords.  So
it's a financing party for the overall portfolio of
companies.

    Q.    Okay.  And then is Eden Rock a parent company, a
sister company, a subsidiary of the debtor?

    A.    It's not a parent or a subsidiary.  I guess I
would categorize it as an affiliated company.  It's neither
above or below Escada America, to the best of my knowledge,
in terms of a chart.

        MR. ESCOBAR:  Okay.  All right.

        Mr. Fritz, do you have any additional information
on this?  I guess where I'm -- what I'm trying to flesh out
is, and I'm going to do this for every secured creditor, at
least it's my intention to, is to kind of flesh out why

this creditor is considered an insider or related party?

       MR. FRITZ:  For sure.  I think it's -- I think it
fits into the definition of affiliate under the Bankruptcy
Code as being a sister kind of -- a sister company, as you
called it.

       MR. ESCOBAR:  Um-hum.

       MR. FRITZ:  If it's not a parent, it's not a
subsidiary, but it -- if you roll up to some level of
common ownership and then roll back down, it would be an
affiliate under that kind of scenario.

       MR. ESCOBAR:  Okay.

       MR. FRITZ:  And I think that's going to be true
for the other secured creditors, such as those insiders on
this chart.

       MR. ESCOBAR:  Okay.  So who at the debtor or who,
in general -- I guess they don't have to be at the debtor.
Who would be able to speak under oath about the exact
relationship between these one, two, four secured creditors
and the debtor?

       MR. FRITZ:  I know that we have -- although not
under oath, I -- I don't know if Mr. Walsh -- Mr. Walsh is
under oath and I don't know if the debtor's in-house
counsel might be able to shed more light on it, although
he's not under oath.

       MR. ESCOBAR:  Sure.  And I normally don't put

counsel, even when they're in-house counsel for the debtor, under oath simply because they are counsel so they are officers of the court and so I would expect them to abide by all their ethical requirements.

So, Mr. DePatie, do you know anything about the relationship between these four secured creditors and the debtor?  Would you be able to school to that?

MR. DePATIE:  Yes.  So Eden Rock is not -- it's under common control, but it's, as my colleagues have pointed out, it's neither a subsidiary nor a parent.  Eden Rock is simply another business, separate business, under common ownership which provided the financing to the debtor throughout COVID to basically keep the debtor alive, to make it as far down the road as it has now made it.

But as Kevin Walsh pointed out, there is no day-to-day ongoing relationship or, you know, there's no vendor, kind of, relationship party day-to-day.

MR. ESCOBAR:  Okay.

MR. DePATIE:  It may -- it made a loan to -- for the debtor to -- allowed to survive up until now.  Yeah.

MR. ESCOBAR:  Okay.  So, Mister --

THE WITNESS:  I can confirm that.  I can confirm that and also confirm that there has been no other transactions except for that one time loan.

MR. ESCOBAR:  Okay.  And that was you speaking,

Mr. Walsh, just now?

           THE WITNESS:  Apologize.  I didn't -- yes,
it's --

           MR. ESCOBAR:  Okay.

           THE WITNESS:  -- Kevin Walsh.

           MR. ESCOBAR:  Thank you.  That's okay.  Thank
you.

           Okay, Mr. Fritz, I'm going to flag this as an
item that I'm going to include in my kind of all
encompassing email to you at -- after the 341(a).  I think
I'm going to want to see a chart of sorts.  Usually charts
will help me.

           I'd like to see how these four secured creditors
are connected to the debtor such that they are insiders or
related parties.  All right.

           MR. FRITZ:  Understood.

           MR. ESCOBAR:  Okay.  All right.  Moving right
along.  I'm looking at Claim 2.2, still on Schedule D, for
Escada Sourcing.

BY MR. ESCOBAR:

    Q.  I didn't see a date.  I don't know if maybe it
just cut off somehow, but I didn't see a date upon which
the debt was incurred.  I'm wondering if that is
intentional, just an oversight?

    A.  I would say that it's -- it's ongoing and --

P 888.272.0022  F 818.343.7119      BENHYATT
Certified Deposition Reporters      www.benhyatt.com
Page 68

Q.    Um-hum.

A.    -- and also, as you look back, same -- same
response.  There's a portion of this, which represents
legacy debt of the debtor to this entity for -- for prior
debts and it's also the entity that had the consignment
relationship as it's kind of called out in 2.3 of the owner
of the inventory, which the debtor markets in the U.S.

Q.    Okay.  And I do definitely understand that.

A.    It's made above kind of ongoing transactions --

Q.    Right.

A.    -- forward and backward.

Q.    Right.  Okay.  So that makes sense to me.  But
the UCC itself, I mean that was filed or recorded on a
specific date, right?  Like there aren't ongoing UCCs being
filed?

A.    Correct.

Q.    Okay.  Do you know when that UCC was filed or
recorded such that Escada Sourcing became a secured
creditor?

A.    It's -- I know it's in the file.

Q.    Okay.  All right.

A.    Let me see.

Q.    I'll take a look.  I think I do recall seeing --

A.    I can --

Q.    -- something with --



A.    -- I can look --

Q.    -- the first day motions.

A.    -- for it while we --

Q.    Okay.

MR. FRITZ:  It's -- and, Eryk, this is J.P.
Fritz.

MR. ESCOBAR:  Yes.

MR. FRITZ:  As part of the first day filings --

MR. ESCOBAR:  Yeah.

MR. FRITZ:  -- there's a declaration by me with a
UCC report.

MR. ESCOBAR:  Okay.  I'll take --

MR. FRITZ:  I believe it's a date in February of
2021.

MR. ESCOBAR:  February of 2021.  Okay.

MR. FRITZ:  And it's my understanding that the
consignment, the UCC-1 consignment, is filed in a matter of
beginning notice of the consignment, not that it's a
secured debt.

MR. ESCOBAR:  Okay.  Okay.  I'm looking at Claim
2.3 now, so page 14 of the .pdf.

BY MR. ESCOBAR:

Q.    So in response to is the creditor an insider or
related party, the debtor marked the no box, is that
correct?



MR. FRITZ:  That -- this is J.P. Fritz.  That
looks like an error.  That needs to be -- we'll -- we will
amend that.

THE WITNESS:  Agree with that.  We separately
include them on a list of insiders and another section to
filing.

MR. ESCOBAR:  Okay.  And I think I have that
section marked as a question because it did confuse me when
I was looking at this, but also I think a slightly
different name was used and so I just wanted to clarify, so
we'll get to that in a minute.  Okay.  So -- okay.
BY MR. ESCOBAR:

Q.   So it is the testimony today that Escada Sourcing
and Production LLC is an insider or related party of the
debtor, correct?

A.   Yeah.  This is Kevin Walsh.  Correct.

Q.   Okay.  And this claim is -- (indiscernible).  The
property that is the security is legacy debt related to
other entities?  That's the security or that's the nature
of the debt?  I'm confused by that description.

A.   Nature.

Q.   Okay.

A.   We can come back and confirm that but, you know,
my understanding is Source and Production acquired a debt,
you know, Escada America's prior obligations to a prior

creditor.

     Q.   I see.

     A.   But we can confirm.

     Q.   Okay.  So that -- so then the --

     A.   (Indiscernible) say that --

     Q.   -- the legacy debt --

     A.   -- (indiscernible).

     Q.   The legacy debt itself is not the security.  What is the security?

     A.   Yeah.  That might be more of a legal term, but I don't -- I -- I'm not sure that I'm prepared to answer. I'd probably say we can confirm and come back to you, if that's okay?

     Q.   Okay.  Yeah, that's fine.  All righty.  Okay. I'm jumping now to Schedule EF and I'm going to page 17. For Claim 3.1, it's 6935th Owner, LLC.  The basis for the claim is rent.  The debt marked that this claim is contingent and unliquidated.

