JOHN-PATRICK M. FRITZ (State Bar No. 245240)
JONATHAN D. GOTTLIEB (State Bar No. 339650)
LEVENE, NEALE, BENDER,
YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234
Facsimile:   (310) 229-1244
Email: JPF@LNBYG.COM; JDG@LNBYG.COM

Attorneys for Chapter 11
Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>ESCADA AMERICA LLC,<br><br>        Debtor and Debtor in Possession. | ) Case No.: 2:22-bk-10266-BB<br>) Chapter 11 Case<br>)<br>) **DEBTOR'S NOTICE OF MOTION AND**<br>) **MOTION FOR AN ORDER**<br>) **AUTHORIZING DEBTOR TO ENTER**<br>) **INTO AGREEMENT TO TERMINATE**<br>) **LEASE, PERMIT LANDLORD TO**<br>) **RECOVER SECURITY DEPOSIT, AND**<br>) **RELEASE CLAIM AGAINST DEBTOR**<br>) **AND THE ESTATE; MEMORANDUM**<br>) **AND AUTHORITIES IN SUPPORT**<br>) **THEREOF; DECLARATION OF**<br>) **KEVIN WALSH IN SUPPORT**<br>) **THEREOF**<br>) **[Landlord: 693 Fifth Owner LLC]**<br>)<br>) <u>Hearing:</u><br>) Date:   September 14, 2022<br>) Time:  10:00 a.m.<br>) Place:  Courtroom 1539<br>)          255 East Temple Street<br>)          Los Angeles, CA 90012<br>)<br>) Hearing to be held in-person and by video-<br>) conference Government Zoom, see Court's<br>) website under "Telephonic Instructions" for<br>) more details:<br>) https://www.cacb.uscourts.gov/judges/honor<br>) able-sheri-bluebond<br>)<br>) |

1

**PLEASE TAKE NOTICE** that a hearing will be held on September 14, 2022, at 10:00 a.m. before the Honorable Sheri Bluebond, United Stated Bankruptcy Judge for the Central District of California, in Courtroom 1539 located at 255 East Temple Street, Los Angeles, California 90012 for the Court to consider "Debtor's Notice of Motion and Motion for an Order Authorizing Debtor to Enter into Agreement to Terminate Lease, Permit Landlord to Recover Security Deposit, and Release Claim Against Debtor and the Estate" (the "<u>Motion</u>") filed by Escada America LLC, a Delaware limited liability company (the "<u>Debtor</u>"), the debtor and debtor-in-possession in the above referenced chapter 11 bankruptcy case.

On July 19, 2018, the Debtor entered into that certain "*Agreement of Lease*" (the "<u>Agreement</u>") as amended by the "*First Amendment to Agreement of Lease*" dated October 9, 20202, but effective as of April 1, 2020 (the "<u>First Amendment</u>" and with the Agreement, together, the "<u>Lease</u>"), with 693 Fifth Owner LLC, a Delaware limited liability company (the "<u>Landlord</u>"), for the Debtor's lease of the entire sixth floor of the building located at 693 Fifth Avenue, New York, NY (the "<u>Premises</u>").  The term of the lease expires May 31, 2029.  A true and correct copy of the Lease is attached as **Exhibit "1"** hereto.

The Debtor and Landlord have entered into a "*Lease Termination and Surrender Agreement*" (the "<u>Termination Agreement</u>"), dated July 12, 2022, subject to Court approval by way of this Motion.  A true and correct copy of the Termination Agreement is attached as **Exhibit "2"** hereto.

The most salient and key term of the Termination Agreement is that the Lease is being terminated such that Landlord will have an allowed claim and authorization to collect the security deposit of $192,582, but otherwise will not have any lease rejection damages claim or any other claim against the Debtor or the Debtor's estate.  (Although the Termination Agreement has an "outside date" of August 24, 2022, to obtain an order approving the Termination Agreement, the Landlord has agreed to extend that outside date by one month to September 24, 2022.)

1     The Debtor scheduled the Landlord as holding a prepetition unsecured claim in the

2    amount of $1,641.00. According to the Debtor's calculations, if the Debtor were to reject the

3    Lease pursuant to 11 U.S.C. § 365, the resulting lease rejection damages claim under 11 U.S.C.

4    § 502(b)(6) would be approximately $476,642.24. After allowing the Landlord's recovery of

5    the security deposit (to which the Debtor does not have any colorable objection), the Landlord

6    would have a remaining general unsecured claim of approximately $284,060.24, which the

7    Landlord is agreeing to waive in favor of the Debtor and the estate. The Debtor's calculations

8    are summarized in the attached **Exhibit "3"** hereto.

9     The Debtor respectfully submits that the Termination Agreement, as a compromise,

10   should be approved by the Court under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

11   The matter is not complex or difficult. If forced to litigate, the Debtor does not believe it could

12   obtain any better result, and, litigation would only add to administrative expenses with a net

13   loss, and there is nothing for the Debtor to collect, even if it could somehow otherwise prevail.

14   The Termination Agreement is a great result for the estate and all creditors by eliminating estate

15   liability. Accordingly, the Motion should be granted.

16    **PLEASE TAKE FURTHER NOTICE** that this Motion is based upon Rule 9013-1 of

17   the Local Bankruptcy Rules for the Central District of California ("LBR"), Rules 9013 and 9019

18   of the Federal Rules of Bankruptcy Procedure ("FRBP"), 11 U.S.C. §§ 105(a), 363 365, and

19   502, this Motion, the supporting Memorandum of Points and Authorities, the annexed

20   Declaration of Kevin Walsh (the "Declaration"), the arguments and statements of counsel to be

21   made at the hearing on this Motion, and other admissible evidence properly brought before the

22   Court.

23    **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

24   1(f), any opposition to this Motion must be filed with the Clerk of the United States Bankruptcy

25   Court and served upon the United States Trustee as well as counsel for the Debtor at the address

26   located in the upper left-hand corner of the first page of this Notice and Motion by no later than

27   fourteen (14) days before the hearing on this Motion.

28

1          **PLEASE TAKE FURTHER NOTICE** that the failure to file and serve a timely

2    response to this Motion may be deemed by the Court to be consent to the granting of the relief

3    requested in this Motion.

4          **PLEASE TAKE FURTHER NOTICE** that the failure to file and serve a timely

5    response to this Motion may be deemed by the Court to be consent to the granting of the relief

6    requested in this Motion.

7          **WHEREFORE,** the Debtor respectfully requests that this Court enter an order:

8        (1)    affirming the adequacy of the notice of the Motion;

9        (2)    granting the Motion in its entirety;

10        (3)    authorizing the Debtor to enter into the Termination Agreement;

11        (4)    terminating the Lease without rejection;

12        (5)    permitting the Landlord to collect the security deposit in the amount of

13    $192,582.00;

14        (6)    disallowing any other claim that the Landlord may have against the Debtor or the

15    Debtor's estate; and

16        (7)    granting such further and other relief as the Court deems just and proper.

17    Dated: August 22, 2022        ESCADA AMERICA LLC

18                    By: ___*/s/ John-Patrick M. Fritz*_____

19                        JOHN-PATRICK M. FRITZ

                    JONATHAN D. GOTTLIEB

20                        LEVENE, NEALE, BENDER,

                    YOO & GOLUBCHIK L.L.P.

21                        Attorneys for Chapter 11

22                        Debtor and Debtor in Possession

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      STATEMENT OF FACTS

**A.      Case Background.**

1.      The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on January 18, 2022 (the "Petition Date").  The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession.

2.      The Debtor was formed as a Delaware limited liability company in 2009.  The Debtor is a national specialty retailer selling high-end, ready-to-wear women's apparel with its main office in Beverly Hills, California, an office New York City, New York, and, as of the Petition Date, ten (10) retail stores across seven (7) states in the United States, and over 50 fulltime employees.  As part of its first-day motions, the Debtor rejected five (5) leases, later rejected two more leases by way of motion, another two leases ended on their own terms, and now the Debtor is operating at one location with approximately 4 employees in its corporate office and 6 employees in the store.

3.      The Debtor's retail business is generally known to the public and branded as "Escada."  The Debtor uses the "Escada" brand via a license agreement and does not own any intellectual property rights in connection with the "Escada" brand.  For several decades, Escada had been a global retail brand for high-fashion, high-end, ready-to-wear apparel for women, with an emphasis on high-fashion evening wear. On a global scale, Escada has various retail stores and subsidiaries in several countries in Europe, including but not limited to Spain, England and Germany.  Escada also has retail stores in North America, including the Debtor, which operates Escada's brick-and-mortar retail business only in the United States.

4.      By 2019, the Escada business on a global scale was in deep distress and could not continue.  At that time, the Debtor, together with other subsidiaries of Escada's then-parent company, was acquired by new ownership (which is now the current ownership and management).  At the time of the acquisition of Debtor in 2019, Escada had 29 subsidiaries in

22 countries, all of which were financially distressed.   In December 2019, the Debtor devised and began implementation of a plan to turn around the United States Escada retail business. Debtor believed that the business could be operated at a profit if fundamental business-model changes were implemented, such as overhauling the Debtor's technological suite and reducing speed to market by shifting supply chains from Asia to Europe.  Debtor's turnaround plan was also contingent upon Debtor's ability to sell product at Debtor's physical locations because ecommerce sales were minimal.  However, what was not – and could not be – known at the time of the acquisition in November 2019, was that an unprecedented, global, catastrophic, and life-changing event with severe economic consequences was on the immediate horizon – the Covid-19 pandemic.

5.    In December 2019, just one month after the acquisition and just as the Debtor's transformation plan was being put into effect, the novel corona virus, known to us now as Covid-19, was quietly spreading in certain regions of Asia, unbeknownst to the rest of the world.  From December 2019 through February 2020, the Debtor prepared to implement a number of business-model and operational changes.  However, in March 2020, the world drastically changed, and set the Debtor on course for this current bankruptcy filing.  On or about March 15, 2020, the City of Los Angeles declared a state of emergency with shelter in place orders. In the following days, many business and financial centers across the United States came to a near total standstill as the nation was gripped by the Covid-19 crisis.  In the span of just 12 days, all fifteen (15) of the Debtor's then-active stores in eight (8) States were shuttered due to lockdown restrictions.

6.    In late March 2020, the United States federal government responded with historic economic aid, passing the CARES Act and providing approximately $3 trillion of stimulus to the economy, which may have bolstered the stock market's recovery, but such economic stimulus did nothing to help retail businesses such as the Debtor, which rely on foot traffic from customer shopping in stores to generate sales.  Unfortunately, the Debtor was not eligible for any of these stimulus payments and was left with no support during these unprecedented times.

In addition, as long as the pandemic lockdowns continued and stores remained closed, or shoppers refrained from shopping due to deep concerns about their health and safety, the Covid-19 recession for retail businesses would continue.

7.    From March 2020 to December 2021, the Debtor reduced its overhead expenses by an estimated $13,383,037.40 and entered into negotiations with its commercial landlords for rent relief at all store locations.  Nonetheless, the 21 months leading up to the Debtor's petition date were a marked state of tremendous uncertainty for the world's health and economic affairs brought on by an unprecedented pandemic, followed by an unprecedented recession, then unprecedented trillions of dollars of government aid, none of which has prevented the ongoing uncertainty posed by Covid-19 variants and the attendant on-again-off-again lockdowns across the nation and around the world, all of which made business in the current economic environment very difficult.

8.    The Debtor negotiated workouts with some, but not all, of its various landlords during 2020 and 2021, but with the consequences of the Covid-19 pandemic that Debtor was forced to file bankruptcy to restructure its business affairs.  The Debtor could not survive ongoing litigation with these landlords and the attendant litigation costs and potential liability for breach of those leases.  Accordingly, the Debtor determined that it was in the best interest of its estate to file this current bankruptcy case to preserve the going-concern value of its business and save the jobs of its employees.

**B.    The Lease and the Termination Agreement**

9.    On July 19, 2018, the Debtor entered into that certain "*Agreement of Lease*" (the "Agreement") as amended by the "*First Amendment to Agreement of Lease*" dated October 9, 20202, but effective as of April 1, 2020 (the "First Amendment" and with the Agreement, together, the "Lease"), with 693 Fifth Owner LLC, a Delaware limited liability company (the "Landlord"), for the Debtor's lease of the entire sixth floor of the building located at 693 Fifth Avenue, New York, NY (the "Premises").  The term of the lease expires May 31, 2029.  A true and correct copy of the Lease is attached as **Exhibit "1"** hereto.

10.    The Debtor and Landlord have entered into a "*Lease Termination and Surrender Agreement*" (the "Termination Agreement"), dated July 12, 2022, and subject to Court approval by way of this Motion.  A true and correct copy of the Termination Agreement is attached as **Exhibit "2"** hereto.

11.    The most salient and key term of the Termination Agreement is that the Lease is being terminated such that Landlord will have an allowed claim and authorization to collect the security deposit of $192,582, but otherwise will not have any lease rejection claim and therefore will not have any other claim against the Debtor or the Debtor's estate.  (Although the Termination Agreement has an "outside date" of August 24, 2022, to obtain an order approving the Termination Agreement, the Landlord has agreed to extend that outside date by one month to September 24, 2022.)

12.    The Debtor scheduled the Landlord as holding a prepetition unsecured claim in the amount of $1,641.00.  According to the Debtor's calculations, if the Debtor were to reject the Lease pursuant to 11 U.S.C. § 365, the resulting lease rejection damages claim under 11 U.S.C. § 502(b)(6) would be approximately $476,642.24.  After allowing the Landlord's recovery of the security deposit (to which the Debtor does not have any colorable objection), the Landlord would have a remaining general unsecured claim of approximately $284,060.24, which the Landlord is agreeing to waive in favor of the Debtor and the estate.  Attached as **Exhibit "3"** hereto is a calculation of the rejection claim.

13.    The Debtor has evaluated the market and believes that the Lease rent rate is over market, particularly as it was signed in 2018 in a pre-Covid-19 environment, and now the commercial real estate market in New York City is significantly lower due to more remote-work models, making the Debtor's prepetition Lease terms unattractive compared to the current market for lessees.  Therefore, the Debtor believes that there is no value in attempting to assume and assign the Lease.

## II.    DISCUSSION

### A.  Standard for Approving the Termination Agreement as a Compromise

1    Rule 9019 of the Federal Rules of Bankruptcy Procedure states that "the court may

2    approve a compromise or settlement." FED.R.BANKR.P. 9019(a).  The decision of whether a

3    compromise or settlement should be accepted or rejected lies within the sound discretion of the

4    Court.  *In re Carson*, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987); *In re Hydronic Enterprise,*

5    *Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I. 1986); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605,

6    607 (Bankr. N.D. Ohio 1985); *Knowles v. Putterbaugh (In re Hallet)*, 33 B.R. 564, 565 (Bankr.

7    D. Me. 1983).

8    Sound discretion is judicial power exercised fairly and equitably. As the Supreme Court

9    noted, the term "discretion" denotes the absence of a hard and fast rule:

10    When invoked as a guide to judicial action, it means a sound
11    discretion, that is to say, a discretion exercised not arbitrarily or
      willfully, but with regard to what is right and equitable under the
12    circumstances and the law, and directed by the reasonableness and
      conscience of the judge to a just result.

13

14    *Langnes v. Green*, 282 U.S. 531, 541 (1931).  Correspondingly, the Ninth Circuit has recognized

15    that "the bankruptcy court has great latitude in approving settlements."  *In re Woodson*, 839

16    F.2d 610, 620 (9th Cir. 1988).  It is well-established that, as a matter of public policy, settlements

17    are favored over continued litigation.  *See, e.g., In re A & C Properties*, 784 F.2d 1377 (9th Cir.

18    1986); *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *In re Heissenger Resources, Ltd.,* 67 B.R.

19    378, 382 (C.D. Ill. 1986).

20    The focus of inquiry in reviewing and approving compromises is whether the settlement

21    is reasonable under the particular circumstances of the case.  *See In re General Store of Beverly*

22    *Hills*, 11 B.R. 539 (9th Cir. BAP 1981).  It is not the bankruptcy judge's responsibility to decide

23    the numerous questions of law and fact with respect to the merits of the litigation, but rather to

24    "canvas the issues and see whether the settlement falls below the lowest point of the range of

25    reasonableness."  *Heissenger Resources*, 67 B.R. at 383.  Among the factors to be considered in

26    determining whether a settlement is fair, equitable and reasonable are the following:

27

28    (1)    the probability of success in the litigation;

9

(2)    any impediments to collection;

(3)    the complexity, expense, inconvenience and

delay of litigation; and

(4)    the interest of creditors with deference to

their reasonable opinions.

*A & C Properties*, 784 F.2d at 1381.  From an analysis of the foregoing factors in this case, the Court should conclude that the terms of the compromise set forth in the Termination Agreement is fair and equitable and well within the range of reasonableness.

The most salient and key term of the Termination Agreement is that the Lease is being terminated such that Landlord will have an allowed claim and authorization to collect the security deposit of $192,582, but otherwise will not have any lease rejection claim and therefore will not have any other claim against the Debtor or the Debtor's estate.

The Debtor scheduled the Landlord as holding a prepetition unsecured claim in the amount of $1,641.00.  According to the Debtor's calculations, if the Debtor were to reject the Lease pursuant to 11 U.S.C. § 365, the resulting lease rejection damages claim under 11 U.S.C. § 502(b)(6) would be approximately $476,642.24.  After allowing the Landlord's recovery of the security deposit (to which the Debtor does not have any colorable objection), the Landlord would have a remaining general unsecured claim of approximately $284,060.24, which the Landlord is agreeing to waive in favor of the Debtor and the estate.

**B.  The Landlord's Secured Claim Right to the Security Deposit**

The matter underlying this compromise is not complex or difficult.  Section 502(b)(6) caps a landlord's claim in bankruptcy for damages resulting from the termination of a real property lease.  *Solow v. PPI Enter's (U.S.), Inc. (In re PPI Enter's (U.S.), Inc.)*, 324 F.3d 197, 207 (3d Cir.2003).  A security deposit, or letter of credit serving as a security deposit, should be applied to pay the landlord's damages claim after the claim is capped by 11 U.S.C. § 502(b)(6).  *Id.* at 208.  Because the Landlord's § 502(b)(6) capped claim will exceed the security deposit by hundreds of thousands of dollars, there is nothing for the Debtor to collect from the Landlord,

and, if litigated, the likely result would be an additional $284,060.24 or more of general unsecured debt on the estate.  The Termination Agreement is a great result in the best interest of the estate and creditors and should be approved.

### C.  The Waiver of the Landlord's Remaining Unsecured Lease Rejection Claim

Section 502(b)(6) operates to limit a landlord's claim based on a commercial lease so as to prevent such claims from overburdening the bankruptcy estate at the expense of all other creditors.  *Saddleback Valley Comm. Church v. El Toro Materials Co., Inc. (In re El Toro Materials Co., Inc.)*, 504 F.3d 978, 979-80 (9th Cir.2007).  Section 502 provides, in pertinent part, as follows:

(a)    A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed unless a party in interest . . . objects.

(b)    . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –

* * *

(6)    if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds –

(A)    the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following

(i)    the date of the filing of the petition; and

(ii)    the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B)    any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

* * *

11 U.S.C. § 502. Absent an absurd result, the court must interpret section 502(b)(6) according to its plain language. *In re El Toro Materials Co.*, 504 F.3d at 981; *Wall Street Plaza v. JSJF Corp. (In re JSJF Corp.)*, 344 B.R. 94, 101 (9th Cir.B.A.P.2006) (citing *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) and *U.S. v. Lopez-Perera*, 438 F.3d 932, 933-34 (9th Cir.2006)).

The plain language of section 502(b)(6) requires a distinct two part analysis. First, as set forth in the introductory paragraph of subsection 502(b)(6), the Court must analyze whether the claim is "for damages resulting from termination of lease of real property." After answering this question in the affirmative, the Court then must limit, allow, and disallow the claim according to the formula set forth in subsections 502(b)(6)(A) and (B).

Here, the Debtor anticipates surrendering the property on September 30, 2022. The calculation of pre-termination rent under subsection 502(b)(6)(B) and post-termination rent under subsection 502(b)(6)(A) turns on that date. Attached as **Exhibit "3"** hereto is a calculation of the rejection claim.

To calculate the allowed amount of the Claim under 11 U.S.C. § 502(b)(6)(A), the Court must analyze (x) the rent reserved by the lease without acceleration for one year, (y) the rent reserved by the lease without acceleration for 15% of the remaining term of the lease, and (z) the rent reserved by the lease without acceleration for three years.

As can be seen from Exhibit 3, the rent reserved by the Lease without acceleration for one year is $433,959.20. The rent reserved by the lease without acceleration for 15% of the remaining term of the lease is $475,001.24 (three years of rent would be nearly $1.5 million). The 15% calculation might be changed depending on whether 15% is applied to the term remaining under the Lease or the dollars owed under the Lease. *See* 5 COLLIER ON BANKRUPTCY ¶ 502.03[7][c] at 502-44 & 45 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); . *In re Heller Ehrman LLP*, 2011 WL 635224 (N.D.Cal. 2011). However, the purpose of this Motion

is not to precisely calculate the Landlord's lease rejection § 502(b)(6) claim with exact precision, but instead to point out that the compromise in Termination Agreement is saving the estate approximately $284,060.24 in general unsecured claims, which is a great benefit to the estate. Thus, the Motion should be granted.

### III.    <u>CONCLUSION</u>

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order:

(1)    affirming the adequacy of the notice of the Motion;

(2)    granting the Motion in its entirety;

(3)    authorizing the Debtor to enter into the Termination Agreement;

(4)    terminating the Lease without rejection;

(5)    permitting the Landlord to collect the security deposit in the amount of $192,582.00;

(6)    disallowing any other claim that the Landlord may have against the Debtor or the Debtor's estate; and

(7)    granting such further and other relief as the Court deems just and proper.

Dated: August 22, 2022                    ESCADA AMERICA LLC


                                          By:   _/s/ John-Patrick M. Fritz_____
                                              JOHN-PATRICK M. FRITZ
                                              JONATHAN D. GOTTLIEB
                                              LEVENE, NEALE, BENDER,
                                              YOO & GOLUBCHIK L.L.P.
                                              Attorneys for Chapter 11
                                              Debtor and Debtor in Possession

### DECLARATION OF KEVIN WALSH

I, Kevin Walsh, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Director of Finance for Escada America LLC, a Delaware limited liability company. (the "Debtor"), the debtor and debtor in possession in this chapter 11 bankruptcy case.

3.      I am an experienced finance professional, having worked for the Debtor since 2016 and with prior work experience at Fortune 500 companies including Johnson & Johnson (Controller/Director) and Pfizer (Finance Director).

4.      I have reviewed and am familiar with and am knowledgeable about the books and records of the Debtor, which books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

5.      I make this declaration in support of "the Debtor's Notice of Motion and Motion for an Order Authorizing Debtor to Enter into Agreement to Terminate Lease, Permit Landlord to Recover Security Deposit, and Release Claim Against Debtor and the Estate" (the "Motion").

6.      The Debtor commenced its bankruptcy case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on January 18, 2022 (the "Petition Date").  The Debtor continues to manage its financial affairs, operate its business, and administer its bankruptcy estate as a debtor in possession.

7.      The Debtor was formed as a Delaware limited liability company in 2009.  The Debtor is a national specialty retailer selling high-end, ready-to-wear women's apparel with its main office in Beverly Hills, California, an office New York City, New York, and, as of the Petition Date, ten (10) retail stores across seven (7) states in the United States, and over 50 fulltime employees.  As part of its first-day motions, the Debtor rejected five (5)  leases, later rejected two more leases by way of motion, another two leases ended on their own terms, and

14

now the Debtor is operating at one location with approximately 4 employees in its corporate office and 6 employees in the store.

8. The Debtor's retail business is generally known to the public and branded as "Escada." The Debtor uses the "Escada" brand via a license agreement and does not own any intellectual property rights in connection with the "Escada" brand. For several decades, Escada had been a global retail brand for high-fashion, high-end, ready-to-wear apparel for women, with an emphasis on high-fashion evening wear. On a global scale, Escada has various retail stores and subsidiaries in several countries in Europe, including but not limited to Spain, England and Germany. Escada also has retail stores in North America, including the Debtor, which operates Escada's brick-and-mortar retail business only in the United States.

9. By 2019, the Escada business on a global scale was in deep distress and could not continue. At that time, the Debtor, together with other subsidiaries of Escada's then-parent company, was acquired by new ownership (which is now the current ownership and management). At the time of the acquisition of Debtor in 2019, Escada had 29 subsidiaries in 22 countries, all of which were financially distressed. In December 2019, the Debtor devised and began implementation of a plan to turn around the United States Escada retail business. Debtor believed that the business could be operated at a profit if fundamental business-model changes were implemented, such as overhauling the Debtor's technological suite and reducing speed to market by shifting supply chains from Asia to Europe. Debtor's turnaround plan was also contingent upon Debtor's ability to sell product at Debtor's physical locations because ecommerce sales were minimal. However, what was not – and could not be – known at the time of the acquisition in November 2019, was that an unprecedented, global, catastrophic, and life-changing event with severe economic consequences was on the immediate horizon – the Covid-19 pandemic.

10. In December 2019, just one month after the acquisition and just as the Debtor's transformation plan was being put into effect, the novel corona virus, known to us now as Covid-19, was quietly spreading in certain regions of Asia, unbeknownst to the rest of the world. From

December 2019 through February 2020, the Debtor prepared to implement a number of business-model and operational changes with the goal of making the United States Escada retail business profitable and correct the mistakes of its prior management and prior owners. However, in March 2020, the world drastically changed, and set the Debtor on course for this current bankruptcy filing.  On or about March 15, 2020, the City of Los Angeles declared a state of emergency with shelter in place orders. In the following days, many business and financial centers across the United States came to a near total standstill as the nation was gripped by the Covid-19 crisis.  In the span of just 12 days, all fifteen (15) of the Debtor's then-active stores in eight (8) States were shuttered due to lockdown restrictions.

11.    In late March 2020, the United States federal government responded with historic economic aid, passing the CARES Act and providing approximately $3 trillion of stimulus to the economy, which may have bolstered the stock market's recovery, but such economic stimulus did nothing to help retail businesses such as the Debtor, which rely on foot traffic from customer shopping in stores to generate sales.  Unfortunately, the Debtor was not eligible for any of these stimulus payments and was left with no support during these unprecedented times. In addition, as long as the pandemic lockdowns continued and stores remained closed, or shoppers refrained from shopping due to deep concerns about their health and safety, the Covid-19 recession for retail businesses would continue.

12.    From March 2020 to December 2021, the Debtor reduced its overhead expenses by an estimated $13,383,037.40 and entered into negotiations with its commercial landlords for rent relief at all store locations.  Nonetheless, the 21 months leading up to the Debtor's petition date were a marked state of tremendous uncertainty for the world's health and economic affairs brought on by an unprecedented pandemic, followed by an unprecedented recession, then unprecedented trillions of dollars of government aid, none of which has prevented the ongoing uncertainty posed by Covid-19 variants and the attendant on-again-off-again lockdowns across the nation and around the world, all of which made business in the current economic environment very difficult.

13.    The Debtor negotiated workouts with some, but not all, of its various landlords during 2020 and 2021, but with the consequences of the Covid-19 pandemic that Debtor was forced to file bankruptcy to restructure its business affairs.  The Debtor could not survive ongoing litigation with these landlords and the attendant litigation costs and potential liability for breach of those leases.  Accordingly, the Debtor determined that it was in the best interest of its estate to file this current bankruptcy case to preserve the going-concern value of its business and save the jobs of its employees.

14.    The Debtor commenced its bankruptcy case as a subchapter V case, which requires a plan to be filed within the first 90 days of the Petition Date, unless the Court extends the deadline for reasons for which the Debtor should not justly be held accountable. Accordingly, shortly after the first date of the 341 Meeting, the Debtor, through counsel, engaged in extensive and continuous discussions with some its largest creditors in an attempt to formulate a consensual plan of reorganization.

15.    On July 19, 2018, the Debtor entered into that certain "*Agreement of Lease*" (the "Agreeement") as amended by the "*First Amendment to Agreement of Lease*" dated October 9, 20202, but effective as of April 1, 2020 (the "First Amendment" and with the Agreement, together, the "Lease"), with 693 Fifth Owner LLC, a Delaware limited liability company (the "Landlord"), for the Debtor's lease of the entire sixth floor of the building located at 693 Fifth Avenue, New York, NY (the "Premises").  The term of the lease expires May 31, 2029.  A true and correct copy of the Lease is attached as **Exhibit "1"** hereto.

16.    The Debtor and Landlord have entered into a "*Lease Termination and Surrender Agreement*" (the "Termination Agreement"), dated July 12, 2022, and subject to Court approval by way of this Motion.  A true and correct copy of the Termination Agreement is attached as **Exhibit "2"** hereto.

17.    The most salient and key term of the Termination Agreement is that the Lease is being terminated such that Landlord will have an allowed claim and authorization to collect the security deposit of $192,582, but otherwise will not have any lease rejection claim and therefore

will not have any other claim against the Debtor or the Debtor's estate.  (Although the Termination Agreement has an "outside date" of August 24, 2022, to obtain an order approving the Termination Agreement, the Landlord has agreed to extend that outside date by one month to September 24, 2022.)

18.    The Debtor scheduled the Landlord as holding a prepetition unsecured claim in the amount of $1,641.00.  According to the Debtor's calculations, if the Debtor were to reject the Lease, the resulting lease rejection damages would be approximately $476,642.24.  After allowing the Landlord's recovery of the security deposit (to which the Debtor does not have any colorable objection), the Landlord would have a remaining general unsecured claim of approximately $284,060.24, which the Landlord is agreeing to waive in favor of the Debtor and the estate.  Attached as **Exhibit "3"** hereto is a calculation of the rejection claim.

19.    The Debtor has evaluated the market and believes that the Lease rent rate is over market, particularly as it was signed in 2018 in a pre-Covid-19 environment, and now the commercial real estate market in New York City is significantly lower due to more remote-work models, making the Debtor's prepetition Lease terms unattractive compared to the current market for lessees.  Therefore, the Debtor believes that there is no value in attempting to assume and assign the Lease.

Executed on this 22nd day of August 2022, at Manhattan, New York.


