Eric R. Wilson (CA Bar No. 192220)
Robert L. LeHane (admitted *pro hac vice*)
Kristin S. Elliott (admitted *pro hac vice*)
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
Email: ewilson@kelleydrye.com
rlehane@kelleydrye.com
kelliott@kelleydrye.com

Becca J. Wahlquist (CA Bar No. 215948)
KELLEY DRYE & WARREN LLP
350 South Grand Avenue, Suite 3800
Los Angeles, CA 90071
Telephone: (213) 547-4900
Facsimile: (213) 547-4901
Email: bwahlquist@kelleydrye.com

Counsel for the Official Committee of
Unsecured Creditors of Escada America, LLC

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>ESCADA AMERICA, LLC,<br><br>Debtor and Debtor-in- Possession. | Case No: 2:22-bk-10266-BB<br><br>Chapter 11 Case<br><br>**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTOR'S MOTION FOR ORDER: (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; AND (II) APPROVING ADEQUATE PROTECTION; DECLARATIONS OF PHILIP A. WEINTRAUB, ESQ. AND JOHN P. MADDEN**<br><br><u>Hearing</u>:<br>Date: October 12, 2022<br>Time: 10:00 a.m.<br>Place:[1] Courtroom 1539<br>255 East Temple Street<br>Los Angeles, CA 90012 |

[1] Hearing in-person and by video-conference Government Zoom, see Court's website under "Telephonic Instructions for more details: https://www.cacb.uscourts.gov/judges/honorable-sheri-bluebond.

The Official Committee of Unsecured Creditors (the "Committee") of Escada America, LLC, the above-captioned debtor and debtor-in-possession (the "Debtor") objects to the Debtor's *Motion for Order: (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code; and (II) Approving Adequate Protection* (the "Motion")[2] and respectfully states:

## I. INTRODUCTION

1. Since its formation, the Committee has pursued two (2) goals: (i) investigate the Debtor's assets and liabilities, including litigation claims against the Debtor's insiders, so that (ii) it can attempt to negotiate a consensual resolution of this case fairly, expeditiously and cost-effectively. Although the Debtor shares the Committee's goal to exit bankruptcy quickly, it does not share the desire to investigate or pursue estate litigation assets against insiders for value, despite the existence of numerous colorable claims. Instead, the Debtor is working overtime to shield its insiders from scrutiny. The Motion lays this bare.

2. After months of professing a desire to work with the Committee to provide information informally and to negotiate in good faith over a plan, the Debtor filed the Motion with no notice to the Committee, after business hours on the last day the Motion could be filed on regular notice, all while the parties were preparing to mediate plan issues pursuant the Exclusivity Stipulation.[3] For the first time, the Motion requests authority for the Debtor to use cash on a final basis, on vastly different terms than the consensual Interim Cash Collateral Orders that have governed the Debtor's use of cash for the past nine (9) months. This includes the past four (4) months during which the Committee has worked to get the most basic information about the Debtor required for the Committee to negotiate a reasonable outcome for this case.

3. As the Committee's efforts to obtain information have intensified, the Debtor and its Insider Secured Creditors apparently now realize they will not be able to exit bankruptcy on the cheap. Instead of pursuing a status quo consensual use of cash collateral while the parties continue their ongoing negotiations, the Debtor and the Insider Secured Creditors entered into a Stipulation on

---

[2] Docket No. 312. Capitalized terms used but not defined in this objection have the meanings ascribed to them in the Motion.

[3] Capitalized terms used in the Introduction have the meanings ascribed to them further below.

the eve of mediation, to further tilt this case in their favor. Among other things, and without any evidence supporting how the Stipulation is in the best interest of the estate, the Debtor has now stipulated to:

- the validity and perfection of the Insider Secured Creditors' liens, despite two of those liens being granted for no apparent value during statutory lookback periods;
- the amount of the Insider Secured Creditors' claims, including unspecified prepetition amounts for which no proof of claim was filed by the bar date and undocumented administrative claims;
- conditions on the use of cash that will ensure no other party can investigate or pursue any claims or challenges against the Insider Secured Creditors; and
- make sizeable posptetition cash payments to the Insider Secured Creditors on account of suspect liens and objectionable claims, when the Insider Secured Creditors already will enjoy an equity cushion and other forms of adequate protection during the proposed Budget period.

4. If the Debtor's agreements stand, the estate will be left hopelessly insolvent and the Insider Secured Creditors will obtain de facto third party releases for no value, just so the Debtor can use cash through October 12, when exclusivity will terminate automatically as to the Committee if a consensual deal is not reached by then. The Debtor and the Insider Secured Creditors were wrong if they thought the Stipulation would deter the Committee's on-going investigation and efforts to maximize non-insider recoveries.

5. No faithful fiduciary would ever agree to the Stipulation. The Motion is bereft of evidence that the Stipulation is fair to the estate or will maximize value for non-insider creditors, because it will not. During its time in bankruptcy, the Debtor has shuttered all but one (1) store it operates unprofitably for an affiliate. The Motion is not an attempt to preserve a going concern. Rather, it is an improper and misguided attempt to freeze the Committee out of the Chapter 11 process in favor of the Insider Secured Creditors who control the Debtor. The Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Procedural Background

6.    On January 18, 2022 (the "Petition Date"), the Debtor filed a voluntary petition under subchapter V of chapter 11 ("Subchapter V") of the Bankruptcy Code.

7.    Since the Petition Date, the Debtor has remained in possession of its assets pursuant to section 1107 of the Bankruptcy Code.  As discussed below, it is unclear who is operating the Debtor's business or managing its assets.