     So starting with contingent, why is this claim contingent?

     MR. FRITZ:  This is J. P. Fritz.  Eryk, could you please let me know which number you're looking at again?

     MR. ESCOBAR:  Yes.  I'm starting with Claim 3.1. That's on page 17 of the .pdf or page 2 of Schedule EF, 6 --



MR. FRITZ:  Okay.  I think that that might be more of a legal question.  In looking at how to calculate claims related to commercial leases there are a number of variables based on Bankruptcy Code Sections 502(b)(1), 502(b)(6), 365 and whether the lease is going to be assumed or rejected and what sort of date might be used under 502(g) in calculating the resulting claims and then what also might be available in terms of state law and offset and cover damages and trying to figure out what the claim would be, if any, and how it was -- resulted in so many different permutations that it could be that the claim might not be fully appreciable and, therefore, contingent.

MR. ESCOBAR:  Okay.  So what I heard in all that was the contingency, right, the thing that might happen or not happen is a lease being assumed or rejected.  Was there anything else in there that I missed, some other contingency, some other event that could or could not happen?

MR. FRITZ:  I think your summary is accurate.

MR. ESCOBAR:  Okay.

BY MR. ESCOBAR:

Q.   And so this claim here for $1,641, is that pre-petition arrears?

A.   Yeah.  So it would have been -- this is Kevin Walsh.  It would have been pre-petition and probably some

small arrearage related to miscellaneous fees.  I don't

have the details in front of me, but fairly minor in

nature.

Q.    Okay.

A.    You're speaking about 3.1, right?

Q.    Yes.  Um-hum.  Okay.

A.    Yeah.

MR. ESCOBAR:  All right.  So as to not take up so

much time, because there are other parties here who I'm

sure have questions, I'm not going to ask the same question

for each unsecured debt where the basis for the claim is

rent, because I will take it as a given that the

contingency that is being claimed as to each is the same

answer basically, that it's unknown if the lease will be

assumed or rejected.

Is that fair, Mr. Fritz?

MR. FRITZ:  Yes.

MR. ESCOBAR:  Okay.  So I'm just going to then

try and focus on any that don't list rent as the basis for

the contingent box being marked.  Rent, rent, rent, rent,

rent.  Could be all of them.  Rent, rent.  Okay.

I'm going to jump to 3.47.  So that's on page 24

of the .pdf or page 9 of Schedule EF.  So this is the claim

for Cushman & Wakefield.  It is also marked as contingent.

It's a lease for accounting services.

BY MR. ESCOBAR:

Q.   Would this be the same answer?  I know it's not
like a -- the lease -- type of leases we were just
discussing with landlords, but I -- it's described as a
lease.  So is that the same answer?

A.   I don't want to misspeak, but Cushman & Wakefield
is around these accounting services provided in the context
of leases --

Q.   I see.

A.   -- and is a former vendor and current creditor.

Q.   Okay.  So the debtor doesn't have a lease with
Cushman & Wakefield.  They're providing accountants --
accounting services with respect to leases that the debtor
has with other people.  Okay.

So what is the contingency for this claim?  What
event has to happen or may not happen?

A.   I believe, and apologies on the legal component
of this and definition of contingency.  I'll defer to
Mr. Fritz, but it's possible that that should not be
checked and it was checked in error for this one.

Q.   Okay.

A.   But it -- I guess it ultimately depends, and
maybe the basis for it is, you know, depends how many
leases are managed and, yeah, I --

Q.   Well, so let me ask this.  The 43,000 and change

listed here for this claim, this represents monies owed to
Cushman for services that they provided pre-petition,
correct?

    A.    It does, yeah.

    Q.    Okay.  And they provided these services, right?
They've completed their services, is that correct?

    A.    Yeah.  I think there was some dispute on that
including records and things like that.  Yeah.

    Q.    Okay.

    A.    But the services, I can confirm the services were
pre-petition.

    Q.    They were pre-petition.  Okay.  And how is --
what -- how -- what's the contract relationship between
debtor and Cushman, meaning are they paid at an hourly
rate, is it a kind of flat fee per lease that they're
looking at for you?  How does that work?

    A.    Yeah, more the latter.  They were paid based on
properties that the debtor had and the support that they
did for us as the debtor.

    Q.    Okay.  So they were paid more of a flat fee per
property that they looked at on your behalf -- on the
debtor's behalf, is that correct?

    A.    Correct.

    Q.    Okay.

    A.    Correct.



          MR. ESCOBAR:  Okay.  Mr. Fritz, did you have
anything to add on this one?

          MR. FRITZ:  Only that I'm going to have to take a
look at the contract and see if there's something in the
nature of the claim in terms of commission or if there's
any triggering events --

          MR. ESCOBAR:  Uh-huh.

          MR. FRITZ:  -- as to this claim that might make
it contingent and we will look into it and if an amendment
is appropriate, we will make that amendment.

          MR. ESCOBAR:  Okay.  Thank you.  All right.
Let's jump to Claim 3.62.  That's on page 26 of the .pdf
page 11 of Schedule EF.  This is for Funaro & Company.  The
contingent box is marked and the basis for the claim is tax
services.

BY MR. ESCOBAR:

     Q.   So same question here.  What's the contingency
here?  What event has to happen, hasn't happened?

     A.   Yeah.  I -- this is for tax services, I think
historical tax services, and I know that there hasn't been
a completion of handover records, work papers, things like
that, in its entirety.  So I'm pretty sure that's why this
is indicated as contingent.

     Q.   Okay.  And then the dollar figure -- the claim,
sorry, represents monies owed by the debtor to Funaro for

pre-petition tax services, correct?

        A.    Correct.

        Q.    Okay.  And so the contingency that is kind of
outstanding is the turnover of documents by Funaro to the
debtor?

        A.    Correct, at a high level, yes.

        Q.    Okay.  All right.  Anything else?  Any other
contingency on this one?

        A.    (No audible response.)

        Q.    Okay.

        A.    No, not --

        Q.    So --

        A.    -- not that I'm aware.

        Q.    Okay.  All right.  And, as I said earlier, I'm
skipping past all the ones -- all the claims that are based
on rent, because I'm assuming that we've already said this,
that it's the same answer, so I'm just flipping through
here.  Okay.  I think that gets me through Schedule EF and
this line of questioning.

            So I think, right, if I'm not mistaken, some of
the landlords that were listed in Schedule EF as contingent
and the basis for the claim being rent, those include the
landlords whose leases were rejected during the first day
filings.

            So what is the contingency as to those landlords

who are in a different position because their lease has already been rejected, and I understand that was the answer previously given, right, for all leases.  But this one's different.  These landlords are in a different position.

       So what's the answer as to them?  Why are their claims still contingent or are they no longer?

A.   They were -- they're contingent as of the petition date and --

Q.   Right.

A.   -- the schedules reflect --

Q.   Okay.

A.   -- the situation as of the petition date.

Q.   Okay.  All right.  Okay.  I am now looking at Exhibit 3 to the SOFA, which is page 54 of the .pdf itself. There's no other page number.  Again, Exhibit 3 to the SOFA.  It's the exhibit that I believe lists all payments or transfers within 90 days of the petition.

       I'm looking at the entry for Escada Desert Hills Premium Outlets.  Who or what is that entity?

A.   That is the landlord for the Cabazon location.

Q.   Okay.  And --

A.   The Cabazon store.

Q.   Okay.  And is Escada Desert Hills --

A.   Hills.

Q.   -- Premium Outlets an insider of the debtor?

P 888.272.0022  F 818.343.7119    BENHYATT
Certified Deposition Reporters    www.benhyatt.com
Page 79

A.    No.  It's a -- the landlord is actually under the assignment umbrella for that property.  It might just be likely as just internal nomenclature that that Escada was attached there as a -- as a location.