*Kevin G Walsh*
_____
KEVIN WALSH
Declarant

**Exhibit 1**

# AGREEMENT OF LEASE

## 693 Fifth Owner LLC

Landlord

and

## Escada America LLC

Tenant

Premises:    Entire 6th Floor
693 Fifth Avenue
New York, New York

[1065228-9]

## TABLE OF CONTENTS

| **Article** | | **Page** |
|---|---|---|
| 1. | PURPOSE | 1 |
| 2. | TERM AND RENT | 2 |
| 3. | ELECTRICITY | 8 |
| 6. | RE-LETTING, ETC. | 19 |
| 7. | LANDLORD MAY CURE DEFAULTS | 21 |
| 8. | ALTERATIONS | 21 |
| 9. | LIENS | 23 |
| 10. | REPAIRS | 23 |
| 11. | DESTRUCTION | 24 |
| 12. | END OF TERM | 26 |
| 13. | SUBORDINATION AND ESTOPPEL, ETC. | 27 |
| 14. | CONDEMNATION | 29 |
| 15. | REQUIREMENTS OF LAW | 30 |
| 16. | CERTIFICATE OF OCCUPANCY | 30 |
| 17. | POSSESSION | 30 |
| 18. | QUIET ENJOYMENT | 30 |
| 19. | RIGHT OF ENTRY | 31 |
| 20. | VAULT SPACE | 31 |
| 21. | INDEMNITY | 31 |
| 22. | LANDLORD'S LIABILITY | 32 |
| 23. | CONDITION OF PREMISES | 33 |
| 25. | JURY WAIVER; DAMAGES | 37 |
| 26. | NO WAIVER, ETC. | 38 |
| 27. | SIGNAGE, ETC. | 38 |
| 28. | NOTICES | 39 |
| 29. | WATER CHARGES | 40 |
| 30. | HEAT | 40 |
| 31. | SCAFFOLDING | 40 |
| 32. | SECURITY DEPOSIT | 40 |
| 33. | RENT CONTROL | 42 |
| 34. | SHORING | 42 |
| 35. | EFFECT OF CONVEYANCE, ETC. | 42 |
| 36. | RIGHTS OF SUCCESSORS AND ASSIGNS | 42 |
| 37. | CAPTIONS | 42 |
| 38. | LEASE SUBMISSION | 43 |
| 39. | ELEVATORS AND LOADING | 43 |
| 40. | BROKERAGE | 43 |
| 41. | ARBITRATION | 44 |

i

[1065228-9]

| | | |
|---|---|---|
| 42. | INSURANCE | 44 |
| 43. | LATE CHARGES AND DEFAULT INTEREST | 46 |
| 44. | ENVIRONMENTAL COMPLIANCE | 47 |
| 45. | LEASE FULLY NEGOTIATED | 47 |
| 46. | SMOKING RESTRICTIONS | 47 |
| 47. | ANTI-TERRORISM REQUIREMENTS | 48 |
| 48. | ZONING LOT MERGER AGREEMENT | 48 |
| 49. | ADDITIONAL DEFINITIONS | 48 |
| 50. | CONDOMINIUM | 49 |
| 51. | FORCE MAJEURE | 51 |
| 52. | RENEWAL OPTION | 52 |
| 53. | COUNTERPARTS | 53 |

| | |
|---|---|
| EXHIBIT A – 1 | FLOOR PLAN |
| EXHIBIT A | TENANT CONSTRUCTION GUIDELINES |
| EXHIBIT B | CERTIFICATE OF OCCUPANCY |
| EXHIBIT C | FORM LETTER OF CREDIT |
| EXHIBIT D | CONTRACTOR INSURANCE |
| EXHIBIT E | TENANT'S INITIAL WORK |
| EXHIBIT F | CLEANING SPECIFICATIONS |
| EXHIBIT G | LANDLORD'S WORK |
| | |
| SCHEDULE A | RULES AND REGULATIONS |

[1065228-9]

**LEASE** (this "Lease") made as of this ___ day of July, 2018, between **693 Fifth Owner LLC**, a Delaware limited partnership, with an address c/o Savitt Partners, LLC, 530 Seventh Avenue, New York, New York 10018, attention: Mr. Michael Dubin, hereinafter referred to as "Landlord", and **Escada America LLC**, a Delaware limited liability company with an address at 26 Main Street, Suite 101, Chatham, NJ 07928, hereinafter referred to as "Tenant".

**WITNESSETH:**

Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the entire 6th floor as shown on the floor plan annexed hereto as Exhibit A-1 (the "Premises"), in the building known as 693 Fifth Avenue, New York, New York (the "Building") in the County of New York, City of New York, for a term to commence on the first business day after the full execution and delivery of this Lease (the "Commencement Date"), and to expire on the last day of the calendar month in which the ten year, four month anniversary of the Commencement Date occurs (the "Expiration Date"), or until such term shall sooner end as herein provided, both dates inclusive, upon the terms and conditions hereinafter provided.  Landlord and Tenant conclusively agree that the Premises contains 5,844 rentable square feet.

Landlord and Tenant covenant and agree:

1.    **PURPOSE**

Tenant shall use and occupy the Premises for an apparel and accessories showroom and general and executive offices and for no other purpose.  Without limiting the generality of the foregoing, it is expressly understood that no portion of the Premises shall be used as, by or for (a) retail operations of any retail or branch bank, trust company, a savings bank, industrial bank, savings and loan association, credit union or personal loan operation, or (b) a public stenographer or typist, (c) a barber shop, beauty shop, beauty parlor or shop, (d) a telephone or telegraph agency, (e) a telephone or secretarial service, (f) a messenger service, (g) a travel or tourist agency, (h) an employment agency, (i) a restaurant, bar or night club, (j) a commercial document reproduction or offset printing service, except for Tenant's own use, (k) public vending machines, except for Tenant's employees and guests, (l) a retail, wholesale or discount shop for sale of books, magazines, audio or video tapes, CD ROM, DVD ROM or other devices for the recording or transmitting of audio or visual signals, images, music or speech, electronic equipment and accessories or any other merchandise, (m) a retail service shop, (n) a labor union, (o) a school or classroom, (p) a governmental or *quasi*-governmental bureau, department or agency, including an autonomous governmental corporation, embassy or consular office of any country or other *quasi*-autonomous or sovereign organization, (q)  a firm whose principal business is residential real estate brokerage, (r) a firm whose principal business is real estate brokerage, (s) a company engaged in the business of renting office or desk space, (t) any person, organization, association, corporation, company, partnership entity or other agency immune from service or suit in the courts of the State of New York or the assets of which may be exempt from execution by Landlord in any action for damages, (u) manufacturing or (v) retail sales from the Premises. Subject to the terms of this Lease, force majeure, and such security requirements as Landlord may reasonably impose, Tenant shall have access to the Premises three hundred sixty five (365) days a year, twenty four (24) hours a day.

[1065228-9]

## 2. TERM AND RENT

All rent shall be paid to Landlord, at its office, or at such other place as Landlord shall designate to Tenant, in lawful money of the United States of America, and without any notice (except as specifically set forth herein), set off or deduction whatsoever. Any sum other than fixed annual rent payable hereunder shall be deemed additional rent and due within twenty (20) days after demand unless otherwise specifically provided. Landlord shall have the same rights and remedies hereunder with respect to Tenant's non-payment of additional rent as it has with respect to Tenant's non-payment of fixed annual rent.

A. **Fixed Annual Rent**: There is herein reserved to Landlord for the entire term of this Lease, fixed annual rent ("Fixed Annual Rent") equal to the aggregate amount of the sums hereinafter set forth. On the first day of each month throughout the term of this Lease, Tenant shall pay to Landlord, without notice, deduction, set off or reduction (except as specifically set forth herein), payments of Fixed Annual Rent in the following amounts (except that the first full monthly installment of Fixed Annual Rent is being paid upon the execution hereof):

    (i)    for the period from the Commencement Date through and including the day preceding the one year, four month anniversary of the Commencement Date, the sum of Three Hundred Eighty-Five Thousand Seven Hundred Four Dollars ($385,704.00) per annum, payable in consecutive equal monthly installments of Thirty-Two Thousand One Hundred Forty-Two Dollars ($32,142.00) during such period (each succeeding twelve-month period being hereinafter referred to as the sequential "Lease Year");

    (ii)    for Lease Year 2, the sum of Three Hundred Ninety-Three Thousand Four Hundred Eighteen and 08/100 Dollars ($393,418.08) per annum, payable in consecutive equal monthly installments of Thirty-Two Thousand Seven Hundred Eighty-Four and 84/100 Dollars ($32,784.84) during such period;

    (iii)    for Lease Year 3, the sum of Four Hundred One Thousand Two Hundred Eighty-Six and 44/100 Dollars ($401,286.44) per annum, payable in consecutive equal monthly installments of Thirty-Three Thousand Four Hundred Forty and 54/100 Dollars ($33,440.54) during such period;

    (iv)    for Lease Year 4, the sum of Four Hundred Twenty-Six Thousand Eight Hundred Forty-Four and 16/100 Dollars ($426,844.16) per annum, payable in consecutive equal monthly installments of Thirty-Five Thousand Five Hundred Seventy and 35/100 Dollars ($35,570.35) during such period;

    (v)    for Lease Year 5, the sum of Four Hundred Thirty-Five Thousand Three Hundred Eighty-One and 04/100 Dollars ($435,381.04) per annum, payable in consecutive equal monthly installments of Thirty-Six Thousand Two Hundred Eighty-One and 75/100 Dollars ($36,281.75) during such period;

    (vi)    for Lease Year 6, the sum of Four Hundred Forty-Four Thousand Eighty-Eight and 66/100 Dollars ($444,088.66) per annum, payable in consecutive equal

2

monthly installments of Thirty-Seven Thousand Seven and 39/100 Dollars ($37,007.39) during such period;

(vii)     for Lease Year 7, the sum of Four Hundred Seventy-Six Thousand Three Hundred Forty-Six and 00/100 Dollars ($476,346.00) per annum, payable in consecutive equal monthly installments of Thirty-Six Thousand Three Hundred Sixty-Two and 17/100 Dollars ($36,362.17) during such period;

(viii)    for Lease Year 8, the sum of Four Hundred Eighty-Five Thousand Eight Hundred Seventy-Three and 00/100 Dollars ($485,873.00) per annum, payable in consecutive equal monthly installments of Forty Thousand Four Hundred Eighty-Nine and 42/100 Dollars ($40,489.42) during such period;

(ix)      for Lease Year 9, the sum of Four Hundred Ninety-Five Thousand Five Hundred Ninety-One and 00/100 Dollars ($495,591.00) per annum, payable in consecutive equal monthly installments of Forty-One Thousand Two Hundred Ninety-Nine and 25/100 Dollars ($41,299.25) during such period; and

(x)       for Lease Year 10 through the Expiration Date, the sum of Five Hundred Five Thousand Five Hundred Three and 00/100 Dollars ($505,503) per annum, payable in consecutive equal monthly installments of Forty-Two Thousand One Hundred Twenty-Five and 25/100 Dollars ($42,125.25) during such period.

If the Commencement Date occurs on a date that is not the first day of a calendar month, the Fixed Annual Rent for the calendar month in which the Commencement Date occurs shall be prorated on a per diem basis.

Provided that Tenant is not in default of any of Tenant's obligations under this Lease beyond applicable notice and cure periods, Fixed Annual Rent will abate for the period running from the Commencement Date through the day preceding the four month anniversary of the Commencement Date (in the aggregate amount of $128,568.00) (collectively, the "Abated Rent").

If Tenant is in default of any of Tenant's obligations under this Lease beyond all applicable notice and cure periods and, as a result thereof, Landlord terminates this Lease, the unamortized amount of the Abated Rent shall immediately be due and payable by Tenant to Landlord, which Abated Rent shall amortize monthly on a straight-line basis over the Term of this Lease from and after the Commencement Date.

Tenant may pay Fixed Annual Rent and Additional Rent by wire transfer as follows:

| | |
|---|---|
| Bank: | Wells Fargo Bank, N.A. |
| ABA # | 121-000-248 |
| Name: | 693 Fifth Owner LLC |
| Acct # | 453-189-4566 |
| Swift Code: | WFB1US6S |
| Savitt Contact: | Danielle Smith (dsmith@savittpartners.com) |

3

Remittance Notice:        tenants@savittpartners.com

Remittance Address:       693 Fifth Owner LLC
                          PO Box 780522
                          Philadelphia, PA 19178-0522

B.      As used in this Lease, "Additional Rent" (whether capitalized or not) shall be and consist of all sums of money, costs, expenses or charges of any kind or amount whatsoever (other than Fixed Annual Rent) which become due and payable by Tenant to Landlord pursuant to this Lease.  Landlord shall have the same rights and remedies upon Tenant's failure to pay the Additional Rent as for the non-payment of any monthly installment of the Fixed Annual Rent.

The obligation of Tenant to pay any and all sums of Additional Rent to Landlord shall commence on the Commencement Date and there shall be no abatement whatsoever of the obligation of Tenant to pay any and all sums of Additional Rent during any period or part of the term of this Lease, except as otherwise expressly set forth herein.

C.      **Tax Escalation:**  Tenant shall pay to Landlord, as Additional Rent, tax escalation in accordance with this paragraph B:

(i)      Definitions:  For the purpose of this Article, the following definitions shall apply:

(a)      The term "base taxes" as hereinafter set forth for the determination of real estate tax escalation, shall mean the real estate taxes, as finally determined assessed against the building project (as defined below), for the average of the tax years ending June 30, 2018 and June 30, 2019.

(b)      The term "the Percentage", for purposes of computing tax escalation and other charges pursuant to this Lease, shall mean 5.996%.

(c)      The term "the building project" shall mean the aggregate combined parcel of land on which the Building is constructed and the Building.

(d)      The term "comparative year" shall mean the twelve (12) month tax year ending June 30, 2020, and each subsequent period of twelve (12) months.

(e)      The term "real estate taxes" shall mean the total of all taxes and special or other assessments (including, without limitation, so-called business improvement district assessments) levied, assessed or imposed at any time by any governmental authority upon or against the building project, and also any tax or assessment levied, assessed or imposed at any time by any governmental authority in connection with the receipt of income or rents from said building project to the extent that same shall be in lieu of all or a portion of any of the aforesaid taxes or assessments, or additions or increases thereof, upon or against said building project.  If, due to a future change in the method of taxation or in the taxing authority, or for any other reason, a franchise, income, transit, profit or other tax or governmental imposition, however designated, shall be levied against Landlord

4

[1065228-9]

in substitution in whole or in part for the real estate taxes, or in lieu of additions to or increases of said real estate taxes, then such franchise, income, transit, profit or other tax or governmental imposition shall be deemed to be included within the definition of "real estate taxes" for the purposes hereof. As to special assessments which are payable over a period of time extending beyond the term of this Lease, only a pro rata portion thereof covering the portion of the term of this Lease unexpired at the time of the imposition of such assessment, shall be included in "real estate taxes." If by law, any assessment may be paid in installments, then, for the purposes hereof (a) such assessment shall be deemed to have been payable in the maximum number of installments permitted by law and (b) there shall be included in real estate taxes, for each comparative year in which such installments may be paid, the installments of such assessment so becoming payable during such comparative year, together with interest payable during such comparative year.

(f)    Where more than one assessment is imposed by the City of New York for any tax year, whether denominated an "actual assessment" or "transitional assessment" or otherwise, then the phrases herein "assessed value" and "assessments" shall mean whichever of the actual, transitional or other assessment is designated by the City of New York as the taxable assessment for that tax year.

(g)    The phrase "real estate taxes payable during the base tax year" shall mean the real estate taxes payable for the building project for the base tax year.

(ii)    (a)    In the event that the real estate taxes payable for any comparative year shall exceed the amount of the real estate taxes payable during the base tax year, Tenant shall pay to Landlord, as additional rent for such comparative year, an amount equal to the Percentage of the excess ("Tenant's Tax Payment"). Before or after the start of each comparative year, Landlord shall furnish to Tenant a statement setting forth Landlord's estimate of Tenant's Tax Payment for such comparative year (the "Tax Estimate"). Tenant shall pay to Landlord on the 1st day of each month during such comparative year an amount equal to 1/12th of the Tax Estimate for such comparative year. If Landlord furnishes a Tax Estimate for a comparative year subsequent to the commencement thereof, then (i) until the 1st day of the month following the month in which the Tax Estimate is furnished to Tenant, Tenant shall pay to Landlord on the 1st day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this Section 2B(ii)(a) for the last month of the preceding comparative year; (ii) promptly after the Tax Estimate is furnished to Tenant or together therewith, Landlord shall give notice to Tenant stating whether the installments of the Tax Estimate previously made for such comparative year were greater or less than the installments of the Tax Estimate to be made for such comparative year in accordance with the Tax Estimate, and (x) if there shall be a deficiency, Tenant shall pay the amount thereof within twenty (20) days after demand, or (y) if there shall have been an overpayment, Landlord shall credit the amount thereof against subsequent payments of Tenant's Tax Payment next coming due hereunder (or shall refund same to Tenant if the credit is due to Tenant at the end of the term of this Lease); and (iii) on the 1st day of the month following the month in which

5

the Tax Estimate is furnished to Tenant, and on the 1st day of each month thereafter throughout the remainder of such comparative year, Tenant shall pay to Landlord an amount equal to 1/12th of the Tax Estimate.  Landlord may, during each comparative year, furnish to Tenant a revised Tax Estimate for such comparative year, and in such case, Tenant's Tax Payment for such comparative year shall be adjusted and any deficiencies paid or overpayments credited, as the case may be, substantially in the same manner as provided in the preceding sentence.  After the end of each comparative year, Landlord shall furnish to Tenant a statement of real estate taxes applicable to Tenant's Tax Payment payable for such comparative year and (A) if such statement shall show that the sums so paid by Tenant were less than Tenant's Tax Payment due for such comparative year, Tenant shall pay to Landlord the amount of such deficiency within twenty (20) days after delivery of the statement to Tenant, or (B) if such statement shall show that the sums so paid by Tenant were more than such Tenant's Tax Payment, Landlord shall credit such overpayment against subsequent payments of Tenant's Tax Payment next coming due hereunder (or shall refund same to Tenant if the credit is due to Tenant at the end of the term of this Lease).  If there shall be any increase in the real estate taxes for any comparative year, whether during or after such comparative year, or if there shall be any decrease in the real estate taxes for any comparative year, Tenant's Tax Payment for such comparative year shall be appropriately adjusted and any deficiencies paid or overpayments credited, as the case may be, substantially in the same manner as provided in the preceding sentence.

Additionally, Tenant shall pay to Landlord, within twenty (20) days after demand, a sum equal to the Percentage of any government imposed business improvement district assessment payable by the building project during the term of this Lease, it being understood that any such assessments which are payable over a period of time extending beyond the term of this Lease, only a *pro rata* portion thereof covering the portion of the term of this Lease unexpired at the time of the imposition of such assessment, shall be included in "real estate taxes".

(b)    Should the real estate taxes payable during the base tax year be reduced by final determination of legal proceedings, settlement or otherwise, then, the real estate taxes payable during the base tax year shall be correspondingly revised, the additional rent theretofore paid or payable hereunder for all comparative years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord as additional rent, within thirty (30) days after being billed therefor, any deficiency between the amount of such additional rent as theretofore computed and the amount thereof due as the result of such recomputations.  Should the real estate taxes payable during the base tax year be increased by such final determination of legal proceedings, settlement or otherwise, then appropriate recomputation and adjustment also shall be made.

(c)    Provided Tenant is not then in monetary default of any obligation hereunder beyond any applicable notice and cure periods, then if Tenant shall have made a payment of additional rent under this paragraph, and Landlord shall receive a refund of any portion of the real estate taxes payable for any

6

comparative year after the base tax year on which such payment of additional rent shall have been based, as a result of a reduction of such real estate taxes by final determination of legal proceedings, settlement or otherwise, Landlord shall promptly after receiving the refund pay to Tenant the Percentage of the refund less the Percentage of expenses (including attorneys' and appraisers' fees) incurred by Landlord in connection with any such application or proceeding, but only to the extent such expenses were not previously included in Tenant's Tax Payment. If prior to the payment of taxes for any comparative year, Landlord shall have obtained a reduction of that comparative year's assessed valuation of the building project, and therefore of said taxes, then the term "real estate taxes" for that comparative year shall be deemed to include the amount of Landlord's expenses in obtaining such reduction in assessed valuation, including attorneys' and appraisers' fees.

(d)    The statement of the real estate taxes to be furnished by Landlord as provided above shall be certified by Landlord and shall constitute a final determination as between Landlord and Tenant of the real estate taxes for the periods represented thereby, unless Tenant within ninety (90) days after they are furnished shall give a written notice to Landlord that it disputes their accuracy or their appropriateness, which notice shall specify the particular respects in which the statement is inaccurate or inappropriate. If Tenant shall so dispute said statement then, pending the resolution of such dispute, Tenant shall pay the additional rent to Landlord in accordance with the statement furnished by Landlord.

(e)    In no event shall the fixed annual rent under this Lease (exclusive of the additional rent under this Article) be reduced by virtue of this Article.

(f)    Upon the date of any expiration or termination of this Lease (except termination because of Tenant's default) whether the same be the date hereinabove set forth for the expiration of the term or any prior or subsequent date, a proportionate share of the additional rent for the comparative year during which such expiration or termination occurs shall promptly become due and payable by Tenant to Landlord, if it was not theretofore already billed and paid. The said proportionate share shall be based upon the length of time that this Lease shall have been in existence during such comparative year. Landlord shall cause statements of said additional rent for that comparative year to be prepared and furnished to Tenant. Landlord and Tenant shall thereupon make appropriate adjustments of amounts then owing.

(g)    Any delay or failure of Landlord in billing any tax escalation hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such tax escalation hereunder.

D.    **Failure to Bill**: Landlord's failure to bill on a timely basis all or any portion of any amount payable pursuant to this Lease for any period during the term hereof shall neither constitute a waiver of Landlord's right ultimately to collect such amount or to bill Tenant at any

7

subsequent time retroactively for the entire amount so un-billed (which previously un-billed amount shall be payable within thirty (30) days after demand therefor).  Tenant's obligation to pay any fixed annual rent and additional rent shall survive the expiration or earlier termination of this Lease.

   E. **No Reduction in Fixed Annual Rent**:  In no event shall the Fixed Annual Rent under this Lease be reduced by virtue of any decrease in the amount of any additional rent payment under this Article or any other provision of this Lease.  If Landlord receives from Tenant any payment less than the sum of the fixed annual rent and additional rent then due and owing pursuant to this Lease, Tenant hereby waives its right, if any, to designate the items to which such payment shall be applied and agrees that Landlord in its sole discretion may apply such payment in whole or in part to any fixed annual rent, additional rent or to any combination thereof then due and payable hereunder.  Unless Landlord shall otherwise expressly agree in writing, acceptance of any portion of the fixed annual rent or additional rent from anyone other than Tenant shall not relieve Tenant of any of its other obligations under this Lease, including the obligation to pay other fixed annual rent and additional rent.  Furthermore, such acceptance of fixed annual rent and additional rent shall not be deemed to constitute Landlord's consent to an assignment of this Lease or a subletting or other occupancy of the Premises by anyone other than Tenant, nor a waiver of any of Landlord's right or Tenant's obligations under this Lease.

   F. **Survival of Obligations**:  Landlord's and Tenant's obligation to make the adjustments and payments referred to in this Article shall survive any expiration or termination of this Lease.

**3. ELECTRICITY**

   Landlord shall furnish sufficient electricity for Tenant's reasonable needs on a "sub-metering" basis, which may be effectuated by Landlord through one or more submeters servicing at the Premises.  Landlord agrees that Landlord will provide six (6) watts per usable square foot of electric capacity to the Premises.  Electricity and electric service, as used herein, shall mean any element affecting the generation, transmission, and/or distribution or redistribution of electricity, including but not limited to services which facilitate the distribution of electric service.

   A. Tenant covenants and agrees to purchase electricity from Landlord or Landlord's designated agent at charges, terms and rates, including, without limitation, fuel adjustments and taxes, equal to those specified in the rate schedule of the utility company providing electricity to Landlord for its use in the Building from time to time on a sub-metering basis (the "effective date"), or any successor rate schedule or service classification, plus five percent (5%) for administrative and surveying costs. Where more than one meter measures the service of Tenant in the Building, the service rendered through each meter may be computed and billed separately in accordance with the rates herein specified. Bills therefor shall be rendered at such times as Landlord may elect and the amount, as computed from a meter, shall be deemed to be, and be paid as, additional rent. If any tax is imposed upon Landlord's receipt from the sale or resale of electricity energy or gas or telephone service to Tenant by any Federal, State or Municipal authority, Tenant covenants and agrees that where permitted by law, Tenant's

[1065228-9]

Percentage of such taxes shall be passed on to and be included in the bill of, and paid by, Tenant to Landlord.

        B.      Intentionally Omitted.

        C.      Unless due solely to the negligence or willful misconduct of Landlord, Landlord shall not be liable to Tenant for any loss or damage or expense which Tenant may sustain or incur if either the quantity or character of electric service is changed or is no longer available or suitable for Tenant's requirements, nor shall any such change, interruption, unavailability or unsuitability constitute an actual or constructive eviction of Tenant. In the event electricity, as the same currently or hereafter furnished to Tenant, is discontinued, from and after the effective date of such discontinuance, Tenant shall (i) arrange to obtain electricity directly from the public utility company supplying electricity to the Building, and (ii) all meters, equipment and other facilities which may be required for Tenant to obtain electricity directly from such public entity shall be installed by Landlord, at its expense, and (iii) any such installation shall be maintained by Landlord, at its expense, provided such meter(s) shall be subject to such conditions as Landlord and/or the public utility company may require and Landlord shall not be liable to Tenant therefor and the same shall not be deemed to be a lessening or diminution of services within the meaning of any law, rule or regulation now or hereafter enacted, promulgated or issued. Tenant covenants and agrees that at all times its use of electric current shall never exceed the capacity of existing feeders to the Building or its wiring installation. Tenant agrees not to connect any additional electrical equipment to the Building electric distribution system, other than standard and customary office equipment and office machines which consume comparable amounts of electricity, without Landlord's prior written consent, which consent shall not be unreasonably withheld.  The parties acknowledge that they understand that it is anticipated that electric rates and charges, may be changed by virtue of time-of-day rates or changes or other methods of billing, electricity purchases and the redistribution thereof, and that the references in the foregoing paragraphs to changes in methods of or rules on billing are intended to include any such changes. Anything hereinabove to the contrary notwithstanding, in no event is the sub-metering additional rent or any "alternative charge" to be less than an amount equal to the total of Landlord's payment to public utilities and/or other providers for the electricity consumed by Tenant (and any taxes thereon or on redistribution of same) plus five percent (5%) for administrative and surveying costs. Landlord reserves the right to terminate the furnishing of electricity upon ninety (90) days' written notice to Tenant, in which event Tenant may make application directly to the public utility and/or other providers for Tenant's entire separate supply of electric current and Landlord shall permit its wires and conduits, to the extent available and safely capable, to be used for such purpose, but only to the extent of Tenant's then authorized load. Any meters, risers, or other equipment or connections necessary to furnish electricity on a sub-metering basis or to enable Tenant to obtain electric current directly from such utility and/or other providers shall be installed at Landlord's sole cost and expense. Only rigid conduit or electricity metal tubing (EMT) will be allowed.

        D.      Landlord on the date hereof obtains electric service for the Building from Consolidated Edison Company.  Notwithstanding anything herein set forth to the contrary, if permitted by law, Landlord may contract separately with Consolidated Edison Company and/or one or more other providers ("Alternative Service Providers") to provide one or more of the

9

component services which together make up the entire package of electric service (*e.g.*, transmission, generation, distribution and ancillary services) to the Building and/or Landlord may provide its own electricity services to the Building. If Landlord elects to contract with any Alternative Service Provider or provide its own electricity services to the Building, Tenant shall cooperate with Landlord and each such Alternative Service Provider, if applicable, to effect any change to the method or means of providing and distributing electricity service to the Premises or any other portion of the Building by reason of such change in the provision of electricity. Such cooperation shall include but not be limited to providing Landlord or any such Alternative Service Provider and any other person reasonable access to the Premises and to all wiring, conduits, lines, feeders, cables and risers, electricity panel boxes and any other component of the electrical distribution system within or adjacent to the Premises. Landlord shall not be liable to Tenant for any loss or damage or expense which Tenant may sustain or incur if such change shall interfere with Tenant's business or either the quantity or character of electric service is changed, interrupted or is no longer available or suitable for Tenant's requirements by reason of such change in the provision of electric service nor shall any such interference, change, interruption, unavailability or unsuitability constitute an actual or constructive eviction of Tenant.

The location and manner of installation of all connections and wiring associated with telecommunications equipment in the Premises shall be subject to Landlord's prior approval, in accordance with the provisions of Article 8 hereof. Landlord reserves the right to reject any such additional service if Landlord believes that such service will adversely affect an existing system.

Tenant shall at all times comply with the rules, regulations, terms and conditions applicable to service, equipment, wiring and requirements of the public utility supplying electricity to the Building. Tenant shall not use any electrical equipment which, in Landlord's reasonable judgment, would exceed the capacity of the feeders, risers and other electrical installations serving the Premises or interfere with the electrical service to other tenants of the Building. Subject to Landlord's obligation to provide six (6) watts per usable square foot of electric capacity to the Premises, in the event that, in Landlord's sole but good faith judgment, Tenant's electrical requirements necessitate installation of an additional riser, risers or other proper and necessary equipment, Landlord shall so notify Tenant of same. Within ten (10) days after receipt of such notice, Tenant shall either cease such use of such additional electricity or shall request that additional electrical capacity (specifying the amount requested) be made available to Tenant. Landlord, in Landlord's sole judgment shall determine whether to make available such additional electrical capacity to Tenant and the amount of such additional electrical capacity to be made available. If Landlord shall agree to make available additional electrical capacity and the same necessitates installation of an additional riser, risers or other proper and necessary equipment, including, without limitation, any switchgear, the same shall be installed by Landlord at Tenant's sole cost and expense, and shall be chargeable and collectible as additional rent and paid within thirty (30) days after the rendition of a bill to Tenant therefor.