8.    On February 1, 2022 the Debtor filed its *Schedules of Assets and Liabilities* (the "Schedules") *and Statement of Financial Affairs* (the "SOFA").[4]  Thereafter, the Debtor was forced to amend its Schedules and/or SOFA three (3) times to correct information and omissions about the Debtor's prepetition transactions with insiders.  Most recently and troubling, was an amendment on July 21, 2022 – six (6) months into this case – to disclose for the first time, approximately $1.4 million in payments to Mega during the year preceding the Petition Date.[5]

9.    On February 8, 2022, the Office of the United States Trustee (the "UST") conducted a Section 341 Meeting of Creditors of the Debtor (the "341 Meeting").[6]

10.    On March 16, 2022, Simon Property Group ("Simon") and Brookfield Properties ("Brookfield"), two of the Debtor's largest non-insider creditors,[7] challenged the Debtor's eligibility for relief under Subchapter V because the Debtor improperly characterized its landlords' claims for overdue rent as disputed and contingent.[8]  On March 23, 2022, 717 GFC LLC ("717 GFC"), the

---

[4]    Docket No. 75.
[5]    Docket Nos. 79, 92 and 258.  *See* Docket No. 258 at 19 (disclosing $1,399,298.39 in one-year payments to Mega), *see also* fn 60 *infra*.
[6]    Docket Nos. 31.  A copy of the transcript of the 341 Meeting (the "341 Transcript") is attached as Exhibit A to the *Declaration of Philip A. Weintraub, Esq.* (the "Weintraub Decl."), filed contemporaneously with this objection.  The UST continued the 341 Meeting on March 10 and 22, 2022.  Docket Nos. 82 and 99.
[7]    Docket No. 1 at 7-9.
[8]    Docket No. 103.

Debtor's then-largest non-insider creditor,[9] joined Simon and Brookfield's challenge.[10] The UST separately challenged the Debtor's Subchapter V election on May 18, 2022.[11]

11. In response to these challenges, the Debtor revoked its Subchapter V election on May 4, 2022.[12]

12. On May 18, 2022, the UST formed the Committee.[13] The Committee originally consisted of three (3) members: Simon, Brookfield and GFC 717.[14] Upon the sale of its claim, GFC 717 resigned from the Committee. As a result, the Committee currently consists of two (2) members, Simon and Brookfield.[15]

13. On May 23, 2022, the Committee selected Kelley Drye & Warren LLP as its counsel.[16] On July 27, 2022, the Committee selected Emerald Capital Advisors as its financial advisor.[17]

**B. The Debtor's Business**

14. The Debtor conducts the U.S. brick and mortar operations of the Escada enterprise.[18] The Escada enterprise consists of many entities,[19] all of which ultimately are owned by Regent LP ("Regent"), a private equity fund.[20] Michael Reinstein is chairman, founder and chief executive officer of Regent.[21]

15. Before the Petition Date, the Debtor leased as many as fifteen (15) stores throughout the country.[22] As of the Petition Date, the Debtor operated ten (10) stores,[23] including three (3)

---

9 Docket No. 1 at 7. On August 4, 2022, 717 GFC transferred its general unsecured claim to TRC Master Fund LLC. Docket Nos. 262 and 263.

10 Docket No. 111.

11 Docket No. 145.

12 Docket No. 149.

13 Docket 172.

14 *Id.*

15 Docket No. 292.

16 Docket No. 244.

17 Docket No. 303.

18 *Declaration of Kevin Walsh* in support of the Motion, Docket No. 312 (the "Walsh Decl.") at 24, ¶13.

19 *Id.* at 24, ¶ 15. The Committee requested that the Debtor provide a list identifying all of the Debtor's insiders and affiliates. *See* Weintraub Decl., Ex. B. The Debtor refused to provide such information. *See* Weintraub Decl., Ex. E.

20 REGENT LP, https://www.regentlp.com/portfolio (last visited September 25, 2022).

21 REGENT LP, https://www.regentlp.com/team (last visited September 25, 2022).

22 Walsh Decl. at 25, ¶22.

23 *Id.* at 23-24, ¶8.

stores leased by Escada America Management LLC ("EAM"), a non-debtor affiliate.[24]  Since the Petition Date, the Debtor has rejected all of its real property leases and currently operates one (1) location on an informal basis for EAM.[25]

16.    The Debtor also owns Escada Online LLC ("Escada Online") which "handles the online transactions or sales for Escada on behalf of Sourcing and Production."[26]

17.    Escasda Online GmbH ("Online GmbH") is a non-debtor affiliate of the Debtor that the Debtor proposed to release under the *Debtor's Chapter 11 Plan of Reorganization, Dated May 12, 2022* (the "Plan").[27]  The Committee does not know why the Debtor sought to release Online GmbH (or even what Online GmbH does with respect to the Debtor), and the Committee is unaware of any consideration Online GmbH agreed to provide to the Debtor in exchange its contemplated release.[28]

18.     Since the Petition Date, the Debtor's workforce has shrunk from fifty (50) full-time employees to five (5) store-level employees and four (4) employees in the Debtor's corporate offices.[29]  It is unclear why the Debtor needs four (4) corporate employees to manage one (1) store and five (5) employees when, as discussed below, Mega performs the Debtor's back-office functions.[30]

**C.    The Debtor's Management**

19.    It is unclear who manages the Debtor.  Kevin Walsh is the Debtor's Director of Finance and the person who executes documents on behalf of the Debtor in this case, including the

---

[24]    Docket No. 197 at 16, ¶16 (noting the rejection of the last remaining stores for which the Debtor was lessee, leaving open only those stores leased by EAM).

[25]    Walsh Decl. at 24, ¶9.  *See* Weintraub Decl. at ¶9, Ex. E (Debtor's admission that it has no written agreement with EAM).

[26]    341 Transcript at 12:18-24.

[27]    Docket No. 160 at 22:23-27 and Exhibit 4 to Plan.

[28]    The Committee requested information regarding Online GmbH from the Debtor.  Weintraub Decl. at Ex. C.  The Debtor refused to provide such information, claiming it is not relevant to this case because the Debtor has withdrawn the Plan.  *Id.* at Ex. E.