Q.    Okay.

A.    Meaning the Desert Hills store.

Q.    Okay.  So as --

MR. GOLD:  This is Ivan Gold.  I represent Simon in this matter.  I can tell you that all four of these, there are four --

MR. ESCOBAR:  Yes.

MR. GOLD:  -- locations here that are listed with the Escada name that are not Escada that's the name of the store.

MR. ESCOBAR:  Okay.

MR. GOLD:  Desert Hills, Woodbury Commons, Sawgrass Mills, Las Vegas North Outlets all have the Escada --

MR. ESCOBAR:  Right.

MR. GOLD:  -- name affixed to the landlord name.  There is no such entity with an Escada name and these entities are properly described elsewhere.  There's just a flaw in the chart.

MR. ESCOBAR:  Okay.  That answers my confusion.  Thank you.

All right.  Turning to Exhibit 4 then on the next page, Exhibit 4 to the SOFA.  So this is payments and transfers within one year.  I think I'm probably -- Mr. Fritz, I'm probably going to also going to ask for some sort of chart kind of laying out how all these entities are connected, obviously especially as it related to the debtor, just so that I kind of understand how this is working.

I have a feeling that if I try to ask those questions, I'll probably get similar answers, so I think that'll probably be the most efficient way to handle that. The one question I will ask about this now though is, which I highlighted on -- touched on earlier.

BY MR. ESCOBAR:

Q.   The last entity here, Escada Sourcing and Production Group, is that really the name of this entity or is this one and the same as the previous one, which I believe is Escada Sourcing and Production, LLC, the one listed on Schedule D?

A.   LLC.

Q.   LLC.  Okay.  Okay.

A.   That's an LLC.

Q.   Thank you.  Okay.  Okay.  Starting with Escada U.K. LTD, why did they receive 77,000?  What is the nature of that?

A.    These first two entities provide shared service
or accounting services to the debtor.

Q.    Okay.  And so the 77,000 is payment for these
services or something else?

A.    No.  Yeah, services.

Q.    Okay.  And is this --

A.    We have a shared service center located in
Manchester.

Q.    Okay.  And is the 77,000 represent, like, one
lump sum payment or is it, you know, monthly payments?  How
was that 77,000 paid out?

A.    I'm pretty certain that there is some sort of
routine or regular billing.  I'm not sure if it's monthly
or quarterly.  It, to be honest with you, it's paid based
on affordability at the time for the services provided.

Q.    Meaning the debtor pays what they can afford to
pay?

A.    Yeah.

Q.    Okay.  Okay.  Let's go to Escada Shared Services
LTD.  Why did they receive 610,000?

A.    Yeah.  I -- both these entities provide services
to the debtor with the majority of the services coming from
Escada Limited.

Q.    What types of services does Escada Shared
Services provide to the debtor?



A.    Accounting, accounts payable, accounts
receivable, treasury.  So we receive services from those
entities, both of the two -- the two that we've spoken to
now and charged for those and -- and pay based on
affordability --

Q.    Okay.

A.    -- for the financial management for the broader
Escada group is also located in that -- in that entity, as
well.  So --

Q.    Okay.

A.    There's also some IT systems that are, you know,
baked into that as well.

Q.    Okay.  So as to these last two entities we just
went over, you've said now that for both.  Basically the
debtor pays based on affordability.  So is -- does the
debtor receive invoices from Escada U.K. or Escada Shared
Services?

A.    Yeah.  So we're -- we are charged from the
provider and under normal circumstances, their services are
payable up front.  They're obviously providing staff and
the like in providing us services.

          But this Shared Service entity, you know, granted
some deferrals to us just in terms of, you know, survival
of the company given -- given where we were.  But, you
know, if you're in a normal operation, those would be

payable up front for what's provided.  We benefitted from
those deferrals.

Q.    Okay.  All right.  Let's jump to Escada Online.
Why did Escada Online receive 30,000 from the debtor?

A.    I believe -- let me just see that here.  Escada
Online, as we talked about, is 100 percent owned by Escada
America LLC.

Q.    Um-hum.

A.    I think there was some royalty transactions
probably between the two.  That's what comes to mind right
now.

Q.    Royalty.  Okay.  Royalties for what?

A.    Let me -- sorry.  I'm just trying to look in my
files here.  Yeah.  I think what that balance represents is
some -- probably represents some pass-through of inventory
between the two, right?

So as we talked about, Escada Online is marketing
the online channel as opposed to the store model, and
there's some -- probably some minor transactions between
the two on transfer of, you know, racks or different things
that the -- you know, the two businesses kind of share.

They market to third parties.  I'd have to come
back on the details of the makeup of that specific balance
though.

Q.    Okay.  All right.  Escada Store Services, why did

they get 25,000?

A.    Yeah.  Same.  Apologies, but same response.  It's
a pretty small amount off the top of my head.  I don't know
the specific reason --

Q.    Okay.

A.    -- that payment -- I mean obviously it's focused
on identifying those, but it's fairly minor in nature.  I'd
have to come back rather that --

Q.    Okay.

A.    -- rather than guess what that is in front of me.

Q.    Okay.  And finally, Escada Sourcing and
Production, why did they receive two million?

A.    Well, you know, that's for the -- the inventory,
the largest debtor that we have and I guess it was -- it
was part of the, you know -- similar to Escada U.S.  As the
sales were made -- sorry -- Escada U.K.  As sales were made
in the U.S. and funds collected, we were obligated to kind
of forward that money back to the owner of the inventory,
Escada Sourcing and Production.

Q.    Okay.

A.    That's a royalty --

Q.    Okay.

A.    -- and similar to the U.K.  We haven't done that
and completely got some sort of relief on that and it
showed itself in growing balance of that debt to that

entity.

Q.   Okay.  So then this two million that Escada
Sourcing and Production received within one year from the
bankruptcy filing, that two million does not represent
payment on the secured obligations that Escada Sourcing and
Production has, right?

A.   At the time of filing?  No.

Q.   So let me ask that again, because I'm not sure
maybe that you understand, and that's my fault.  Okay.  So
Escada Sourcing and Production, right, is a secured
creditor.  They have two claims.  You've listed two claims
that they have against the debtor.

In this Exhibit 4 to the statement of financial
affairs, you've disclosed -- the debtor discloses that
Escada Sourcing and Production received two million.  You
just described to me kind of what, in your opinion, that
two million was for.

What I didn't hear was that this two million
was -- represents paying down of the two secured claims.
So these weren't payments on the secured claims that the
debt -- that Escada Sourcing has against the debtor, is
that right?

A.   (No audible response.)

Q.   If you don't understand my question, that's fine.
You can --

A.    I believe --

Q.    -- say that.

A.    -- that's correct.  Yes.

Q.    You believe that's correct.  Okay.

A.    Yeah.  I may not understand the legalese of the designation of secured, but what specifically it represents the secured --

Q.    Sure.

A.    -- piece of that.

Q.    Well, and it's not meant to be a legal question.

A.    No.  It --

Q.    It's really just a factual question, and it's just really whether this two million includes payments for these two claims that Escada Sourcing has against the debtor, and it sounds like the answer is no, that this two million was for what you've just described.

A.    No.  I would categorize it as a partial payment for funds collected --

Q.    Uh-huh.

A.    -- in the U.S. for sales of personal production inventory --

Q.    Okay.

A.    -- versus payment of any sort of historical plan.

Q.    Okay.  And then kind of relatedly what I didn't see on Exhibit 4, I didn't see Eden Rock.  I don't see



Mega.  So was the debtor not making any payments on these
two claims within the one year since the filing of the
bankruptcy?