E.    Landlord's Liability.    Landlord shall in no manner be liable for any failure, inadequacy or defect in the character or supply of alternating electric current, gas, water or steam furnished to the Premises by any public or private service company or any other supplier thereof if such inadequacy or defect is not due solely to the negligence or willful misconduct of Landlord, its agents, servants or employees (Landlord shall in any event, to the extent the same is

10

[1065228-9]

within its control, use commercially reasonable efforts to minimize the effect of such failure, inadequacy or defect and to eliminate the same at the earliest practicable time provided that Landlord shall not be required to perform such services on an overtime or premium pay basis).

Notwithstanding anything to the contrary contained in this Lease, in the event that there is an interruption in any utility service to be provided to Tenant under this Lease and such failure or interruption is caused solely by:

(i)     the negligence or willful misconduct of Landlord and such utility failure or interruption causes Tenant to cease operating its business in the Premises (or a portion of the Premises) and such interruption or failure is not remedied within five (5) days after Tenant shall have given Landlord written notice of such failure, then all Fixed Annual Rent and Additional Rent shall be abated (or proportionally abated, if Tenant ceases to operate in only a part of the Premises) as of the sixth (6th) consecutive day after such notice until such failure is substantially remedied, or

(ii)    the performance by Landlord of improvements to the Building not required by law or due to Landlord's breach of an obligation to perform repairs, and as a result Tenant ceases operating its business in the Premises (or a portion of the Premises) and such condition is not remedied within five (5) days after Tenant shall have given Landlord written notice of such failure, then all Fixed Annual Rent and Additional Rent shall be abated (or proportionately abated if Tenant ceases to operate in only a part of the Premises) as of the sixth (6th) consecutive day after such notice until such failure is substantially remedied.

F.    Stoppage or Interruption of Services.  Landlord may stop or interrupt the supply of alternating electric current, gas, water, chilled water or steam at such times as may be necessary and for as long as may reasonably be required by reason of accidents, strikes, the making of repairs, alterations or improvements, inability to secure a proper supply of fuel, gas, water, electricity, labor or supplies or by reason of any cause beyond the reasonable control of Landlord; provided, however, that Landlord shall use its commercially reasonable efforts to make any repair, alteration or improvement at such times and in such manner as to minimize any unreasonable interference with Tenant's use of the Premises, and Landlord shall give reasonable prior notice of not less than three (3) days (except in the event of emergency, when notice shall not be required) of the anticipated commencement, duration and nature thereof.  Tenant shall not be entitled to any abatement of fixed annual rent or additional rent or other compensation nor shall this Lease or any of Tenant's obligations hereunder by affected by reason of such stoppage or interruption.

4.    **ASSIGNMENT, SUBLETTING AND OTHER TRANSFERS**

A.  Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns expressly covenants that it shall not transfer, assign, hypothecate, mortgage or otherwise encumber this Lease, nor underlet, or suffer or permit the Premises or any

11

part thereof to be used or occupied by others, without the prior written consent of Landlord in each instance, except as otherwise expressly provided in Section 4(B) herein. The transfer of a majority of the issued and outstanding capital stock of any corporate tenant or subtenant of this Lease or a majority of the total interests in any partnership tenant or subtenant or any other form of entity or organization, however accomplished, and whether in a single transaction or in a series of transactions, and the conversion of a tenant or subtenant entity to either a limited liability company or a limited liability partnership, shall be deemed an assignment of this Lease or of such sublease. The merger or consolidation of a tenant or subtenant, whether a corporation, partnership, limited liability company or other form of entity or organization, where the net worth of the resulting or surviving corporation, partnership, limited liability company or other form of entity or organization, is less than the net worth of Tenant or subtenant immediately prior to such merger or consolidation shall be deemed an assignment of this Lease or of such sublease. If this Lease be assigned, or if the Premises or any part thereof be underlet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, undertenant or occupant, and apply the net amount collected to the rent herein reserved, but no assignment, underletting, occupancy or collection shall be deemed a waiver of the provisions hereof, the acceptance of the assignee, undertenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Landlord to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or underletting. In no event shall any permitted subtenant assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, without Landlord's prior written consent in each instance, in accordance with this Article 4. Landlord's prior written consent shall also be required for any modification (other than a de minimis modification) to a sublease, which consent shall not be unreasonably withheld (and which standards of issuance or withholding of consent, to the extent applicable, shall be governed by the terms and provisions of clause 4 of paragraph (B) of this Article 4) provided that if the modification in question materially affects either the term of the sublease or the rent and/or additional rent payable under the sublease then Landlord shall have the option to recapture the Premises and terminate the Lease. Notwithstanding anything contained herein to the contrary, Landlord's prior written consent shall not be required if the modification to the sublease is merely memorializing the exercise of a right contained in the sublease. If any lien is filed against the Premises or the Building for brokerage services claimed to have been performed for Tenant, whether or not actually performed, the same shall be discharged by Tenant within thirty (30) days thereafter, at Tenant's expense, by filing the bond required by law, or otherwise, and paying any other necessary sums, and Tenant agrees to indemnify Landlord and its agents and hold them harmless from and against any and all claims, losses or liability resulting from such lien for brokerage services rendered. For the purposes of this Article, an "interest" shall mean a right to participate, directly or indirectly, through one or more intermediaries, nominees, trustees or agents, in any of the profits, losses, dividends, distributions, income, gain, losses or capital of any entity or other organization.

B. Notwithstanding anything to the contrary contained in Section 4(A) above, the following shall govern:

[1065228-9]

(1)    <u>Prohibition Without Consent</u>.  If Tenant shall at any time or times during the term of this Lease desire to assign this Lease or sublet all or any portion of the Premises, Tenant shall give notice thereof to Landlord, which notice shall be accompanied by (i) a conformed or photostatic copy of the executed proposed assignment or sublease, the effective or commencement date of which shall be not less than thirty (30) nor more than one hundred twenty (120) days after the giving of such notice, (ii) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the Premises, and (iii) current financial information with respect to the proposed assignee or subtenant, including, without limitation, its most recent financial report, which shall have been certified by its chief financial officer or a certified public accountant.  The aforesaid notice shall be deemed an offer from Tenant to Landlord whereby Landlord (or Landlord's designee) may, at its option, recapture the Premises and terminate this Lease.  Said option may be exercised by Landlord by notice to Tenant at any time within thirty (30) days after Landlord's receipt of the aforesaid notice; and during such thirty (30) day period Tenant shall not assign this Lease nor sublet such space to any person.

(2)    <u>Termination by Landlord</u>.  If Landlord exercises its option to terminate this Lease as provided in Section 4(B)(1) above, then this Lease shall end and expire on the date that such assignment or sublet was to be effective or commence, as the case may be, and the rent due hereunder shall be paid and apportioned to such date.  If Landlord exercises its option to terminate this Lease pursuant to Section 4(B)(1) above, Landlord may lease the Premises (or any part thereof) to Tenant's prospective assignee or subtenant.

**(3)    <u>Intentionally Omitted</u>.**

(4)    <u>Conditions for Landlord's Approval</u>.  In the event Landlord does not exercise its option provided to it pursuant to Section 4(B)(1) above and provided that Tenant is not in default of any of Tenant's obligations under this Lease beyond all applicable notice and cure periods, Landlord's consent (which must be in writing and form reasonably satisfactory to Landlord) to the proposed assignment or sublease shall not be unreasonably withheld, provided and upon condition that:

(i)    Tenant shall have complied with the provisions of Section 4(B)(1) above and Landlord shall not have exercised its option under said Section 4(B)(1) above within the time permitted therefor;

(ii)    In Landlord's sole but good faith judgment, the proposed assignee or subtenant is engaged in a business or activity, and the Premises will be used in a manner, that (x) is in keeping with the then standards of the Building, (y) is limited to the use of the Premises for the use permitted in this Lease, and (z) will not violate any negative covenant as to use contained in any other lease of space in the Building;

(iii)    The proposed assignee or subtenant is a reputable person or entity of good character and with sufficient financial worth, in Landlord's sole but good faith judgment, considering the responsibility involved, and Landlord has been furnished with reasonable proof thereof, current financial information with respect to the proposed assignee or

13

subtenant, including, without limitation, its most recent financial report, which shall have been certified by an officer of the company or by an independent public accountant;

(iv)    The proposed assignee or sublessee is not a person or entity with whom Landlord is then negotiating to lease space in any part of the Building of which the Premises form a part or any other property owned by Landlord in the City of New York;

(v)    The form of the proposed sublease or instrument of assignment (i) shall be in form reasonably satisfactory to Landlord and (ii) shall comply with the applicable provisions of this Article 4;

(vi)    Any sublease shall be a sublease for all of the Premises;

(vii)    The rental and other material terms and conditions of the sublease are substantially the same as those contained in the proposed sublease furnished to Landlord pursuant to Section 4(B)(1) above;

(viii)    Tenant shall reimburse Landlord within twenty (20) days after demand for the reasonable costs that may be incurred by Landlord in connection with said assignment or sublease, including without limitation, the costs of making investigations as to the acceptability of the proposed assignee or subtenant and the reasonable legal costs incurred in connection with the granting of any requested consent;

(ix)    Tenant shall not have advertised or publicized in any way the availability of the Premises without prior notice to Landlord, nor shall any advertisement state the proposed rental;

(x)    The proposed subtenant or assignee shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to the service of process in, and the jurisdiction of the courts of New York State; and

(xi)    Tenant delivers to Landlord a certified statement of the full extent of the consideration, if any, to be paid to Tenant by the assignee or the sublessee for or by reason of such assignment or sublease, as the case may be, (including, but not limited to, sums paid for the sale of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property).

(5)    Reactivation of Termination Option.  In the event that (i) Landlord fails to exercise its option under Section 4(B)(1) above and consents to a proposed assignment or sublease, and (ii) Tenant fails to execute and deliver the assignment or sublease to which Landlord consented within ninety (90) days after the giving of such consent, then Tenant shall again comply with all of the provisions and conditions of Section 4(B)(1) above before assigning this Lease or subletting the Premises.

(6)    Sublease Provisions.  With respect to each and every sublease or subletting authorized by Landlord under the provisions of this Lease, it is further agreed that:

14

(i)    No subletting shall be for a term ending later than one (1) day prior to the Expiration Date of this Lease;

(ii)    No sublease shall be delivered, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord;

(iii)    Each sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublessor, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (a) be liable for any previous act or omission of Tenant under such sublease, (b) be subject to any counterclaim, offset or defense not expressly provided in such sublease and that theretofore accrued to such subtenant against Tenant, or (c) be bound by any previous modification of such sublease or by any previous prepayment of more than one (1) month's fixed annual rent. The provisions of this Article 4 shall be self-operative and no further instrument shall be required to give effect to this provision.

(iv)    Each subletting pursuant to this Article 4 shall be subject to all of the covenants, agreements, terms, provisions and conditions contained in this Lease. Notwithstanding any such subletting to any subtenant and/or acceptance of fixed annual rent or additional rent by Landlord from any subtenant, (x) Tenant shall remain fully liable for (i) the payment of the fixed annual rent and additional due and to become due hereunder and (ii) the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on the part of Tenant to be observed and performed, and (y) all acts and omissions of any licensee or subtenant, or anyone claiming under or through any subtenant, that shall be in violation of any of the obligations of this Lease, and any such violation shall be deemed to be a violation by Tenant. Tenant further agrees that notwithstanding any such subletting, no further subletting of the Premises by Tenant or any person claiming through or under Tenant shall or will be made except upon compliance with and subject to the provisions of this Article 4. If Landlord shall decline to give its consent to any proposed assignment or sublease, or if Landlord shall exercise its option under Section 4(B)(1), Tenant shall indemnify, defend and hold harmless Landlord to the fullest extent permitted by law against and from any and all loss, liability, damages, costs and expenses (including reasonable counsel fees) resulting from any claims that may be made against Landlord by the proposed assignee or sublessee.

(7)    Profits. If Landlord shall give its consent to any assignment of this Lease or to any sublease, Tenant shall in consideration therefor, pay to Landlord, as additional rent the following sums:

(i)    in the case of an assignment, an amount equal to fifty (50%) percent of all sums and other considerations paid to Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof

15

determined on the basis of Tenant's federal income tax returns) less all expenses reasonably and actually incurred by Tenant on account of brokerage commissions and advertising costs in connection with such assignment, provided that Tenant shall submit to Landlord a receipt evidencing the payment of such expenses (or other proof of payment as Landlord shall require); and

(ii)    in the case of a sublease, fifty (50%) percent of any rents, additional charges or other consideration payable under the sublease to Tenant by the subtenant that is in excess of the rent accruing during the term of the sublease in respect of the sublease space pursuant to the terms hereof (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture or other personal property, less, in the case of the sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns), less all expenses reasonably and actually incurred by Tenant on account of brokerage commissions and advertising costs in connection with such sublease, provided that Tenant shall submit to Landlord a receipt evidencing the payment of such expenses (or other proof of payment as Landlord shall reasonably require).  The sums payable under this Section shall be paid to Landlord as and when payable by the subtenant to Tenant.

(8)    <u>Permitted Transfers</u>.  Notwithstanding anything to the contrary contained in this Article 4 and without any Landlord right of recapture or profit sharing or obligation of Tenant to reimburse Landlord its costs incurred in connection with such assignment or sublease, provided, and on the condition, that, Tenant shall not then be in default hereunder beyond applicable notice and cure periods, this Lease may be assigned and Tenant shall have the right to sublease the entire Premises, without the consent of Landlord to (x) any corporation, limited liability company or other legal entity into which or with which Tenant may be merged or consolidated, or which shall purchase all or substantially all of the assets or a controlling interest in the stock of Tenant, (y) to any Affiliate (which term "<u>Affiliate</u>" shall mean any entity, directly or indirectly, through one or more intermediaries, which controls, is controlled by or is under common control with Tenant, as such terms are defined below, or is a partner of Tenant) or (z) any successor entity created by merger, reorganization, recapitalization or acquisition of Tenant, provided each of the following conditions shall be complied with:

(i)    If such assignment or sublease of the entire Premises shall be to a successor by merger or consolidation, reorganization or recapitalization or by acquisition of assets or a controlling interest in the stock of Tenant, such successor shall have acquired all or substantially all of the assets or a controlling interest in the stock, and assumed all of the liabilities, of Tenant, and shall have a total net worth at least equal to the total net worth of Tenant as of the day immediately prior to the date of the assignment or sublease.

(ii)    If such assignment or sublease of the entire Premises shall be to an Affiliate, such Affiliate shall have assumed all of the liabilities hereunder of Tenant, and Tenant shall have expressly agreed, in writing, to continue to remain liable under the Lease; provided, that with respect to such Affiliate, any future transaction or occurrence whereby it ceases to be an Affiliate shall not be deemed to be a Permitted Transfer (as herein defined) under

16

this Section 4(B)(8) (but rather shall be deemed an assignment or sublease requiring Landlord's consent as provided hereinabove).

(iii)    The assignee or subtenant, as applicable, shall at all times use the Premises for only the use permitted herein.

(iv)    The transaction shall be made for a good faith operating business purpose, and not intended to evade compliance with the provisions of this Article concerning assignment.

(v)    Landlord shall be given a duplicate original counterpart of the instrument of assignment within fifteen (15) days following the effective date thereof).

For the purposes of this Subsection (8): (x) "control" shall mean the power by ownership or contract, effectively to control the operations and management of the entity controlled along with some equity ownership; and (y) "net worth" shall be deemed to mean an entity's equity, as reported in such entity's annual financial statements (prepared in accordance with generally accepted accounting principles), less the intangible assets of such entity, including but not limited to, copyrights, trademarks, trade names, licenses, patents, franchises, goodwill, operating rights and deferred financing costs. Any assignment or sublease by Tenant pursuant to this Section 4(B)(8) to an Affiliate or in connection with a sale or merger shall be for a legitimate, bona fide purpose and not, either directly or indirectly, to transfer the leasehold created hereby in order to circumvent this Article 4. Any such assignment or sublease to an Affiliate shall only constitute a Permitted Transfer if and for so long as the assignee or sublessee, as applicable, remains an Affiliate of Tenant, and upon cessation of such affiliation Tenant shall treat the assignee or sublessee, as applicable, as an unrelated third party and the transfer provisions of this Article 4 shall apply to such assignee or sublessee, as applicable. Any transaction meeting the requirements of this Subsection (8) shall be referred to as a "Permitted Transfer".

(9)    Assumption by Assignee. Any assignment or transfer of this Lease shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement in form and substance reasonably satisfactory to Landlord whereby the assignee shall assume the obligations of this Lease on the part of Tenant to be performed or observed and whereby the assignee shall agree that the provisions in this Article 4, shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers. The original named Tenant covenants that, notwithstanding any assignment or transfer, whether or not in violation of the provisions of this Lease, and notwithstanding the acceptance of rent by Landlord from an assignee, transferee, or any other party, the original named Tenant shall remain fully liable for the payment of the rent and for the other obligations of this Lease on the part of Tenant to be performed or observed.

Liability by Tenant. The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant and the due performance of the obligations of this Lease on Tenant's part to be performed or observed shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord extending the time, or modifying any of the obligations, of this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of this Lease. In no event shall any assignment of this Lease or

17

sublease of the Premises, whether or not in violation of the terms and conditions of this Article 4, release Tenant of any liability hereunder.

(10) <u>Re-entry by Landlord</u>. If Landlord shall recover or come into possession of the Premises before the date herein fixed for the termination of this Lease, Landlord shall have the right, at its option, to take over any and all subleases or sublettings of the Premises or any part thereof made by Tenant and to succeed to all the rights of said subleases and sublettings or such of them as it may elect to take over. Tenant hereby expressly assigns and transfers to Landlord such of the subleases and sublettings as Landlord may elect to take over at the time of such recovery of possession, such assignment and transfer not to be effective until the termination of this Lease or re-entry by Landlord hereunder or if Landlord shall otherwise succeed to Tenant's estate in the Premises, at which time Tenant shall upon request of Landlord, execute, acknowledge and deliver to Landlord such further instruments of assignment and transfer as may be necessary to vest in Landlord the then existing subleases and sublettings. Every subletting hereunder is subject to the condition and by its acceptance of and entry into a sublease, each subtenant thereunder shall be deemed conclusively to have thereby agreed from and after the termination of this Lease or re-entry by Landlord hereunder of or if Landlord shall otherwise succeed to Tenant's estate in the Premises, that such subtenant shall waive any right to surrender possession or to terminate the sublease and, at Landlord's election, such subtenant shall be bound to Landlord for the balance of the term of such sublease and shall attorn to and recognize Landlord, as its Landlord, under all of the then executory terms of such sublease, except that Landlord shall not (i) be liable for any previous act, omission or negligence of Tenant under such sublease, (ii) be subject to any counterclaim, defense or offset not expressly provided for in such sublease, which theretofore accrued to such subtenant against Tenant, (iii) be bound by any previous modification or amendment of such sublease or by any previous prepayment of more than one (1) month's rent and additional rent, which shall be payable as provided in the sublease, or (iv) be obligated to perform any work in the subleased space or the Building or to prepare them for occupancy beyond Landlord's obligations under this Lease, and the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant of Tenant shall be deemed automatically upon and as a condition of occupying or using the Premises or any part thereof, to have given a waiver of the type described in and to the extent and upon the conditions set forth in this Article 4.

## 5.    DEFAULT

Landlord may terminate this Lease on five (5) days' notice: (a) if fixed annual rent is not paid when due and such failure continues for five (5) days after written notice from Landlord; or (b) if additional rent or any other payment due hereunder is not paid when due and such failure continues for ten (10) days after written notice from Landlord; or (c) if Tenant shall fail to keep, observe or perform any covenant or agreement of this Lease (except the payment of rent), and such failure continues for thirty (30) days after written notice thereof from Landlord, or if such default cannot be completely cured in such time, if Tenant shall not promptly proceed to cure such default within said thirty (30) days, or shall not complete the curing of such default with due diligence; or (d) when and to the extent permitted by law, if a petition in bankruptcy shall be filed by or against Tenant or if Tenant shall make a general assignment for the benefit of

18

creditors, or receive the benefit of any insolvency or reorganization act; or (e) if a receiver or trustee is appointed for any portion of Tenant's property and such appointment is not vacated within ninety (90) days; or (f) if an execution or attachment shall be issued under which the Premises shall be taken or occupied or attempted to be taken or occupied by anyone other than Tenant; or (g) if the Premises become and remain vacant or deserted for a period over ten (10) business days (for reasons other than casualty or force majeure) and Tenant shall not have provided adequate security to prevent unapproved access to the Premises. At the expiration of the five (5) day notice period, this Lease and any rights of renewal or extension (if any) thereof shall terminate as completely as if that were the date originally fixed for the expiration of the term of this Lease; but Tenant shall remain liable as hereinafter provided.

If this Lease shall terminate in accordance with this Article 5 or if the term of this Lease shall naturally expire or be terminated as provided elsewhere in this Lease, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter into or upon the Premises and dispossess Tenant therefrom, or any part thereof, either by summary dispossession proceedings or by any lawful action or proceeding at law.  Landlord shall not be liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any persons therefrom, to the end that Landlord may have, hold and enjoy the Premises again as and of its first estate and interest therein.

6.    **RE-LETTING, ETC.**

Tenant hereby expressly waives any right of redemption granted by any present or future law.  "Re-enter" and "re-entry" as used in this Lease are not restricted to their technical legal meaning.  In the event of a breach or threatened breach of any of the covenants or provisions hereof Landlord shall have the right to seek an injunction. Mention herein of any particular remedy shall not preclude Landlord from any other available remedy. Landlord shall recover as liquidated damages, in addition to accrued rent and other charges, if Landlord's re-entry is the result of Tenant's bankruptcy, insolvency, or reorganization, the full rental for the maximum period allowed by any act relating to bankruptcy, insolvency or reorganization.

In case of any re-entry, dispossess by summary proceedings or termination of the term hereof due to Tenant's default, (x) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or termination; (y) Landlord may re-let the Premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms, which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the term of this Lease and may grant concessions or occupancy free of rent for any period; and (z) Tenant shall also pay Landlord as liquidated damages for the failure of Tenant to perform any obligation, at Landlord's election, either of the amounts provided for in item (1) or item (2) below and, in addition thereto, the amounts provided for in item (3).  Landlord shall have no obligation to re-let the Premises, and its failure or refusal to do so, or failure to collect rent on re-letting, shall not affect Tenant's liability hereunder. In no event shall Tenant be entitled to a credit or repayment for rerental income which exceed the sums payable to Tenant hereunder or which covers a period after the original term of this Lease.  Said items (1), (2) and (3) are as follows:

19

(1)    A sum which, at the time of such re-entry, dispossess or termination, as the case may be, represents the then value (assuming a discount at a rate per annum equal to the interest rate then applicable to the United States Treasury Bonds having a term which most closely approximates the period commencing on the date that this Lease is so terminated and ending on the then established expiration date of the term of this Lease) of the amount by which (x) the aggregate of the fixed annual rent and any regularly payable additional rent hereunder that would have been payable by Tenant for the period commencing with such re-entry, dispossess or termination, as the case may be, and ending on the date then established herein for the expiration of the term of this Lease exceeds (y) the aggregate rental value of the Premises for the same period (which sum is sometimes hereinafter called "the lump sum payment"); or

(2)    Sums equal to any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected (*i.e.*, the amount of rents collected hereunder less all of the costs referred to in item (3) below incurred by Landlord) on account of the lease or leases of the Premises for each month of the period which would otherwise have constituted the balance of the term of this Lease. Such deficiency shall become due and payable monthly, as it is determined; and

(3)    A sum to be added to such lump sum payment or deficiency, as the case may be, equal to the expenses that Landlord incurs in connection with re-letting the Premises and pursuing Landlord's rights and remedies (whether or not any legal action is commenced) including, but not limited to, legal expenses, reasonable attorneys' fees, court costs, brokerage commissions, advertising costs, the value of any rent-free period, the costs of all alterations and decorations deemed advisable by Landlord to market the Premises following such re-entry or dispossess, and costs to keep the Premises in good order and/or for preparing the same for re-letting provided that all re-letting costs shall be prorated based on a fraction the numerator of which is the number of months which otherwise would have constituted the balance of the term of this Lease and the denominator of which is the number of months in the replacement tenant's lease.

If Landlord re-enters the Premises for any cause, or if Tenant abandons or vacates the Premises, and after the expiration of the term of this Lease, any property left in the Premises by Tenant shall be deemed to have been abandoned by Tenant, and Landlord shall have the right to retain or dispose of such property (at Tenant's sole cost and expense) in any manner without any obligation to account therefor to Tenant.  If Tenant shall at any time default hereunder, and if Landlord shall institute an action or summary proceeding against Tenant based upon such default, then Tenant will reimburse Landlord for the legal expenses and fees thereby incurred by Landlord.

[1065228-9]

7.  **LANDLORD MAY CURE DEFAULTS**

If Tenant shall default beyond the expiration of the applicable notice and grace period (or sooner in case of emergency) in performing any covenant or condition of this Lease, Landlord may perform the same for the account of Tenant, and if Landlord, in connection therewith, or in connection with any default by Tenant, makes any expenditures or incurs any obligations for the payment of money, including but not limited to reasonable attorneys' fees and disbursements, such sums so paid or obligations incurred shall be deemed to be additional rent hereunder, and shall be paid by Tenant to Landlord, together with interest at the rate set forth in Article 43 hereof, within thirty (30) days of rendition of any bill or statement therefor, and if the term of this Lease shall have expired at the time of the making of such expenditures or incurring such obligations, such sums shall be recoverable by Landlord as damages.

8.  **ALTERATIONS**

A.  Tenant shall make no decoration, alteration, addition or improvement in the Premises, including without limitation Tenant's Work, as hereinafter defined ("alteration"), without the prior written consent of Landlord, and then only by contractors or mechanics and in such manner and with such materials as shall be reasonably approved by Landlord.  All alterations, additions or improvements to the Premises, including window and central air conditioning equipment and duct work, if any, and fixtures, equipment and built-ins, except movable office furniture and equipment installed at the expense of Tenant, shall become the property of Landlord, and shall be surrendered with the Premises at the expiration or sooner termination of the term of this Lease.  Notwithstanding the foregoing, Landlord may require Tenant to remove Specialty Alterations (as hereinafter defined) at the end of the Lease term. For purposes hereof, "Specialty Alterations" means alterations made by or on behalf of Tenant or anyone claiming by, through or under Tenant, consisting of kitchens and pantries, executive bathrooms, raised floors, internal staircases, dumb waiters, pneumatic tubes, vertical and horizontal transportation systems and other alterations of a similar character that are above and beyond standard or typical office installations in general office space in New York City and are more costly and difficult to remove than standard office installations.  Only those Specialty Alterations which Landlord shall designate for removal at the time Landlord approves such alteration, shall be removed by Tenant and any damage repaired, at Tenant's expense prior to the expiration of the term of this Lease.  For the avoidance of doubt, Tenant shall not be required to remove the pantry.  All alterations shall be in accordance with the Tenant Construction Guidelines and the Building Design Guidelines attached hereto as Exhibit A.

B.  Anything in this Article to the contrary notwithstanding, Landlord shall not unreasonably withhold approval of written requests of Tenant to make nonstructural interior alterations in the Premises, provided that such alterations do not affect utility services or plumbing and electrical lines or other systems of the Building. Notwithstanding the foregoing, Tenant may perform merely decorative alterations (in the nature of carpeting, painting and wallpapering) each estimated to cost less than Fifty Thousand Dollars ($50,000) without Landlord's consent but upon prior notice to Landlord.  Landlord may withhold its consent to any other alterations in its sole discretion. Tenant shall pay to Landlord, within twenty (20) days after demand, all of Landlord's reasonable costs and expenses actually incurred (including architects' and engineers' fees) for reviewing Tenant's plans for the alterations (excluding Tenant's Initial

21

Work) and inspecting the alterations during the performance thereof (excluding Tenant's Initial Work). All alterations shall be performed in accordance with the following conditions:

(i)      All alterations requiring the submission of plans to any governmental agency (including the department of buildings of the City of New York) shall be performed in accordance with detailed plans and specifications (including scaled layout, architectural, mechanical and structural drawings) in three (3) hard copies and diskette form first submitted to Landlord for its prior written approval. Tenant represents to Landlord that Tenant's Initial Work does not require the submission of plans to any governmental agency.

(ii)      All alterations shall be performed in a good and workmanlike manner. Tenant shall, prior to the commencement of any such alterations, at its sole cost and expense, obtain and exhibit to Landlord any governmental permit required in connection with such alterations.

(iii)      All alterations shall be done in compliance with all other applicable provisions of this Lease, all Building regulations (including specifications for construction material and finishes criteria adopted by Landlord for the Building) and with all applicable laws, ordinances, directions, rules and regulations of governmental authorities having jurisdiction, including, without limitation, The Americans with Disabilities Act of 1990, as amended (the "ADA"), New York City Local Law No. 5/73 and New York City Local Law No. 58/87 and similar present or future laws, and regulations issued pursuant thereto, and also New York City Local Law No. 76 and similar present or future laws, and regulations issued pursuant thereto, on abatement, storage, transportation and disposal of asbestos. Tenant shall, at its option, retain an expediter designated by Landlord to submit plans for alterations to all applicable governmental agencies and obtain all necessary governmental permits in connection with the performance of alterations. Notwithstanding anything to the contrary herein contained, Tenant agrees not to penetrate or disrupt the structural columns of the Building located within the Premises in connection with any alteration performed for or on behalf of Tenant.

(iv)      Tenant agrees that alterations shall only be performed by contractors approved by Landlord in Landlord's sole but reasonable discretion. Any contractor approved by Landlord shall cooperate with Landlord so that such contractor shall comply with Landlord's rules and regulations in connection with the Building and/or the Premises, including without limitation, Landlord's insurance requirements pertaining to all contractors and subcontractors contained in the Tenant Construction Guidelines attached hereto as Exhibit A. Tenant shall not, at any time prior to or during the term, directly or indirectly employ, or permit the employment of, any contractor, mechanic or laborer in the Premises, whether in connection with any alterations, if, in Landlord's sole discretion, such employment will interfere or cause any conflict with other contractors, mechanics, or laborers engaged in the construction, maintenance or operation of the Building by Landlord, Tenant or others. In the event of any such interference or conflict, Tenant, upon demand of Landlord, shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Building immediately.