[29]    Walsh Decl. at 24, ¶9 and Docket No. 311 at 19-20, ¶7.

[30]    *See infra.* at ¶¶ 28-38.  The Debtor has also paid other affiliates for shared services, but there are no written agreements governing or describing any such services.  *See* Weintraub Decl. at ¶9, Ex. E.

Petition, Schedules, SOFA and each of the declarations supporting the Debtor's various requests to use cash collateral since the Petition Date (collectively, the "Cash Collateral Declarations").[31]

20. Many of the Cash Collateral Declarations are virtually identical to each other. This is particularly evident with regards to the Cash Collateral Declaration supporting the Motion for which it appears as though Mr. Walsh did little more than re-date and re-execute the same form of Cash Collateral Declaration that was filed the last time the Debtor sought this Court's authority to use cash.[32] With respect to the Motion, the Cash Collateral Declaration does not mention (let alone attempt to justify) the new forms of adequate protection and other benefits Debtor has agreed to grant to the Insider Secured Creditors (defined below).

21. Perhaps that is because Mr. Walsh is not the person in charge of the Debtor. Upon information and belief, the Debtor is managed by Mega, Michael Reinstein, or both. By way of example:

- Mr. Walsh testified at the 341 Meeting that, although he was uncertain to whom he reported technically, Mr. Reinstein is the Debtor's principal and effectively the president of the Debtor;[33]
- Mega provides back office services to the Debtor pursuant to an Administrative Services Agreement between Mega and the Debtor under which Mega charged the Debtor over $1 million per year;[34]
- Anthony Depatie, a Mega in-house lawyer, appeared on behalf of the Debtor at the 341 Meeting;[35] and
- Debtor's counsel refers to Mr. Depatie and other Mega employees as its client in this proceeding.[36]

[31] Docket Nos. 16, 101, 144, 231 and 312.
[32] Weintraub Decl. at ¶11, Ex. F (comparing declaration filed in support of the Debtor's previous request for use of cash collateral with the Walsh Decl. filed in support of the Motion).
[33] 341 Transcript at 44:3-45:4.
[34] Docket No. 258 at 19; Weintraub Decl. at ¶7.
[35] 341 Transcript at 45:24-46:11.
[36] *See* Weintraub Decl. at ¶12

**D. The Insider Secured Creditors**

22. The Debtor has three (3) insider secured creditors (collectively, the "Insider Secured Creditors")[37] whose claims and/or security interests are patently subject to challenge.

**1. Eden Roc**

23. On or about June 26, 2020, Eden Roc "loaned" the Debtor $579,025.32 (the "Eden Roc Loan"). The Eden Roc Loan was made to the Debtor "to basically keep the Debtor alive."[38] There is no question the Debtor was insolvent when Eden Roc made the Eden Roc Loan.[39]

24. The Eden Roc Loan is evidenced by a Promissory Note dated July 31, 2020.[40] Under the Eden Roc Promissory Note, the Eden Roc Loan matured on July 31, 2020 (approximately 30 days after it was made).[41] If the Debtor could not pay the Eden Roc Loan when due, the Eden Roc Promissory Note simply requires the Debtor to make payment "as soon as possible."[42] The Eden Roc Loan bears no interest, even upon the Debtor's default.[43]

25. On June 26, 2020, Eden Roc and the Debtor entered into a Security Agreement with respect to the Eden Roc Loan.[44] In the Eden Rock Security Agreement, the Debtor granted Eden Rock a security interest in substantially all of the Debtor's assets.[45] Eden Roc filed a UCC-1 financing statement against the Debtor on July 2, 2020.[46]

26. As of the Petition Date, the Debtor contends that $579,025.32 (*i.e.* the original loan balance) was due on account of the Eden Roc Loan.[47] Upon information and belief, Eden Roc took no action before the Petition Date to collect the defaulted, overdue Eden Roc Loan. Eden Roc did not file a proof of claim against the Debtor.

---

[37] The Debtor does not dispute that each Insider Secured Creditor is an insider.

[38] 341 Transcript at 19:8-20.

[39] *See* Walsh Decl. at ¶¶ 16-31.

[40] Weintraub Decl., Ex. G (the "Eden Roc Promissory Note"). The same individual executed the Eden Roc Promissory Note for both the Debtor and Eden Roc.

[41] *Id.* at §1.2.

[42] *Id*. at §1.3.

[43] *Id*. at preamble

[44] Weintraub Decl., Ex. H (the "Eden Roc Security Agreement"). The same individual executed the Eden Roc Security Agreement for both the Debtor and Eden Roc.

[45] Eden Roc Security Agreement at §2(a).

[46] *Declaration of John-Patrick M. Fritz, Esq. in Support of Emergency First Day Motions*, Docket No. 15 (the "Fritz First Day Decl.") at 8.

[47] Walsh Decl. at 13 ¶30.

27. On these facts, it appears that the Promissory Note is an unenforceable, illusory agreement and/or the Eden Roc Loan is subject to recharacterization as a disguised equity contribution in the Debtor.[48]

**2. Mega**

28. By its own words, Mega "is the operational infrastructure of Regent's portfolio companies[.]"[49] Upon information and belief, Mega, along with certain other affiliates of the Debtor,[50] has performed virtually all of the Debtor's back-office functions since Regent acquired the Debtor in 2019.[51]

29. Less than (2) years before the Petition Date, Mega and the Debtor entered into (i) the Administrative Services Agreement on or about April 28, 2020 (with a purported effective date of October 31, 2019),[52] and (ii) a Security Agreement with respect to such services on or about February 27, 2020.[53]

30. In the Mega Services Security Agreement, the Debtor granted Mega a security interest in substantially all of its assets.[54] On February 11, 2021, Mega filed a UCC-1 financing statement against the Debtor.[55]

31. Upon information and belief, the Debtor received no consideration in exchange for entering into the Administrative Services Agreement or the Mega Services Security Agreement. The Debtor was insolvent when each of these agreements was entered.[56] As a result, Mega's lien against the Debtor is avoidable.[57]

---

48 *See, e.g., In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1146 (9th Cir. 2013) (bankruptcy courts can recharacterize debt to equity); *In re L. Scott Apparel, Inc.*, 615 B.R. 881, 891 (C.D. Cal. 2020) (affirming decision to recharacterize insider's debt).