    A.    Eden Rock I can confirm, no.

    Q.    Okay.

    A.    I wonder -- I'm just looking for it in the other
list.  I'm going to have to come back to you on Mega --

    Q.    Okay.

    A.    -- because I just want to make sure that that
wasn't an omission and/or it wasn't picked up.  It was
considered maybe on a third-party list.

    Q.    Okay.

    A.    It may be that there was no payments in the past
year, but I just want to reconfirm that.

    Q.    Okay.  Perfect.  Thank you for that.  All right.
All right.  Jumping now to Exhibit 7 to the Statement of
Financial Affairs, which is page 56 of the docket, Entry
Number 75, I see that Dunright Services breach of contract
suit in Florida concluded.

      Does the debtor owe any money on behalf of this
lawsuit?

    A.    (No audible response.)

    Q.    Was there a judgment against the debtor as a
result of this lawsuit?

    A.    I believe it settled, but I'm not sure.

Q.   Okay.  So I'm just going to --

A.   I --

Q.   -- flag that because really the underlying reason for my question is, I didn't see Dunright Services as a creditor.  Maybe I missed them.  Maybe they're listed as something else, but I just didn't see a claim for them listed on the schedules.

So to the extent any judgment or obligation came out of this lawsuit, right, that's kind of the question; why aren't they on the schedules.  So I'll just flag that as something that you guys will look into for me.

A.   Yeah.

Q.   For *Escada v. Kahn*, that one also concluded.  I see that there -- Escada, the debtor, is the plaintiff but did any judgment against the debtor come out of this lawsuit?

A.   Can you just repeat which one?

Q.   Yeah.  *Escada America LLC v. Kahn Lucas Lancaster Inc*.  It's a breach of contract, landlord/tenant that was in the Supreme Court of the state of New York and it's listed as concluded.

A.   Yeah, I don't -- I don't think so.

Q.   Okay.  And then lastly, the very last one on this exhibit, *Site Crew Inc. (phonetic) v. Regent LP, et. al*. This one is also listed as concluded.  Did a judgment

against the debtor result from this lawsuit?

A.    (No audible response.)

Q.    And if you don't know, that --

A.    I don't.

Q.    -- is okay to say.

A.    I don't think so either.

Q.    You don't think so.

A.    I think that -- yeah.  I think it was resolved, but we can confirm.

Q.    Okay.  Yeah, because, again, I didn't see *Site Crew*, so just wanted to make sure.  All right.

A.    On the creditor list.  Understood.  We can confirm that.

Q.    All right.  And then I think this might be the last question for me before I open it up to folks.  I just wanted to clarify, Mr. Walsh, in the schedules, I think you've indicated that you've been with the debtor since the second quarter of 2017.

But then in your declaration, you state you've been with the debtor since 2016.  So I was just trying to understand which statement is right.  Maybe they're both right and there's some detail there that I'm missing.  So could you just clarify that for me?  How long have you been with the debtor?

A.    Yeah.  I actually started with the debtor as an

employee --

    Q.    Um-hum.

    A.    -- in 2017 and was there on a third-party contract or basis prior to that at the very end of 2016, up until becoming an employee --

    Q.    Okay.

    A.    -- in the second quarter.

        MR. ESCOBAR:  Okay.  Sounds good.

        Okay.  All right.  Trustee Jones, do you have any questions for the debtor?

        MR. JONES:  (No audible response.)

        MR. ESCOBAR:  Mr. Trustee, are you there?

        MR. JONES:  (No audible response.)

        MR. ESCOBAR:  Maybe he had to jump off.  Okay. Let's see.  Let's move onto the creditors then.  Mr. Gold, do you have any questions for the debtor?

        MR. GOLD:  I do.  Thank you.

        MR. ESCOBAR:  Okay.  Go ahead.

EXAMINATION BY MR. GOLD:

    Q.    Mr. Walsh, my name is Ivan Gold.  I represent a number of the debtor's former landlords.  Are you an officer, director or employee of other -- any other Escada-affiliated entities?

    A.    I'm not.

    Q.    Does any other Escada-affiliated entity



contribute to your salary?

    A.    It does not.

    Q.    Who are the current officers and directors of
Escada America LLC?

    A.    I know Mr. Reinstein is a principal of the
debtor.

    Q.    Well, who do you report to?

    A.    I don't have an official direct reporting
relationship in terms of a day-to-day manager.  We don't
really have a --

    A.    No.  It does not have --

    Q.    Do you have a president or CEO?  You have had
one.  So who's your president or CEO?

    A.    Escada Store Services oversees Escada America
LLC, but on -- on the payroll of Escada America LLC, there
isn't a specific president.

    Q.    Okay.

    A.    If I'm understanding your question correctly.

    Q.    Well, who do you -- you say that Escada Stores
oversees, that was your word, Escada Store Services LLC
oversees the operations of Escada America.  So who is the
president or CEO of Escada Store Services LLC?

    A.    I guess as we talked about earlier.  I can
confirm that Escada Store Services LLC is the 100 percent
owner of Escada America LLC and Michael Reinstein, you

know, I think the -- the president.  To be honest with you,
I just don't use that title president, but he's -- he's
the -- I'd use the word "principal," but I think it would
be fair to call him the president of both entities.

Q.   You've mentioned Mr. Reinstein a number of times.
What's his master entity?

A.   I -- I don't know the answer to that question.  I
mean I work for Escada America LLC and there's certainly
some affiliation and affiliated companies, but we've spoke
about already.  But he's in -- obviously has multiple
entities under the overall group.

Q.   When you say "group," isn't the group Regent LP a
hedge fund?  Isn't that who Mr. Reinstein's entity is?

A.   It's one of the entities that I'm aware of.
It -- for me to answer that is his entity, there's no
ownership relationship that I'm aware of and I can confirm
of Regent LP to Escada America LLC.  But it's got --

Q.   Well, isn't Regent the entity --

A.   (Indiscernible) --

Q.   -- isn't Regent LP the ultimate parent?  Isn't
that who owns Escada Store Services LLC?

A.   I do not believe so, but I also -- I'm not --
yeah, I don't know the answer to that in all honesty.

Q.   Who employs Mr. DePatie?

A.   (Indiscernible.)



Q.    What --

A.    I also don't the --

Q.    Which entity --

A.    -- answer to that.

Q.    -- employees Mr. DePatie?

A.    Yeah.  I --

        MR. FRITZ:  This is J.P. Fritz.  Mr. Walsh can
answer if he knows, but Mr. DePatie is also on the phone
and perhaps he could answer.

        MR. DePATIE:  Yeah.  Yeah.  I'm happy to answer.
I'm paid by Mega International LLC.

        MR. GOLD:  Mega International who's been
identified as a secured creditor is also represented here
today to be in-house counsel of the debtor?

        MR. DePATIE:  It's Shared Services.

        MR. GOLD:  That Mega International?

        MR. DePATIE:  So we -- no.  We provide legal --

        MR. GOLD:  Shared Services --

        MR. DePATIE:  -- service.

        MR. GOLD:  -- is a different entity?

        MR. DePATIE:  (Indiscernible.)

        MR. GOLD:  Shared Services is a different entity.
Mega was described as a lender.  Are you representing that
Mega International provides shared services to the debtor
over and above the $700,000 in Shared Services identified



in SOFA?

        MR. DePATIE:  That's correct.

        MR. GOLD:  Mega International, I think --

        MR. DePATIE:  Mega International provides shared services.  I don't mean Shared Services, the entity.  Mega International provides services to Escada America LLC while the business operates.

        MR. GOLD:  In addition to providing it with loans reflected in the schedules or those payments for secured services?

        THE WITNESS:  The loan --

        MR. DePATIE:  That's correct.