(v)      Tenant shall keep the Building and the Premises free and clear of all liens for any work or material claimed to have been furnished to Tenant or to the Premises.

[1065228-9]

(vi)    All work to be performed by Tenant shall be done in a manner which will not interfere with or unreasonably disturb other tenants and occupants of the Building. No demolition or core drilling or welding shall be permitted between the hours of 7:00 a.m. and 6:00 p.m. on Mondays through Fridays.

(vii)    Within thirty (30) days after final completion of any alteration (excluding Tenant's Initial Work), Tenant shall deliver to Landlord "as built" plans and drawings of the alteration including, as may be pertinent to the work performed, a reflected ceiling plan, mechanical and electrical drawings, partition plan and any other drawings which may be required to indicate accurately the layout and systems of the Premises. Tenant shall require its architect to load and maintain such record plans on a CADD system.

C.    Promptly after the Commencement Date, Tenant shall proceed with its initial work at the Premises to prepare the same for Tenant's business therein ("Tenant's Initial Work") as described in Exhibit E hereto, Tenant's Initial Work is hereby approved by Landlord .

## 9.    LIENS

Tenant at its expense shall cause any lien filed against the Premises or the Building, for work or materials claimed to have been furnished to Tenant, to be discharged of record (by payment of the amount due or the posting of a bond) within thirty (30) days after notice thereof.

## 10.    REPAIRS

A.    Tenant shall take good care of the Premises and the fixtures and appurtenances therein, and shall make all repairs to and replacements of the Premises, at its sole cost and expense, necessary to keep them in good working order and condition, including, without limitation, the interior of the Premises and operational parts therein (plumbing equipment and fixtures), the heating, ventilation and air-conditioning equipment located inside the Premises and exclusively serving the Premises (the "HVAC System"), interior maintenance (floors, doors (including interior and exterior portions thereof), toilets, light replacements), all other elements or systems within and exclusively serving the Premises from the point of connection to the Building systems, and structural repairs when those are necessitated by (i) the act, omission or negligence of Tenant or its agents, contractors employees or invitees, (ii) required as a result of Tenant's specific manner of use of the Premises (other than general office and showroom purposes), (iii) any repairs, installations or alterations made by or on behalf of Tenant, and (iv) any breach of Tenant's obligations under this Lease. Repairs, parts, materials, and equipment used by Tenant to fulfill its obligations hereunder shall be made with new parts and materials of at least of a quality equivalent to those initially installed within the Premises and shall be performed in accordance with then existing laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders, extraordinary and ordinary, of all governmental authorities, including without limitation, the ADA and all requirements of any applicable fire rating bureau or other body exercising similar functions, affecting the Building, and all requirements of all insurance bodies affecting the Premises. In addition, Tenant shall maintain in force and provide a copy of same to Landlord, a HVAC System repair and full service maintenance contract in form satisfactory to Landlord (the "Maintenance Contract") with an HVAC contractor or servicing organization approved by Landlord within thirty (30) days after Tenant takes possession

23

of the Premises for the conduct of Tenant's business. The Maintenance Contract shall cover all elements of the HVAC System beyond the air handlers (such as, by way of example, motors, belts, filters and duct work).  Any such contract shall expressly state (i) that it shall be an automatically renewing contract terminable by no less than thirty (30) days prior written notice to the Landlord, and (ii) that the contractor providing such service shall maintain a log at the Premises detailing the service provided during each visit pursuant to such contract.  Tenant shall keep such log at the Premises and permit Landlord to review same promptly after Landlord's request.  The entire HVAC System is and shall at all times remain the property of Landlord and at the expiration or sooner termination of this Lease, Tenant shall surrender to Landlord the same in good working order and condition, reasonable wear and tear and damage due to casualty excepted. Tenant shall not make any changes or additions to the HVAC System until Tenant shall have received Landlord's written consent thereto.  Should Tenant fail to obtain the contract required herein, Landlord may do so and charge the Tenant the monthly cost of same plus an administrative fee equal to fifteen percent (15%) of such cost, as additional rent hereunder, and Tenant shall pay the first installment of same by no later than the sooner to occur of (a) the tenth (10th) day after Landlord bills Tenant for such charge, or (b) the date Tenant's next installment of fixed annual rent is due.  Thereafter, Tenant shall pay such monthly charge with its monthly fixed rental installment.

B.    The exterior walls of the Building, the windows and the portions of all window sills outside same and areas above any hung ceiling are not part of the Premises demised by this Lease, and Landlord hereby reserves all rights to such parts of the Building. Landlord shall replace, or at Landlord's option Tenant shall replace, in either case at the expense of Tenant, any glass damaged or broken from any cause whatsoever in and about the Premises. Landlord may insure, and keep insured, at Tenant's expense, all glass in the Premises for and in the name of Landlord.  Bills for the premium therefor shall be rendered by Landlord to Tenant at such times as Landlord may elect and shall be due from and payable by Tenant when rendered and the amount thereof shall be deemed to be and paid as additional rent.  If the conduct and/or performance of any alterations made by or on behalf of Tenant, require Landlord to make any alterations or improvements to any part of the Building in order to comply with any legal requirements, Tenant shall pay all reasonable costs and expenses incurred by Landlord in connection with such alterations or improvements.

C.    Landlord shall maintain the structural elements of the Building and the base Building systems and the common and public areas of the Building in good condition and repair and in compliance with all applicable laws.

## 11.    DESTRUCTION

Section 11.1. If the Premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give prompt written notice thereof to Landlord.  Landlord shall, subject to the provisions of <u>Sections 11.2</u> and <u>11.3</u> below, proceed with reasonable diligence, after receipt of the net proceeds of insurance, to repair or cause to be repaired such damage at its expense, but in no event shall Landlord be obligated to repair any damage to or to restore any of Tenant's leasehold improvements or alterations, whether initially installed by Landlord or Tenant.  Tenant shall repair and restore in accordance with <u>Article 8</u> and with reasonable dispatch all leasehold improvements and Alterations made by or for Tenant in the Premises.  If the Premises, or any part thereof, shall be rendered untenantable by reason of such damage, then the Fixed Annual

24

Rent and the Additional Rent, or an amount thereof apportioned according to the area of the Premises so rendered untenantable (if less than the entire Premises shall be so rendered untenantable), shall be abated for the period from the date of such damage to the date when the repair of such damage shall have been substantially completed by Landlord. Landlord's determination of the date when the Premises are tenantable shall be controlling unless Tenant disputes the same by notice to Landlord given within ten (10) Business Days after Tenant's receipt of notice from Landlord of such determination by Landlord, and pending resolution of such dispute, Tenant shall commence the payment of the Fixed Annual Rent and the Additional Rent that had been abated, as of the date specified by Landlord. Tenant covenants and agrees to cooperate with Landlord and the holder of any Superior Interest in their efforts to collect insurance proceeds (including rent insurance proceeds) payable to such parties. Landlord shall not be liable for any delay which may arise by reason of adjustment of insurance on the part of Landlord and/or Tenant, or any cause beyond the control of Landlord or contractors employed by Landlord.

Section 11.2. Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from damage from fire or other casualty or the repair thereof. Tenant understands that Landlord, in reliance upon Article 42, will not carry insurance of any kind on Tenant's property, Tenant's alterations and on leasehold improvements, and that Landlord shall not be obligated to repair any damage thereto or replace the same. In the event of a partial or total destruction of the Premises, Tenant shall as soon as practicable remove any and all of Tenant's property from the Premises or the portion thereof destroyed, as the case may be, and if Tenant does not promptly so remove Tenant's property, Landlord may, after ten (10) days' written notice, remove Tenant's property to a public warehouse for deposit.

Section 11.3(A). Notwithstanding anything to the contrary contained in Sections 11.1 and 11.2 above, in the event that:

(i)    the Building shall be damaged by fire or other casualty so that substantial alteration or reconstruction of the Building shall, in Landlord's sole opinion, be required (whether or not the Premises shall have been damaged by such fire or other casualty and without regard to the structural integrity of the Building); or

(ii)    the Premises shall be totally or substantially damaged or shall be rendered wholly or substantially untenantable and in either case the repair or restoration is estimated to take more than one hundred eighty (180) days; or

(iii)    there shall be any damage to the Premises within, the last year of the Term wherein the cost of repair exceeds an amount equal to three (3) monthly installments of Fixed Rent;

then Landlord (to the extent Landlord terminates all similarly situated tenants in regard to clause (i) above, and/or Tenant, in regard to clause (iii) above), may, in its sole and absolute discretion, terminate this Lease and the term and estate hereby granted, by written notice within ninety (90) days after the date of such damage. In the event that such a notice of termination

25

[1065228-9]

shall be given, then this Lease and the term and estate hereby granted shall, expire as of the date of such notice with the same effect as if that were the expiration of the term of this Lease, and the Annual Fixed Rent and Additional Rent hereunder shall be apportioned as of such date.

Section 11.4. Except as may be provided in this Lease, nothing herein contained shall relieve Tenant from any liability to Landlord or to Landlord's insurers in connection with any damage to the Premises or the Building by fire or other casualty if Tenant shall be legally liable in such respect.

Section 11.5. This Lease shall be considered an express agreement governing any case of damage to or destruction of the Building or any part thereof by fire or other casualty, and Section 227 of the Real Property Law of the State of New York providing for such a contingency in the absence of express agreement and any other law of like import now or hereafter in force, shall have no application in such case.

## 12.    END OF TERM

Tenant shall surrender the Premises to Landlord at the expiration or sooner termination of this Lease in good order and condition, except for reasonable wear and tear and damage by fire or other casualty, and Tenant shall remove all of its personal property. Tenant agrees that any personal property remaining in the Premises following the expiration of the term of this Lease (or within a reasonable period of time after such earlier date as of which the term hereof may have been terminated) shall for all purposes be deemed conveyed to and to be the property of Landlord who shall be free to dispose of such property, at Tenant's cost, in any manner Landlord shall determine. Landlord may retain or assign any salvage or other residual value of such property. In consideration of Landlord's disposing of such property, Tenant shall reimburse Landlord or pay to Landlord any cost which Landlord may incur in disposing of such property within ten (10) days after demand therefor. Landlord hereby agrees to waive any lien rights it may be entitled to with respect to Tenant's merchandise, any moveable property, furniture, fixtures and equipment that are placed within the Premises. The parties recognize and agree that if possession of the Premises is not surrendered to Landlord within five (5) days after the expiration or sooner termination of the term of this Lease, Tenant's occupancy shall be a month-to-month tenancy upon all of the terms set forth in this lease except that Tenant shall pay Landlord as liquidated damages for each month during which Tenant holds over in the Premises after expiration or termination of the term of this Lease, a sum equal to the greater of two hundred percent (200%) of (i) the then fair market value of the Premises and (ii) the monthly installment of Fixed Annual Rent which was payable during the last month of the term thereof

If Tenant shall remain in possession for more than thirty (30) days beyond the expiration date then Tenant shall be liable for all consequential damages and shall indemnify and save Landlord harmless against all costs, claims, loss or liability resulting from delay by Tenant in so surrendering the Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay. The aforesaid obligations shall survive the expiration or sooner termination of the term of this Lease. Anything in this Lease to the contrary notwithstanding, the acceptance of any rent shall not preclude Landlord from commencing and prosecuting a holdover

[1065228-9]

or summary eviction proceeding, and the preceding sentence shall be deemed to be an agreement expressly "providing otherwise" within the meaning of Section 232-c of the Real Property Law of the State of New York and any successor law of like import. Tenant expressly waives, for itself and for any person or entity claiming through or under the Tenant, any rights which the Tenant or any such person or entity may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute. Tenant's obligations under this paragraph shall survive the expiration or sooner termination of the term of this Lease.

**13.    SUBORDINATION AND ESTOPPEL, ETC.**

A.    This Lease and Tenant's rights hereunder are and shall be subject and subordinate to and all master leases of the Building project, ground or underlying leases and to the lien of all mortgages, building loan agreements, leasehold mortgages, spreader and consolidation agreements and other similar documents and instruments (individually, a "Superior Interest" and collectively, "Superior Interests"), which may now or hereafter affect such leases or the real property of which the Premises form a part and to all renewals, modifications, consolidations, replacements, extensions, assignments, spreaders, consolidations and refinancings thereof and to all advances made or hereafter made thereunder. This Article shall be self-operative and no further instrument of subordination shall be necessary. In confirmation of such subordination, Tenant shall within twenty (20) days after written request execute any reasonable and customary instrument in recordable form that Landlord or the holder of any Superior Interest may reasonably request. If Tenant fails to execute any such instrument within such twenty (20) day period, Tenant hereby appoints Landlord as Tenant's irrevocable attorney-in-fact to execute any such instrument on behalf of Tenant. The foregoing power of attorney is a power coupled with an interest and not revocable during the term of this Lease.

B.    Any holder of a Superior Interest may elect that this Lease shall have priority over such Superior Interest and, upon notification by such holder of a Superior Interest to Tenant, this Lease shall be deemed to have priority over such Superior Interest, whether this Lease is dated prior to or subsequent to the date of such Superior Interest. In the event that any master lease or any other ground or underlying lease is terminated as aforesaid, or if the interests of Landlord under this Lease are transferred by reason of or assigned in lieu of foreclosure or other proceedings for enforcement of any mortgage, or if the holder of any mortgage acquires a lease in substitution therefor, or if the holder of any Superior Interest shall otherwise succeed to Landlord's estate in the lease or the Building, or the rights of Landlord under this Lease, then Tenant will, attorn to it and will perform for its benefit all the terms, covenants and conditions of this Lease on Tenant's part to be performed with the same force and effect as if said lessor, mortgagee or such purchaser, assignee or lessee, were the landlord originally named in this Lease. The foregoing provisions shall inure to the benefit of any such successor landlord, shall be self-operative upon any such request and no further instrument shall be required to give effect to said provisions; provided, however, that upon request of any such successor landlord, Tenant shall promptly execute and deliver, from time to time, any instrument in recordable form that any successor landlord may reasonably request to evidence and confirm the foregoing provisions of this paragraph, in reasonable and customary form and content.

27

C.    Intentionally Omitted.

D.    From time to time but not more frequently than once per year, Tenant, on twenty (20) days' prior written request by Landlord, will deliver to Landlord and the holder of any Superior Interest a statement in writing certifying that this Lease is unmodified and is in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent and other charges have been paid, stating the date of expiration of the term hereof and whether any renewal options exists (and if so, the terms thereof), stating whether, to Tenant's knowledge, any defense or counterclaim to the payment of any rent exists, whether any allowance or work is due to Tenant from Landlord, stating whether or not, to Tenant's knowledge, the Landlord is in default in performance of any covenant, agreement or condition contained in this Lease and, if so, specifying each such default of which Tenant may have knowledge and containing such other information as the holder of any Superior Interest may reasonably request. If Tenant shall fail to deliver such a statement within such twenty (20) day period, Landlord is hereby appointed the true and lawful attorney-in-fact of Tenant, coupled with an interest, for the purpose of executing and delivering such statement on behalf of Tenant. Nothing contained herein will be deemed to impair any right, privilege or option of the holder of any Superior Interest. If, in connection with obtaining, continuing or renewing financing or refinancing for the Building and/or the land, the lender shall request reasonable modifications to this Lease as a condition to such financing or refinancing, Tenant will not unreasonably withhold, delay or defer its consent thereto, provided that such modifications do not materially and adversely increase the obligations of Tenant hereunder (except, perhaps, to the extent that Tenant may be required to give notices of any defaults by Landlord to such lender with the granting of such additional time for such curing as may be required for such lender to get possession of the said Building and/or land) or materially and adversely affect the leasehold interest hereby created or the rights of Tenant thereunder. If any act or omission by Landlord shall give Tenant the right, immediately or after the lapse of time, to cancel or terminate this Lease or to claim a partial or total eviction, Tenant shall not exercise any such right until: (a) it shall have given written notice of such act or omission to each holder of any Superior Interest of which it has written notice, and (b) a reasonable period for remedying such act or omission shall have elapsed following such notice (which reasonable period shall be equal to the period to which Landlord would be entitled under this Lease to effect such remedy, plus an additional thirty (30) day period), provided such holder or lessor shall, with reasonable diligence, give Tenant notice of its intention to remedy such act or omission and shall commence and continue to act upon such intention.

E.    Landlord shall use commercially reasonable efforts to obtain for Tenant, a form Subordination, Non-Disturbance and Attornment Agreement ("SNDA") from: (i) Landlord's current lender and (ii) the holder of any future Superior Interest. The delivery of an SNDA form by such holder shall not be a condition to the effectiveness or continuing validity of this Lease, and Landlord makes no representation that an SNDA is obtainable from any such holder. Landlord shall have no obligation to incur any expense or take any action whatsoever (other than making the request) in order for Tenant to obtain an SNDA, and if such holder agrees to deliver an SNDA to Tenant, any costs or expense payable to the holder or its counsel or representative for the delivery thereof shall be paid by Tenant.

[1065228-9]

## 14.    CONDEMNATION

A.    In the event that the whole of the Premises shall be lawfully condemned or taken in any manner for any public or *quasi*-public use or purpose, this Lease and the term and estate hereby granted shall forthwith cease and terminate as of the date of vesting of title (hereinafter referred to as the "date of taking"), and Tenant shall have no claim against Landlord for, or make any claim for, the value of any unexpired term of this Lease, and the fixed annual rent and additional rent shall be apportioned as of such date.

B.    In the event that any part of the Premises shall be so condemned or taken, then this Lease shall be and remain unaffected by such condemnation or taking, except that the Fixed Annual Rent and Additional Rent allocable to the part so taken shall be apportioned as of the date of taking, provided, however, that Tenant may elect to cancel this Lease in the event more than twenty-five percent (25%) of the Premises should be so condemned or taken, provided such notice of election is given by Tenant to Landlord not later than thirty (30) days after the date when title shall vest in the condemning authority. Landlord shall give Tenant copies of any notice received from the condemning authority as to vesting.  Upon the giving of such notice, this Lease shall terminate on the thirtieth (30th) day following the date of such notice and the fixed annual rent and additional rent shall be apportioned as of such termination date.  Upon such partial taking and this Lease continuing in force as to any part of the Premises, the Fixed Annual Rent and Additional Rent shall be diminished by an amount representing the part of said Fixed Annual Rent and Additional Rent properly applicable to the portion or portions of the Premises which may be so condemned or taken.  If as a result of the partial taking (and this Lease continuing in force as to the part of the Premises not so taken), Landlord agrees with reasonable promptness to commence the work necessary to restore the damaged portion to the condition existing immediately prior to the taking (subject to paragraph D below), and prosecute the same with reasonable diligence to its completion.  In the event Landlord and Tenant are unable to agree as to the amount by which the Fixed Annual Rent and Additional Rent shall be diminished, the matter shall be determined by arbitration in New York City.

C.    Nothing herein provided shall preclude Tenant from appearing, claiming, proving and receiving in the condemnation proceeding, Tenant's moving expenses, and the value of Tenant's fixtures, or Tenant's alterations, installations and improvements which do not become part of the Building, or property of Landlord; or, in the case of temporary taking, so long as rent hereunder is paid to Landlord, Tenant may make a claim for rental value and damages to the Premises (which are of a nature that Tenant is obligated hereunder to repair same) or damages to Tenant's furniture and fixtures, provided that in all such circumstances, Tenant's claim does affect or diminish Landlord's recovery in condemnation.

D.    In the event that only a part of the Premises shall be so taken and Tenant shall not have elected to cancel this Lease as above provided, the entire award for a partial taking shall be paid to Landlord, and Landlord, at Landlord's own expense, shall to the extent of the net proceeds (after deducting reasonable expenses including attorneys' and appraisers' fees) of the award restore the unaffected part of the Building to substantially the same condition and tenantability as existed prior to the taking.

29

## 15.    REQUIREMENTS OF LAW

A.    Tenant at its expense shall comply with all laws, orders and regulations of any governmental authority having or asserting jurisdiction over the Premises (whether any such law, order or regulation is in effect on, or enacted or made effective after, the date hereof, whether contemplated or foreseen on the date hereof or not), which shall impose any violation, order or duty upon Landlord or Tenant with respect to the Premises or the use or occupancy thereof but in no event shall Tenant be required to make any capital improvements to the Premises or the Building unless the capital improvements are required due to Tenant's particular manner of use of the Premises.  Landlord, at its sole cost and expense, shall be responsible for all other compliance with law obligations relating to the Premises or the Building including but not limited to any law, order or regulation affecting its structural integrity; the physical condition of its façade, roof, parapets or other exterior part thereof; its life, fire, sprinkler or other safety systems outside of the Premises; the accessibility of the Building and its accouterments to the handicapped or disabled; or the regulation, containment, abatement, or removal of Hazardous Substances (as hereinafter defined) therein (including, without limitation, asbestos and asbestos containing materials), including, without limitation, compliance with New York City Local Law No. 5/73, Local Law 10/80, Local law 16/84, and the ADA, as amended, that requires Landlord to incur any obligation or expense to install, alter, make any addition to or improve the Building or any system thereof or any equipment or accouterment to any of the foregoing or install any new system.

B.    Tenant at its expense shall comply with all requirements of the New York Board of Fire Underwriters, or any other similar body affecting the Premises and shall not use the Premises in a manner which shall increase the then current rate of fire insurance of Landlord.  If Tenant's use of the Premises increases the fire insurance rate, Tenant shall reimburse Landlord for all such increased costs.

## 16.    CERTIFICATE OF OCCUPANCY

The statement in this Lease of the nature of the business to be conducted by Tenant shall not be deemed to constitute a representation or guaranty by Landlord that such use is lawful or permissible in the Premises, and if any change is required to the certificate of occupancy in order for Tenant to lawfully conduct its business in the Premises, then Tenant shall cause the certificate of occupancy to be modified at its sole cost and expense.  Landlord represents to Tenant that, attached hereto as Exhibit B, is a copy of the Certificate of Occupancy for the Building. Landlord agrees that, throughout the Term of this Lease, Landlord will continue to maintain the Certificate of Occupancy in full force and effect.

## 17.    POSSESSION

Intentionally Omitted.

## 18.    QUIET ENJOYMENT

Landlord covenants that if Tenant pays the rent and performs all of Tenant's other obligations under this Lease, Tenant may peaceably and quietly enjoy the Premises, subject to

30

the terms, covenants and conditions of this Lease and to any master lease and other Superior Interests.

## 19.    RIGHT OF ENTRY

Tenant shall permit Landlord to erect and maintain pipes and conduits in and through the Premises provided the same are installed adjacent to or concealed behind walls and ceilings of the Premises and are installed by such methods and at such locations as will not materially interfere with or impair Tenant's layout or use of the Premises. Landlord or its agents shall have the right at reasonable times upon reasonable prior notice (except in the event of emergency in which case notice shall not be required) and accompanied by an authorized representative of Tenant (and in a manner designed to avoid interference with the normal conduct of Tenant's business in the Premises), to examine the same, to exhibit the Premises to prospective purchasers, investors and lenders, (and during the last year of the term of this Lease, to prospective tenants) and to make such repairs, installations, alterations or additions as to the Building or the Premises as may be required by law or as Landlord may deem necessary or desirable, and to take into and store within and upon the Premises all material that may be used in connection with any such repair, installation, alteration or addition work. Such entry, storage and work in connection with any such repair, installation, alteration or addition shall not constitute an eviction (whether actual or constructive) of Tenant in whole or in part or breach of the covenant of quiet enjoyment, shall not be grounds for any abatement of rent, and shall not impose any liability on Landlord to Tenant by reason of inconvenience or injury to Tenant's business or to the Premises. Landlord shall have the right at any time, without the same constituting an actual or constructive eviction, and without incurring any liability to Tenant, to change the arrangement and/or location of entrances or passageways, windows, corridors, elevators, stairs, toilets, or other public parts of the Building provided access to the Building shall not be materially impaired and there shall be no material impairment of access to the Premises or unreasonable interference with Tenant's use or enjoyment thereof, and to change the name or number by which the Building is known.

## 20.    VAULT SPACE

Anything contained in any plan or blueprint to the contrary notwithstanding, no vault or other space not within the Building property line is demised hereunder. Any use of such space by Tenant shall be deemed to be pursuant to a license, revocable at will by Landlord, without diminution of the rent payable hereunder. If Tenant shall use such vault space, any fees, taxes or charges made by any governmental authority for such space shall be paid by Tenant.

## 21.    INDEMNITY

Except to the extent of Landlord's negligence or willful misconduct, Tenant shall defend, indemnify and hold harmless Landlord, and Landlord Parties (as hereinafter defined) to the full extent allowable under applicable law from and against any and all claims, demands, liability, losses, damages, costs and expenses (including reasonable attorneys' fees and disbursements) arising from or in connection with: (a) any breach or default by Tenant (beyond all applicable notice and cure periods) in the full and prompt payment and performance of Tenant's obligations hereunder; (b) the use or occupancy or manner of use or occupancy of the Premises by Tenant or

31

any person claiming under or through Tenant; (c) any act, omission or negligence of Tenant or any of its subtenants, assignees or licensees or its or their partners, principals, directors, officers, agents, invitees, employees, guests, customers or contractors during the term hereof; (d) any accident, injury or damage occurring in or about the Premises during the term hereof; (e) the performance by Tenant of any alteration in the Premises including, without limitation, Tenant's failure to obtain any permit, authorization or license or failure to pay in full any contractor, subcontractor or materialmen performing work on such alteration; and (f) mechanics lien filed, claimed or asserted in connection with any alteration or any other work, labor, services or materials done for or supplied to, or claimed to have been done for or supplied to Tenant, or any person claiming through or under Tenant.  If any claim, action or proceeding is brought against any of the Landlord Parties for a matter covered by this indemnity, Tenant, upon notice from the indemnified person or entity, shall defend such claim, action or proceeding with counsel reasonably satisfactory to Landlord and the indemnified person or entity.  The provisions of this Article shall survive the expiration or sooner termination of this Lease.

## 22.    LANDLORD'S LIABILITY

This Lease and the obligations of Tenant hereunder shall in no way be affected because Landlord is unable to fulfill any of its obligations or to supply any service (including, without limitation, heat, electricity, air conditioning (if Landlord is obligated hereunder to furnish the same), elevators, water, chilled water, or condenser water), by reason of any of the causes set forth in paragraph A above.  Landlord shall have the right, without incurring any liability to Tenant, to stop any service because of accident or emergency, or for repairs, alterations or improvements, necessary or desirable in the judgment of Landlord to the Building or the Premises, until such repairs, alterations or improvements shall have been completed, provided that Landlord shall use commercially reasonable efforts so that any such stoppage for that purpose of making any repair, alteration or improvement shall be made at such times and in such manner as to minimize interference with Tenant's use of the Premises and Landlord shall use commercially reasonable efforts to give reasonable prior notice of not less than two (2) days (except in the event of emergency, when notice shall not be required) of the anticipated commencement, duration and nature thereof.  Landlord shall not be liable to Tenant or anyone else, for any loss or damage to person, property or business, unless due to the negligence or willful misconduct of Landlord nor shall Landlord be liable for any latent defect in the Premises or the Building not the result of Landlord's negligence or willful misconduct.  Landlord or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the Building nor for the loss of or damage to any property of Tenant by theft or otherwise.  Landlord or its agents shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling ceilings, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of said Building or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause or whatsoever nature, including but not limited to the making or repairs and improvements, unless caused by or due to the negligence of Landlord, its agents, servants or employees; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in said Building or caused by operations in construction of any private, public or quasi public work.    Tenant shall give immediate notice to Landlord in case of fire or accidents in the Premises or in the Building or of defects therein or in any fixtures or equipment.

[1065228-9]

TENANT AGREES TO LOOK SOLELY TO LANDLORD'S ESTATE AND INTEREST IN THE LAND AND BUILDING, OR THE LEASE OF THE BUILDING OR OF THE LAND AND BUILDING, AND THE PREMISES, FOR THE SATISFACTION OF ANY RIGHT OR REMEDY OF TENANT FOR THE COLLECTION OF A JUDGMENT (OR OTHER JUDICIAL PROCESS) REQUIRING THE PAYMENT OF MONEY BY LANDLORD, IN THE EVENT OF ANY LIABILITY BY LANDLORD, AND NO OTHER PROPERTY OR ASSETS OF LANDLORD SHALL BE SUBJECT TO LEVY, EXECUTION OR OTHER ENFORCEMENT PROCEDURE FOR THE SATISFACTION OF TENANT'S REMEDIES UNDER OR WITH RESPECT TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, OR TENANT'S USE AND OCCUPANCY OF THE PREMISES OR ANY OTHER LIABILITY OF LANDLORD TO TENANT (EXCEPT FOR NEGLIGENCE, IN WHICH CASE TENANT MAY ALSO LOOK TO THE PROCEEDS OF ANY INSURANCE CARRIED BY LANDLORD AND NOT PAYABLE UNDER INSURANCE TO BE MAINTAINED BY TENANT PURSUANT TO THE TERMS HEREOF). IN NO EVENT SHALL TENANT BE ENTITLED TO MAKE, NOR SHALL TENANT MAKE, ANY CLAIM, AND TENANT HEREBY WAIVES ANY CLAIM, FOR MONEY DAMAGES (NOR SHALL TENANT CLAIM ANY MONEY DAMAGES BY WAY OF SET-OFF, COUNTERCLAIM OR DEFENSE) BASED UPON ANY CLAIM OR ASSERTION BY TENANT THAT LANDLORD HAS UNREASONABLY WITHHELD OR UNREASONABLY DELAYED ITS CONSENT OR APPROVAL TO A PROPOSED ASSIGNMENT OR SUBLETTING AS PROVIDED FOR IN THIS LEASE. TENANT'S SOLE REMEDY SHALL BE AN ACTION OR PROCEEDING TO ENFORCE ANY SUCH PROVISION, OR FOR SPECIFIC PERFORMANCE, INJUNCTION OR DECLARATORY JUDGMENT. TENANT AGREES THAT THE PARTNERS, SHAREHOLDERS, DIRECTORS, OFFICERS AND PRINCIPALS, DIRECT AND INDIRECT, OF LANDLORD SHALL NOT BE LIABLE FOR THE PERFORMANCE OF LANDLORD'S OBLIGATIONS UNDER THIS LEASE. LANDLORD AGREES THAT THE PARTNERS, SHAREHOLDERS, DIRECTORS, OFFICERS AND PRINCIPALS, DIRECT AND INDIRECT, OF TENANT SHALL NOT BE LIABLE FOR THE PERFORMANCE OF TENANT'S OBLIGATIONS UNDER THIS LEASE.