49 MCO, https://www.mco.com/about-us (last visited September 28, 2022).

50 *See e.g.* 341 Transcript at 47:2-48:2

51 *See* Weintraub Decl., Ex. D (the "Administrative Services Agreement") §1.2 (reflecting the provision of legal, accounting, HR, tax, IT, strategic management and other services).

52 *Id.* at preamble.

53 *See* Weintraub Decl., Ex. I (the "Mega Services Security Agreement")

54 Mega Services Security Agreement at §2(a).

55 Fritz First Day Declaration at 14.

56 *See* fn. 39, *supra*.

57 *See, e.g.* 11 U.S.C. § 548(a)(1)(B).

32. The Debtor contends that it owed Mega $1,506,953 as of the Petition Date.[58] Mega did not file a proof of claim against the Debtor.

33. The Debtor paid Mega $3,112,474.41 before the Petition Date,[59] including $1,399,298.39 during the one (1) year preceding the Petition Date.[60]

34. Despite its request, the Committee has not received information from the Debtor or Mega demonstrating (i) that Mega's claims against the Debtor are valid and not subject to reduction or offset, (ii) that Mega's lien against the Debtor's assets is not avoidable as a constructively fraudulent transfer, or (iii) the amounts paid to Mega prepetition are not avoidable as preferences or constructively fraudulent transfers.

35. For example, the Committee requested documents from the Debtor reflecting the methodology by which Mega charged the Debtor for its services, which Mega was supposed to provide to the Debtor in writing annually under the Administrative Services Agreement.[61] The Debtor does not have any such documents.[62] The Committee also requested copies of all invoices Mega issued to the Debtor under the Administrative Services Agreement.[63] Although the Committee received copies of invoices, it cannot determine the nature of the services rendered and, therefore, cannot assess whether the asserted amount is valid or reasonable.

36. The lack of detail supporting the Debtor's prepetition payments to Mega and Mega's asserted claims against the Debtor is particularly troubling because it appears that, at least until January 14, 2022, one or both of Mega's principals used Mega as a vehicle to abuse Regent's portfolio companies for their personal gain.

37. On January 21, 2022, Mega and others filed a lawsuit against David Steinhafel, a former Regent principal, alleging that, for years, Mr. Steinhafel used Mega to strip Regent's

---

[58] Walsh Decl. at 13 ¶31; upon information and belief, this amount includes a $70,955.49 "loan" from Mega made on July 1, 2020 that the Committee believes is subject to recharacterization for the same reasons as the Eden Roc Loan. *See* ¶¶23 - 27, *supra*.

[59] *See* Weintraub Decl. at ¶7.

[60] The Debtor did not disclose these payments on the SOFA until July 21, 2022, six (6) months after the Petition Date and over five (5) months after Mr. Walsh admitted under oath at the 341 Meeting that the Debtor had likely made payments to Mega that should have been disclosed. *See* 341 Transcript at 39:24 – 40:14..

[61] Administrative Services Agreement §2.2; Weintraub Decl., Ex. C.

[62] *See* Weintraub Decl. at ¶9, Ex. E.

[63] *See Id.* at Ex. C.

portfolio companies of value for his personal benefit.[64] Mr Steinhafel disputes those allegations and alleges that Mr. Reinstein (i) was aware of, and did not oppose, Mr. Steinhafel's conduct, and (ii) also uses Mega to strip Regent's portfolio companies of value for personal gain.[65] The litigation is ongoing.

38. Despite Mega's admission that, at the very least, a key employee was inappropriately reimbursing personal expenses by misappropriating funds from portfolio companies on a regular ongoing basis, upon information and belief, the Debtor has not investigated whether it has claims or causes of action against Mega or its current and former principals. In light of these allegations, the Debtor's prepetition transactions with Mega must be fully investigated.[66]

**3. ESP**

39. ESP holds two prepetition claims against the Debtor:

- Consignment Claim: $675,361.39 claim for prepetition inventory ESP supplied to the Debtor pursuant to a Consignment Agreement entered on February 11, 2021[67] (less than one year before the Petition Date) and purportedly effective as of November 25, 2020;[68] and

- Legacy Debt Claim: $19,044,356.07 claim for unsecured debt ESP acquired from the Debtor's foreign affiliates on undisclosed terms.[69]

40. On February 11, 2021 (less than one year before the Petition Date), the Debtor entered into a Security Agreement with ESP.[70] In the ESP Security Agreement, the Debtor granted

---

64 *Id.*, Ex. J (Am. Compl., *Regent, LP, et al. v. Steinhafel, et al.*, No. 22STCV02610 (Cal. Super. Ct. May 23, 2022) at ¶¶ 1-6, 48-52.

65 *Id.*, Ex. K (Cross-Compl., *Regent, LP, et al. v. Steinhafel, et al.*, No. 22STCV02610 (Cal. Super. Ct. Apr. 1, 2022) at ¶¶ 11-33.

66 The Committee has endeavored to investigate all such transactions. While the Committee has received documents from Mega and the Debtor it has many open questions and the story remains in flux. In fact, just yesterday, the Debtor produced a previously undisclosed document that appears to change the story about Mega's claims against the Debtor.

67 Weintraub Decl., Ex. L (the "Consignment Agreement"). The same individual executed the Consignment Agreement for both the Debtor and ESP.