        THE WITNESS:  -- specifically -- yeah, sorry.  I'll just jump in here.  This is Kevin Walsh.  The loan that we discussed clearly was with Eden Rock and we also, just so there's -- there's no confusion, when we talked about shared services with the U.K. entity, that's primarily financial shared services in nature, and I provided some examples like accounts payable, accounts receivable, general accounting, et cetera.

        Mega provides other elements of shared service in terms of some legal services.  We benefit from some scale in terms of IT software licenses, consulting that we don't have on staff.  We're very lean.  So those are the type of either services that are billed or invoices that are paid

and attributable to Escada America LLC, the debtor if that
helps clarify somewhat.

BY MR. GOLD:

    Q.   Well, Mr. Walsh, can you turn on Docket #75.
It's the initially filed schedules.  I'm referring to page
14 of the .pdf, Item 2.4 of Schedule D, creditors who have
claimed secured by property, Mega International purports to
have a $1.5 million indebtedness owed by the debtor that is
secured by personal and fixture property and evidenced by a
UCC-1.  Do you see all that?

    A.   Yes.  I'm aware of it.  To be honest with you
right now, my -- my computer screen has frozen up.  Again,
I -- I'm not up on all the legal terminology, but I can
confirm that Escada America LLC owes Mega and does, in
fact, have a debt.

       If there's something from a legal point of view
that I might have misconstrued or misunderstood when I
responded to your question, I apologize.  But I can
confirm --

    Q.   No.  I'm trying to -- I'm trying to understand
the debt, because loaning the company money and securing it
by UCC-1 is one thing and providing a stream of shared
services, which you've described in detail, and then having
that secured by a UCC-1, and to accumulate $1.5 million in
shared services raises many questions.

So the question is, which one is it?  Is the $1.5 million indebtedness to Mega from a loan?  Is it from a stream of shared services over a period of time or is it some combination of the two?

A.   I would say a combination of the two.  Mega has clearly been funding and allowing Escada to continue as long as it has through funding expenses, including, you know, I'd have to -- I'd have to look into the exact breakdown, but paying benefits of Escada's employees and items like that.

Q.   And has that relationship, as you've described it involving multiple transactions, has that been continuous since the current ownership of the company since 2019 or that a new development?

A.   It has been continuous.

Q.   And in contrast, you described the Eden Rock transaction as keeping the debtor alive during COVID. That's listed at $579,000 and change and has a 6/26/20 date as the date the debt was incurred.  I'm speaking of Item 2.1 in the schedules.

Was that a one-time loan?  In other words, it was literally $579,000 and change with a mouse click or a wire transfer or was that a series of transactions?

A.   My recollection is it was a one-time loan.

Q.   Okay.  What are the terms of that loan?  Is it a

demand note?   Is there a payment schedule?   Does it draw

interest?

    A.   There is a loan document.   I don't have it in

front of me right now.

    Q.   Now you have referred to -- we've identified at

least two entities, Escada Shared Services LLC and Mega,

that provide a basket of services to the brick and mortar

operations of Escada America LLC.

        Are there -- is there one or more shared services

agreements that delineate these services and how they're

going to be charged?

    A.   There is a shared service agreement, I believe,

for the U.K.  I think I would answer as Mega that you would

find that most of that activity is funding of payments, you

know, for -- for vendors or shared vendors.

        We obviously benefit from the fact that Mega

provides services to a number of businesses across

different industries and that's -- that's helped Escada

America tremendously, right, because we're getting

economies of scale and we're also having them pay for

things at a time when probably Escada was not in the

position -- if it was forced to do its own payments, this

would've happened sooner.

    Q.   Well, okay.  That's your answer as to Mega.  How

about as to Escada Shared Services?

A.    Yeah.  There is --

Q.    You described a --

A.    -- I know there --

Q.    -- whole bunch of things they provide you with.
Is there an agreement?

A.    There is a document I've seen.  In terms of the
level of detail, I can't recall off the top of my head
right now exactly what was provided.  But it's -- I'll
reiterate again that it's an extremely lean organization
when you look at the headcounts in Escada America LLC.  So
it's -- those services in finance, accounting, accounts
payable, accounts receivable, treasury are provided from
that entity.

Q.    You signed both the schedules --

A.    Out of --

Q.    -- that were filed on February 1st and the
amended schedules filed last evening, is that correct?

A.    Correct.

Q.    Do you know why the contract with Escada Shared
Services LLC is not identified in Schedule G on either of
the two schedules?

A.    I think I also called it a document.  I just
haven't -- I'd have to go back and check on if it's a
formal contract or it's an email document or an
understanding.  That would be my response.

Q.    You paid Escada Shared Services $610,000 within a
year of the petition based on an email?

A.    No.  The billing has been consistent based on a
methodology that's followed not just for Escada America
LLC, but other entities to which they provide service.  So
it's not, in any way, a unique transaction or something
that, you know, just started and only relates to Escada
America.

Q.    I understand that you're sharing services with
other entities.  But is there an agreement that says you
pay 27 percent or 19 percent or whatever the number is of
AP or AR services or IT services?  Is there a document that
delineates your share of the shared services and how you'll
be paid for them -- how you'll be billed for them?  Excuse
me.

A.    Yes, I believe so.  I've seen it in the past and
I -- I don't have that in front of me right now.

Q.    You testified that it's not their -- Escada
Shared Services is paid based on what you can afford at any
one time, is that correct?

A.    Correct.

Q.    That means you don't pay all of it, is that
correct?

A.    Correct.  To the best of my knowledge, yes.

Q.    Do you know how much is unpaid?  You referred to

the -- you used the word deferral in your testimony

earlier.  How much is deferred?

    A.   Yeah.  I think -- I think when I said deferral, I

think under normal circumstances, the expectation would be

since that organization was employing folks doing primarily

finance work, the expectation would be that we're paying up

front.

        We haven't been doing that.  So when I said

deferral, we were historically running balances there and

in -- that's what I meant by deferral.  I don't know if

there's a legal definition.

    Q.   Okay.  No, no, I got you now.  But that's a good

clarification.  Like, so use --

    A.   Delayed.

    Q.   -- the word balance --

    A.   Delayed payments.  Delayed payments.

    Q.   Okay.  Okay.  So let's use the word balance,

which you just used.  What is the balance, approximately,

that Escada America owes to Escada Shared Services LLC,

either as of today or as of the petition date?  What's your

best estimate?

    A.   Yeah.  I'm just going to reboot my computer here.

I apologize.  It froze up.  I can tell you what the -- what

the balance is in a second.

        MR. ESCOBAR:  Okay.  While Mr. Walsh is doing

that, this is Eryk from the U.S. Trustee.  Mr. Gold, I'll

give you until about 11:00 and then I'm going to proceed to

others in case others have questions.  So just keep that in

mind.

         (Pause.)

BY MR. GOLD:

    Q.   If you can't readily retrieve it, Mr. Walsh, I'll

try it a different way.  Is it a six figure amount?

    A.   Sorry.  I didn't -- I didn't hear your question.

I apologize.  Did you just ask something?

    Q.   If you're having difficulty retrieving the

document, I'll ask it a simple, different way.  Is the

balance --

    A.   Yeah.  No, I'm just --

    Q.   -- for then a six-figure --

    A.   -- I'm just rebooting --

    Q.   -- amount?

    A.   -- computer.  I don't believe it to be a six-

figure amount, but I will --

    Q.   Okay.

    A.   -- get the answer shortly.

    Q.   Okay.  Why is Escada Shared Services LLC not

listed as a creditor in the schedules if you owed them

money?

    A.   Let -- again, I'll confirm what the amount is, if



any, in a second.

        (Pause.)

        THE WITNESS:  Okay.  Sorry about that.  I
rebooted and I called up the file.

        (Pause.)