23.   **CONDITION OF PREMISES**

A.   Tenant expressly acknowledges that it has inspected the Premises and is fully familiar with the physical condition thereof.  Landlord shall deliver broom clean possession of the Premises to Tenant on the Commencement Date and Landlord shall have no obligation to do any work in and to the Premises in order to make them suitable and ready for occupancy and use by Tenant, except Landlord shall, at its sole cost and expense, complete Landlord's Work as set forth in Exhibit G hereto in a good and workmanlike manner and in accordance with all applicable laws, on or before the Outside Date (as hereinafter defined).  Landlord's Work shall be performed in a manner that does not unreasonably interfere with nor delay the performance of Tenant's Initial Work.

B.   Notwithstanding anything to the contrary contained herein, (i) if for any reason Landlord's Work is not complete on or before August 1, 2018 (the "Outside Date") then for a period of no greater than three (3) months, Tenant shall receive a credit against Fixed Annual Rent equal to $2,113.45 for each day from and after the Outside Date that Landlord's Work is

33

not complete, which credit shall be applied against Fixed Annual Rent from and after the Commencement Date until fully applied and (ii) if for any reason Landlord's Work is not complete on or before November 1, 2018 then Tenant may, as Tenant's sole and exclusive remedy, terminate this Lease upon fifteen (15) days' notice to Landlord given no later than November 15, 2018, whereupon the Term of this Lease will end as of the expiration of said fifteen (15) day period as if same were the Expiration Date.

C.    Tenant acknowledges that, except with respect to Landlord's Work, Landlord (i) has made no representation respecting the physical condition of the Premises, including the existence or non-existence of any hazardous substances, any defects or other matters concerning their physical condition and (ii) shall have no obligation to do any work in and to the Premises in order to make them suitable and ready for occupancy and use by Tenant.

D.    (i)    Landlord shall contribute an amount not to exceed One Hundred Forty-Six Thousand One Hundred Dollars ($146,100.00) (the "Tenant Fund") toward the cost of the Tenant's Initial Work.

(ii)    Provided that Tenant is not in default of this Lease beyond all applicable notice and cure periods, Landlord shall disburse the Tenant Fund to Tenant, within twenty (20) days after receipt of the items set forth in subparagraph (iii) hereof.  The Tenant Fund shall be in an amount equal to the aggregate amounts theretofore paid by Tenant (as certified by the Chief Financial Officer of Tenant), for costs arising out of Tenant's Initial Work, to Tenant's contractors, subcontractors, materialmen and vendors .

(iii)    Subject to the terms and provisions of this Article 23, Landlord shall disburse the Tenant Fund within twenty (20) days after Tenant's completion of Tenant's Initial Work and Landlord's receipt of: (a) a request for such disbursement from Tenant signed by the Chief Financial Officer of Tenant, together with the certification required by subparagraph (ii) hereof, (b) in the case of a guaranteed maximum price contract only, copies of all receipts, invoices and bills for the work completed and materials furnished in connection with the Tenant's Initial Work and incorporated in the Premises which have been paid by Tenant and for which Tenant is seeking reimbursement, and, in the case of a lump sum contract, Tenant shall provide a current sworn statement from its contractor setting forth all subcontractors and any material suppliers with whom the contractor has contracted, the amount of each such contract, the amount paid to any subcontractor or material supplier pursuant to an invoice or application for payment, and (c) general waivers of lien from all contractors, subcontractors and materialmen involved in the performance of the Tenant's Initial Work.

(iv)    In no event shall the aggregate amount paid by Landlord to Tenant under this subparagraph (iv) exceed the amount of the Tenant Fund.  Upon the disbursement of the entire Tenant Fund (or the portion thereof if upon completion of Tenant's Initial Work the Tenant Fund is not exhausted), Landlord shall have no further obligation or liability whatsoever to Tenant for further disbursement of any portion of the Tenant Fund to Tenant. It is expressly understood and agreed that Tenant shall complete, at its sole cost and expense, Tenant's Initial Work, whether or not the Tenant Fund is sufficient to fund such completion.

(v)    In the event that Landlord fails to disburse the Tenant Fund within twenty (20) days after Tenant's satisfaction of the foregoing, then Tenant shall notify Landlord in writing and

34

[1065228-9]

if Landlord either fails to disburse the Tenant Fund or fails to respond to Tenant's notice disputing payment in good faith within ten (10) days after Landlord's receipt of Tenant's notice, then Tenant shall have the right to offset the unpaid amount of the Tenant Fund against Fixed Annual Rent payable pursuant to the provisions of this Lease, until such amount has been fully credited or otherwise paid by Landlord.

**24.    SERVICES**

A.    Landlord, at its expense, shall cause the premises to be cleaned in a manner standard to the Building as set forth in the specifications annexed hereto as Exhibit F.  Landlord and its cleaning contractor and its employees shall have access to the premises after 6:00 p.m. and before 8:00 a.m. and shall have the right to use, without charge therefor, all light, electric power and water in the Premises reasonably required to clean the Premises.  Tenant shall pay to Landlord within 20 days after demand, the costs incurred by Landlord for (a) extra cleaning work in the Premises required because of (i) misuse or neglect on the part of Tenant or its subtenants or its or their employees or visitors, (ii) use of portions of the premises for preparation, serving or consumption of food or beverages, data processing or reproducing operations, private lavatories or private toilets or other special purposes requiring greater or more difficult cleaning work than office areas, (iii) unusual quantity of interior glass surfaces, and (iv) non-building standard materials or finishes installed by Tenant or at its request, and (b) removal from the Premises and the Building of any refuse and rubbish of Tenant in excess of that ordinarily accumulated in business executive office/showroom occupancy.  Landlord agrees that Tenant may contract directly with Landlord's cleaning contractor (presently Green Peak) to receive cleaning services over and above those set forth in Exhibit F, Tenant may engage the services of a third party cleaning contractor, provided that Tenant identifies the cleaning contractor to Landlord and Landlord approves the cleaning contractor, which approval by Landlord shall not be unreasonably withheld or delayed.  Any proposed cleaning contractor shall be required to satisfy insurance and bonding requirements reasonably imposed by Landlord.

B.    Landlord, at Landlord's expense shall furnish and distribute to the Premises through the HVAC System, when required for the comfortable occupancy of the Premises, HVAC on a year round basis from 8:00 A.M. to 6:00 P.M. on Business Days. Landlord, throughout the Term, shall have free access to any and all mechanical installations of Landlord, including, but not limited to, air-cooling, fan, ventilating and machine rooms and electrical closets and Tenant shall not construct partitions or other obstructions which may interfere with Landlord's free access thereto, or interfere with the moving of Landlord's equipment to and from the enclosures containing said installations. Neither Tenant, nor its agents, employees or contractors shall at any time enter the said enclosures or tamper with, adjust or touch or otherwise in any manner affect said mechanical installations. Tenant shall draw and close the draperies or blinds for the windows of the Premises whenever the HVAC System is in operation and the position of the sun so requires and shall at all times cooperate fully with Landlord and abide by all of the regulations and requirements which Landlord may prescribe for the proper functioning and protection of the HVAC System.

Landlord agrees that in the event that Tenant requires additional HVAC in the Premises, and Landlord, upon Tenant's request therefor, consents to the installation of a system in the Premises to provide such additional HVAC, then and in such event, Tenant may install, and

35

Landlord consents to the installation of, at Tenant's own cost and expense in accordance with, and subject to, the applicable provisions of this Lease (including, without limitation, Article 8 hereof) an additional HVAC system (hereinafter referred to as the "Supplemental HVAC System"). The costs of installation (including, without limitation, connection to any condenser water source), maintenance and operation of the Supplemental HVAC System shall be borne by Tenant and Tenant shall be responsible for the engineering costs incurred by Landlord in connection with the installation of the Supplemental HVAC System. Any Supplemental HVAC System shall be located wholly within the Premises. Whenever Tenant shall make a connection to any condenser water source, Tenant shall also leave additional valved outlets of a size, and in such locations, to be determined by Landlord. All facilities, equipment, machinery and ducts installed by Tenant in connection with the Supplemental HVAC System shall (a) be subject to Landlord's prior written approval, (b) comply with Landlord's requirements as to installation, maintenance and operation, and (c) comply with all other terms, covenants and conditions of this Lease applicable thereto. Landlord shall have no liability or responsibility whatsoever for any interruption in service of the Supplemental HVAC System (if any) for any cause whatsoever, nor shall any such interruption be construed as an actual or constructive eviction of Tenant, or entitle Tenant to any abatement of Fixed Annual Rent or additional rent, or relieve or release Tenant from any of its obligations under this Lease. Tenant agrees to cooperate fully with Landlord and to abide by all reasonable regulations and requirements which Landlord may prescribe for the proper connection, functioning and protection of the Supplemental HVAC System.

In the event that Tenant shall install such Supplemental HVAC System, Landlord shall furnish, if required and to the extent available, condenser water for Tenant's Supplemental HVAC System at a charge of $600.00 per ton per year, as additional rent. If after the date of this Lease, the cost to Landlord of furnishing condenser water for such Supplemental HVAC System shall be increased, then the aforesaid charge to Tenant shall be increased to reflect the amount of the increased cost to Landlord. In addition to the foregoing charges, there shall be a one (1) time tap-in fee of $1,500.00, which amount shall be subject to increase if Landlord's costs shall be increased after the date of this Lease and shall be payable within twenty (20) days after rendition of a bill therefor.

C.    The Fixed Rent does not reflect or include any charge to Tenant for the furnishing or distributing of any necessary HVAC to the Premises during periods other than the hours and days set forth above ("Overtime Periods"). Accordingly, if Landlord shall furnish such HVAC to the Premises at the request of Tenant during Overtime Periods, Tenant shall pay Landlord additional rent for such services at the standard rates then fixed by Landlord for the Building. Landlord shall not be required to furnish any such services during any Overtime Periods unless Landlord has received advance notice from Tenant requesting such services prior to 2:00 P.M. of the day upon which such services are requested or by 2:00 P.M. of the last preceding Business Day if such Overtime Periods are to occur on a day other than a Business Day. If Tenant fails to give Landlord such advance notice, then, failure by Landlord to furnish or distribute any such services during such Overtime Periods shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business or otherwise.

36

D.       Throughout the term of this Lease, the lobby of the Building shall, subject to the requirements of law, casualty, emergencies, and provisions of this Lease, be attended on business days (i.e. Mondays through Fridays other than days recognized as holidays by any unions providing services in the Building) between the hours of 8:00 A.M. and 6:00 P.M.

E.       If Landlord, at Tenant's request, provides Tenant with any over-standard utilities or services, then Tenant shall pay Landlord for Landlord's then Building-standard charges in connection with such over-standard utilities or services within twenty (20) days following Landlord's demand thereof.

F.       Landlord, upon ninety (90) days' notice to Tenant, may discontinue any utilities or services which Landlord provides to Tenant and Tenant shall contract directly with the applicable utility or service provider and shall pay all charges directly to the same. Landlord shall be responsible for the cost of installing and maintaining any meters to measure Tenant's consumption of such utilities.

## 25.    JURY WAIVER; DAMAGES

THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF SUCH PARTIES AGAINST THE OTHER WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR FOR THE ENFORCEMENT OF ANY REMEDY WHETHER PURSUANT TO STATUTE, IN CONTRACT OR TORT, AND IRRESPECTIVE OF THE NATURE OR BASIS OF THE CLAIM INCLUDING BREACH OF AN OBLIGATION TO MAKE ANY PAYMENT, FRAUD, DECEIT, MISREPRESENTATION OF FACT, FAILURE TO PERFORM ANY ACT, NEGLIGENCE, MISCONDUCT OF ANY NATURE OR VIOLATION OF STATUTE, RULE, REGULATION OR ORDINANCE. IF LANDLORD COMMENCES AGAINST TENANT ANY SUMMARY PROCEEDING OR OTHER ACTION TO RECOVER POSSESSION OF THE PREMISES OR TO RECOVER ANY RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING OR ACTION EXCEPT FOR COUNTERCLAIMS WHICH WOULD BE WAIVED IF NOT INTERPOSED IN LANDLORD'S ACTION. NO DAMAGES SHALL BE AWARDED AND TENANT HEREBY WAIVES ANY CLAIM FOR DAMAGES (WHETHER ACTUAL, COMPENSATORY, CONSEQUENTIAL, SPECIAL OR PUNITIVE) IN ANY ACTION OR PROCEEDING (WHETHER JUDICIAL OR AN ARBITRATION) RELATING TO LANDLORD'S WITHHOLDING, DELAYING OR CONDITIONING ANY CONSENT OR APPROVAL OR THE REASONABLENESS OF ANY SUCH WITHHOLDING, DELAY OR CONDITION. OTHER THAN AS SPECIFICALLY SET FORTH IN ARTICLE 12 HEREOF, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, AND EACH PARTY HEREBY WAIVES ANY CLAIM FOR, ANY INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS OR BUSINESS OPPORTUNITY, ARISING UNDER OR IN CONNECTION WITH THIS LEASE, EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS LEASE.

[1065228-9]

26.    **NO WAIVER, ETC.**

No act or omission of Landlord or its agents shall constitute an actual or constructive partial or total eviction or give rise to a right of Tenant to terminate this Lease or receive an abatement of any portion of its rent, or to be relieved of any other obligation hereunder or to be compensated for any loss or injury suffered by it, except as otherwise explicitly set forth herein. No act or omission of Landlord or its agents shall constitute acceptance of a surrender of the Premises, except by writing signed by Landlord.  The delivery of keys to Landlord or its agents shall not constitute a termination of this Lease or a surrender of the Premises.  Acceptance by Landlord of less than the rent herein provided shall at Landlord's option be deemed on account of earliest rent remaining unpaid.  No endorsement on any check, or letter accompanying rent, shall be deemed an accord and satisfaction, and such check may be cashed without prejudice to Landlord.  No waiver of any provision of this Lease shall be effective, unless such waiver be in writing signed by the party against who enforcement is sought.  This Lease contains the entire agreement between the parties, and no modification thereof shall be binding unless in writing and signed by both parties.  Tenant shall comply with the rules and regulations set forth on Schedule A attached hereto and made a part hereof, and any reasonable, non-discriminatory modifications thereof or additions thereto.  Landlord shall not be liable to Tenant for the violation of such rules and regulations by any other tenant.  Failure of Landlord to enforce any provision of this Lease, or any rule or regulation, shall not be construed as the waiver of any subsequent violation of a provision of this Lease, or any rule or regulation.  This Lease shall not be affected by nor shall Landlord in any way be liable for the closing, darkening or bricking up of windows in the Premises, for any reason, including as the result of construction on any property of which the Premises are not a part or by Landlord's own acts.

27.    **SIGNAGE, ETC.**

A.    Tenant shall not obstruct or permit the obstruction of the light, halls, areas, roof, stairway entrances to the Building or windows thereof, and will not affix, erect or inscribe any signs, projections, awnings, signals or advertisements of any kind to any part of the Premises including the inside or outside of the windows or doors thereof and will not paint the outside of the doors thereof or the inside or outside of the windows thereof unless and until the style, size, color, construction and location thereof have been approved by Landlord in its sole discretion. Landlord also reserves to itself the sole right to designate the person, firm or corporation which shall do the work of lettering and erecting of any and all signs to be affixed to the Premises or the Building.  In the event that said work is done by Tenant through any person, firm or corporation, other than that designated by Landlord, Landlord is hereby given the right to remove said signs without being liable to Tenant by reason thereof and to charge the cost of so doing to Tenant as additional rent payable on the first day of the next following month, or at Landlord's option, on the first day of any subsequent month.

B.    Without Landlord's prior written consent, which consent Landlord may withhold in its sole discretion, Tenant shall not affix any sign or other means of advertisement to any window or exterior surface of the Premises nor install or place any sign or other means of advertisement within the Premises that may be seen from the outside. Tenant may, with Landlord's consent, which consent shall not be unreasonably withheld, and subject to this Article

38

27, install and maintain signage (for identification and directional purposes only) on its entry door and in the hallway of the floor on which the Premises is located.

C.    Landlord shall provide Tenant with appropriate listings (based on Tenant's proportionate share) in the Building's directory and lobby and in the elevators of the Building, in a manner consistent with Landlord's signage and identification policies to the extent that Landlord provides such signage and identification.

## 28.    NOTICES

A.    In order to be effective, any notice, demand, consent or approval (a "Notice") hereunder shall be in writing (except as otherwise expressly stated herein) and signed by the party giving such Notice.  The attorneys for the parties are authorized to give any Notice which may be given by the parties themselves hereunder.  Any Notice in writing, except as otherwise provided in the preceding sentence, shall be personally delivered, sent by a nationally recognized courier service which provides for receipted delivery or mailed by registered or certified mail, return receipt requested, addressed as follows:

If to Landlord, at:

> c/o Savitt Partners, LLC
> 530 Seventh Avenue
> New York, New York 10018, attention:
> Attn:  Mr. Michael Dubin

With a copy to:

> Tannenbaum Helpern Syracuse & Hirschtritt LLP
> 900 Third Avenue
> New York, New York 10022
> Attn:  Neil E. Botwinoff, Esq.

If to Tenant, at:

> Escada America LLC
> 26 Main Street, Suite 101
> Chatham, New Jersey 07928
> Attn: Suzanne Humbert, President

With a copy to:

> Arent Fox LLP
> 1301 Avenue of the Americas, Floor 42
> New York, NY 10019
> Attn: Anthony V. Lupo, Esq.

Notices in writing shall be deemed given three days after mailing same by certified mail, return receipt requested, the next business day if the Notice is sent by overnight courier or the same day if the Notice is sent by hand so that it is received during normal business hours.  Each party shall have the right to change its address for Notices by giving Notice in the manner set forth herein, provided, however, Notice of a change in address shall not be deemed delivered until actually received.

[1065228-9]

29.    **WATER CHARGES**

Tenant shall pay the amount of Landlord's cost for all water used by Tenant for any purpose other than ordinary lavatory uses, and any sewer rent or tax based thereon, including, without limitation, air conditioning condenser water if applicable. If Tenant consumes water for additional purposes, then Landlord may install a water meter to measure Tenant's water consumption for all purposes and Tenant agrees to pay for the installation and maintenance thereof and for water consumed as shown on said meter.

30.    **HEAT**

A.    Landlord shall provide heat to the Premises when and as required by law on business days from 8 a.m. to 8 p.m.

B.    In no event shall Landlord be required to furnish heat during hours other than those as set forth in paragraph A above; provided, however, that Landlord shall provide after-hours heating at Landlord's then existing schedule of rates for after-hours heating for tenants in the Building, provided that Tenant shall give notice to Landlord, requesting such after-hours heating, prior to 3:00 p.m. in the case of after hours service on weekdays and prior to 1:00 p.m. on Fridays in the case of after-hours service on weekends but Landlord shall endeavor to provide such service on such shorter notice as Tenant may provide.

31.    **SCAFFOLDING**

Landlord shall be entitled to erect scaffolding and/or sidewalk sheds from time to time on and around the Building. Tenant understands that it may be necessary for Landlord to erect scaffolding in front of the Building in connection with repairs, alterations, improvements or inspections to, or expansion of, the Building. Tenant agrees that the existence of such scaffolding will not in and of itself entitle Tenant to make a claim against Landlord for damages or entitle Tenant to an abatement of fixed annual rent or additional rent. Landlord shall use commercially reasonable efforts to minimize the period of time during which such scaffolding, sidewalk shed or other protective structure must remain in place, to the extent reasonably practicable under the circumstances.

32.    **SECURITY DEPOSIT**

A.    Tenant shall, upon the full execution and delivery of this Lease, deliver to Landlord a letter of credit (the "Letter of Credit"), substantially in the form of the letter of credit attached hereto as Exhibit C and made a part hereof, issued in favor of Landlord in the sum of One Hundred Ninety-Two Thousand Five Hundred Eighty-Two Dollars ($192,582) (the "Security Deposit"), as security for the faithful performance and observance by Tenant of the terms, conditions and provisions of this Lease.

It is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of fixed annual rent and additional rent or any other sum for which Tenant is liable hereunder, Landlord may draw upon the Letter of Credit and apply or retain any portion or all of the amount received from such draw

40

to the extent required for the payment of any fixed annual rent and additional rent or any other sum as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease including, but not limited to, any damages or deficiency in the reletting of the Premises, whether such damages or deficiency accrue or accrues before or after summary proceedings or other re-entry by Landlord.  If Landlord draws upon all or any part of the Letter of Credit and applies or retains any portion or all of the amount received from such draw, Tenant, shall within five (5) business days thereafter restore the face amount of the Letter of Credit to an amount equal to the Security Deposit so applied or retained so that Landlord shall have the full Security Deposit on hand at all times during the term hereof.

B.    Any Letter of Credit delivered by Tenant shall be a clean irrevocable commercial Letter of Credit in the amount of the Security Deposit, such Letter of Credit to be in form and substance reasonably satisfactory to Landlord, and issued by a member bank of the New York Clearing House Association reasonably acceptable to Landlord, or issued by such other bank with assets and reserves payable upon the presentation by Landlord to such bank of a sight-draft, without presentation of any other documents, statements or authorizations, which Letter of Credit shall provide (i) for the continuance of such Letter of Credit for the period of at least one (1) year from the date hereof, and (ii) for the automatic extension of such Letter of Credit for additional periods of one (1) year from the initial and each future expiration date thereof (the last such extension to provide for the continuance of such Letter of Credit for at least sixty (60) days beyond the expiration date of this Lease) unless such bank gives Landlord notice of its intention not to renew such Letter of Credit, not less than forty-five (45) days prior to the initial or any future expiration date of such Letter of Credit.  Each Letter of Credit to be deposited and maintained with Landlord (or the proceeds thereof) shall be held by Landlord as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease, and in the event that (x) any default by Tenant beyond any applicable notice and cure periods occurs under this Lease, or (y) notice is given by the bank issuing such Letter of Credit that it does not intend to renew the same, as above provided, and a substitute Letter of Credit complying with the terms of this Article is not received by Landlord within thirty (30) days after such notice is given, then, in any such event, Landlord may draw on such Letter of Credit, and the proceeds of such Letter of Credit shall then be held and applied as security (and be replenished, if necessary) as provided in this Article and this Lease.

C.    If Tenant is not in default of this Lease beyond applicable notice and cure periods, the Security Deposit delivered by Tenant shall be returned to Tenant promptly after the expiration date of this Lease and after delivery of the entire possession of the Premises to Landlord in the condition required pursuant to the terms of this Lease.  Landlord agrees that Landlord will not transfer the Security Deposit except in the event of a sale of the Building or leasing of the Building, or in connection with a merger or consolidation of Landlord with another entity.  In such case, Landlord shall transfer the Security Deposit to the vendee or lessee or successor entity, as the case may be, and Landlord shall thereupon be released by Tenant from all liability for the return of the Security Deposit.  Upon such transfer from Landlord to the new landlord, Tenant agrees to look solely to the new Landlord for the return of the Security Deposit. It is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new landlord.  Tenant further covenants that it will not assign or encumber

41

or attempt to assign or encumber the Security Deposit and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

## 33.    RENT CONTROL

In the event the additional rent or any part thereof provided to be paid by Tenant under the provisions of this Lease during the term hereof shall become uncollectible or shall be reduced or required to be reduced or refunded by virtue of any Federal, State, County or City law, order or regulation, or by any direction of a public officer or body pursuant to law, or the orders, rules, codes or regulations of any organization or entity formed pursuant to law, whether such organization or entity be public or private, then the fixed annual rent herein reserved shall be adjusted so that Landlord receives the same amount of total rent that it would otherwise be entitled to hereunder.

## 34.    SHORING

Tenant shall permit any person authorized to make an excavation on land adjacent to the Building containing the Premises and to do any work within the Premises necessary to preserve the wall of the Building from injury or damage, and Tenant shall have no claim against Landlord for damages or abatement of rent by reason thereof.

## 35.    EFFECT OF CONVEYANCE, ETC.

If the Building containing the Premises shall be sold, transferred or leased, or the lease thereof transferred or sold, Landlord shall be relieved of all future obligations and liabilities hereunder and the purchaser, transferee or tenant of the Building shall be deemed to have assumed and agreed to perform all such obligations and liabilities of Landlord hereunder.  In the event of such sale, transfer or lease, Landlord shall also be relieved of all existing obligations and liabilities hereunder, provided that the purchaser, transferee or tenant of the Building assumes in writing such obligations and liabilities.

## 36.    RIGHTS OF SUCCESSORS AND ASSIGNS

This Lease shall bind and inure to the benefit of the heirs, executors, administrators, successors, and, except as otherwise provided herein, the assigns of the parties hereto.  If any provision of any Article of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of that Article, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of said Article and of this Lease shall be valid and be enforced to the fullest extent permitted by law.

## 37.    CAPTIONS

The captions herein are inserted only for convenience, and are in no way to be construed as a part of this Lease or as a limitation of the scope of any provision of this Lease.

[1065228-9]

**38.    LEASE SUBMISSION**

The submission and negotiation of this Lease shall not be deemed an offer to enter the same by Landlord, but the solicitation of such an offer by Tenant.

**39.    ELEVATORS AND LOADING**

A.    Tenant acknowledges it has been advised that the freight elevator (which is a passenger elevator dedicated by Landlord for use from time to time as a freight elevator) servicing the Building may be used on a non-exclusive basis from 8 A.M. to 6 P.M. on business days only, for less than truckload deliveries. Freight elevator use for more than truckload deliveries must be scheduled with Landlord at least three (3) days in advance. Freight elevator use is subject to availability and Landlord's then Building-standard charges (for more than truckload deliveries). Tenant shall be entitled to up to 30 hours of overtime freight elevator usage for Tenant's Initial Work and initial move-in to the Premises, at no cost to Tenant. At least one passenger elevator will be available 24 hours per day, 7 days per week, 365 days per year.

B.    It is the intention of Landlord to maintain in the Building, operatorless automatic control elevators. However, Landlord may, at its option, maintain in the Building either manually operated elevators or operatorless automatic control elevators or part one and part the other, and Landlord shall have the right from time to time during said term, to change, in whole or in part, from one to the other, or upgrade the same, without notice to Tenant and without in any way constituting an eviction of Tenant or affecting the obligations of Tenant hereunder or incurring any liability to Tenant hereunder provided that during all business hours on business days at least one elevator is in service.

**40.    BROKERAGE**

Each party represents and warrants to the other that it has not dealt with any broker or Person in connection with this Lease other than Savitt Partners LLC and Cushman and Wakefield (collectively, the "Brokers"). The execution and delivery of this Lease by each party shall be conclusive evidence that such party has relied upon the foregoing representation and warranty. Tenant shall indemnify and hold Landlord harmless from and against any and all claims for commission, fee or other compensation by any person or entity (other than the Brokers) who shall claim to have dealt with Tenant in connection with this Lease and for any and all costs incurred by Landlord in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord shall indemnify and hold Tenant harmless from and against any and all claims for commission, fee or other compensation by the Brokers and any other person who shall claim to have dealt with Landlord in connection with this Lease and for any and all costs incurred by Tenant in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord agrees to pay the Brokers in accordance with the terms of a separate agreement by and between Landlord and the Brokers. The provisions of this Article shall survive expiration of the term of this Lease.

43

## 41.    ARBITRATION

In each case specified in this Lease in which resort to arbitration shall be required, such arbitration (unless otherwise specifically provided in this Lease) shall be in Manhattan in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") and the provisions of this Lease, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  In the event that it is provided in this Lease that the exercise of any right by, or performance of any obligation of, Tenant shall be subject to the consent or approval of Landlord, and that the consent or approval of Landlord shall not be unreasonably withheld or delayed, then in any case in which Landlord shall withhold or delay its consent, such determination by Landlord shall be conclusive upon Tenant, unless Tenant shall, within thirty (30) days after Notice from Landlord of its determination, elect to have this matter submitted for determination to a Court of competent jurisdiction or for expedited arbitration pursuant to the rules of the AAA, which such submission shall be the sole remedy of Tenant for any such withholding of consent or approval by Landlord.  In the event that any matter shall be submitted by Tenant pursuant to the provisions of this Article, the sole issue shall be the determination as to whether the withholding of consent or approval by Landlord shall have been reasonable or unreasonable, and in the event that a determination shall be made that the withholding of consent or approval by Landlord was unreasonable, then the decision shall annul such withholding of consent or approval, such annulment being the sole remedy of Tenant; it being the intention of the parties hereto (as to which they are conclusively bound) that in no event shall any such withholding or delay of consent or approval by Landlord, or any decision with respect thereto: (i) impose any financial liability upon or result in any damages being recoverable from Landlord other than the recovery of Tenant's reasonable attorney fees; and/or (ii) create any right cognizable or remedy enforceable in favor of Tenant and against Landlord in law or equity or under any special statutory proceeding or at all; provided, however, that any such decision may also provide for an assessment of the costs of the proceeding with respect thereto as between Landlord and Tenant.

## 42.    INSURANCE

Section 42.1.  (A)    Tenant, at Tenant's sole cost and expense, shall obtain, maintain and keep in full force and effect during the Term commercial general liability insurance in a form approved in New York State (including broad form property damage coverages and coverage for contractual liability recognizing the indemnity provisions of this Lease and protecting Landlord and the manager of the Building and the holders of a Superior Interest (the "Indemnitees") as required.  The limits of liability shall be not less than Five Million and 00/100 ($5,000,000.00) Dollars per occurrence, which amount may be satisfied with a primary commercial general liability policy of not less than $1,000,000.00 per occurrence/$2,000,000.00 general aggregate and an excess (or "Umbrella") liability policy affording coverage, at least as broad as that afforded by the primary commercial general liability policy, in an amount not less than the difference between $5,000,000 and the amount of the primary policy.  Landlord and the Indemnitees shall be included as additional insureds in said policies on a primary, non-contributory basis.  All said policies of insurance shall be written on an "occurrence" basis with general aggregate limits provided on a "per location" basis. These policies shall contain a waiver of subrogation against Landlord and the Indemnites.