68 The Stipulation indicates that ESP believes its prepetition claim exceeds the Debtor's scheduled amount of $675,361.39. ESP did not file a proof of claim against the Debtor, and the bar date has passed. Therefore, ESP's allowed prepetition claim is no more than $675,361.39. The Stipulation also references a $2,411,097.32 postpetition administrative expense claim against the Debtor. The Committee has no information regarding the basis, amount or validity of this alleged claim (to which the Debtor has agreed to stipulate).

69 The Committee has requested information from ESP regarding the terms on which it acquired this claim. *See* Weintraub Decl., Ex. B. Except for one heavily redacted document from which no material information can be gleaned, the Committee has received no information regarding this transaction. *See* Weintraub Decl. at ¶9.

ESP a security interest in the Debtor's inventory, related rights and proceeds thereof.[71] On February 11, 2021, ESP filed a UCC-1 financing statement against the Debtor.[72]

41. Upon information and belief, the Debtor received no consideration in exchange for entering into the Consignment Agreement and the Security Agreement with ESP. The Debtor was insolvent when it entered each of these agreements.[73] As a result, ESP's lien against the Debtor is avoidable as an insider preference, fraudulent transfer, or both.[74]

42. Since January 15, 2021, the Debtor has paid ESP $2,217,636,[75] including $2,067,636 during the year preceding the Petition Date.[76] The Debtor admits its prepetition payments to ESP were made on account of inventory and the legacy debt ESP acquired from the Debtor's foreign affiliates.[77] The Debtor cannot, however, state which portion of its prepetition payments to ESP relate to one obligation or the other.[78]

**E. The Motion**

43. Since the Petition Date, the Debtor has operated pursuant to a series of interim cash collateral orders (collectively, the "Interim Cash Collateral Orders").[79] None of the Interim Cash Collateral Orders (i) stipulate to the amount, validity or perfection of any lien or claim held by an Insider Secured Creditor, (ii) provide for adequate protection payments to any Insider Secured Creditor, or (iii) limit the Debtor's or the Committee's right to investigate or pursue any challenge against any Insider Secured Creditor. [80]

44. Pursuant to the *Third Stipulation to Extend Deadlines and Scheduling Regarding: (1) Debtor's Motion for an Order Extending the Plan Exclusivity Period to File Chapter 11 Plan and Obtain Acceptances Thereof & (2) Motion for Order Authorizing Use of Cash Collateral and*

(...Continued)

[70] *Id.*, Ex. M (the "ESP Security Agreement"). The same individual executed the ESP Security Agreement for both the Debtor and ESP.

[71] ESP Security Agreement at §2(a).

[72] Fritz First Day Declaration at 12-13 (omitting reference to proceeds).

[73] *See* fn. 39, *supra*.

[74] 11 U.S.C. §§ 547(b), 548(a)(1)(B).

[75] *See* Weintraub Decl. at ¶7.

[76] *See* Docket No 258 at 18. (listing payments to "Escada Sourcing & Production group").

[77] *Id.*

[78] Weintraub Decl., Ex. E.

[79] Docket Nos. 56; 85; 131; 154; 190, and; 247.

[80] Docket Nos. 56, ¶¶ 1-9; 85, ¶¶ 1-4; 131, ¶¶ 1-6; 154, ¶¶ 1-6; 190, ¶¶ 1-4, and; 247, ¶¶ 1-7.

*Providing Adequate Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code* (the "Exclusivity Stipulation"), the Debtor and the Committee agreed that the Debtor's pending motion to continue using cash collateral consistent with the Interim Cash Collateral Orders would be heard on October 12, 2022.[81] Pursuant to the Exclusivity Stipulation, unless the Debtor and the Committee reach agreement on a consensual plan by October 12, 2022, the Debtor's exclusive periods will terminate automatically as to the Committee.[82]

45. Without providing any notice or attempting to negotiate with the Committee, the Debtor filed the Motion on September 21, 2022.[83] The Motion seeks authority for the Debtor to use cash collateral on dramatically different terms that benefit the insiders at the expense of the Debtor's estate and other stakeholders. Among other things, the Debtor now:

- Stipulates to the validity, amount, priority and perfection of the Insider Secured Creditors' liens and claims against the Debtor,[84] despite (i) the clear challenges and unresolved questions discussed above, and (ii) the absence of any evidence supporting the Debtor's business judgment or good faith in making such concessions to its insiders;

- Agrees to pay $25,000 a month to each Insider Secured Creditor[85] with no evidence demonstrating why such amount is required or reasonable under the Bankruptcy Code or in the best interest of the estate;

- Agrees to pay the Insider Secured Creditors' legal fees in connection with this chapter 11 case (including to defend any challenge to their claims/liens or cause of action to recover avoidable payments they received prepetition);[86]

- Agrees to hamstring the Committee's ability to complete its investigation of the insiders by prescribing an inadequate investigation budget and prohibiting the use of cash to initiate any challenge, claim or objection against the Insider Secured Creditors;

- Fails to provide any mechanism to (i) disgorge any rights or payments the Insider Secured Creditors receive under the Stipulation if any of their claims or liens are successfully challenged, and (ii) preserve all rights,

---

81 Docket No. 289, ¶2.
82 *Id*. at ¶7.
83 *See* Weintraub Decl. at ¶20, Ex. N.
84 Stipulation at ¶2.
85 *Id*. at ¶9.
86 *Id*. at ¶10.

claims and challenges against the Insider Secured Creditors if the Debtor's case is converted to chapter 7 trustee or a trustee is appointed; and

- Agrees that its ability to use cash shall terminate if it Debtor loses "its exclusivity rights . . . for any reason[,]" including the termination of exclusivity as to the Committee under the Exclusivity Stipulation if the Debtor and the Committee do not agree to the terms of a consensual plan by October 12.[87]