        THE WITNESS:  Yeah.  So it looks like I see, if
I'm reading this correctly, 32,000.

BY MR. GOLD:

    Q.   Yeah.  Let's assume 32,000 is correct.  My
question stands.  Why are they not listed as a creditor?

    A.   I believe we have them included on the balance
sheet section.  It -- no, maybe they're --

    Q.   I'm not referring to --

    A.   -- (indiscernible) --

    Q.   -- the balance sheet, sir.  I'm referring to the
schedule filed --

    A.   Understood.

    Q.   -- in the bankruptcy court.

    A.   Understood, and I appreciate the question.
Perhaps they should have been in terms of the creditors.  I
would -- yeah, I'd have to circle back on that.  Certainly,
the creditors --

    Q.   Let's move to another topic.

    A.   -- are --

    Q.   You said Escada Sourcing owns all the inventory



in North America, is that correct?

    A.    Correct.  Sourcing and Production.

    Q.    Okay.  Why don't they pay for their own customs bonds to import inventory into the United States?

    A.    It just --

        (Audio terminates abruptly.  Off the record.)

        (On the record.)

        MR. ESCOBAR:  This is Eryk Escobar with the U.S. Trustee's Office.  We are still on the 341(a) meeting of creditors for Escada America LLC, Case Number 22-10266.  It is still February 8, 2022 and Mr. Gold was still asking questions.

        Go ahead, Mr. Gold.

        MR. GOLD:  Thank you.

BY MR. GOLD:

    Q.    So, Mr. Walsh, you were explaining why it is that the debtor funds, what looks like from Exhibit 7, the Schedule AB, $1.4 million in deposits to Western Surety Company for the purposes of obtaining customs bonds for inventory that's ultimately owned by another entity, why is that?

    A.    (No audible response.)

        MR. ESCOBAR:  Mr. Walsh, are you there?

        MR. GOLD:  Mr. Walsh, you have a question.

        THE WITNESS:  Oh, sorry.  Apologies.  Yeah.  It



does so as a service to Sourcing and Production would be --
would be my answer and it's, you know, that was something
that, you know, first kind of to use of importation was
something but between the two entities that's continued.

BY MR. GOLD:

Q.   Is that under a written agreement?

A.    To be honest with you, I didn't -- I didn't set
that structure up.  I'm not sure if that's your specific
question it's specifically called out in an agreement or in
the consignment agreement.

Q.   And your first day declaration, you referred to
the fact that the debtor operates three store locations for
a separate non-debtor entity called Escada America
Management LLC, is that correct?

A.   Correct.  There are stores, yes.

Q.   Okay.  Is there an agreement between Escada
America Management LLC and the debtor with respect to the
operations of those stores, a license agreement, a sublease
or some other arrangement?

A.   The debtor's getting full benefit --

Q.   Not my question, sir.

A.   -- of the store.

Q.   That's not my question.  My question is, is there
an agreement between these two entities governing the
relationship by which the debtor gets the full benefit of

leases signed in another party's name?

A.   I'm -- I'm not sure about that.

Q.   What are those three locations?

A.   The locations are -- that have leases under Escada America Management are Beverly Hills, Costa Mesa, and Chicago.

Q.   And Chicago, is it true that that both Chicago --

A.   That would --

Q.   -- and Costa Mesa, the debtor has provided the security deposits to the landlords to those locations?

A.   Yes, because the debtor used to be the tenant and the LCs are -- they're in the process of being moved over to the other entity.

MR. ESCOBAR:  Okay.

THE WITNESS:  I can confirm and --

MR. GOLD:  The process was --

THE WITNESS:  -- let me speak to that.

MR. ESCOBAR:  Okay.  This is Eryk from the --

MR. GOLD:  All right.

MR. ESCOBAR:  -- U.S. Trustee.  Mr. Gold, I'm going to jump in.  I gave you a little past 11:00 --

MR. GOLD:  Yeah.

MR. ESCOBAR:  -- because the recorder died.  So before I let you go further, I'd like to give others an opportunity.



Mr. Cannizzaro, do you have any questions for the debtor?

MR. CANNIZZARO:  I do.

MR. ESCOBAR:  Go ahead.

MR. CANNIZZARO:  Good morning.  This is John Cannizzaro.  For the record, John Cannizzaro, Ice Miller, for 717 GFC LLC.  I want to start by apologizing, Mr. Fritz, but I wanted to get you a list of questions in advance so you could be prepared.

If there's anything that I touch on that you don't know, we can always follow up, but I think this should be pretty short.

EXAMINATION BY MR. CANNIZZARO:

Q.   Going back to the inventory that's in the name of Escada Sourcing and Production, if I understand your testimony correctly, that all of the inventory is owned by the ESP entity and consigned to the debtor, is that correct, or is that your contention?

A.   Correct.

Q.   Line 18 of the schedules doesn't list any inventory and line 21 of the SOFA lists property held for another, and it lists ESP there but with a value of unknown.  There's also the amount on Schedule D, part of it is for consigned goods and part of it is for legacy liabilities.

Is the amount listed for consigned goods the value of goods that the debtor is currently holding and has yet to remit payments for on sale or is it for goods that the debtor has sold and owes a remittance to ESP?

A.   I believe it's a net amount reflecting the amount that the debtor owes, less a commission owed to the debtor.

Q.   So just to be clear, it's for goods that were consigned to the debtor that have been sold and the debtor collected payment from customers and has yet to remit the net to ESP?

A.   Correct.

Q.   Okay.  For the goods, the consigned goods that the debtor is currently holding, do you know approximately the -- let's say the net value of those goods if they're sold?

A.   Well, they're -- just to be clear, they're not on the books of the debtor, right?

Q.   I understand that's what the debtor's point of view is.  I'm just trying to understand the value of the property that you're currently holding under consignment.

A.   Off the top of my head, I'd probably estimate somewhere around three to four million, but it is an estimate.

Q.   Okay.  And then with -- again, with relation to ESP and the debts listed on Schedule D, if the first debt

is related to amounts that are due and owing for goods that were sold but payment has not yet been remitted, what's the nature of these what's described as legacy debt to other entities?

A.    That debt represents monies owed by Escada America to other affiliates in Europe and Sourcing and Production acquired that debt from those affiliates. Escada America had that obligation and continues to have that obligation.    It's just a structure established by the -- by the prior ownership that was based out of Europe.

Q.    So is the debts to these European entities were acquired as part of the 2019 transactions --

A.    Correct.  I -- as part of that, the global Escada group was -- was part of the transaction, but there's been -- my understanding is there's been other changes in Europe leading to Sourcing and Production acquiring those debts.    I believe there were other insolvency precedents that occurred in Europe and believe that that's where Sourcing and Production acquired those debts.

BY MR. CANNIZZARO:

Q.    Okay.  So kind of harkening back to Mr. Escobar's question about the dates that was acquired, these -- the debt, the original debt for the $19 million on line 2.3, could pre-date 2019, but at -- in 2019, the debt was transferred to the ESP entity?  To clarify --

A.    That's correct.

Q.    -- the ESP entities purchased the debt from various entity -- from various European entities?

A.    Yeah.  I think that's correct.  I think it was later than 2019, but yes.

Q.    Okay.

A.    Just --

Q.    Change -- oh, go ahead.  I don't want to interrupt.

A.    No.  I think that's all.

Q.    Okay.  Thank you.  Did the debtor receive any PPP funds?

A.    We did not.  My understanding is we didn't qualify.

Q.    Okay.  With respect to the entities that are listed on Exhibit 4 to the SOFA as having received -- as insiders having received payments, is it your understanding that those -- yeah, should there be a cause of action against one or more of those entities, that they would be collectible?