44

(B)    Tenant, at Tenant's sole cost and expense, shall obtain, maintain and keep in full force and effect during the Term the following additional coverages: (i) Special Form "All Risk" Property insurance, with commercially reasonable deductibles, protecting and indemnifying Tenant against any and all damage to or loss of any alterations and leasehold improvements, including any made by Landlord to prepare the Premises for Tenant's occupancy, and Tenant's property. Such insurance shall not contain any exclusions for flood, mold/fungus or acts of terrorism or similar events; provided that Tenant may have sub-limits as to flood insurance in the amount of $25,000 annual aggregate and $50,000 annual aggregate for fungus/mold clean-up and removal. All said policies shall cover the full replacement value of all Alterations, leasehold improvements and Tenant's property; (ii) Workers' Compensation and Employers Liability insurance in amounts required by the laws of the State of New York with a broad form all-states endorsement and a waiver of subrogation against Landlord and the Indemnitees, and (iii) Business interruption insurance (including Extra Expense) fully compensating for the amount of Fixed Rent, additional rent and other charges owed to Landlord by Tenant for a period of not less than twelve (12) months. The coverage shall be "All Risk" as stated in clause (i) above.

(C)    All policies of insurance shall be: issued by reputable and independent insurance companies rated in Best's Insurance Guide or any successor thereto (or, if there is none, an organization having a national reputation), as having a general policyholder rating of "A" and a financial rating of at least "13", and which are licensed to do business in the State of New York. Prior to the Commencement Date, Tenant shall provide a certificate of insurance evidencing its compliance with the requirements of this Article 42 and shall endeavor to thereafter furnish to Landlord at least ten (10) days prior to the expiration of any such policies, but in any event prior to the expiration of any such policies and any renewal thereof, a new certificate in lieu thereof. Tenant shall provide Landlord with prompt notice of any changes in, or cancellation or termination of, such policy(ies).

(D)    Tenant shall pay all premiums and charges for all of said policies, and, if Tenant shall fail to make any payment when due or carry any such policy, Landlord may, but shall not be obligated to, after written notice to Tenant, make such payment or carry such policy, and the amount paid by Landlord, with interest thereon (at the Applicable Rate), shall be repaid to Landlord by Tenant within twenty (20) days after demand, and all such amounts so repayable, together with such interest, shall be deemed to constitute Additional Rent hereunder. Payment by Landlord of any such premium, or the carrying by Landlord of any such policy, shall not be deemed to waive or release the default of Tenant with respect thereto.

(E)    Landlord, at its expense, shall maintain at all times during the term of this lease: (i) Special Form "All Risk" Property insurance (with commercially reasonable deductibles) on the Building; and (ii) commercial general liability insurance in respect of the Building and Landlord's ownership thereof.

Section 42.2.    (A)    Notwithstanding anything to the contrary provided herein, each party hereby waives any and all right of recovery which it might otherwise have against the other party, its agents and employees (including Landlord's management company), for loss or damage occurring to such party's property, notwithstanding that such loss or damage may result

45

from the negligence or fault of such party, its agents or employees. Landlord shall cause each policy carried by Landlord insuring the Building against loss, damage or destruction by fire or other casualty, and Tenant shall cause each insurance policy carried by Tenant and insuring the Premises and Tenant's alterations, leasehold improvements and Tenant's property against loss, damage or destruction by fire or other casualty, to be written in a manner so as to provide that the insurance company waives all rights of recovery by way of subrogation against the other party in connection with any loss or damage covered by any such policy.

(B)    Nothing contained in this Section 42.2 shall be deemed to relieve either party from any duty imposed elsewhere in this Lease to repair, restore and rebuild.

## 43.    LATE CHARGES AND DEFAULT INTEREST

A.    If Tenant shall fail to pay all or any part of any installment of Fixed Annual Rent or Additional Rent for more than five (5) days after the same shall have become due and payable, Tenant shall pay, within ten (10) days after demand, as additional rent hereunder to Landlord a late charge of five cents ($.05) for each dollar of the amount of such fixed annual rent or additional rent which shall not have been paid to Landlord within such five (5) days after becoming due and payable (provided such late charge shall not be applicable with respect to the first such delinquent payments in any twelve (12) month period provided that Landlord receives each such delinquent payment within five (5) days after written notice to Tenant that any such payment is past due, it being understood that for the second and any subsequent delinquent payment in such twelve (12) month period no written notice to Tenant shall be required in order for such late charge to be applied) and (ii) interest on the amount outstanding from the date which is thirty (30) days after the date it initially becomes due until it is paid at an annual rate which shall be four (4) percentage points in excess of the prime or base rate set by the New York City office of Citibank, NA. or any successor thereof (the "Base Rate"), but in no event more than the highest rate of interest which at such time shall be permitted under the laws of the State of New York. Tenant acknowledges that the payment of rent after the date when first due shall result in loss and injury to Landlord the exact amount of which is not susceptible of reasonable calculation and that the aforesaid amount of late charge represents a reasonable estimate of such losses and injury under the circumstances, especially after taking into account the grace period hereby afforded Tenant before such late charge is to be imposed. The late charge payable pursuant to this Article 43 shall be without prejudice to any of Landlord's rights and remedies hereunder at law and equity for non-payment or late payment of rent or other sums and in addition to any such rights and remedies, including the right to institute and prosecute a proceeding under Article 7 of the Real Property Actions and Proceedings Law. No failure by Landlord to insist upon the strict performance by Tenant of Tenant's obligation to pay late charges as provided in this Article shall constitute a waiver by Landlord of its right to enforce the provisions of this Article in any instance thereafter occurring. The provisions of this Article shall not be construed in any way to extend the grace periods or notice periods provided for elsewhere in this Lease.

B.    Notwithstanding anything contained herein to the contrary, if Landlord fails to bill Tenant for any charge payable under this Lease within three (3) years of the date such charge was incurred, Tenant shall have no obligation with respect to such unbilled amount.

46

**44.    ENVIRONMENTAL COMPLIANCE**

Tenant covenants and agrees that Tenant shall, at Tenant's sole cost and expense, comply at all times with all laws governing the use, generation, storage, treatment and/or disposal of any Hazardous Materials (as defined below), the presence of which results from or in connection with the act or omission of Tenant or Tenant's agents, servants or employees or the breach of this Lease by Tenant or Tenant's agents, servants or employees.  The term "Hazardous Materials" shall mean any biologically or chemically active or other toxic or hazardous wastes, pollutants or substances, including, without limitation, asbestos, PCBs, petroleum products and by-products, substances defined or listed as "hazardous substances" or "toxic substances" or similarly identified in or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., and as hazardous wastes under the Resource Conservation and Recovery Act, 42 U.S.C. § 6010, et seq., any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. § 2601, et seq., any "toxic pollutant" under the Clean Water Act, 33 U.S.C. § 466 et seq., as amended, any hazardous air pollutant under the Clean Air Act, 42 U.S.C. § 7401 et seq., hazardous materials identified in or pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. § 1802, et seq., and any hazardous or toxic substances or pollutant regulated under any other laws.  Tenant shall, to the fullest extent permitted by law, indemnify, defend and hold harmless all Indemnitees from and against any loss, cost, damage, liability or expense (including reasonable attorneys' fees and disbursements) arising by reason of any clean up, removal, remediation, detoxification action or any other activity required by any Government Authority by reason of the presence in or about the Building or the Premises of any Hazardous Materials, as a result of the act or omission of Tenant or Tenant's agents, servants or employees or the breach of this Lease by Tenant or Tenant's agents, servants or employees.  Notwithstanding the foregoing, in no event shall Tenant have any obligation to remove any Hazardous Materials existing prior to the Commencement Date or any Hazardous Materials introduced by Landlord or those acting under Landlord's authority or control.   The foregoing covenants and indemnity shall survive the expiration or any termination of this Lease.

**45.    LEASE FULLY NEGOTIATED**

In construing this Lease, it shall be deemed to be a document fully negotiated and drafted jointly by counsel to Landlord and counsel to Tenant and the authorship of any term or provision hereof shall not be deemed germane to its meaning.

**46.    SMOKING RESTRICTIONS**

Landlord reserves and shall have the right to restrict to certain designated areas within the Premises or to prohibit altogether smoking of cigarettes, cigars, other tobacco products or any other substances and the use of pipes and other paraphernalia for such purposes.  Without limiting Landlord's rights under the preceding sentence, Tenant shall enforce within the Premises the provisions of Local Law 5 of 1995.

[1065228-9]

## 47.    ANTI-TERRORISM REQUIREMENTS

Tenant represents and warrants that (i) neither Tenant nor any person who owns any direct or indirect beneficial interest in Tenant or any of them, is listed on the list maintained by the United States Department of the Treasury, Office of Foreign Assets Control (commonly known as the OFAC List) or otherwise qualifies as a person with whom business by a United States citizen or resident is prohibited and (ii) neither Tenant nor any person who owns any direct or indirect beneficial interest in Tenant or any of them is in violation of any to anti-money laundering or anti-terrorism statute, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56 (commonly known as the USA PATRIOT Act), and the related regulations issued thereunder, including temporary regulations, all as amended from time to time.

## 48.    ZONING LOT MERGER AGREEMENT.

Tenant acknowledges that it has no rights to any development rights, air rights or comparable rights appurtenant to the Building and consents, without further consideration, to any utilization of such rights by Landlord and agrees to promptly execute and deliver any instruments which may be requested by Landlord, including instruments merging zoning lots, evidencing such acknowledgment and consent.  The provisions of this Section 48 shall be deemed to be and shall be construed as an express waiver by Tenant of any interest Tenant may have as a "party in interest" (as such quoted term is defined in Section 12-10 Zoning Lot of the Zoning Resolution of the City of New York) in the Building.

## 49.    ADDITIONAL DEFINITIONS

"Business days" shall mean all days, except Saturdays, Sundays, and all days celebrated as holidays under union contracts applicable to the Building.  The words "herein," "hereof," "hereto," "hereunder" and similar words shall be interpreted as being references to this Lease as a whole and not merely the clause, paragraph, Section or Article in which such word appears. The words "shall" and "will" are interchangeable, each imposing a mandatory obligation upon the party to whom such verb applies.  The words "include" and "including" shall be interpreted to mean "including, without limitation." Unless otherwise indicated, the word "control" and the variations thereof used in this Lease shall have the meanings ascribed to them under the Securities Act of 1933, as amended, and the regulations promulgated under it.  Wherever appropriate in this Lease, personal pronouns shall be deemed to include the other genders and the singular or plural of any defined term or other word shall, as the context may require, be deemed to include, as the case may be, either the singular or the plural.  All Article and paragraph and subsection references set forth herein shall, unless the context otherwise specifically requires, be deemed references to the Articles, paragraphs and subsections of this Lease.  Wherever herein Tenant is required to comply with laws, orders and regulations of any governmental authority having or asserting jurisdiction over the Premises, such laws, orders and regulations shall include, as and where applicable to the Premises:  the Americans with Disabilities Act of 1990, Local Law 5/1973, Local Laws 16/1984, and 16/1987, Local Law 58/1987, and Local Law 80/1985, as each may be amended and any successor statutes of like or similar import. References to Landlord as having no liability to Tenant or being without liability to Tenant shall

[1065228-9]

mean that, except as otherwise provided in this Lease, Tenant is not entitled to terminate this Lease, or to claim actual or constructive eviction, partial or total, or to receive any abatement or diminution of rent, or to be relieved in any manner of any of its other obligations hereunder, or to be compensated for loss or injury suffered or to enforce any other kind of liability whatsoever against Landlord under or with respect to this Lease or with respect to tenant's use or occupancy of the Premises.

**50.    CONDOMINIUM**

A.    Tenant acknowledges that the Building and the land of which the Premises form a part may be subjected to the condominium form of ownership prior to the end of the term of this Lease. Tenant agrees that if, at any time during the term, the Building and the land shall be subjected to the condominium form of ownership, then, this Lease and all rights of Tenant hereunder are and shall be subject and subordinate in all respects to any condominium declaration (the "Declaration") and any other documents (together with the Declaration, collectively, the "Condominium Documents"; the condominium association and/or the board thereof, hereafter, the "Condominium") which shall be recorded in order to convert the Building and the land of which the Premises form a part to a condominium form of ownership in accordance with the provisions of Article 9-B of the Real Property Law of the State of New York or any successor thereto, provided that the Declaration and the Condominium Documents do not increase the obligations or diminish the rights of Tenant hereunder or reduce Landlord's obligations hereunder or have an adverse impact upon the rights of Tenant hereunder (in any case beyond a de minimis extent) and provided further that as a condition thereto the Board of Managers of the Condominium (the "Board") shall enter into a non-disturbance agreement with Tenant in form and substance reasonably satisfactory to Tenant, confirming that, so long as Tenant is not in default of its obligations under this Lease after notice and expiration of applicable grace periods, any foreclosure of the unit of which the Premises are a part or the exercise by the Board of any of its rights under the Condominium Documents shall not result in termination of this Lease or otherwise interfere with the rights of Tenant under this Lease. If any such Declaration is to be recorded, Tenant, upon request of Landlord, but subject to the foregoing, shall enter into an amendment of this Lease in such respects as shall be necessary to conform to such condominiumization, including, without limitation, appropriate adjustments to the Percentage and to real estate taxes payable during the base tax year, subject to paragraph G below; provided, however, no such adjustments shall in any way increase Tenant's payments with respect to real estate taxes, expenses or any other items of rent above such rents as Tenant would have incurred had such condominium conversion not occurred, and provided further, that Tenant's rights and obligations hereunder shall not be affected (except to a de minimis extent).

B.    Subject to the other provisions of this Article 50, Tenant agrees that it shall comply with the non-discriminatory rules and regulations of the Condominium as well as Landlord's rules and regulations provided, in either case, that such rules and regulations do not diminish Tenant's rights or increase Tenant's obligations under this Lease. Tenant's use of the Premises shall comply in all respects with the provisions of the Condominium Documents.

C.    Notwithstanding anything to the contrary contained herein, if at any time during the term, Landlord shall receive notice from the Condominium, unit owners of the Condominium

49

or occupants of the Building or other persons that any use or manner of use or the operation of the Premises or part thereof which is in violation or breach of the provisions of this Lease, by Tenant or other persons claiming by, through or under Tenant, violates any provision of the Condominium Documents or results in a breach of any duty or obligation which Landlord may have or owe to the Condominium, any unit owner of the Condominium or other occupant of the Building or other person, then Tenant hereby agrees to indemnify, defend and hold Landlord, its successors and assigns, harmless from and against any cost, loss or expense (including reasonable attorneys' fees) suffered or incurred by Landlord, its successor or assigns arising from Tenant's breach hereof, such indemnification obligation to survive the expiration or other termination of this Lease. Notwithstanding anything to the contrary contained herein, if Tenant is using the Premises for the permitted use as set forth in Section 1 of this Lease, then the Condominium, the unit owners of the Condominium or any other person shall not have the right to claim that such use is prohibited under the Condominium Documents.

D.    If at any time, pursuant to law or the provisions of the Condominium Documents, the Building shall cease to be a condominium, unless any condition exists pursuant to which this Lease may otherwise be terminated, then, this Lease shall continue in full force and effect between Tenant and the new owner of the Building, except that this Lease shall be deemed modified to delete provisions relating to the Condominium which are no longer relevant. At the request of Landlord, Tenant will execute a modification of this Lease confirming such changes at that time.

E.    With regard to any items of repair, maintenance, restoration, services or other obligations of Landlord under this Lease which under the Condominium Documents or by law is the duty or responsibility of the Condominium, the board of managers, or the owner of any other unit in the Condominium (each of the foregoing being a "Responsible Party"), except as expressly set forth herein, Landlord shall have no liability to Tenant for the performance (or the failure to perform) such work or obligations and Tenant shall look directly to the Responsible Party whose obligation is involved for such work or obligations therefor and for any damages therefrom, except that Landlord shall use commercially reasonable efforts to cause such Responsible Party to perform such work or other obligations. Without limiting the foregoing, the failure of any Responsible Party to perform any of its obligations shall not be the grounds for any termination of this Lease by Tenant on the basis of a claim for constructive eviction against Landlord. Notwithstanding the foregoing, Landlord shall use commercially reasonable efforts to cause the Responsible Party to perform any tasks requested by Tenant that are required to be performed by either the Landlord or the Responsible Party under the Lease with respect to which tasks Landlord shall have (i) standing to enforce, and (ii) a reasonable basis to make such a request to the Board pursuant to the Condominium Documents or applicable law, as reasonably determined by Landlord. In the event Landlord is unable to cause the Responsible Party to perform as aforesaid, Landlord agrees that Tenant may proceed directly against the Responsible Party to enforce such right and Landlord agrees it shall assign any and all rights Landlord has to Tenant in order for Tenant to proceed directly against the Responsible Party including litigation if necessary (and allow Tenant to proceed directly in Landlord's name if required and Landlord will cooperate in order to bring litigation in its name) in the event the Responsible Party fails to timely comply with its maintenance and repair obligations as set forth in the Condominium

50

Documents and any amounts received by Tenant in such litigation (whether brought in Tenant or Landlord's name) shall belong to Tenant.

      F.     Tenant acknowledges that Landlord retains the right, at any time during the term, and from time to time, to split the Building into two (2) or more separate condominium units. In any such event, Tenant agrees as follows: (i) Tenant will give such consents if any, as may be required to effectuate any such further condominiumization within the Building; (ii) Tenant agrees that it will, at Landlord's sole cost and expense, promptly cooperate and comply with all requests reasonably made by Landlord in furtherance of any such further condominiumization, which may include, without limitation, executing such documents as may necessary in connection with the further condominiumization and consenting to any modifications of this Lease as may be reasonably requested by Landlord in connection therewith, provided the same do not increase the obligations of Tenant under this Lease or have an adverse impact upon the rights of Tenant or increase any of Landlord's rights or diminish any of Landlord's obligations under this Lease and Tenant agrees that its failure to so cooperate within thirty (30) days after receipt of a request in writing therefor shall, at Landlord's option, constitute a default by Tenant under this Lease entitling Landlord to exercise all remedies hereunder after notice and the expiration of the grace period applicable to non-monetary defaults; and (iii) Tenant agrees that from and after any such conversion of the Building to two (2) or more condominium units, and provided Tenant's rights and obligations hereunder are not adversely affected, the word "Landlord" as used herein shall refer to the owner of the unit or units of the Condominium which comprise the Premises and such other definitional charges as may be appropriate shall be made. From and after such further condominiumization, if any, the computation of Tenant's Percentage shall be appropriately adjusted to reflect the relative size of the Premises to the tax lot constituting the condominium unit(s) containing the Premises, and any other escalation or other changes payable on the basis of a percentage of square footage of the Building shall be appropriately adjusted, if necessary, to accurately reflect Tenant's percentage thereof, provided however that in no event shall Tenant's overall obligation for real estate taxes or any other charge be greater than they would have been if the condominiumization had not occurred. Without limiting the generality of the foregoing, but subject to the limitation imposed in the preceding sentence, from and after such condominiumization, the base taxes shall be determined by multiplying the base taxes referred to in paragraph 2 of this Lease times a fraction, the numerator of which is the amount of real estate taxes initially payable by the Condominium containing the Premises when the Condominium has been established and the denominator of which is the total amount of real estate taxes payable by all Condominiums in the Building when all such Condominiums have been established.

**51.**    **FORCE MAJEURE**

     Unless otherwise specifically provided herein, if either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or any other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, then performance of such act shall be excused for the period of the delay, and the period for the performance of such act shall be extended for a period equivalent to the period of such delay;

provided, however, this Section 51 shall not operate to excuse the prompt payment of rent or any other payments required by this Lease.

## 52.    RENEWAL OPTION

A.    Landlord hereby grants Tenant the right and option to renew the term of this Lease for one (1) period of five (5) years (the "Renewal Term"), provided, however, that (i) Tenant is not in default under this Lease beyond applicable cure or grace periods and this Lease is in full force and effect at the time of the exercise of such option and as of the initial Expiration Date, and (ii) Tenant herein named shall not have assigned or subleased the Premises or any part thereof to any party other than as expressly permitted herein. Tenant shall give notice to Landlord of Tenant's intention to exercise such option (a "Renewal Notice") no earlier than eighteen (18) months and no later than nine (9) months prior to the initial Expiration Date, and time shall be of the essence with respect to the giving of such notice. If Tenant timely delivers the Renewal Notice, this Lease shall be deemed to be extended pursuant to the Renewal Notice. The Renewal Term shall commence on the day following the Expiration Date and shall end at midnight on the date that is five (5) years thereafter. All of the terms, covenants and conditions of this Lease shall continue in full force and effect during the Renewal Term, except that (i) the annual fixed rent during the Renewal Term ("Renewal Rent") shall be the greater of (x) one hundred percent (100%) of the Fair Market Rental Rate (as defined below) as of the Determination Date (as defined below) or (y) $509,286.93, (ii) during the Renewal Term, Tenant shall have no further right to extend the term of this Lease, and (iii) the Renewal Rent shall be annually increased at the same rate as provided for during the initial term of this Lease. Any termination, cancellation or surrender of Tenant's interest in this Lease at any time during the term hereof, as the same may be extended, shall terminate any of Tenant's right to exercise renewal rights hereunder.

B.    If Tenant timely delivers the Renewal Notice and is not otherwise in default beyond applicable cure or grace periods, then commencing on the date that is one hundred fifty (150) days prior to the commencement of the Renewal Term (the "Determination Date"), Landlord and Tenant shall use good faith efforts to agree upon the Fair Market Rental Rate of the Premises as of such Determination Date. The "Fair Market Rental Rate" shall be the then fair market rental value of the Premises, as of the Determination Date, taking into consideration all relevant factors including, without limitation, that (1) there shall be no brokerage commission payable, (2) there shall be no free rent period or other rental concession, (3) there shall be no tenant improvement allowance, (4) the scheduled Renewal Rent provides for interim increases, and (5) there shall be no period in which the Premises remains unoccupied during which rent hereunder shall not be paid; provided, however, that in no event shall Tenant's personalty or alterations be taken into account in connection with the calculation of the Fair Market Rental Rate.

C.    If the parties hereto cannot agree on the Fair Market Rental Rate within sixty (60) days after the Determination Date, as aforesaid, then, Landlord shall notify Tenant in writing ("Landlord's Notice") of such failure, which Landlord's Notice shall be given promptly after the expiration of such sixty (60) day period, and which shall designate Landlord's Qualified Appraiser (as defined below) for purposes of initiating the arbitration process provided for herein and specifying Landlord's determination of the Fair Market Rental Rate ("Landlord's

52

Determination"). For purposes hereof the term "Qualified Appraiser" shall mean a licensed real estate broker having at least fifteen (15) years' experience in the leasing of commercial office real estate in New York City in the immediate vicinity of the Building. Within fifteen (15) days of delivery to Tenant of Landlord's Notice, Tenant shall notify Landlord in writing ("Tenant's Notice") of Tenant's Qualified Appraiser and specifying Tenant's determination of the Fair Market Rental Rate ("Tenant's Determination") as of the Determination Date. If the difference between Landlord's Determination and Tenant's Determination is less than One Hundred Thousand and 00/100 Dollars ($100,000.00) per year, then the average of such determinations shall be the Fair Market Rental Rate for purposes hereof. Landlord's Qualified Appraiser and Tenant's Qualified Appraiser shall have thirty (30) days from the date of Tenant's Notice to attempt to agree upon the Fair Market Rental Rate of the Premises for such Renewal Term. If Landlord's Qualified Appraiser and Tenant's Qualified Appraiser cannot so agree as to the Fair Market Rental Rate prior to the expiration of such thirty (30) day period, and the difference between Landlord's Qualified Appraiser's determination and Tenant's Qualified Appraiser's determination exceeds One Hundred Thousand and 00/100 Dollars ($100,000.00) per year for the Renewal Term, then together Landlord's Qualified Appraiser and Tenant's Qualified Appraiser shall select, within ten (10) days after expiration of such thirty (30) day period, a mutually agreeable third Qualified Appraiser (the "Third Qualified Appraiser") or if unable to so agree within such ten (10) day period, then Landlord's Qualified Appraiser and Tenant's Qualified Appraiser shall immediately apply to the president of the Real Estate Board of New York (or if such organization no longer exists, then by the head of a substantially similar organization operating in the New York City area) for the selection of a Qualified Appraiser who shall act as the Third Qualified Appraiser. The Third Qualified Appraiser shall render its decision as to the Fair Market Rental Rate of the Premises as of the Determination Date within thirty (30) days after the appointment of such Third Qualified Appraiser, by choosing either the Landlord's Determination or the Tenant's Determination with respect to the Premises. The decision of the Third Qualified Appraiser shall be binding and conclusive upon Landlord and Tenant hereunder. Each of Landlord and Tenant shall bear the costs of its own Qualified Appraiser and shall bear the costs of the Third Qualified Appraiser, if any, equally.

D.     Unless and until the Renewal Rent shall be determined in accordance herewith, Tenant shall pay fixed annual rent for the Renewal Term at the annual rate of $499,300.92. Upon determination of the Renewal Rent by arbitration pursuant hereto, the Renewal Rent so determined shall be deemed to apply retroactively to the first day of the Renewal Term, and, within twenty (20) days after such determination, Tenant shall pay to Landlord an amount equal to the difference, if any, between (a) the Renewal Rent, as so determined, with respect to the period commencing on the first day of the Renewal Term and terminating on the last day of the month during which such determination occurs, and (b) the fixed annual rent theretofore paid by Tenant with respect to such period. Any excess fixed annual rent paid by Tenant to Landlord prior to the determination of the Renewal Rent shall be credited against the next due installment of Renewal Rent once determined as aforesaid.

## 53.     COUNTERPARTS

This Lease may be executed in any number of counterparts (each of which shall be deemed an original, and all of which shall together constitute one and the same instrument). A

[1065228-9]

signed counterpart of this lease which is executed and is transmitted by facsimile, email, or other electronic means shall be deemed to be an original for all purposes.

## 54.    CONFLICT

Notwithstanding anything to the contrary, in the event of a conflict between the body of this Lease, the Exhibits attached hereto and Tenant's final plans and specifications approved by Landlord, the following order of priority shall be determinative in resolving such conflict: (i) Tenant's final plans and specifications approved by Landlord; (ii) the body of this Lease; and (iii) the Exhibits.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

[1065228-9]

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

693 FIFTH OWNER LLC
By: Namlac Inc., sole member

By: _____
           Bernard de Lattre, Director

TENANT:

ESCADA AMERICA LLC

By: *Suzanne Humbert*
Name: *Suzanne Humbert*
Title: *President*

S-1

## EXHIBIT A-1

### Floor Plan

The floor plan which follows is intended solely to identify the general location of the Premises, and should not be used for any other purpose. All areas, dimensions and locations are approximate, and any physical conditions indicated may not exist as shown.



5TH AVENUE

6TH FLOOR PLAN
SCALE: NTS

**EXHIBIT A**
**Tenant Construction Guidelines**

## SAVITT PARTNERS

Construction Guidelines

1. Prior to every alteration/project, tenant and contractor must coordinate with Building Management office. Plans and specifications for alterations must be reviewed and approved by Building Management architect/engineer at Tenant's expense.

2. Tenant/Architect/General Contractor are required to have submitted prior to the date on which the work in question commences, to Building Management the required Certificate(s) of Insurance relevant to the project and any and all subcontractors.

3. All work must conform to Federal, State, Municipal and OSHA rules and regulations. If any violation is received in connection with any Tenant alteration, Tenant agrees that at their sole cost and expense, to commence within five (5) business days upon receiving notice of same, and to diligently pursue to completion the correction of such violation and to the extent required by applicable law, obtain a Notice of Dismissal from the department having jurisdiction and governing same.

4. If any scope of work requires access to portions of the building other than the Premises or may inconvenience/disturb other tenants in the building, work must be scheduled and performed before or after normal work hours.

5. Construction materials, equipment, rubbish removal, etc. must be loaded in and out of the building via the use of freight elevators. If major quantities of contractor's materials are delivered to the project site, the freight elevator must be reserved before or after work hours. The tenant is responsible for all overtime charges associated with all overtime freight elevator use. There is a four-hour minimum on weekends.

6. Any welding, soldering or other activities generating excessive heat or open flame shall be performed after normal business hours Monday thru Friday or on weekends, which are to be coordinated and scheduled with Building Management. Only persons having a valid New York Certificate of Fitness for welding on his person shall perform welding activities. During all welding operations there must be a person in the capacity of Fire Watcher having fire extinguisher and protective blankets. Prior to any welding in the building, the Contractor is to contact the Building Office twenty-four (24) hours in advance to have the Fire Alarm disabled.

7. Fire extinguishers must be on the job site at all times. Fire extinguisher must be fully charged and placed in a conspicuous located clearly marked.

8. Do not locate equipment, partition, fixed installations or other facilities in areas that might block or interfere with necessary access, entrances or exits. All Fire Exits shall be kept clear and accessible at all times.

9. All construction materials shall be delivered to the project site in proper containers and stored within the work area. Waste, excess building materials tools or equipment shall not be stored or allowed to accumulate outside the work area.

10. Smoking on premises is prohibited at all times.

[1065228-9]

11.    All construction personnel must use the freight elevator to access floors and are not permitted to use stairwells or passenger elevators.

12.    Construction personnel working on multi-tenant floors are not allowed to use lavatories on those floors.

13.    Walls and flooring in corridors adjacent to construction areas and leading to the freight elevators are to be protected with masonite or equivalent with special protection for corners.

14.    All fireproofing on steel must be properly repaired if damaged or missing. Contact Building Management for inspection and approval prior to installing ceilings. All openings/penetrations made in ceilings, columns, walls, floors, etc. are required to be properly sealed (fire-stopped).

15.    Tenant agrees to keep the land and buildings of which the demised premises under your lease form a part, free and clear of any and all mechanics' liens for work performed and materials furnished. At all times to indemnify and hold harmless the Landlord and Agent from any and all claims, liability, loss, damage or injury to persons or property arising out of or incidental to any alteration, installation or operation or maintenance of the same performed by you or your agents, servants, contractors or employees.

16.    Upon completion of construction, all construction debris, dust, etc. must be cleaned and removed from the premises, including dust and debris on convector covers, windows, etc.

17.    The project architect and/or engineer of record must certify at the project completion that all improvements were built in accordance with the plans, specifications, local code and ordinance. A certificate from the design professional, as well as a Certificate of Completion executed and issued by NYC Dept. of Buildings must be submitted to the Landlord.