46. The Debtor's proposed use of cash is subject to the Budget. The Budget reflects that the Debtor currently has $1.6 million in cash and is projected to have $882,000 in cash on January 7, 2023. The Debtor will have approximately $1.1 million in cash if it does not make the adequate protection payments to the Insider Secured Creditors.[88]

47. In addition to cash on hand, the Budget does not include $2.2 million in cash proceeds of surety bonds the Debtor maintained for ESP's benefit.[89] When the bond proceeds are added to the Debtor's cash, the Debtor is projected to have approximately $3 million in cash/cash equivalents on January 7, 2023.[90]

48. The Budget reflects that the Debtor intends to pay, *inter alia*:

- $58,000 per month in employee wages and benefits against $44,000 in projected monthly sales;
- $15,000 per month in rent under a lease to which the Debtor is not a party and which the Debtor is not liable to pay; and
- $75,000 per month in adequate protection payments to the Insider Secured Creditors and $50,000 to their counsel.

49. The Motion is devoid of evidence that Debtor negotiated the Stipulation with the insiders at arms' length or that the insiders would refuse to consent to the Debtor's use of cash on other, less onerous, terms.

---

87 *Id*. at ¶11.i.

88 The *Declaration of John. P. Madden.* (the "Madden Decl."), filed contemporaneously with this objection at ¶8.

89 *Id*. at ¶¶5, 9-10, Exs. B, D

90 *Id*.

**F. Committee Efforts to Obtain Information**

50. Since its formation, the Committee has worked to obtain basic information about the Debtor's business, assets, liabilities and relationships with insiders.[91] The Committee's requests for information have been targeted to ascertain information required for the Committee to fulfill its fiduciary duties and attempt to negotiate a fair, consensual plan for the Debtor.

51. Unfortunately, the Debtor and its insiders are unable or unwilling to provide standard information to the Committee, including key information about the insider claims the Debtor proposes to bless and shield from scrutiny under the Stipulation. Among other things, the Committee has not received information regarding:

- How Mega prices its services under the Administrative Services Agreement, which information Mega was required to provide to the Debtor in writing and which the Debtor admits it does not possess;[92]
- Invoices sufficiently describing the basis for the prepetition payments the Debtor made to Mega; [93]
- An allocation of the prepetition payments the Debtor made to ESP between inventory and legacy debt, which information the Debtor admits it does not possess; [94]
- Transactions between the Debtor and ESP and amounts due and owing under the Consignment Agreement, which information the Debtor has not been able to assemble or produce during the 10 weeks the Committee's request for such information has been outstanding; [95]
- Why the Debtor believes the Insider Secured Creditors' claims and liens are not subject to challenge or avoidance for the reasons discussed above (and others such as equitable subordination); and
- The identity of all of the Debtor's insiders and affiliates, which information the Debtor contends is beyond the scope of this chapter 11 proceeding.[96]

---

91 Docket Nos. 237 at ¶7; 264; 267; 296, and; 298 (each reflecting the Committee's efforts to obtain information).

92 *See* fn 62, *supra*

93 *Id.*

94 *See* fn 78, *supra*

95 Weintraub Decl. Exs. C, E.

96 *See* fn 19, *supra*

## III. OBJECTION

### A. Legal Standards

52. A debtor-in-possession is a fiduciary for its estate and all creditors. *See* 11 U.S.C. § 1107(a) (debtor-in-possession steps into the shoes of the trustee). A debtor-in-possession's fiduciary duties "include a duty of care to protect the [estate's] assets, a duty of loyalty and a duty of impartiality." *In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995). *See also In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (debtor-in-possession's fiduciary duties "include the duty of care to safeguard estate assets, the duty of loyalty and the duty of impartiality").

53. "The duty of loyalty requires the avoidance of self-dealing and conflicts of interest." *Morningstar Marketplace,* 544 B.R. at 303. *See also In re Sun Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003) (debtor-in-possession's duty of loyalty and good faith "forbid directors and other business operators from using their position of trust and control over the rights of other parties to further their own private interest, either by usurping opportunities, holding undisclosed conflicts, or otherwise exploiting their position"); *In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994) (debtor-in-possession has a fiduciary duty "not to engage in self dealing").

54. For this reason, a debtor's transactions with insiders are subject to heightened scrutiny. *See In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998) (insider loans subject to heightened scrutiny); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011). Insider transactions are not subject to the deferential business judgment standard; to be approved, they must be entirely fair. *See Pepper v. Litton*, 308 U.S. 295, 306 (1939) (controlling shareholder's "dealings with the corporation are subject to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder to not only prove the good faith of the transaction but also to show its inherent fairness"); *In re Latam Airlines Group S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020 (applying entire fairness test to insider transaction and stating, "[b]y definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor"). "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining

whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into account." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

55. Section 363 of the Bankruptcy Code allows a debtor-in-possession to use cash collateral if (i) a secured creditor consents, or (ii) the court approves the debtor's use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c)(2). If a secured creditor objects to a debtor's proposed use of cash collateral, the debtor bears the burden of proving that the secured creditor is adequately protected. *See* 11 U.S.C. § 363(p)(1). A secured creditor seeking adequate protection has the burden of proof regarding the validity, priority and extent of its lien. *See* 11 U.S.C. § 363(p)(2). Adequate protection can take many forms, including replacement liens, superpriority claims and/or an equity cushion. *See* 11 U.S.C. § 361; *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984); *In re Helionetics, Inc.*, 70 B.R. 433, 440 (Bankr. C.D. Cal. 1987).