A.    I can't opine on that, both from a legal point of view nor from a point of view on those -- on those entities.

Q.    Okay.  Prior to the filing of the bankruptcy case were there any efforts pre-petition to market the debtor

for sale?

A.    Not to the best of my knowledge.

Q.    Okay.  And specifically with respect to my client, 717 GFC LLC, is it your understanding that the lease is still in place for the 717 ship location or that it terminated prior to the bankruptcy case?

A.    I probably would ask Mr. Fritz to weigh in there from a legal point of view.  I know that we -- the debtor vacated the space.

MR. FRITZ:  From a legal point of view, I -- we would have to review the lease agreement, look at the law controlling it under the agreement, and look at how the state law interprets the term terminate.  I know some states take different approaches to it before we can answer that question.

MR. CANNIZZARO:  Thank you both.  That makes --

THE WITNESS:  Yeah.

MR. CANNIZZARO:  -- sense to me.  We can confer, I think, offline to clarify that.  The only other thing I would ask is that if an org chart is circulated connecting the various entities, if I could be copied on that.  I would appreciate it.   But I have no further questions.

MR. ESCOBAR:  Okay.  Thank you.  This is Eryk Escobar with the U.S. Trustee.  Has any other creditor joined us since we've started this call?

        (No response.)

        MR. ESCOBAR:  Hearing none, I will proceed.

        Okay.  I'm going to need a continuance on this.
There's a number of items that I flagged and items that I
will be requesting, so I would like the opportunity to kind
of look into that and confer with counsel offline.

        I'm looking at March 8th at the same time.
March 8th?  Mr. Fritz, does that work with your calendar?

        MR. GOLD:  Mr. Escobar, before we conclude, may I
ask a single question about an omitted creditor?

        MR. ESCOBAR:  I'm sorry.  Who's this?

        MR. GOLD:  This is Ivan Gold.

        MR. ESCOBAR:  Oh, hi, Mr. Gold.

        MR. GOLD:  I just wanted to ask one more question
about an omitted creditor.

        MR. ESCOBAR:  Yeah, yeah.  Just hang tight
though.  Hang tight.  Let me finish this first.

        Mr. Fritz, does March 8th work for your calendar?

        MR. FRITZ:  March 8th is a busy day for me.
Could we look at March 9 perhaps?

        MR. ESCOBAR:  You know, that's Judge Bluebond's
hearings usually for Chapter 11s.  So let me just go out to
March 15th, which is the next Tuesday.

        MR. FRITZ:  I have a highly contested plan
confirmation hearing on that date.

MR. ESCOBAR:  Okay.  Let me take step back.

MR. FRITZ:  Would the 16th be available or is that also not available?

MR. ESCOBAR:  Yeah.  Wednesdays I typically just like to leave for Judge Bluebond's Chapter 11 calendars, so I'd rather not try to squeeze anything in on a Wednesday.

MR. FRITZ:  What about March 10?

MR. ESCOBAR:  March 10?  Yeah, that works. Thursday, March 10th at the same time, 9:15.

Mr. Walsh, are you available at that time?

THE WITNESS:  Yes.

MR. ESCOBAR:  Okay.  Great.  All right.  So as I said, this will be continued.  It's not being concluded. It'll be continued to Thursday, March 10 at 9:15.

Before we do that, Mr. Gold, you said you had one more question?

MR. GOLD:  I do, and thank you, again, Eryk.

EXAMINATION BY MR. GOLD:

Q.    Mr. Walsh, on Exhibit 7 to the SOFA, you were asked about this earlier, has a list of pending litigation against the debtor at the time of the petition.  Do you see that?

A.    Yes.

Q.    Okay.  About halfway down the list, you have an action pending in Gwinnett County, Georgia.  You

characterized it as the Real Property Trust.  I'll

represent to you it's the *Retail Property Trust v. Escada*

*America*.  Are you familiar with that litigation?

A.    I'm not involved in all these litigations or --

Q.    Are you --

A.    -- concerning (indiscernible) --

Q.    -- aware of -- are you aware of that litigation

is based on debtor's failure to pay under a lease

termination agreement?  Are you familiar with that?

A.    Yes, I'm familiar that there was a claim, I

believe, related to a location in Atlanta.

Q.    Okay.  Do you know why this plaintiff was a party

with the debtor to a written lease termination agreement is

not listed as a creditor on the schedules, but it's listed

here?

A.    Yeah.  I think because the lease was over but,

no, I can -- I can discuss that with Mr. Fritz if that was

an oversight.

MR. ESCOBAR:  Okay.  Great.  This is Eryk again

with --

MR. GOLD:  We have to provide --

MR. ESCOBAR:  -- the U.S. Trustee --

MR. GOLD:  -- Mr. Fritz with a copy of the

written agreement for a liquidated sum that is the subject

of that action, and I thank you, Mr. Escobar, for the

opportunity to ask the questions.

       MR. ESCOBAR:  Of course.  Okay.  So as I said, this matter stands continued to Thursday, March 10th at 9:15 a.m.  Thank you everybody and you can look out for the dial in information on the docket.  I'll file that within a couple days.

       Thank you.  And we're off the record.

            * * * * * * * *

       I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____     Date:  02/25/2022

RUTH ANN HAGER, C.E.T.**D-641

# EXHIBIT C

0.0/
- /3-16-20/ /cdl



**1 OF 1 RECORD(S)**

FOR INFORMATIONAL PURPOSES ONLY
Copyright © 2022 LexisNexis
a division of Reed Elsevier Inc. All Rights Reserved.
Report Created: February 15, 2022 - Tuesday 4:48 PM

# Business Registration Records
**This data is for informational purposes only.**

## Business Information

|  |  |
|---|---|
| **Filing Number:** | 7445753 |
| **Company Name:** | EDEN ROC INTERNATIONAL LLC |
| **Mailing Address:** | 3500 S DUPONT HWY |
|  | DOVER, DE 19901-6041 |
| **Corporation Code:** | Secretary of State |
| **Secretary Of State Code:** | Limited Liability Company |
| **Status:** | Active |
| **Filing Date:** | 05/31/2019 |

## Business Registration Officers

|  |  |
|---|---|
| **Position:** | AGENT |
| **Address:** | 3500 S DUPONT HWY |
|  | DOVER, DE 19901-6041 |

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. In addition, Industry Classifications and Normalized Titles are data elements automatically derived and unverified. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use: Litigation
Your GLBA Permissible Use: Legal Compliance
Copyright© 2022 LexisNexis. All rights reserved.

**End of Document**

# EXHIBIT D

0.0/
. /0-0-00/ /cdl

| LLC-5 | **Application to Register a Foreign Limited Liability Company (LLC)** | **20162321 0470** |

To register in California an LLC from another state, country or other place, fill out this form, and submit for filing along with:

- A **$70** filing fee, and
- A certificate of good standing, issued within the last six (6) months by the agency where the LLC was formed.
- A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form.

***Important!*** LLCs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

Registered LLCs cannot provide in California "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

**FILED** ᴸᵏᴬ
Secretary of State
State of California ⅋

**AUG 1 5 2016**

ICC

This Space For Office Use Only

**For questions about this form, go to** *www.sos.ca.gov/business/be/filing-tips.htm*

### LLC Name to be used for this LLC in California

① a. <u>Mega International, LLC</u>
   *LLC Name* — List the LLC name you use **now** (exactly as listed on your certificate of good standing)

   b.
   *Alternate Name* — If the LLC name in Item 1a does not comply with California Corporations Code section 17701.08; list an alternate name to be used in California exactly as it is to appear on the records of the California Secretary of State. The alternate name must include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and **may not** include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company. For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

### LLC History

② a. Date your LLC was formed (*MM, DD, YYYY*): _____ 07/31/2015 _____

   b. State, country or other place where your LLC was formed: _____ Delaware _____

   c. Your LLC currently has powers and privileges to conduct business in the state, country or other place listed above.