18.    Upon completion, Tenant is required to submit two (2) sets of as-built architectural and engineering drawings and an electronic file of the as-built documents in an AutoCAD format.

[1065228-9]

# EXHIBIT B

## Certificate of Occupancy


**Buildings**

*Certificate of Occupancy*

Page 1 of 4

**CO Number:**          **100075133T042**

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. *This document or a copy shall be available for inspection at the building at all reasonable times.*

**A.**

| | | |
|---|---|---|
| **Borough:** Manhattan | **Block Number:** 01290 | **Certificate Type:** Temporary |
| **Address:** 693 5 AVENUE | **Lot Number(s):** 3 | **Effective Date:** 06/28/2018 |
| **Building Identification Number (BIN):** 1035742 | | **Expiration Date:** 09/26/2018 |
| | **Building Type:** New | |

*For zoning lot metes & bounds, please see BISWeb.*

**B.**

| | | |
|---|---|---|
| **Construction classification:** | 1-B | (1968 Code) |
| **Building Occupancy Group classification:** E | | (1968 Code) |
| **Multiple Dwelling Law Classification:** | None | |

**No. of stories:** 20      **Height in feet:** 295      **No. of dwelling units:** 0

**C.**  **Fire Protection Equipment:**
Standpipe system, Fire alarm system, Sprinkler system

**D.**  **Type and number of open spaces:**
None associated with this filing.

**E.**  **This Certificate is issued with the following legal limitations:**
None

**Outstanding requirements for obtaining Final Certificate of Occupancy:**
There are 18 outstanding requirements. Please refer to BISWeb for further detail.

**Borough Comments:**   None

Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*



Page 2 of 4

## *Certificate of Occupancy*

CO Number:    **100075133T042**

### Permissible Use and Occupancy

All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations.

| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
|---|---|---|---|---|---|---|
| CEL | 99 | 250 | C | | 6F | STORAGE ACCESSORY TO DEPARTMENT STORE |
| CEL | 13 | 250 | C | | 6F | BREAK ROOM ACCESORY TO DEPARTMENT STORE |
| CEL | 4 | 250 | C D-2 | | 6 | TAYLOR OFFICE ACCESSORY TO DEPARTMENT STORE, MECH/TEL.ROOM |
| CEL | 1 | 250 | E | | 6F | OFFICE ACCESSORY TO DEPARTMENT STORE |
| SUB | 6 | OG | B-1 | | 10 | STORAGE |
| SUB | 11 | OG | E | | 6 | BUILDING/MAINTENANCE OFFICE AND SECURITY CONTROL ROOM ACCESSORY TO BUILDING |
| SUB | 2 | OG | D-2 | | 6 | MECHANICAL ROOM, PUMP ROOM |
| 001 | 121 | 500 | D-2 | | 10 | DEPARTMENT STORE |
| 001 | 2 | 500 | B-1 | | 10 | STORGE ACCESSORY TO DEPARTMENT STORE |
| 001 | | 500 | E | | 6 | LOBBY |
| 002 | 1 | 100 | B-1 | | 10 | STORAGE ACCESSORY DEPARTMENT STORE |
| 002 | 53 | 100 | C | | 10 | DEPARTMENT STORE |
| 003 | 66 | 100 | C | | 10 | DEPARTMENT STORE |

Borough Commissioner

Commissioner

**DOCUMENT CONTINUES ON NEXT PAGE**


**Buildings**

*Certificate of Occupancy*

Page 3 of 4

**CO Number:**  **100075133T042**

## Permissible Use and Occupancy

All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations.

| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
|---|---|---|---|---|---|---|
| 003 | 3 | 100 | B-2 | | 10 | STORAGE ACCESSORY DEPARTMENT STORE |
| 004 | 38 | 100 | C | | 6 | OFFICE |
| 005 | 35 | 100 | E | | 6 | OFFICE |
| 006 | 36 | 100 | E | | 6 | OFFICE |
| 007 | 25 | 100 | E | | 6 | OFFICES |
| 007 | 24 | 100 | F-4 | | 6 | LUNCH ROOM ACCESSORY TO OFFICE |
| 007 | 2 | 100 | B-2 | | 6 | STORAGE ACCESSORY TO OFFICE |
| 008 | 32 | 100 | E | | 6 | OFFICES |
| 008 | 1 | 100 | B-2 | | 6 | ACCESORY STORAGE |
| 009 | 28 | 100 | E | | 6 | OFFICES WITH ACCESSORY TERRACE |
| 010 | 27 | 100 | E | | 6 | OFFICES |
| 011 | 29 | 100 | E | | 6 | OFFICES |
| 012 | 28 | 100 | E | | 6 | OFFICES |

Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*



## *Certificate of Occupancy*

**CO Number:**  **100075133T042**

| Permissible Use and Occupancy | | | | | |
|---|---|---|---|---|---|
| All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations. | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| 013 | 28 | 100 | E | | 6 | OFFICE |
| 014 | 29 | 100 | E | | 6 | OFFICE |
| 015 | 28 | 100 | E | | 6 | BEAUTY SALON |
| 016 | 27 | 100 | E | | 6 | BEAUTY SALON |
| 017 | 27 | 100 | E | | 6 | OFFICE |
| 018 | 27 | 100 | E | | 6 | OFFICE |
| 019 | 6 | 100 | D-2 | | 10 | MECHANICAL |
| 019 | 15 | 100 | E | | 6 | OFFICE |
| 020 | 13 | 100 | E | | 6 | OFFICE |
| 020 | 6 | 100 | D-2 | | 10 | MECHANICAL |
| RO F | | 30 | D-2 | | 10 | ELEVATOR MACHINE ROOM |

THE ZONING LOT HAS BEEN DECLARED ONE ZONING LOT AS PER ZR-12-10

**END OF SECTION**

Borough Commissioner

Commissioner

**END OF DOCUMENT**

100075133/042  6/28/2018 11:11:37 AM

**EXHIBIT C**

Form of Letter of Credit

LETTER OF CREDIT

[Issuer's Letterhead]

[Date]

Gentlemen:

We hereby issue in your favor our irrevocable letter of credit No.: _____ for account of _____ ("Applicant"), for a sum not to exceed U.S. ($      ) Dollars in the aggregate available against your draft(s) drawn on us at sight in the form of Annex 1 hereto, with blanks appropriately completed and purportedly signed by one of your authorized signatories and if presented by any transferee, that such transferee is an assignee of the rights and obligations of [_____], as Landlord, under the Lease.

Partial drawings are allowed under this Letter of Credit. Any drawing under this Letter of Credit will be paid from our general funds and not directly or indirectly from funds or collateral deposited with or for our account by the Applicant, or pledged with or for our account by the Applicant.

This Letter of Credit is transferable and assignable to any transferee of [_____], as Landlord, under the Lease and notwithstanding Article 48 of the Uniform Customs (as defined below), this Letter of Credit may be successively transferred. We shall not recognize any transfer or assignment of this Letter of Credit until an executed transfer form in the form of Annex 2 hereto, with blanks appropriately completed and purportedly signed by one of your authorized signatories, is filed with us and notice thereof is endorsed hereon by us. Our transfer charges, if any, shall be for the account of Applicant and our obligations to you hereunder shall not be contingent upon the receipt of such charges.

This Letter of Credit is valid for presentation at our offices at _____, New York, New York on or before the close of business on _____, 20__ ; provided that, it is a condition of this Letter of Credit that it shall be automatically extended without amendment for a period of one year from the current or any future expiration date, unless at least forty-five (45) days prior to the then current expiration date, we shall notify you at the address shown above, in writing by registered or certified mail, return receipt requested, at the above listed address (or such other address of which you notify us in writing from time to time) of our intention not to renew this Letter of Credit. In all events, this Letter of Credit shall expire no later than [60 days after the expiration date of the Lease] _____, 20__.

Notwithstanding the foregoing, drawings under this Letter of Credit presented by facsimile ("fax") to fax number_____ are acceptable, provided that such fax presentation is received on or before the expiration date in accordance with the terms and conditions of this Letter of Credit. Presentation of original documents is not required if drawings are presented via fax.

Except as expressly stated herein, payment under this Letter of Credit is not subject to any conditions, qualifications or deliveries.

This Letter of Credit shall be subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500 (the "Uniform Customs"), which is incorporated into the text of this Letter of Credit by this reference. This Letter of Credit shall be deemed to be issued under the laws of the State of New York and shall be governed by and construed in accordance with the laws of the State of New York with respect to matters not governed by the Uniform Customs and matters on which the Uniform Customs and the laws of the State of New York are inconsistent

[1065228-9]

We hereby agree with you that drafts drawn under and in compliance with the terms of this Letter of Credit shall be duly honored on presentation to us.

Very truly yours,

_____

Authorized Signature

[1065228-9]

ANNEX 1

LETTER OF CREDIT

SIGHT DRAFT

[Date                        ,

FOR VALUE RECEIVED

PAY        ON        DEMAND        TO                                $                Dollars

Charge to Account of [Insert Name of Issuer] Irrevocable Letter of Credit No.

To:  [Insert name and address of Issuer]

[Name of Beneficiary]

By:

ANNEX 2

LETTER OF CREDIT

[Date]            ,

[Insert Name and Address of Issuer]

Attention:

Re:     Letter of Credit No.

Gentlemen:

For value received, the undersigned beneficiary hereby irrevocably transfers to:

(Name of Transferee)

(Address)

all rights of the undersigned beneficiary to draw under the above Letter of Credit in its entirety.

By this transfer, all rights of the undersigned beneficiary in such Letter of Credit are transferred to the transferee and the transferee shall have the sole rights as beneficiary thereof, including sole rights relating to any amendments, whether now existing or hereafter made.  All amendments are to be advised directly to the transferee without necessity of any consent of or notice to the undersigned beneficiary.

Yours very truly,

SIGNATURE AUTHENTICATED [Insert Name of Beneficiary]

(Bank)                          Signature of Beneficiary

(Authorized Signature)

# EXHIBIT D

**Contractor Insurance**
**[Attached hereto]**

### Contractors (sub) Requirement Agreement
### (Landlord and Contractor)
### 693 Fifth Owner LLC

Contractor and its Subcontractors shall not commence work until it has obtained all required coverages and limits referred to herein and provided evidence of coverage set forth to **693 Fifth Owner LLC.**

Contractor and its Subcontractors shall obtain and maintain at their own cost and expense throughout the term of work done on behalf of **693 Fifth Owner LLC** the following coverages:

1. **PROPERTY INSURANCE** upon all tools, material and equipment (owned, borrowed or leased by the contractor or their employees) to the full replacement value thereof during the full term of this contract. The insurance shall insure against damage or loss caused by fire and all other perils covered by a standard Special Causes of Loss ("All Risk") insurance policy. Contractors agree to waive their right of subrogation against **693 Fifth Owner LLC.** Failure of the contractor to secure and maintain adequate coverage shall not obligate **693 Fifth Owner LLC** or its agents or employees for any loss.

2. **WORKERS COMPENSATION AND EMPLOYERS LIABILITY** insurance affording coverage under the Workers Compensation laws of the State(s) of New York and Employers Liability coverage subject to a limit of no less than Five Hundred Thousand Dollars ($500,000) each employee, Five Hundred Thousand Dollars ($500,000) each accident, Five Hundred Thousand Dollars ($500,000) policy limit.

3. **COMMERCIAL GENERAL LIABILITY (2001 FORM OR EQUIVALENT)** - This policy shall provide a One Million Dollar ($1,000,000) combined single limit for Bodily Injury and Property Damage, subject to no deductible/self-insured retention, including Products/Completed Operations (minimum three (3) years beyond completion of work under this agreement) and all standard form extensions without limitation.

The policy shall include a Two Million Dollar ($2,000,000) general aggregate "per project" and be written on an "occurrence" basis. The policy shall be endorsed to name **693 Fifth Owner LLC**, Lender and Managing Agent as "Additional Insureds" (ISO Endorsement 12/93 CG 20 10 11 85 (Form B) or its equivalent shall be used in this regard). Coverage for the "Additional Insured" shall apply on a Primary basis regardless of any other insurance maintained by **693 Fifth Owner LLC**, whether collectible or not.

4. AUTOMOBILE LIABILITY (if applicable) - The policy shall provide Liability insurance under Symbol "1", providing a One Million Dollar ($1,000,000) combined single limit for Bodily Injury and Property Damage and covering all owned, non-owned and hired vehicles of the contractor.

5. UMBRELLA LIABILITY - An Umbrella policy must be purchased with a limit of not less than ˙Five Million Dollars ($5,000,000), providing excess coverage over all limits and coverages noted in Paragraphs 2, 3 and 4 above without exception. This policy shall be written on an "occurrence" basis and include **693 Fifth Owner LLC**, Lender and Managing Agent as "Additional Insureds".

All policies discussed above shall be written with insurance companies licensed and admitted to do business in the State of New York and rated no lower than A:VIII in the most current edition of A.M. Best's Property Casualty Key Rating Guide.

6. COMPLIANCE DOCUMENTATION - All policies shall be endorsed to provide that in the event of a cancellation, non-renewal or material modification, **693 Fifth Owner LLC** shall receive thirty (30) days written notices thereof.

Contractor shall furnish **693 Fifth Owner LLC** with Certificates Of Insurance evidencing compliance with all insurance provisions noted above no later than seven (7) days prior to commencement of work.

All certificates or policy termination notices shall be delivered to:

Savitt Partners Operations
530 Seventh Avenue
New York, NY 10018

7. **INDEMNIFICATION/HOLD HARMLESS** - The Contractor and its subcontractors shall, to the fullest extent permitted by law at their own cost and expense, defend, indemnify and hold **693 Fifth Owner LLC** , Lender and Managing Agent, its Partners, Directors, Officers, Employees, Servants, Representatives and Agents harmless from and against any and all claims, loss (including attorney fees, witnesses' fees and all court costs) damages, expense and liability (including statutory liability), resulting from injury and/or death of any person or damage to or loss of any property arising out of any negligent or wrongful act, error or omission or breach of contract, in connection with the operations of the Contractor or its Subcontractors. The foregoing indemnity shall include injury or death of any employee of the contractor or subcontractor and shall not be limited in any way by the amount or type of damages, compensation or benefits payable under any applicable Workers Compensation, Disability Benefits or other similar employee benefits acts.

**FAILURE TO COMPLY WITH ANY OF THE INSURANCE PROVISIONS NOTED ABOVE WILL RESULT IN A BREACH OF THIS AGREEMENT BY THE CONTRACTORS.**

AGREED TO: _____

CONTRACTOR: _____

DATE: _____

OWNERSHIP: _____

## EXHIBIT E

### Tenant's Initial Work

1.    Install new suspended track lighting in the area as shown on the drawing attached hereto as Exhibit E-1.

2.    Paint entire ceiling and all ductwork white.

3.    Refinish floors with top coat of Ardex.

4.    Wood finishes in kitchen/pantry changed to white.

5.    Closet/storage wall conversion. Closet wall (per the photo attached hereto as Exhibit E-2) opened up. Doors removed. Glass shelving installed.

6.    Small models room built out in corner, alongside restroom wall. (8' high, open ceiling, not up to deck) in the area as shown on the drawing attached hereto as Exhibit E-3.

7.    Install bar area with counter top in corner area (mini fridge, wine cooler, storage cabinet) adjacent from kitchen in the area as shown on Exhibit E-3 attached hereto.

8.    Install (8) workstations in glass panel office area. Frost glass panels white, up to 2nd panel, leaving top panels clear.

[1065228-9]

693 5TH AVE
NEW YORK, NY

BAR
AREA

MODELS
ROOM

5TH AVENUE

6TH FLOOR PLAN
SCALE NTS

THIS EXHIBIT IS PROVIDED FOR ILLUSTRATIVE
PURPOSES ONLY, AND SHALL NOT BE DEEMED TO BE
A WARRANTY, REPRESENTATION OR AGREEMENT.
LANDLORD DOES NOT REPRESENT COMMON AREAS,
BUILDING IS AND/OR EXHIBIT WILL BE AS
ILLUSTRATED ON THIS EXHIBIT, OR THAT ANY
TENANT WILL AT ANY TIME BE OCCUPANTS OF THE
ENTIRE. WILL AT ANY TIME BE OCCUPANTS OF THIS
CENTER, LANDLORD RESERVES THE RIGHT TO
MODIFY THE CONFIGURATION AND OCCUPANTS OF
THE PREMISES AT ANY TIME.




25 WEST 39TH STREET
NEW YORK, N.Y. 10018
TEL 212 529-5055








## EXHIBIT F

### 693 FIFTH AVENUE CLEANING SPECIFICATIONS - TENANT SPACE

#### OFFICE CLEANING - NIGHTLY

-Excludes pantries, kitchens and cafeterias

-Dust sweep all stone, ceramic tile, marble terrazzo, asphalt tile, linoleum, rubber, vinyl and other types of flooring. Damp mop spot clean when necessary

-Spot sweep all carpets and rugs four (4) times per week

-Vacuum clean all carpets and rugs, once (1) per week

-Police all private stairways and keep in clean condition

-Empty and clean all wastepaper baskets and receptacles; damp dust as necessary

-Remove all normal wastepaper and tenant rubbish to a designated area in the premises (Excluding cafeteria waste, bulk materials, and all special materials such as old desks, furniture, etc.)

-Dust all furniture and window sills as necessary, not including pantries, kitchens and cafeterias

-Dust clean all glass furniture tops

-Dust all chair rails, trim and similar objects as necessary

-Dust all baseboards as necessary

#### OFFICE CLEANING - QUARTERLY

-High dust all horizontal and vertical surfaces not reached during nightly cleaning

-Dust all picture frames and similar hangings not reached during nightly cleaning

#### LAVATORIES - NIGHTLY

-Excludes private and executive lavatories

-Sweep and mop all flooring

-Wipe clean all mirrors, powder shelves and brightwork, including flushometers, piping, toilet seat hinges

-Wash and disinfect all basin, bowls and urinals

-Wash both sides of all toilet seats

-Dust all partitions, tile walls, dispensers and receptacles

-Empty and clean paper towel and sanitary disposal receptacles

-Fill toilet tissue holders, soap dispensers and towel dispensers; materials to be furnished by landlord

-Remove all wastepaper and refuse to designated area in the premises

#### LAVATORIES - QUARTERLY CLEANING

-Machine scrub flooring as necessary

-Wash all partitions, tile walls, and enamel surfaces as necessary

#### PERIMETER WINDOW CLEANING

-Perimeter windows will be cleaned two (2) times per year. To be done by Building Management.

[1065228-9]

**EXHIBIT G**

**Landlord's Work**

1.    Sprinkler work as shown on the plans and specifications identified as SP-100, SP-101 and SP-200 attached hereto.

2.    All lighting fixtures in the bathrooms and pantry of the Premises and all recessed lighting shall remain in the Premises; all other lighting fixtures in the Premises shall be removed.

# ROSINI ENGINEERING, P.C.

24-42 40th Avenue
Long Island City, NY 11101
Tel.: 212 904-0422 Fax: 212 575-0718

**PROJECT:**

Escada
693 5th Avenue
NY, NY 10022

**TITLE:**

SPRINKLER SYMBOLS, DETAILS AND
RISER DIAGRAM

Stamp-Seal

| DATE: | 06-21-18 |
| PROJECT No.: | 18238 |
| DRAWN BY: | NG |
| SCALE: | NOT TO SCALE |
| PAGE No.: | |
| DWG. No.: | 01 of 03 |

## SP-100-00

## FIRE PROTECTION ABBREVIATIONS

| ABBREVIATIONS | DESCRIPTION |
|---|---|
| ABD | AUTOMATIC BALL VALVE W/DRIP |
| ACC. DR | ACCESS DOOR |
| AFF | ABOVE FINISHED FLOOR |
| CLG | CEILING |
| COL | COLUMN |
| CONN | CONNECT TO EXISTING |
| CONN | CONNECT CONNECTION |
| CV | CONTROL VALVE |
| DIA | DIAMETER |
| DN | DOWN |
| DR | DRAIN |
| DWG | DRAWING |
| ELEC | ELECTRICAL |
| EX | EXISTING |
| FCA | SPRINKLER FLOOR CONTROL ASSEMBLY |
| FD | FLOOR DRAIN |
| FDC | FIRE DEPARTMENT CONNECTION |
| FF | FINISHED FLOOR |
| FL | FLOOR |
| NFD | NOT IN THIS CONTRACT |
| N/C | NORMALLY CLOSED |
| N/O | NORMALLY OPEN |
| NFPA | NATIONAL FIRE PROTECTION ASSOCIATION |
| OS&Y | OUTSIDE SCREW & YOKE GATE VALVE |
| PRESS | PRESSURE |
| R | RELOCATED |
| RCV | RISER CONTROL VALVE |
| REC | RECESSED |
| RM | ROOM |
| SP | SPRINKLER SPRINKLER PIPING |
| SP. HD | SPRINKLER HEAD |
| TS | TAMPER SWITCH |
| VERT | VERTICAL |
| WFS | WATER FLOW SWITCH |

## FIRE PROTECTION SYMBOL LIST

| ABBREVIATIONS | DESCRIPTION |
|---|---|
| | SPRINKLER PIPING (SP) |
| | PIPE UP,UNLESS OTHERWISE NOTED |
| | PIPE DROP,UNLESS OTHERWISE NOTED |
| | EXISTING SPRINKLER PIPE |
| | EXISTING SPRINKLER PIPE AND SPRINKLER HEAD TO BE REMOVED |
| | TOP CONNECTION |
| | BOTTOM CONNECTION |
| | CAPPED OUTLET |
| | VALVE ON VERTICAL |
| | OS & Y GATE VALVE |
| | CHECK VALVE |
| | PRESSURE GAUGE WITH GAUGE COCK |
| | NEW CONCEALED PENDENT SPRINKLER HEAD AND PIPING |
| | UPRIGHT TYPE SPRINKLER HEAD AND PIPING |
| | PENDANT TYPE SPRINKLER HEAD AND PIPING |
| | NEW SIDEWALL SPRINKLER HEAD AND PIPING |
| | WALL MOUNTED FIRE DEPARTMENT SIAMESE CONNECTION |



**PLOT PLAN**
NOT TO SCALE

EAST 54TH STREET

693 5th AVENUE
MANHATTAN, NY
BLOCK 1290
LOT 5

5TH AVENUE

EAST 55TH STREET



**DETAIL OF SPK HEAD DROP**

BRANCH LINE
MAIN CEILING
CLOSE NIPPLE
REDUCING TEE
ESCUTCHEON PLATE
DROP NIPPLE
HUNG CEILING

## SPRINKLER HEAD SCHEDULE

| LEGEND | FINISH/TYPE | AREA | DENSITY | TEMP. RATING | K-FACTOR | APPROVALS | MANUFACTURER |
|---|---|---|---|---|---|---|---|
| | QUICK RESPONSE CONCEALED PENDENT SPRINKLER HEAD or ARCHITECT REQUEST | HUNG CEILING AREAS | 0.10 GPM/SQ.FT. | 155°F | 5.6 | UL NYC SE&A 238-19-T | RELIABLE MODEL G4A or APPROVED EQUAL |
| | QUICK RESPONSE UPRIGHT SPRINKLER HEAD 1/2" ORIFICE | EXPOSED CEILING | 0.10 GPM/SQ.FT. | 155°F | 5.6 | UL NYC SE&A # 5917-75+SA NYC SE&A 35-1-E | RELIABLE MODEL F1FR-56 or APPROVED EQUAL |



**CLEVIS HANGER DETAIL**
NOT TO SCALE

**PIPE SLEEVES THRU FIRE RATED WALL**
NOT TO SCALE

**RISER CLAMP SINGLE**

**TYPES OF PIPE HANGERS**

**CLEVIS PIPE HANGER**
NOT TO SCALE

**CLEVIS HANGER DETAIL**
NOT TO SCALE

| PIPE SIZE | PIPE ROD in. |
|---|---|
| 1/2" – 2 | 3/8 |
| 2 1/2" – 3 | 1/2 |
| 4 – 5 | 5/8 |
| 6 | 3/4 |
| 8 – 12 | 7/8 |

**FIRE PROTECTION RISER DIAGRAM**
NOT TO SCALE

ROOF
20TH FL
19TH FL
18TH FL
17TH FL
16TH FL
15TH FL
14TH FL
13TH FL
12TH FL
11TH FL
10TH FL
9TH FL
8TH FL
7TH FL
6TH FL
5TH FL
4TH FL
3RD FL
2ND FL
1ST FL
CELLAR FL

THIS PLAN IS APPROVED ONLY FOR WORK INDICATED ON THE APPLICATION SPECIFICATION SHEET. ALL OTHER MATTERS SHOWN ARE NOT TO BE RELIED UPON AS BEING APPROVED OR AS COMPLYING WITH APPLICABLE CODES.



ROBINI ENGINEERING, P.C.

SPRINKLER SYSTEM SPECIFICATIONS

NEW YORK CITY SPRINKLER NOTES

DESIGN CRITERIA

SEISMIC RESTRAINT NOTES

GENERAL NOTES:

Escada
693 5th Avenue
NY, NY 10022

TITLE
SPRINKLER
SPECIFICATIONS

SP-101-00



## SCHEDULE A

## RULES AND REGULATIONS

1. No animals, birds, bicycles or vehicles shall be brought into or kept in the Premises. The Premises shall not be used for manufacturing or commercial repairing or for sale or display of merchandise or as a lodging place, or for any immoral or illegal purpose, nor shall the Premises be used for a public stenographer or typist; barber or beauty shop; telephone, secretarial or messenger service; employment, travel or tourist agency; school or classroom; commercial document reproduction; or for any business other than specifically provided for in the Lease. Tenant shall not cause or permit in the Premises any disturbing noises which may interfere with occupants of this or neighboring building, any cooking or objectionable odors, or any nuisance of any kind, or any inflammable or explosive fluid, chemical or substance. Canvassing, soliciting and peddling in the Building are prohibited, and each Tenant shall cooperate so as to prevent the same.

2. The toilet rooms and other water apparatus shall not be used for any purposes other than those for which they were constructed, and no sweepings, rags, ink, chemicals or other unsuitable substances shall be thrown therein. Tenant shall not throw anything out of doors, windows or skylights or into hallways, stairways or elevators, nor place food or objects on outside windowsills. Tenant shall not obstruct or cover the halls, stairways and elevators, or use them for any purpose other than ingress and egress to or from the Premises, nor shall skylights, windows, doors and transoms that reflect or admit light into the Building be covered or obstructed in any way.

3. Tenant shall not place a load upon any floor of the Premises in excess of the load per square foot, which such floor was designed to carry and which is allowed by law. Landlord reserves the right to prescribe the weight and position of all safes in the Premises. Business machines and mechanical equipment shall be placed and maintained by Tenant, at Tenant's expense, only with Landlord's consent which shall not be unreasonably withheld or delayed and in settings approved by Landlord to control weight, vibration, noise and annoyance. Smoking or carrying lighted cigars, pipes or cigarettes in the elevators of the Building is prohibited

4. Tenant shall not move any heavy or bulky materials into or out of the Building without Landlord's prior written consent which shall not be unreasonably withheld or delayed, and then only during such hours and in such manner as Landlord shall approve. If any material or equipment requires special handling, Tenant shall employ only persons holding a Master Rigger's License to do such work, and all such work shall comply with all legal requirements. Landlord reserves the right to inspect all freight to be brought into the Building, and to exclude any freight which violates any rule, regulation or other provision of this Lease.

5. No advertising of any kind by Tenant shall refer to the Building, unless first approved in writing by Landlord.

6. No article shall be fastened to, or holes drilled or nails or screws driven into, the ceilings, walls, doors or other portions of the Premises, nor shall any part of the Premises be painted, papered or otherwise covered, or in any way marked or broken, without the prior written consent of Landlord.

7. No existing locks shall be changed, nor shall any additional locks or bolts of any kind be placed upon any door or window by Tenant, without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. At the termination of this Lease, Tenant shall deliver to Landlord all keys for any portion of the Premises or Building. Before leaving the Premises at any time, Tenant shall close all windows and close and lock all doors.

8. No Tenant shall purchase or obtain for use in the Premises any ice, towels, bootblacking, or other such services furnished by any company or person not approved by Landlord. Any necessary exterminating work in the Premises shall be done at Tenant's expense, at such times, in such manner and by such company as Landlord shall require. Landlord reserves the right to exclude from the Building, from 6:00 p.m. to 8:00 a.m., and at all hours on Sunday and legal holidays, all persons who do not present a pass to the Building signed by Landlord. Landlord will furnish passes to all persons reasonably designed by Tenant. Tenant shall be responsible for the acts of all persons to whom passes are issued at Tenant's request.

9. Intentionally Omitted.

10. The use in the Premises of auxiliary heating devices, such as portable electric heaters, heat lamps or other devices whose principal function at the time of operation is to produce space heating, is prohibited.

11. In case of any conflict or inconsistency between any provisions of this Lease and any of the rules and regulations as originally or as hereafter adopted, the provisions of this Lease shall control.

## FIRST AMENDMENT TO AGREEMENT OF LEASE

This FIRST AMENDMENT TO AGREEMENT OF LEASE (this "**Amendment**") is made and entered into this  9  day of October, 2020, but shall be effective as of April 1, 2020 (the "**Effective Date**"), by and between **693 FIFTH OWNER LLC**, a Delaware limited liability company ("**Landlord**"), and **ESCADA AMERICA LLD**, a United Kingdom corporation ("**Tenant**").

### R E C I T A L S

A.    Landlord and Tenant entered into that certain Agreement of Lease dated as of July 19, 2018 (the "**Lease**"), which Lease covers the entire 6th floor (the "**Premises**") in the building known as 693 Fifth Avenue, New York, New York (the "**Building**") in the County of New York, City of New York, as more particularly set forth on the floor plan annexed as Exhibit A-1 to the Lease. Capitalized terms used but not defined herein shall have the meanings set forth in the Lease.

B.    Tenant has requested that Landlord agree to certain modifications to the Lease, and Landlord is willing to so modify the Lease, to include, among other things, certain rent concessions and deferrals and an extension of the term of the Lease, on the terms and conditions as more particularly set forth herein.