**B. The Debtor Has Not Met Its Burden to Prove the Stipulation is Entirely Fair**

56. The Motion provides no evidence that the Debtor negotiated the Stipulation with its insiders impartially, at arms' length or that the Stipulation is entirely fair to all of the Debtor's creditors. There is no evidence, for example, that before capitulating to its insiders' demands, the Debtor considered (i) filing a non-consensual motion to use cash collateral, (ii) filing a motion to convert the case, or (iii) initiating any of the estate's challenges and causes of action against the Insider Secured Creditors, even as leverage. In fact, there is no evidence that anyone negotiated the Stipulation on the Debtor's behalf *at all*.[97]

57. On the other hand, there is evidence that (i) the Debtor did not consult with the Committee (the estate's other fiduciary) before it entered the Stipulation and filed the Motion, and (ii) Mega is making strategic decisions for the Debtor with respect to this case. Together, the absence of any evidence of negotiation, the Debtor's failure to consult with the Committee, and Mega's actual conflicts of interest undermine the Debtor's unsupported claim that the Stipulation

---

[97] Contemporaneously with this objection, the Committee is serving discovery on the Debtor, Mega, ESP and Eden Roc to ascertain how and why the Debtor evaluated and agreed to the Stipulation. The Committee reserves the right to supplement this objection based on additional information it obtains through such discovery.

was entered in good faith and in the estate's best interest. The Debtor has not met its burden to prove that the Stipulation was entered into by a disinterested fiduciary and is fair. *See Innkeepers USA Trust*, 442 B.R. at 231 (to be entirely fair, an insider transaction must result from a fair process in which the estate is represented by an impartial fiduciary). The Motion should be denied.

**C. The Stipulation is Not in the Best Interest of Creditors**

58. The Motion is devoid of evidence to prove the Stipulation is in the best interest of all creditors, because it is not. On May 1, 2022, the Debtor filed a disclosure statement with respect to the Plan, including a liquidation analysis (the "May Liquidation Analysis").[98] The May Liquidation Analysis projected that the Debtor's general unsecured creditors would receive approximately 5.24% to 10.63% if the Debtor was liquidated under chapter 7 of the Bankruptcy Code at that time. The Committee disputes the Debtor's assumptions in the May Liquidation Analysis and believes it understates the projected creditor recoveries.[99]

59. For illustration purposes, however, the Committee has updated the May Liquidation Analysis to reflect the facts agreed to by the Debtor in the Stipulation, including (i) $0.00 on account of avoidance claims against the Insider Secured Creditors, (ii) $0.00 on account of the claim to recharacterize the Eden Roc Loan, (iii) $0.00 on account of claims to equitably subordinate Mega's or ESP's claims based on their (and their principal's) inequitable conduct, (iv) $2.4 million in favor of ESP on account of a previously undisclosed and undocumented administrative expense claim, (v) a $99,000 administrative expense claim in favor of Mega on account of undocumented benefits for a dwindling workforce and dying business, and (vi) $275,000 in cash payments to the Insider Secured Creditors and their counsel.[100]

60. When these concessions are taken into account, the bottom line is shocking. Under the guise of adequately protecting patently avoidable liens the Debtor already should have sued to avoid, the Debtor has stipulated the estate into administrative insolvency to the tune of

---

[98] Docket No. 161, Ex 8; Madden Decl, Ex. C

[99] For example, the May Liquidation Analysis ignored all of the prepetition payments the Debtor made to Mega and, therefore, ascribed $0.00 to the estate's causes of action to avoid and recover such payments from Mega.

[100] Madden Decl. at ¶11, Ex. E.

$3,635,137.18, effectively wiping out the prospect of any recovery for non-insider general unsecured creditors.[101]

61. Needless to say, non-insider creditors will do far better if the Motion is denied, even if that means a disinterested chapter 7 trustee is installed to liquidate the Debtor's assets fairly. Non-insider creditors cannot do any worse in a conversion than they will if the Stipulation is approved.[102] The Stipulation is not in the best interest of the estate under any measure. The Motion should be denied.

**D. Adequate Protection is Excessive**

62. If the Court decides to grant the Motion, the Debtor should not be authorized to make adequate protection payments (including payment of counsel fees) to the Insider Secured Creditors. Any interest the Insider Secured Creditors may have in the Debtor's cash is more than adequately protected by the terms of the Interim Orders: replacement liens, superpriority claims and an equity cushion.

63. The Motion seeks to adequately protect the Insider Secured Creditors with respect to the following documented claims against the Debtor:

| **Insider** | **Claim** | **Evidence**[103] | **Amount** |
|---|---|---|---|
| Eden Roc | Loan | Loan Documents; Schedules | $579,025.32 |
| Mega | Loan | Loan Documents; Walsh Decl. | $70,955.49 |
| Mega | Services | Administrative Services Agreement, Security Agreement, UCC-1; Schedules | $1,506,953.00 |
| ESP | Inventory | Consignment Agreement; Security Agreement, UCC-1; Schedules | $675,361.39 |
| | | **Total** | **$2,832,295.20** |

64. As of January 7, 2023, the date through which the Debtor seeks final authority to use cash, the Debtor is projected to have approximately $3 million in cash and cash equivalents,[104]

---

101 Madden Decl. at ¶12.

102 The Committee is subject to the Exclusivity Stipulation and is prepared to mediate with the Debtor by October 12 as required thereunder. In light of those negotiations, the Committee is not disclosing a range of potential value it believes creditors could achieve at this time.

103 Except for copies of UCC-1 financing statements, neither the Debtor nor the Insider Secured Creditors filed any of the documents they contend establish the Insider Secured Creditors' claims and liens against the Debtor. In addition to the other reasons set forth in this objection, the Motion is deficient for this reason alone. *See* 11 U.S.C. § 363(p) (burden of proof is on the debtor with respect to adequate protection and on a secured creditor to establish the validity of its liens and claims against the debtor).

which is more than the $2.8 million of documented claims that are subject to adequate protection under the Stipulation. In addition to their replacement liens and superpriority claims, this equity cushion is more than sufficient to protect the Insider Secured Creditors' suspect interests in the Debtor's cash. The Debtor's request to make adequate protection payments to the Insider Secured Creditors or their counsel should be denied.