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may **not** list an LLC as the agent. **Do not** list an address if the agent is a California registered corporate agent as the agent's address for service of process is already on file.)

③ a. Michael Reinstein
   *Agent's Name*

   b. <u>2121 Avenue of the Stars, 34th Floor, Los Angeles</u>          **CA**   90067
   *Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box*   *City (no abbreviations)*   *State*   *Zip*

If the agent listed above has resigned or cannot be found or served after reasonable attempts, the California Secretary of State will be appointed the agent for service of process for your LLC.

### LLC Addresses

④ a. 2121 Avenue of the Stars, 34th Floor, Los Angeles,          **CA**   90067
   *Street Address of Principal Executive Office - Do not list a P.O. Box*   *City (no abbreviations)*   *State*   *Zip*

   b. 2121 Avenue of the Stars, 34th Floor, Los Angeles          **CA**   90067
   *Street Address of Principal Office in California, if any - Do not list a P.O. Box*   *City (no abbreviations)*   *State*   *Zip*

   c. _____
   *Mailing Address of Principal Executive Office, if different from 4a or 4b*   *City (no abbreviations)*   *State*   *Zip*

### Read and sign below:

I am authorized to sign this document under the laws of the state, country or other place where this LLC was formed.

| *Sign here* | Michael Reinstein | Authorized Signatory |
| | *Print your name here* | *Your business title* |

| Make check/money order payable to: **Secretary of State** | **By Mail** | **Drop-Off** |
| Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State<br>Business Entities, P.O. Box 944228<br>Sacramento, CA 94244-2280 | Secretary of State<br>1500 11th Street., 3rd Floor<br>Sacramento, CA 95814 |

Corporations Code §§ 17701.04, 17701.08, 17708.02, Revenue and Taxation Code § 17941
LLC-5 (REV 01/2014)

2014 California Secretary of State
www.sos.ca.gov/business/be



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "MEGA INTERNATIONAL, LLC" IS DULY
FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD
STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS
OFFICE SHOW, AS OF THE FIFTEENTH DAY OF AUGUST, A.D. 2016.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "MEGA
INTERNATIONAL, LLC" WAS FORMED ON THE THIRTY-FIRST DAY OF JULY,
A.D. 2015.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN
PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

5796076  8300
SR# 20165367362
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202829495
Date: 08-15-16

**201623210470**

# EXHIBIT E

0.0/
. / 3-16-22/ /



**1 OF 1 RECORD(S)**

FOR INFORMATIONAL PURPOSES ONLY
Copyright © 2022 LexisNexis
a division of Reed Elsevier Inc. All Rights Reserved.
Report Created: February 15, 2022 - Tuesday 4:49 PM

# Business Registration Records
**This data is for informational purposes only.**

## Business Information

| | |
|---:|:---|
| **Filing Number:** | 3085691 |
| **Company Name:** | ESCADA SOURCING AND PRODUCTION LLC |
| **Mailing Address:** | 3500 S DUPONT HWY |
| | DOVER, DE 19901-6041 |
| **NAICS Code:** | 221210 (Natural Gas Distribution) |
| **SIC Code:** | 4925 (GAS PRODUCTION AND/OR DISTRIBUTION) |
| **Corporation Code:** | Secretary of State |
| **Secretary Of State Code:** | Limited Liability Company |
| **Status:** | Active |
| **Filing Date:** | 06/17/2020 |

## Business Registration Officers

| | |
|---:|:---|
| **Position:** | AGENT |
| **Address:** | 3500 S DUPONT HWY |
| | DOVER, DE 19901-6041 |

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. In addition, Industry Classifications and Normalized Titles are data elements automatically derived and unverified. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

Your DPPA Permissible Use: Litigation
Your GLBA Permissible Use: Legal Compliance
Copyright© 2022 LexisNexis. All rights reserved.

**End of Document**

# EXHIBIT F

# Claims Summary

## 2:22-bk-10266-BB Escada America, LLC

Type: bk          Chapter: 11          Office: 2 (Los Angeles)
Assets: y         Judge: BB
Date Filed:       Last Date to File Claims:    Last Date to File (Govt):
01/18/2022        03/29/2022                   07/18/2022
Trustee: Gregory Kent Jones (TR)

| Claim # | | Amount claimed * | Date filed | Creditor number | Creditor name |
|---|---|---|---|---|---|
| 1 | View | $2887.17 | 01/21/2022 | 41069462 | FLORIDA POWER & LIGHT |
| 2 | View | $79500.00 | 01/27/2022 | 41069483 | Internal Revenue Service |
| 3 | View | $841749.01 | 01/28/2022 | 41069532 | Premium Outlet Partners LP |
| 4 | View | $13326.39 | 01/28/2022 | 41078426 | SPG Houston Holdings, L.P. |
| 5-2 | View | $750769.87 | 01/28/2022 | 41078541 | Las Vegas North Outlets, LLC |
| 6 | View | $1546.80 | 01/31/2022 | 41081120 | Harris County Water Control and |
| 7 | View | $8204.13 | 01/31/2022 | 41081122 | Harris County Municipal Utility District #358 |
| 8 | View | $700.25 | 01/31/2022 | 41086364 | Central Telephone Company -Nevada |
| 9 | View | $8537.47 | 02/09/2022 | 41091073 | Los Angeles County Treasurer and Tax Collector |
| 10-2 | View | $440000.00 | 03/10/2022 | 41092180 | The Retail Property Trust |
| 11 | View | $543937.97 | 02/10/2022 | 41092402 | Sawgrass Mills Phase IV, LLC |
| 12 | View | $417439.45 | 02/10/2022 | 41092457 | PREMIUM OUTLET PARTNERS, L.P. |
| 13 | View | $21674.03 | 02/11/2022 | 41093118 | AMEX TRS Co., Inc. |
| 14 | View | $1382622.26 | 02/18/2022 | 41069406 | Ala Moana Anchor Acquisition, LLC |
| 15 | View | $2441373.90 | 02/18/2022 | 41100245 | B.W.Hotel, L.L.C. |
| 16 | View | $250000.00 | 02/21/2022 | 41100945 | CHETRIT 1412 LLC |
| 17 | View | $800.00 | 02/24/2022 | 41105868 | Franchise Tax Board |
| 18 | View | $3600.92 | 03/02/2022 | 41069450 | Direct Construction Company Limited |
| 19 | View | $3164.50 | 03/02/2022 | 41114792 | Opentext Corporation in Waterloo |
| 20 | View | $837026.18 | 03/12/2022 | 41069429 | Chicago Oak Street Partners, LLC |
| 21-2 | View | $266.61 | 03/15/2022 | 41069507 | M19 Retail - Raymark ULC |
| 22 | View | $2677.50 | 03/16/2022 | 41124021 | Fedex Corporate Services, Inc |

**Total Number of Claims: 22**

| | |
|---|---|
| **Total Amount Claimed *** | $8051804.41 |
| **Total Amount Allowed *** | |

\* Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

|                    | Claimed      | Allowed |
| ------------------ | ------------ | ------- |
| Secured            | $9750.93     |         |
| Priority           | $114405.83   |         |
| Administrative     |              |         |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 03/16/2022 12:34:19 | | |
| **PACER Login:** | AllenMatkins1 | **Client Code:** 999903-40000 1487 |
| **Description:** Claims Summary | **Search Criteria:** | 2:22-bk-10266-BB Filed or Entered From: 1/1/2022 Filed or Entered To: 1/1/2023 |
| **Billable Pages:** 1 | **Cost:** | 0.10 |

https://ecf.cacb.uscourts.gov/cgi-bin/SearchClaims.pl?129481776483547-L_1_0-1    3/16/2022