### A G R E E M E N T

NOW THEREFORE, in consideration of the agreements of Landlord and Tenant herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.  **PARTIAL ABATEMENT AND PARTIAL DEFERRAL OF FIXED ANNUAL RENT**

(a) Subject to paragraph 1(d) below, Landlord hereby agrees to:

(i)    abate the Fixed Annual Rent due and payable under the Lease for the period commencing on April 1, 2020 and ending on September 30, 2020, in the aggregate amount of **One Hundred Ninety-Six Thousand Seven Hundred Nine and 04/100 Dollars ($196,709.04)**, as set forth on <u>Exhibit A</u> attached hereto (the "**Abated Fixed Rent**"); and

(ii)    waive any and all late charges and/or default interest that has accrued or may accrue and become due and payable pursuant to Article 43 of the Lease for any late payments of Fixed Annual Rent for the period commencing on April 1, 2020 and ending on September 30, 2020.

(b) Subject to paragraph 1(d) below, Landlord hereby agrees to:

1

(i)   Defer the monthly installments of Fixed Annual Rent due and payable under the Lease for the period commencing on October 1, 2020 and ending on March 31, 2021, in the aggregate amount of **One Hundred Ninety Nine Thousand Three Hundred Thirty-One and 84/100 Dollars ($199,331.84)**, as set forth on **Exhibit B** hereto (the "**Deferred Fixed Rent**"). The Deferred Fixed Rent shall be payable by Tenant to Landlord in accordance with paragraph (c), below.

(c) Commencing on April 1, 2021 and continuing on the first (1st) day of each month through to and including March 1, 2022, Tenant shall pay the Deferred Fixed Rent to Landlord in twelve (12) equal monthly installments of **Sixteen Thousand Six Hundred Ten and 99/100 Dollars ($16,610.99)**, without further notice or demand. The monthly installment schedule for the Deferred Rent is shown on **Exhibit C** hereto. Said monthly installments shall be payable on the first day of each month, and shall be payable in addition to the Fixed Annual Rent, Additional Rent, and all other sums otherwise due and payable under the Lease, and shall be deemed to constitute "rent" for all purposes of the Lease. If Tenant shall fail to pay all or any portion of any installment of the Deferred Fixed Rent when due, and so long as Landlord first provides Tenant with Notice and a seven (7) day period to cure, such failure shall constitute a default by Tenant under the Lease and, in additional to Landlord's remedies under the Lease or at law for a default by Tenant, such unpaid installment shall be subject to late charges and default interest in accordance with Article 43 of the Lease. Notwithstanding the foregoing terms of this paragraph (c), if for any reason whatsoever the Lease shall terminate prior to Tenant's repayment in full of the Deferred Fixed Rent, including any applicable late charges or default interest thereon (if any), then all of the Deferred Fixed Rent then remaining unpaid, together with any applicable late charges or default interest thereon (if any), shall immediately become due and payable in full.

(d) Landlord's willingness to (i) abate the Abated Fixed Rent and waive late charges and/or default interest thereon, in accordance with paragraph (a) above, and (ii) defer the Deferred Fixed Rent, in accordance with paragraph (b) above, is conditioned upon and shall cease if Tenant shall default under the Lease, subject to any applicable notice or cure periods in accordance with the terms of the Lease, at any time after the Effective Date, including, without limitation, any default in payment of any Deferred Fixed Rent, subject to Landlord first providing Tenant with Notice and a seven (7) day period to cure, as provided in paragraph (c) above and default in payment of the Accrued Additional Rent, subject to Landlord providing Tenant with Notice and a seven (7) day period to cure, as provided in paragraph (e) below. If such a default shall occur, then the terms of Paragraphs (a) and (b) above shall be deemed null and void, retroactive to the Effective Date, and Tenant shall immediately pay to Landlord without further demand the aggregate amounts of (X) the Abated Fixed Rent, and any late charges and default interest thereon, and (Y) the Deferred Fixed Rent then remaining unpaid.

2

(e) Notwithstanding anything contained herein to the contrary, the abatement and deferrals of Fixed Annual Rent hereunder shall not in any way be deemed to be an abatement, waiver or deferral of any Additional Rent due and payable, except as expressly provided in paragraph (a) above with respect to late charges and default interest on the Abated Fixed Rent. Tenant acknowledges and agrees that, as of September 30, 2020, Additional Rent in the aggregate amount of **Eighty-Six Thousand Two Hundred Sixty-Eight and 33/100 Dollars ($86,268.33)**, as set forth on **Exhibit D** hereto (the "**Accrued Additional Rent**"), has accrued and is payable by Tenant under the Lease. Tenant shall pay the Accrued Additional Rent to Landlord in two (2) installments, with the first (1st) installment of **Forty Three Thousand One Hundred Thirty-Four and 17/100 Dollars ($43,134.17)** due and payable no later than December 31, 2020, and the second (2nd) installment of **Forty Three Thousand One Hundred Thirty-Four and 16/100 Dollars ($43,134.16)** due and payable no later than March 31, 2021, without further notice or demand. The installment schedule for the Accrued Additional Rent is shown on **Exhibit E** hereto. Said installments shall be payable in addition to the Fixed Annual Rent, Additional Rent, and all other sums otherwise due and payable under the Lease, and shall be deemed to constitute "rent" for all purposes of the Lease. No further late charges or default interest shall accrue on the Accrued Additional Rent so long as the Accrued Additional Rent is paid when due as provided herein. If Tenant shall fail to pay all or any portion of the installments of Accrued Additional Rent by the date such installment payment is due and payable as provided herein, and so long as Landlord first provides Tenant with Notice and a seven (7) day period to cure, such failure shall constitute a default by Tenant under the Lease and, in additional to Landlord's remedies under the Lease or at law for a default by Tenant, such unpaid amounts shall be subject to late charges and default interest in accordance with Article 43 of the Lease. Notwithstanding the foregoing terms of this paragraph (c), if for any reason whatsoever the Lease shall terminate prior to Tenant's repayment in full of the Accrued Additional Rent, including any applicable late charges or default interest thereon (if any), then the outstanding Accrued Additional Rent, together with any applicable late charges or default interest thereon (if any), shall immediately become due and payable in full.

(f) Tenant may prepay installments of Deferred Fixed Rent and Accrued Additional Rent at any time in advance of when otherwise due and payable hereunder.

## 2.  EXTENSION OF TERM

The initial term of the Lease is hereby extended for a period of six (6) months, commencing on December 1, 2028 and ending on May 31, 2029, upon all of the agreements, terms, covenants and conditions of the Lease, as modified by this Amendment. For the avoidance of doubt, the Fixed Annual Rent payable during the last six (6) months of the term of the Lease (from December 1, 2028 through May 31, 2029, as extended by this Amendment) shall be the Fixed Annual Rent as in effect immediately prior to such extension of the term of the Lease, in monthly installments of **Forty-Two Thousand One Hundred Twenty-Five and 25/100 Dollars ($42,125.25)**

3

during such period. All references in the Lease to the "Expiration Date" or "initial Expiration Date" shall mean "May 31, 2029" and all references in the Lease to the "term" or "initial term" of the Lease shall mean the period commencing on the Commencement Date and ending on the Expiration Date, as so extended by the terms hereof, subject to further extension in accordance with and subject to the terms of Article 52 (Renewal Option) of the Lease.

## 3.   BROKERS

Landlord and Tenant each represents and warrants to the other that neither it nor its officers or agents nor anyone acting on its behalf has dealt with any real estate broker in the negotiating or making of this Amendment, and each party agrees to indemnify and hold harmless the other from any claim or claims, and costs and expenses, including attorneys' fees, incurred by the indemnified party in conjunction with any such claim or claims of any other broker or brokers to a commission in connection with this Amendment as a result of the actions of the indemnifying party.

## 4.   REPRESENTATIONS AND WARRANTIES.

Tenant represents and warrants to Landlord that, as of the date hereof, (a) the Lease is in full force and effect and has not been modified except pursuant to this Amendment; (b) there are no defaults existing under the Lease; (c) there exist no valid abatements, causes of action, counterclaims, disputes, defenses, offsets, credits, deductions, or claims against the enforcement of any of the terms and conditions of the Lease; (d) this Amendment has been duly authorized, executed and delivered by Tenant and constitutes the legal, valid and binding obligation of Tenant; (e) Landlord has paid all amounts and performed all work required to be paid or performed under the Lease in connection with Tenant's initial occupancy of the Premises under the Lease; and (f) Landlord is not in default of any of its obligations or covenants under the Lease.

## 5.   MISCELLANEOUS

(a) As amended hereby, the Lease is hereby ratified and confirmed in all respects. In the event of any inconsistencies between the terms of this Amendment and the Lease, the terms of this Amendment shall prevail. This Amendment shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives and successors and assigns.

(b) This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

(c) This Amendment may be executed in counterparts each of which counterparts when taken together shall constitute one and the same agreement.

ny-1998093

(d) Except as set forth in this Amendment, all terms and conditions of the Lease shall remain in full force and effect.

[remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**LANDLORD:**

**693 FIFTH OWNER LLC,**
a Delaware limited liability company

By: _____
Name: _Magali Viandier_
Title: _President_

**TENANT:**

**ESCADA AMERICA LLC,** a Delaware limited liability company

By: _____
Name: _Michael Bernstein_
Title: _Authorized Signatory_

ny-1998093

**Exhibit A**
**Abated Fixed Rent**
**April 1, 2020 through September 30, 2020**

| | |
|---|---|
| 4/2020 | $32,784.84 |
| 5/2020 | $32,784.84 |
| 6/2020 | $32,784.84 |
| 7/2020 | $32,784.84 |
| 8/2020 | $32,784.84 |
| 9/2020 | $32,784.84 |
| Total | $196,709.04 |

7

## Exhibit B
## Deferred Fixed Rent

| 10/2020 | $32,784.84 |
|---------|------------|
| 11/2020 | $32,784.84 |
| 12/2020 | $33,440.54 |
| 01/2021 | $33,440.54 |
| 02/2021 | $33,440.54 |
| 03/2021 | $33,440.54 |
| **Total** | $199,331.84 |

8

**Exhibit C**
**Monthly Installment Schedule for Deferred Fixed Rent**

| | |
|---|---|
| 4/2021 | $16,610.99 |
| 5/2021 | $16,610.99 |
| 6/2021 | $16,610.99 |
| 7/2021 | $16,610.99 |
| 8/2021 | $16,610.99 |
| 9/2021 | $16,610.99 |
| 10/2021 | $16,610.99 |
| 11/2021 | $16,610.99 |
| 12/2021 | $16,610.99 |
| 1/2022 | $16,610.99 |
| 2/2022 | $16,610.99 |
| 3/2022 | $16,610.99 |
| Total | $199,331.84 |

9

**EXHIBIT D**
**Accrued Additional Rent**

| Additional Rent through 08.2020 Breakdown | |
|---|---|
| Real Estate Tax | $73,831.58 |
| Electric | $1,776.72 |
| Sales Tax for Electric | $157.69 |
| Subtotal | $75,765.99 |
| | |
| Additional Rent for 09.2020 Breakdown | |
| Real Estate Tax | $10,127.60 |
| Electric | $344.19 |
| Sales Tax for Electric | $30.55 |
| Subtotal | $10,502.34 |
| | |
| Total | $86,268.33 |

10

**Exhibit E**
**Installment Schedule for Accrued Additional Rent**

| | |
|---|---|
| 12/31/2020 | $43,134.17 |
| 3/31/2021 | $43,134.16 |
| Total | $86,268.33 |

ny-1998093

**Exhibit 2**

*EXECUTION VERSION*

## LEASE TERMINATION AND SURRENDER AGREEMENT

This LEASE TERMINATION AND SURRENDER AGREEMENT (this "Agreement"), is made as of the 12th day of July, 2022, between 693 FIFTH OWNER LLC, a Delaware limited liability company ("Landlord"), having an address at c/o MacDonald Weiss PLLC, 1350 Broadway, Suite 2120, New York, NY 10018 Attn: Armel Amaudric, and ESCADA AMERICA LLC, a Delaware limited liability company ("Tenant"), having an address at 693 Fifth Avenue, 6th Floor, New York, New York 10022.

## W I T N E S S E T H :

**WHEREAS,** Landlord and Tenant are parties to that certain Agreement of Lease dated July 19, 2018 (the "Original Lease"), between Landlord and Tenant, as amended by First Amendment to Agreement of Lease, dated October 9, 2020, but effective as of April 1, 2020 (the "First Amendment"; the Original Lease, as amended by the First Amendment, is hereinafter referred to as the "Lease"), whereby Landlord leased to Tenant and Tenant hired from Landlord the entire 6th floor (the "Premises") in the building known as 693 Fifth Avenue, New York, New York (the "Building"), as more particularly described in the Lease;

**WHEREAS,** the expiration date of the term of the Lease is currently May 31, 2029;

**WHEREAS,** Tenant has requested that Landlord agree to an early termination of the Lease, and Landlord is willing to accept an early termination of the Lease, upon and subject to the terms and conditions set forth in this Agreement and the satisfaction in full of Tenant's obligations under this Agreement;

**WHEREAS,** Landlord is currently holding a security deposit (the "Security Deposit") in the form of a letter of credit issued by JPMorgan Chase in the amount of $192,582 (the "Letter of Credit") and, in consideration of the concessions Landlord has provided to Tenant under the First Amendment and as compensation for Landlord's agreement to an early termination of the Lease, Tenant has agreed to surrender the Security Deposit to Landlord; and

**WHEREAS,** on January 18, 2022, Tenant filed a voluntary petition under 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") commencing a chapter 11 bankruptcy case (the "Bankruptcy Case") bearing case number 2:22-bk-10266-BB, and pending before the Honorable Sheri Bluebond, in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"), and Tenant is operating its business, administering its bankruptcy estate (the "Estate"), and managing its affairs as a debtor and debtor in possession pursuant to Bankruptcy Code Sections 1107 and 1108.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants set forth below, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

NY-2396844

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed thereto in the Lease.

2.      <u>Termination Payment; Security Deposit and Authorized Draw</u>.  As an inducement for Landlord to enter into this Agreement, Tenant agrees to pay to Landlord a termination payment in the amount of $192,582 (the "<u>Termination Payment</u>").  Tenant has provided as a security deposit under the Lease a letter of credit issued by JPMorgan Chase in the amount of $192,582 (the "<u>Letter of Credit</u>").  Tenant agrees to forfeit the full amount of the Security Deposit as payment of the Termination Payment.  Tenant hereby authorizes and directs Landlord to take such action as necessary to draw down the full amount of the Letter of Credit, including, without limitation, and as required, to declare to the issuing bank that a default has occurred under the Lease.  Tenant shall cooperate with Landlord as may be necessary to enable Landlord to so draw on the Letter of Credit, including without limitation as contemplated in Section 22 hereof.  Tenant acknowledges and agrees that the funds received by the Landlord from drawing on the Letter of Credit will be utilized by Landlord to pay the Termination Payment.  Tenant acknowledges that after application of the proceeds from drawing on the Letter of Credit to pay the Termination Payment, no amount thereof will be returned to Tenant.  Tenant hereby waives and releases Landlord from any and all claims against Landlord arising from or as a result of any such draw on the Letter of Credit for application as aforesaid, whether the same has occurred prior to or will occur after the date of this Agreement.  In the event Landlord is unable to draw on the Letter of Credit for any reason, Tenant shall not be released from its obligation to pay and shall remain liable for the Termination Payment as a condition to the effectiveness of this Agreement.

3.      <u>Surrender of Premises; Surrender Condition</u>.  Tenant agrees to remove from the Premises (and the Building) all of the personal property belonging to Tenant, and otherwise deliver the Premises to Landlord in the Surrender Condition (as hereinafter defined) on or before the Early Termination Date (as hereinafter defined).  Tenant shall continue to have access to the premises after the date of this Agreement solely for the purposes of removing Tenant's personal property and restoring the Premises to the Surrender Condition until the Early Termination Date, subject to all of the terms and conditions of the Lease.  As used herein, the term "<u>Surrender Condition</u>" shall mean the Premises shall be free and clear of all tenancies and occupancies arising by, through or under Tenant, and otherwise in the condition Tenant is required to deliver the Premises to Landlord upon expiration of the term of the Lease in compliance with Article 12 of the Lease.

4.      <u>Early Expiration of Term on Early Termination Date</u>.  Subject to Landlord's receipt of the Termination Payment and the satisfaction of Tenant's other obligations under this Agreement, the Lease is amended such that the new "Expiration Date" on which the Term of the Lease shall expire shall be the date on which the Bankruptcy Court enters an order approving this Agreement (the "<u>Early Termination Date</u>"), <u>provided</u>, <u>however</u>, such early termination of the Lease on the Early Termination Date is expressly conditioned upon and subject to Tenant's satisfaction in full of Tenant's obligations under this Agreement, including, without limitation, payment of the Termination Payment, payment of Rent and Additional Rent through and including the Early Termination Date and Tenant's surrender of the Premises on the Early Termination Date in the Surrender Condition (as defined in Section 3 hereof).

2

5.    Continued Performance. Tenant shall continue to observe and perform the terms and conditions of the Lease through the Early Termination Date, including payment of Fixed Annual Rent any Additional Rent (which shall be prorated to the Early Termination Date) and Tenant shall otherwise comply in full with all of its obligations under and in accordance with the terms of this Agreement. In the event Tenant shall fail to perform the terms and conditions of the Lease through the Early Termination Date or surrender vacant possession of the Premises to Landlord in the Surrender Condition by the Early Termination Date, Landlord shall have all the rights and remedies provided to it under the Lease, at law or in equity, including without limitation, as applicable, the right to bring and action for damages or an action for summary proceedings and the right to receive holdover rent as provided under Section 12 (End of Term) of the Lease, subject to obtaining relief from the automatic stay of Bankruptcy Code Section 362.

6.    Possession and Possessory Interest. Tenant expressly represents and warrants that it is the only entity in possession of the Premises, that it has done nothing to give rights in the Premises to any other entity, and that it knows of no other entity that has any claim to any rights in or possession of the Premises. Tenant further agrees that it shall not permit any other entity to obtain any rights in or possession of the Premises by through or under Tenant subsequent to the execution of this Agreement. However, in the event that the Bankruptcy Court does not approve this Agreement, nothing contained herein shall prevent or prejudice Tenant's rights to have the Lease assumed and assigned pursuant to Bankruptcy Code Section 365.

7.    Release. Tenant hereby releases Landlord and its direct and indirect members, parents and affiliates, and its and their respective successors and assigns, from and against any and all claims, obligations and liabilities of every kind or nature whatsoever arising out of or in connection with the Lease, and the lease of the Premises to Tenant under the Lease, as modified by this Agreement.

8.    Broker. Landlord and Tenant mutually represent that in the negotiation of this Agreement they dealt with no broker or brokers other than Collier's International (the fees of which, if any, shall be paid by Landlord).

9.    Ratification. Except as amended hereby, the Lease is hereby ratified and declared to be in full force and effect in accordance with its terms through the Early Termination Date. Tenant represents that as of the date of this Agreement, Tenant has no rights of defense, abatement or set-off with respect to the Fixed Annual Rent or Additional Rent payable under the Lease.

10.    Inconsistency. To the extent of any inconsistency between the terms or provisions of the Lease and the terms or provisions of this Agreement, the terms and provisions of this Agreement shall govern and prevail.

11.    Unenforceability. If any of the provisions of this Agreement, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such provision or provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not

3

NY-2396844

be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.    No Waiver.  This Agreement may not be orally changed or terminated, nor any of its provisions waived, except by an agreement in writing signed by the party against whom enforcement of any change, termination or waiver is sought.

13.    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of the parties hereto, their respective legal representatives, successors and permitted assigns.

14.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile or electronically shall be equally effective as delivery of an original executed counterpart.

15.    Amendment.  This Agreement cannot be changed or terminated orally.  Nothing in this Agreement, expressed or implied, is intended to confer upon any person other than the parties hereto and their legal representatives, successors or permitted assigns any rights, remedies or obligation under or by reason of this Agreement.

16.    Governing Law.  This Agreement is being delivered in the State of New York and shall be construed and enforced in all respects in accordance with the laws of New York.

17.    Survival.  Notwithstanding anything which may be contained or construed herein to the contrary, the term and conditions of this Agreement and all of the Tenant's obligations under this Agreement shall survive the early termination of the Lease.

18.    Construction.  In the event that any word, sentence, section or article of this Agreement is found to be void or voidable, the balance of this Agreement shall nevertheless be legal and binding with the same and effect as though the void or voidable parts were deleted.

19.    Prevailing Party.  In the event of any dispute or litigation between the parties with respect to the terms and conditions of this Agreement, the party which prevails in such dispute or litigation shall reimburse the other party, within twenty (20) days after demand, for the reasonable attorneys' fees and disbursements, and court costs, incurred by the prevailing party in any such dispute or litigation, subject to the claims and administrative expense allowance procedures of the Bankruptcy Court.

20.    Headings.  The descriptive article, section and paragraph headings set forth herein are inserted for convenience of reference only, do not constitute a part of this Agreement and shall not control or affect the meaning or construction of any provision of this Agreement.

21.    Entire Agreement.  This Agreement, together with the Lease as amended hereby, constitute the entire agreement between the parties pertaining to this subject matter and supersedes

4

all prior or contemporaneous agreements and understandings of the parties relating to the same. This Agreement may be amended only in writing signed by all of the parties, and subject to Bankruptcy Court approval of such amendment.

22.   Not Binding.  Each of Landlord and Tenant acknowledge that this Agreement shall not be binding on the parties unless and until Landlord has obtained approval of this Agreement from its mortgagee and both (i) each of Landlord and Tenant shall have executed this Agreement and a fully signed counterpart thereof shall have been delivered to each party by the other party and (ii) the Bankruptcy Court has entered an order approving this Agreement ("Bankruptcy Court Approval").  Tenant agrees to use commercially reasonable efforts to obtain Bankruptcy Court Approval of this Agreement, including specifically Landlord's right to draw on the Letter of Credit as provided in Section 2 hereof, by August 24, 2022 (the "Outside Date").  Notwithstanding anything contained herein to the contrary, in the event Tenant shall not obtain Bankruptcy Court Approval of this Agreement by the Outside Date (as such date may be extended by Landlord in its sole discretion, this agreement shall be null and void and of no further force and effect.  In the event that the Bankruptcy Court does not approve this Agreement, then this Agreement shall be null and void.

23.   No Waiver.  Notwithstanding anything contained herein, in no event shall this Agreement be deemed a waiver of any rights of Landlord in connection with the Bankruptcy Case of Tenant, including without limitation the right of Landlord to file a proof of claim in the Bankruptcy Case for any amount to which the Landlord may be entitled to claim as a result of Tenant's default under Lease.  Notwithstanding anything contained herein, in no event shall this Agreement be deemed a waiver of any rights of Tenant or the Estate to file an objection to any such proof of claim or other pleading filed by Landlord in the Bankruptcy Case.

24.   Authority.  Tenant and Landlord each hereby represents and warrants that it has full right, power and authority to enter into this Agreement, subject to Bankruptcy Court Approval, and that the person executing this Agreement on behalf of Tenant and Landlord, respectively, is duly authorized to do so, subject only to Section 22 hereof.

*(Signature Page Follows)*

5

NY-2396844

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

LANDLORD:                                    TENANT:

693 Fifth Owner LLC                          ESCADA AMERICA, LLC

By: _____                      By: _____
Name:  Fabrice Grasset                       Name: _Finance Dir_
Title:  President of Namlac Inc - Sole member Title: _Kevin Walsh_

6

## ACKNOWLEDGEMENTS

STATE OF NEW YORK        )
                         )
COUNTY OF NEW YORK  )

On *27th* day of ___July___ in the year 2022 before me, the undersigned, personally appeared ___Kelvin Walsh___ known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in her/his capacity, and that by her/his signature on the instrument, the entity, or the person upon behalf of which the individual acted, executed the instrument.

AUGUSTO MADERA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6366602
Qualified in New York County
My Commission Expires 10-30-2025

_____
Notary Public


STATE OF NEW YORK        )
                         )
COUNTY OF NEW YORK  )

On ____ day of _____ in the year 2022 before me, the undersigned, personally appeared _____ known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in her/his capacity, and that by her/his signature on the instrument, the entity, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


NY-2396844

**Exhibit 3**

| | |
|---|---|
| Non-Priority Rejection Claim Amount 502(b)(6)(A) | $475,001.24 |
| Non-Priority Pre-Petition Claim Amount 502(b)(6)(B) | $1,641.00 |
| Subtotal 502(b)(6) Claim | $476,642.24 |
| Security Deposit | $192,582.00 |
| Remaining 502(b)(6) claim after seciurty deposit | $284,060.24 |
| Claim waived by Landlord per Termination Agreement | $284,060.24 |

Petition Date              1/18/2022
Lease Expiration Date      5/31/2029
Lease Surrender Date       9/30/2022

| Lease Yr | Start | End | Months | Monthly | Annual Remaning |
|---|---|---|---|---|---|
| Year 1* | Aug-18 | Nov-19 | 0 | $32,142.00 | $0.00 |
| Year 2* | Dec-19 | Nov-20 | 0 | $32,784.84 | $0.00 |
| Year 3* | Dec-20 | Nov-21 | 0 | $33,440.54 | $0.00 |
| Year 4** | Dec-21 | Nov-22 | 2 | $35,570.35 | $71,140.70 |
| Year 5 | Dec-22 | Nov-23 | 12 | $36,281.75 | $435,381.00 |
| Year 6 | Dec-23 | Nov-24 | 12 | $37,007.39 | $444,088.68 |
| Year 7 | Dec-24 | Nov-25 | 12 | $39,695.50 | $476,346.00 |
| Year 8 | Dec-25 | Nov-26 | 12 | $40,489.42 | $485,873.04 |
| Year 9 | Dec-26 | Nov-27 | 12 | $41,299.25 | $495,591.00 |
| Year 10 | Dec-27 | Nov-28 | 12 | $42,125.25 | $505,503.00 |
| Year 11 | Dec-28 | May-29 | 6 | $42,125.25 | $252,751.50 |
| Total Remaining | | | 80 | | $3,166,674.92 |
| 15% Remaining | | | | | $475,001.24 |
| One Year | | | | | $433,958.20 |

* Years 1, 2, 3 already paid
** Year 4 presumes paying current through 9/30/2022, leaving 2 months.

1

# PROOF OF SERVICE OF DOCUMENT

2

3

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 2818 La Cienega Avenue, Las Angeles, CA 90034

4

5

6

A true and correct copy of the foregoing document entitled **Debtor's Notice Of Motion And Motion For An Order Authorizing Debtor To Enter Into Agreement To Terminate Lease, Permit Landlord To Recover Security Deposit, And Release Claim Against Debtor And The Estate; Memorandum And Authorities In Support Thereof; Declaration Of Kevin Walsh In Support Thereof** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

7

8

9

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 22, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

10

☒ Service information continued on attached page

11

12

13

**2. SERVED BY UNITED STATES MAIL**: On **August 22, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

14

☐ Service information continued on attached page

15

16

17

18

| The Honorable Sheri Bluebond<br>United States Bankruptcy Court<br>Central District of California<br>Edward R. Roybal Federal Building and<br>Courthouse<br>255 E. Temple Street, Suite 1534 /<br>Courtroom 1539<br>Los Angeles, CA 90012 | 693 Fifth Owner LLC<br>c/o Savitt Partners, LLC<br>Attn: Michael Dubin<br>530 Seventh Avenue<br>New York, NY 10018 | Tannenbaum Helpern Syracuse<br>& Hirshchtritt LLP<br>Attn: Neil E. Botwinoff, Esq.<br>900 Third Avenue<br>New York, NY 10022 |
|---|---|---|

19

20

21

22

23

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 22, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

24

☐ Service information continued on attached page

25

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

26

| **August 22, 2022** | Jason Klassi | /s/ Jason Klassi |
|---|---|---|

27

Date                               Type Name                               Signature

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

1

2  **2:22-bk-10266-BB Notice will be electronically mailed to:**

3  Dustin P Branch on behalf of Creditor The Macerich Company
   branchd@ballardspahr.com, carolod@ballardspahr.com;hubenb@ballardspahr.com

4
5  John C Cannizzaro on behalf of Creditor 717 GFC LLC
   john.cannizzaro@icemiller.com, julia.yankula@icemiller.com

6  Michael J Darlow on behalf of Creditor Harris County Municipal Utility District #358
   mdarlow@pbfcm.com, tpope@pbfcm.com

7
8  Caroline Djang on behalf of Interested Party Caroline R. Djang
   cdjang@buchalter.com, docket@buchalter.com;lverstegen@buchalter.com

9  Eryk R Escobar on behalf of U.S. Trustee United States Trustee (LA)
   eryk.r.escobar@usdoj.gov

10
11 John-Patrick M Fritz on behalf of Attorney Levene, Neale, Bender, Yoo & Golubchik L.L.P.
   jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com

12 John-Patrick M Fritz on behalf of Debtor Escada America, LLC
   jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com

13
14 Jonathan Gottlieb on behalf of Debtor Escada America, LLC
   jdg@lnbyg.com

15 William W Huckins on behalf of Creditor Brookfield Properties Retail, Inc.
   whuckins@allenmatkins.com, clynch@allenmatkins.com;igold@allenmatkins.com

16
17 William W Huckins on behalf of Creditor SIMON PROPERTY GROUP INC
   whuckins@allenmatkins.com, clynch@allenmatkins.com;igold@allenmatkins.com

18 Gregory Kent Jones (TR)
   gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com

19
20 Michael S Kogan on behalf of Creditor Michael Kogan Law Firm, APC
   mkogan@koganlawfirm.com

21 Carmela Pagay on behalf of Debtor Escada America, LLC
   ctp@lnbyg.com

22
23 Kristen N Pate on behalf of Creditor Brookfield Properties Retail, Inc.
   bk@bpretail.com

24 Terrel Ross on behalf of Interested Party TR Capital Management LLC
   tross@trcmllc.com

25
26 Lindsey L Smith on behalf of Debtor Escada America, LLC
   lls@lnbyg.com, lls@ecf.inforuptcy.com

27 Ronald M Tucker, Esq on behalf of Creditor SIMON PROPERTY GROUP INC
   rtucker@simon.com, cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com

28
   United States Trustee (LA)

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**

1    ustpregion16.la.ecf@usdoj.gov

2    Eric R Wilson on behalf of Creditor Committee Official Committee Of Unsecured Creditors
3    kdwbankruptcydepartment@kelleydrye.com, MVicinanza@ecf.inforuptcy.com

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**