**E. Other Objectionable Provisions**

65. Other provisions of the Stipulation are equally offensive and should be denied or modified if the Motion is granted:

- Limitations on Chapter 7 Trustee: The Stipulation should not bind a chapter 7 trustee, and it should include a reasonable carve-out for a trustee upon conversion.
- Limitations on Investigation/Challenge: The Stipulation should not limit the Committee's budget to investigate the Insider Secured Creditors or pursue any claim or challenge against them, and certainly not to the unreasonably low amounts set forth in the Stipulation. The Committee must be able to fulfill its statutory mandate, the fees and expenses for which should be subject to allowance and payment pursuant to applicable provisions of the Bankruptcy Code and the Federal and Local Rules of Bankruptcy Procedure.
- Disgorgement/Reversal: Any adequate protection afforded to the Insider Secured Creditors must be subject to reversal/disgorgement upon a successful challenge to the Insider Secured Creditors' liens and claims against the Debtor, and all rights of setoff preserved.
- Reporting: The Committee should receive contemporaneous copies of all reporting delivered to the Insider Secured Creditors under the Stipulation.
- Termination Events: The Stipulation should not terminate if the Debtor's exclusivity rights are terminated pursuant to the Exclusivity Stipulation.

(...Continued)

[104] Madden Decl. at ¶10, Ex. D.

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Motion, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: September 28, 2022

**KELLEY DRYE & WARREN LLP**

By: *_/s/ Eric R. Wilson_*

Eric R. Wilson ( CA Bar No. 192220)
Robert L. LeHane (admitted *pro hac vice*)
Kristin S. Elliott (admitted *pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
Email: ewilson@kelleydrye.com
lehane@kelleydrye.com
kelliott@kelleydrye.com

*Counsel to the Official Committee of Unsecured Creditors of Escada America, LLC*

Main Document Page 22 of 24

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Kelley Drye & Warren LLP, 3 World Trade Center, 175 Greenwich Street, New York, NY 10007.

A true and correct copy of the foregoing document entitled (*specify*): ***OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTOR'S MOTION FOR ORDER: (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; AND (II) APPROVING ADEQUATE PROTECTION; DECLARATIONS OF PHILIP A. WEINTRAUB, ESQ. AND JOHN P. MADDENS*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 9/28/2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

X Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 9/28/2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Holthouse Carlin & Van Trigt LLP
1801 W.Olympic Blvd.
Pasadena, CA 91199-1404

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 9/28/2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT**
The Honorable Sheri Bluebond
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and
Courthouse 255 E. Temple Street, Suite 1534
Courtroom 1539
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/28/2022 | Eric R. Wilson | */s/ Eric R. Wilson* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 23 of 24

**SERVICE VIA ECF**

Dustin P Branch on behalf of Creditor The Macerich Company
branchd@ballardspahr.com, carolod@ballardspahr.com, hubenb@ballardspahr.com

John C Cannizzaro on behalf of Creditor 717 GFC LLC
john.cannizzaro@icemiller.com, julia.yankula@icemiller.com

Michael J Darlow on behalf of Creditor Harris County Municipal Utility District #358
mdarlow@pbfcm.com, tpope@pbfcm.com

Caroline Djang on behalf of Interested Party Caroline R. Djang
cdjang@buchalter.com, docket@buchalter.com lverstegen@buchalter.com

Eryk R Escobar on behalf of U.S. Trustee United States Trustee (LA)
eryk.r.escobar@usdoj.gov

John-Patrick M Fritz on behalf of Attorney Levene, Neale, Bender, Yoo & Golubchik L.L.P.
jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com

John-Patrick M Fritz on behalf of Debtor Escada America, LLC
jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com

Jonathan Gottlieb on behalf of Debtor Escada America, LLC
jdg@lnbyg.com

Marshall J Hogan on behalf of Creditor Escada Sourcing and Production, LLC
mhogan@swlaw.com, knestuk@swlaw.com

Marshall J Hogan on behalf of Creditor Mega International, LLC
mhogan@swlaw.com, knestuk@swlaw.com

William W Huckins on behalf of Creditor Brookfield Properties Retail, Inc.
whuckins@allenmatkins.com, clynch@allenmatkins.com, igold@allenmatkins.com

William W Huckins on behalf of Creditor SIMON PROPERTY GROUP INC
whuckins@allenmatkins.com, clynch@allenmatkins.com, igold@allenmatkins.com

Gregory Kent Jones (TR)
gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com, cpesis@stradlinglaw.com

Michael S Kogan on behalf of Creditor Michael Kogan Law Firm, APC
mkogan@koganlawfirm.com

Carmela Pagay on behalf of Debtor Escada America, LLC
ctp@lnbyg.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 24 of 24

Kristen N Pate on behalf of Creditor Brookfield Properties Retail, Inc.
bk@bpretail.com

Eric S Pezold on behalf of Creditor Escada Sourcing and Production, LLC
epezold@swlaw.com, knestuk@swlaw.com

Eric S Pezold on behalf of Creditor Mega International, LLC
epezold@swlaw.com, knestuk@swlaw.com

Terrel Ross on behalf of Interested Party TR Capital Management LLC
tross@trcmllc.com

Lindsey L Smith on behalf of Debtor Escada America, LLC
lls@lnbyg.com, lls@ecf.inforuptcy.com

Ronald M Tucker, Esq on behalf of Creditor SIMON PROPERTY GROUP INC
rtucker@simon.com, cmartin@simon.com, psummers@simon.com, Bankruptcy@simon.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

**VIA FIRST CLASS MAIL**

Holthouse Carlin & Van Trigt LLP
1801 W.Olympic Blvd.
Pasadena, CA 91199-1404

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**